**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| TEXAS,<br>WISCONSIN,<br>ALABAMA,<br>ARKANSAS,<br>ARIZONA,<br>FLORIDA,<br>GEORGIA,<br>INDIANA,<br>KANSAS,<br>LOUISIANA,<br>PAUL LePAGE, Governor of Maine,<br>MISSISSIPPI, by and through<br>Governor Phil Bryant,<br>MISSOURI,<br>NEBRASKA,<br>NORTH DAKOTA,<br>SOUTH CAROLINA,<br>SOUTH DAKOTA,<br>TENNESSEE,<br>UTAH, and<br>WEST VIRGINIA,<br><br>               Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>UNITED STATES DEPARTMENT<br>OF HEALTH AND HUMAN<br>SERVICES, ALEX AZAR,<br>in his Official Capacity as<br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES, UNITED<br>STATES INTERNAL REVENUE<br>SERVICE, and DAVID J. KAUTTER,<br>in his Official Capacity as Acting<br>COMMISSIONER OF INTERNAL<br>REVENUE,<br>               Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br><br>Civil Action No. _____ |

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

TO THE HONORABLE JUDGE OF SAID COURT:

The Patient Protection and Affordable Care Act (the "Affordable Care Act," "the ACA" or "the Act"), as recently amended, forces an unconstitutional and

irrational regime onto the States and their citizens. Because this recent amendment renders legally *impossible* the Supreme Court's prior savings construction of the Affordable Care Act's core provision—the individual mandate—the Court should hold that the ACA is unlawful and enjoin its operation.

*NFIB v. Sebelius*, 567 U.S. 519 (2012), held that in enacting the ACA, Congress sought to do something unconstitutional: impose a mandate to obtain health insurance by requiring that most Americans "shall" insure that they are "covered under minimum essential coverage." 26 U.S.C. § 5000A(a). "Congress [wrongly] thought it could enact such a command under the Commerce Clause[.]" *NFIB,* 567 U.S. at 562 (Roberts, C.J.). The Supreme Court, however, interpreted the mandate to be part-and-parcel of a tax penalty that applies to many (but not all) of those to whom the mandate applies. Thus, even though Congress sought to do something unconstitutional in enacting the mandate under the Commerce Clause, the Supreme Court salvaged its handiwork as a lawful exercise of the taxing power. But things changed on December 22, 2017.

On December 22, 2017, the President signed into law the Tax Cuts and Jobs Act of 2017. This new legislation eliminated the tax penalty of the ACA, without eliminating the mandate itself. What remains, then, is the individual mandate, without any accompanying exercise of Congress's taxing power, which the Supreme Court already held that Congress has no authority to enact. Not only is the individual mandate now unlawful, but this core provision is not severable from the rest of the ACA—as four Justices of the Supreme Court already concluded. In fact, Congress stated in the legislative text that the ACA does not function without the individual mandate.

The ACA's unconstitutionality follows from three holdings in *NFIB* and the aforementioned provision in the Tax Cuts and Jobs Act of 2017. First, a majority of

the Supreme Court held that Congress lacks the constitutional authority to compel citizens to purchase health insurance. *NFIB*, 567 U.S. at 558 (Roberts, C.J.); *id.* at 657 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) (hereinafter "Dissenting Op."). Second, the same majority concluded that the ACA included a mandate to buy health insurance that applies to most (but not all) citizens, and a separate tax penalty that applies to most (but not all) of those required to buy insurance under the mandate. *Id.* at 562–63 (Roberts, C.J.); *id.* at 663 (Dissenting Op.). Third, a different majority held that, as a matter of constitutional avoidance, it was "fairly possible" to reinterpret the mandate and tax penalty as a single "tax," which Congress may enact under its taxing authority. *Id.* at 564–74. In reaching this end, the majority concluded that Congress's taxing-power interpretation was only "fairly possible" because the provision at issue raised "at least some revenue for the Government." *Id.* at 564 (citing *United States v. Kahriger*, 345 U.S. 22 (1953)). Indeed, the raising of "at least some revenue" was "*the essential* feature of *any* tax." *Id.* (emphasis added). After all, if a provision raises no revenue, it cannot be said "to *pay* the Debts and *provide* for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1 (emphasis added).

Pursuant to the Tax Cuts and Jobs Act of 2017, starting in 2019, the tax penalty is eliminated by reducing the tax to zero. Pub. L. No. 115-97, § 11081, 131 Stat. 2054. The individual mandate itself, however, remains. But because the tax penalty provision in the ACA no longer raises *any* revenue, the Supreme Court's avoidance reading is no longer possible. As the Congressional Budget Office explained, the Tax Cuts and Jobs Act of 2017 "eliminate[s]" the "individual mandate penalty . . . *but [not] the mandate itself.*" Congressional Budget Office, *Repealing the Individual Health Insurance Mandate: An Updated Estimate* 1, (November 2017)

(emphasis added) (hereinafter "CBO 2017 Report").[1] Because the tax penalty raises $0, it lacks "*the essential* feature of *any* tax," and the avoidance interpretation adopted in *NFIB* to save the individual mandate from its unconstitutionality is no longer "fairly possible."

Following the enactment of the Tax Cuts and Jobs Act of 2017, the country is left with an individual mandate to buy health insurance that lacks any constitutional basis. The invalidity of the ACA's core provision (individual mandate) thus follows from *NFIB*.

Once the heart of the ACA—the individual mandate—is declared unconstitutional, the remainder of the ACA must also fall. *NFIB*, 567 U.S. at 691–708 (Dissenting Op.). As Congress made clear, "[t]he requirement [for individuals to buy health insurance] is *essential* to creating effective health insurance markets." 42 U.S.C. § 18091(2)(I) (emphasis added). "[T]he absence of th[is] requirement would undercut Federal regulation of the health insurance market." *Id.* § 18091(2)(H). In particular, "the guaranteed issue and community rating requirements *would not work* without the coverage requirement [i.e., Section 5000A]." *King v. Burwell*, 135 S. Ct. 2480, 2487 (2015) (emphasis added). So because the remainder of ACA does not "function in a manner consistent with the intent of Congress," the whole Act must fall with the mandate. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684–85 (1987) (describing severability analysis) (emphasis added).

Absent the individual mandate, the ACA is an irrational regulatory regime governing an essential market. The ACA's stated objectives are "achiev[ing] near-universal [health-insurance] coverage," 42 U.S.C. § 18091(2)(D), "lower[ing] health

---

[1]     *See*        https://www.cbo.gov/system/files/115th-congress-2017-2018/reports/53300-individual mandate.pdf.

insurance premiums," *id.* § 18091(2)(F), and "creating effective health insurance markets," *id.* § 18091(2)(I). But without the "essential" mandate, coverage will decrease, premiums will rise, and markets will become irrational. *See id.* Thus, the post-mandate ACA lacks "some footing" in the "realities" of the health-insurance market, *Heller v. Doe*, 509 U.S. 312, 321 (1993), and has no "plausible policy reason" for forcing continued compliance, *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012).

In all, the ACA is unlawful and the Court should enjoin its operation. Therefore, Plaintiffs seek declaratory and injunctive relief against the United States of America, United States Department of Health and Human Services, Alex Azar, in his official capacity as Secretary of Health and Human Services, United States Internal Revenue Service, and David J. Kautter, in his official capacity as Acting Commissioner of Internal Revenue, regarding Defendants' actions implementing and enforcing the Patient Protection and Affordable Care Act.

## I. PARTIES

1.      Plaintiff States are all sovereigns within the United States.

2.      Plaintiff Paul LePage is the Governor of Maine and Chief Executive of the Maine Constitution and the laws enacted by the Maine Legislature. Me. Const. art. V, Pt. 1, § 1.

3.      Plaintiff Phil Bryant is the Governor of Mississippi and brings this suit on behalf of Mississippi pursuant to Miss. Code Ann. § 7-1-33.

4.      In addition to performing various sovereign functions and prerogatives, all Plaintiffs function as significant employers with tens of millions under their collective charge.[2]

---

[2] *See, e.g.*, U.S. Census Bureau, *State and Local Government Employment and Payroll Data: March 2015 Annual Survey of Public Employment & Payroll*, http:// factfinder.census.gov/bkmk/table/1.0/en/

5.      Defendants are the United States of America, the United States Department of Health and Human Services ("Department"), Alex Azar, in his official capacity as Secretary of Health and Human Services, the United States Internal Revenue Service ("Service"), and David J. Kautter, in his official capacity as Acting Commissioner of Internal Revenue.

6.      The Department is a federal agency and is responsible for administration and enforcement of the laws challenged here. *See generally* 20 U.S.C. § 3508; 42 U.S.C. §§ 202–03, 3501.

7.      The Service is a bureau of the Department of Treasury, under the direction of the Acting Commissioner of Internal Revenue, David J. Kautter, and is responsible for collecting taxes, administering the Internal Revenue Code, and overseeing various aspects of the Act. *See generally* 26 U.S.C. § 7803 *et. seq.*; *see* https://www.irs.gov/affordable-care-act/affordable-care-act-tax-provisions.

8.      Any injunctive relief requested herein must be imposed upon the Department, Secretary, Service, and the Acting Commissioner for Plaintiffs to obtain full relief.

## II. JURISDICTION AND VENUE

9.      The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this suit concerns the constitutionality of the ACA. The Court also has jurisdiction to compel the Secretary of Health and Human Services and Acting Commissioner of Internal Revenue to perform their duties pursuant to 28 U.S.C. § 1361.

10.     The Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by 5 U.S.C. § 706, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers

GEP/2015/00A4.

of the Court.

11.    Venue is proper under 28 U.S.C. § 1391 because the United States, two of its agencies, and two of its officers in their official capacity are Defendants; and a substantial part of the events giving rise to the Plaintiffs' claims occurred in this District. Further, a plaintiff "resides" in this district, a "substantial part of the events [ ] giving rise to the claim occurred" in this district, and "no real property is involved." *Id.* § 1391(e)(1).

## III. FACTUAL BACKGROUND

### A.    The Individual Mandate and the Affordable Care Act.

12.    In 2010, Congress enacted a sweeping new regulatory framework for the nation's healthcare system by passing the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, and the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, collectively and commonly referred to as the "Affordable Care Act." *See Patient Protection and Affordable Care Act*, Pub. L. No. 111-148, 124 Stat. 119-1025 (Mar. 23, 2010) (hereinafter, collectively, "the Affordable Care Act," "the ACA" or "the Act"). President Obama signed the Patient Protection and Affordable Care Act (H.R. 3590, 111th Cong.) into law on March 23, 2010, and the Health Care and Education Reconciliation Act (H.R. 4872, 111th Cong.) into law on March 30, 2010.

13.    The ACA has the express statutory goals of "achiev[ing] near-universal [health-insurance] coverage," 42 U.S.C. § 18091(2)(D), "lower[ing] health insurance premiums," *id.* § 18091(2)(F), and "creating effective health insurance markets," *id.* § 18091(2)(I).

14.    The ACA contains three main features relevant to this lawsuit.

15.    First, the ACA contains an "individual mandate" on most Americans to purchase health insurance and, separately, a tax penalty for most who fail to

comply. ACA § 1501; 26 U.S.C. § 5000A.

a. The statutory title of the individual mandate is "Requirement To Maintain Minimum Essential Coverage," ACA § 1501; 26 U.S.C. § 5000A(a), and the statutory title for the tax penalty is "Shared Responsibility Payment," ACA § 1501; 26 U.S.C. § 5000A(b). The individual mandate provides: "An applicable individual shall . . . ensure that the individual . . . is covered under minimum essential coverage." 26 U.S.C. § 5000A(a).

b. Subsection (b) of Section 5000A—the "Shared Responsibility Payment"—imposed a tax "penalty" on individuals who failed to comply with Subsection (a): "If a taxpayer who is an applicable individual . . . fails to meet the requirement of subsection (a) . . . then . . . there is hereby imposed on the taxpayer a penalty with respect to such failure[ ]." 26 U.S.C. § 5000A(b)(1). Subsection (c) determines the amount of the tax penalty with a multi-step formula. *Id.* § 5000A(c).

c. Some Americans are exempt from the individual mandate, *see* 26 U.S.C. § 5000A(d)(2)–(4); *id.* § 1402(g)(1), while others are subject to the mandate but exempt from the tax penalty, see 26 U.S.C. § 5000A(e)(1)–(5). "Many individuals . . . [will] comply with a mandate, even in the absence of penalties, because they believe in abiding by the nation's laws." Congressional Budget Office, *Key Issues in Analyzing Major Health Insurance Proposals* 53 (Dec. 2008).[3]

16. Second, the ACA imposes regulations on health-insurance companies.

a. The Act requires health insurance companies to "accept every

---

[3] *See* https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-18-keyissues.pdf.

employer and individual in the State that applies for [ ] coverage,"
regardless of preexisting conditions (commonly termed "guaranteed
issue"). ACA § 1201; 42 U.S.C. § 300gg-1–4.

b. The Act prohibits insurance companies from charging individuals
higher premiums because of their health (commonly termed
"community rating"). ACA § 1201; 42 U.S.C. § 300gg-4(a)(1).

c. The Act imposes numerous coverage requirements on all health-
insurance plans, termed "essential health benefits" in the Act, and
limitations on "cost-sharing" on all plans. *See* ACA §§ 1301–02; 42
U.S.C. §§ 18021–22.

d. The Act charges "the Secretary" with the authority to "define the
essential health benefits" that plans must include. ACA § 1302; 42
U.S.C. § 18022. Such benefits "shall include" at least "ambulatory
patient services," "emergency services," "hospitalization," "maternity
and newborn care," "mental health and substance use disorder
services, including behavioral health treatment," "prescription drugs,"
"rehabilitative and habilitative services and devices," "laboratory
services," "preventive and wellness services and chronic disease
management," and "pediatric services, including oral and vision care."
ACA § 1302; 42 U.S.C. § 18022(b)(1)(A)–(J) (capitalization altered).

17. Third, the ACA contains other regulations to promote access to health
insurance and the affordability of that insurance.

a. Employers of 50 or more full-time employees (defined as working "on
average at least 30 hours [ ] per week," ACA § 1513; 26 U.S.C.
§ 4980H(c)(4)(A)) must offer affordable health insurance if one
employee qualifies for a subsidy to purchase health insurance on the

health-insurance exchanges created by the ACA. *See* ACA § 1513; 26 U.S.C. § 4980H.

b. Covered employers that fail to offer any insurance must pay a penalty of $2,000 per year per employee. ACA § 1513; 26 U.S.C. § 4980H(a), (c)(1). If the employer fails to offer affordable insurance, then it must pay $3,000 per year per employee. ACA § 1513; 26 U.S.C. § 4980H(b); 79 Fed. Reg. 8544, 8544 (Feb. 12, 2014).

c. The Act also authorizes refundable tax credits to make insurance purchased on the exchanges more affordable for individuals between 100% and 400% of the poverty line. *See* ACA § 1401; 26 U.S.C. § 36B.

d. The Act substantially expanded Medicaid, requiring States to cover—with an expanded benefits package—all individuals under 65 who have income below 133% of the poverty line. 42 U.S.C. § 1396; *see generally NFIB*, 567 U.S. at 574–80 (Roberts, C.J.) (describing expansion and holding that forcing States to comply is unconstitutional).

e. The Act also imposes additional insurance taxes and regulations, like a tax on high cost employer-sponsored health coverage, 26 U.S.C. § 4980I, a requirement that insurance providers cover dependents up to 26 years of age, 42 U.S.C. § 300gg-14(a), the elimination of coverage limits, *id.* § 300gg-11, and a reduction in federal reimbursement rates to hospitals, *see* 42 U.S.C. § 1395ww.

f. Finally, the Act contains a grab bag of other provisions. For example, the Act imposes a 2.3% tax on certain medical devices, 26 U.S.C. § 4191(a), creates mechanisms for the Secretary to issue compliance waivers to States attempting to reduce costs through otherwise-prohibited means, 42 U.S.C. § 1315, and regulates the display of

nutritional content at certain restaurants, 21 U.S.C. § 343(q)(5)(H).

18.     According to Congress's own findings, the ACA's provisions do not function rationally without the individual mandate.

a. Congress stressed the importance of Section 5000A's individual mandate with explicit findings in the text of the ACA itself. ACA § 1501; 42 U.S.C. § 18091.

b. Chief among these legislative findings is Section 18091(a)(2)(I), which provides:

> Under sections 2704 and 2705 of the Public Health Service Act [42 U.S.C. 300gg-3, 300gg-4] (as added by section 1201 of this Act), if there were no requirement [to buy health insurance], many individuals would wait to purchase health insurance until they needed care. By significantly increasing health insurance coverage, the requirement [to buy health insurance], together with the other provisions of this Act, will minimize this adverse selection and broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums. *The requirement is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold.*

42 U.S.C. § 18091(a)(2)(G) (emphasis added). Even after the recent legislative change, the individual mandate remains part of the ACA, permitting the ACA to function exactly as Congress outlined and intended.

c. Other legislative findings from Section 18091 reinforce this point.

i. "By significantly reducing the number of the uninsured, the requirement, together with the other provisions of th[e] [ACA], will significantly reduce [health care's] economic cost." *Id.* § 18091(2)(E). "[B]y significantly reducing the number of the uninsured, the requirement, together with the other provisions

of th[e] [ACA], will lower health insurance premiums." *Id.* § 18091(2)(F).

   ii. "The requirement is *an essential part* of [the Government's] regulation of economic activity, and the absence of the requirement would undercut Federal regulation of the health insurance market." *Id.* § 18091(2)(H) (emphasis added).

   iii. "[T]he requirement, together with the other provisions of th[e] [ACA], will significantly reduce administrative costs and lower health insurance premiums. The requirement is *essential* to creating effective health insurance markets that do not require underwriting and eliminate its associated administrative costs." *Id.* § 18091(2)(J) (emphasis added).

d.  The Supreme Court explained that the ACA's provisions are "closely intertwined," such that "the guaranteed issue and community rating requirements *would not work* without the coverage requirement [i.e., Section 5000A]." *King*, 135 S. Ct. at 2487 (emphasis added); *NFIB*, 567 U.S. at 547–48 (Roberts, C.J.).

e.  Upsetting this balance "would destabilize the individual insurance market" in the manner "Congress designed the Act to avoid." *King*, 135 S. Ct. at 2493.

**B.**   **The Individual Mandate and the Tax Penalty Are Inextricably Intertwined—One Cannot Exist Without the Other under *NFIB v. Sebelius.***

19.   In *NFIB v. Sebelius*, 567 U.S. 519 (2012), the constitutionality of the ACA was challenged by most of the Plaintiff States herein.

20.   As relevant here, the States argued that Section 5000A "exceeded Congress's powers under Article I of the Constitution." *Id.* at 540 (Roberts, C.J.).

Specifically, the States argued that: (1) the Commerce Clause did not support the individual mandate; (2) Congress's tax power did not support the mandate; and (3) if Section 5000A is unconstitutional, the Court must enjoin the entire ACA because it is non-severable. *See id.* at 538–43 (Roberts, C.J.).

21.     A majority of the Supreme Court held (via the opinion of the Chief Justice and the four-Justice dissenting opinion) that the individual mandate exceeded Congress's power under the Commerce Clause and the Necessary and Proper Clause. *Id.* at 558–61 (Roberts, C.J.); *id.* at 657 (Dissenting Op.).

22.     A different majority (via the opinion of the Chief Justice and the four-Justice concurring opinion) then held it was "fairly possible" to read the individual mandate plus its tax penalty as a single, unified tax provision, and thus could be supported under Congress's tax power. *Id.* at 563 (Roberts, C.J.).

23.     Under this alternate tax interpretation, Section 5000A is no longer "a legal command to buy insurance" backed up by a threat of paying a penalty that is applicable to some, but not all, of those to whom the mandate applies; "[r]ather, it makes going without insurance just another thing the Government taxes, like buying gasoline or earning income." *Id.* (Roberts, C.J.).

24.     "The *essential* feature" of the Court's alternative tax holding is that the tax penalty "produces at least some revenue for the Government." *Id.* at 564 (Roberts, C.J.) (citing *Kahriger*, 345 U.S. at 28 n.4) (emphasis added). "Indeed, the payment is expected to raise about $4 billion per year by 2017." *Id.* (Roberts, C.J.). Absent that "essential feature," the Court's alternative interpretation was not "fairly possible" under both the Constitution's text and longstanding Supreme Court precedent.

25.     The *NFIB* dissent rejected this alternate reading. The dissent explained that Section 5000A is "a mandate that individuals maintain minimum

essential coverage, [which is] *enforced by a penalty*." *Id.* at 662 (Dissenting Op.) (emphasis added). It is "a mandate to which a penalty is attached," not "a simple tax." *Id.* at 665 (Dissenting Op.).

26.    The dissent explained that the structure of Section 5000A supported the mandate-attached-to-a-penalty-that-sometimes-applies reading: Section 5000A mandates that individuals buy insurance in Subsection (a), and then in Subsection (b) it imposes the penalty for failure to comply with Subsection (a). *Id.* at 663 (Dissenting Op.). Section 5000A exempts "some" people from the mandate, but not the penalty—"those with religious objections," who "participate in a health care sharing ministry," and "those who are not lawfully present in the United States." *Id.* at 665 (Dissenting Op.) (citations omitted). "If [Section] 5000A were [simply] a tax" and "no[t] [a] requirement" to obtain health insurance, exempting anyone from the mandate provision, but not the penalty provision, "would make no sense." *Id.* (Dissenting Op.).

27.    The Chief Justice agreed with the dissent's primary conclusion (thereby creating a majority) that the "most straightforward reading of" Section 5000A "is that it commands individuals to purchase insurance." *Id.* at 562 (Roberts, C.J.). "Congress thought it could enact such a command under the Commerce Clause, and the Government primarily defended the law on that basis." *Id.* (Roberts, C.J.). The "most natural interpretation of the mandate" is that it is a command backed up by a penalty, not a tax. *Id.* at 563 (Roberts, C.J.).

**C.    The Tax Cuts and Jobs Act of 2017 Repealed The Tax Penalty, Leaving Only the Unconstitutional Individual Mandate.**

28.    On December 22, 2017, the President signed into law the Tax Cuts and Jobs Act of 2017. Among many other provisions, the new law amended Section 5000A. Pub. L. No. 115-97, § 11081.

29.     This amendment reduces the operative parts of Section 5000A(c)'s tax penalty formula to "Zero percent" and "$0." Pub. L. No. 115-97, § 11081. This change applies after December 31, 2018. *Id.* After the Tax Cuts and Jobs Act of 2017, Section 5000A(a) still contains the individual mandate, requiring "[a]n applicable individual" to "ensure that the individual . . . is covered under minimum essential coverage," but Section 5000A(b)'s tax "penalty" for an individual who "fails to meet th[is] requirement" is now $0.

30.     The House Conference Report of the Tax Cuts and Jobs Act of 2017 agreed. "Under the [ACA], individuals must be covered by a health plan that provides at least minimum essential coverage or be subject to a tax (also referred to as a penalty) for failure to maintain the coverage (commonly referred to as the 'individual mandate')." H.R. Rep. No. 115-466, at 323 (2017).[4] "The Senate amendment reduces the amount of the individual responsibility payment, enacted as part of the Affordable Care Act, to zero." *Id.* at 324. The Conference Report is silent about the individual mandate itself.

31.     The CBO's report on the Tax Cuts and Jobs Act of 2017 explains that the bill "eliminate[s]" the "individual mandate penalty . . . *but [not] the mandate itself.*" CBO 2017 Report 1. The CBO added that "a small number of people who enroll in insurance because of the mandate under current law would continue to do so [post elimination of the individual mandate's penalty] solely because of a willingness to comply with the law." *Id.*

32.     In the Tax Cuts and Jobs Act of 2017, Congress did not amend or repeal the ACA's legislative findings that the individual mandate is essential to the operation of the ACA.

---

[4] *See* https://www.gpo.gov/fdsys/pkg/CRPT-115hrpt466/pdf/CRPT-115hrpt466.pdf.

33.     As the Supreme Court explained in *NFIB*, "the *essential* feature of any tax" is that it "produces some revenue." 567 U.S. at 564 (emphasis added).

34.     Section 5000A, as amended by the Tax Cuts and Jobs Act of 2017, now "produces" no revenue (beginning Jan. 1, 2019). Accordingly, it is not possible to interpret the individual mandate as part of a single unified tax provision.

35.     Instead, the "most natural interpretation of the mandate," *id.* at 563 (Roberts, C.J.), is now the *only* interpretation possible: an unconstitutional command from the federal government to individuals to purchase a product.

**D.     The ACA, As Amended, Imposes Serious Injury and Irreparable Harm Upon the States and Their Citizens.**

36.     As Congress itself found, the ACA's provisions only work rationally with the individual mandate—a mandate now unconstitutional under *NFIB*.

37.     The unconstitutional individual mandate, along with the ACA itself, significantly harms and impacts the States, as independent sovereigns, in various ways:

    a. Imposing a burdensome and unsustainable panoply of regulations on a market that each State has the sovereign responsibility to regulate and maintain within its own borders, to wit:

        i. The ACA imposes a health insurance exchange in each State for consumers to shop for health plans and access subsidies to help pay for coverage. Under the ACA, States can choose between three types of exchanges:

            1. State-based exchange (adopted by 16 States, plus the District of Columbia), including five federally-supported exchanges, which rely on the Healthcare.gov technology platform;

2. State-partnership with a federally facilitated exchange (adopted by six States), or

3. Federally-facilitated exchange (adopted by 28 States). Defendant HHS established and imposed the exchange infrastructure on the States and certifies at the federal level that participating health plans meet the federal requirements to sell plans on the exchange. The ACA does not grant States statutory authority to enforce the ACA and HHS maintains the authority to take enforcement action. For States involved in the federally-facilitated exchange, carriers must file plans with both the state regulatory authority and CMS (Centers for Medicare and Medicaid Services), even if they do not plan to participate in the exchange. Whether they are sold on or off the federal Marketplace, all individual and small group health insurance plans must include the essential health benefits package and comply with other federal requirements.

ii. The ACA also imposed myriad market reforms on the States, including guaranteed issue, prohibition on preexisting condition exclusions, and modified community ratings.

b. By forcing state, non-federal governmental officials and citizens to comply with the mandates of the ACA, including the individual mandate, and all of the ACA's associated rules and regulations, instead of state-based policy regarding health insurance, Plaintiffs are injured. Sovereigns suffer injury when their duly enacted laws or policies are

enjoined or impeded. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982) (recognizing the interest of a sovereign in its "power to create and enforce a legal code, both civil and criminal"); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 n.1 (D.C. Cir. 1989) (agreeing that the State has standing to seek declaratory and injunctive relief "because DOT claims that its rules preempt state consumer protection statutes, [and therefore] the States have suffered injury to their sovereign power to enforce state law"); *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (citing *New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")); *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *Coalition for Econ. Equity v. Wilson,* 122 F.3d 718, 719 (9th Cir. 1997); *Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370, 372 (7th Cir. 1997) (State has standing where it "complains that a federal regulation will preempt one of the state's laws.").

c.  The unconstitutional individual mandate, along with the ACA itself, significantly harms and impacts the States by compelling them to take corrective action, at great cost, to save their insurance markets, to wit:

    i.  On January 21, 2018, Governor Scott Walker of Wisconsin called on the Legislature to pass "a state-based reinsurance program" for individuals purchasing insurance on the ACA's exchanges,

which will "stabilize[ ]" the market after "insurers exit[ ] [and] shock rate increases." Governor Scott Walker, Press Release, Governor Walker Proposes Health Care Stability Plan to Stabilize Premiums for Wisconsinites on Obamacare (Jan. 21, 2018).[5] This proposal would cost $200 million, split between State and federal funds.   Governor Scott Walker, Memo Accompanying Jan. 21, 2018 Press Release.[6] The Wisconsin Legislature passed a reinsurance program in February 2018.[7] Wisconsin's reinsurance program is necessary because the ACA's regulations of the individual market causes health-insurance premiums to rise substantially. Without Wisconsin's intervention, plans in the individual market would either not be offered, or would be prohibitively expensive.

   ii.  Wisconsin's Insurance Commissioner, like the insurance commissioners of all States, will need to take other corrective actions to protect Wisconsin citizens from the ACA's irrational regime.

  iii.  While the Texas Legislature did not adopt most ACA requirements into Texas law, the Texas Department of Insurance ("TDI") monitors the impact of the ACA on the Texas insurance market and takes action, when warranted, to protect consumers and minimize market disruptions. For example, TDI

---

[5]   *See*   https://walker.wi.gov/press-releases/governor-walker-proposes-health-care-stability-plan-stabilize-premiums-wisconsinites.

[6]   *See*   https://jwyjh41vxje2rqecx3efy4kf-wpengine.netdna-ssl.com/wp-content/uploads/2018/01/180120Overview.pdf.

[7] *See* Wisconsin State Legislature, Senate Bill 770, https://docs.legis.wisconsin.gov/2017/proposals/reg/sen/bill/sb770.

developed navigator rules to address insufficient federal standards for navigators, 28 TAC §§ 19.4001–19.4017, and the ACA-forced dissolution of the Texas Health Insurance Pool caused insurance coverage disruptions given the difficulties with the federal health exchange rollout, requiring TDI to issue an emergency rule extending existing insurance coverage for Texas Health Insurance Pool enrollees.

iv. Moreover, like other States, many health insurers have withdrawn from Texas due to unsustainable rising costs. Some federally designated regions of Texas have only one insurance carrier offering healthcare plans. Texas residents and employers, including Texas itself as an employer, suffer as a result of this lack of choice and higher costs.

v. Likewise, the ACA has wrought havoc on the health insurance market in Nebraska. In 2017, two insurers exited Nebraska's individual market, leaving only a single insurer remaining. Aetna announced its withdrawal from Nebraska's individual market in May 2017, citing an expected loss of $200 million for 2017 in the four states Aetna sold individual coverage. In June 2017, Blue Cross and Blue Shield of Nebraska also announced its withdrawal from Nebraska's individual market, citing an expected loss of $12 million for 2017, in addition to the approximately $150 million loss the company experienced in Nebraska from 2014 to 2016. In the wake of these companies' departures, only a single insurer, Medica, is left in Nebraska's individual market. Nebraskans are left to hope Medica—which

itself raised premiums in plan year 2017 by an average of nearly 31 percent—remains in the market for 2019.

vi.  In Missouri, the Interim Committee on Stabilizing Missouri's Health Insurance Markets, a bi-partisan committee of the Missouri House, was formed to work on solving the rising instability plaguing the Missouri insurance markets as a result of the ACA. The committee voted unanimously to create the "Missouri Reinsurance Plan," and legislation to establish the Missouri Reinsurance Plan, introduced on February 22, 2018. H.B. 2539, 99th General Assembly (Mo. 2018).[8]

vii.  Governor Otter of Idaho recently issued an Executive Order to the Idaho Department of Insurance to "approve [health-insurance plans] that follow all State-based requirements, even if not all [ACA] requirements are met." Office of Governor C.L. "Butch" Otter, Executive Order No. 2018-02 (Jan. 5, 2018).[9] The Idaho Department of Insurance has issued a bulletin implementing this order. Idaho Dep't of Ins., Bulletin No. 18-01 (Jan. 24, 2018).[10]

viii.  Maryland began investigating the enactment of its own state-level individual mandate to replace the amended ACA individual mandate.[11]

---

[8] *See* https://www.house.mo.gov/billtracking/bills181/hlrbillspdf/5903H.01I.pdf.
[9] *See* https://gov.idaho.gov/mediacenter/execorders/eo2018/EO%202018-02.pdf.
[10] *See* https://doi.idaho.gov/DisplayPDF?Id=4712.
[11] *See* Josh Hicks, *With Obama's Federal Mandate Disappearing, Md. Democrats Push 'Down Payment' Plan*, Wash. Post (Jan. 9, 2018), https://www.washingtonpost.com/local/md-politics/md-democrats-push-insurance-down-payment-plan-to-replace-federal-mandate/2018/01/09/bc0afbb0-f4f4-11e7-beb6-c8d48830c54d_story.html?utm_term=.789a454ab8bf.

ix. Other States will need to take similar corrective measures to address the ACA's irrational regime.

38. The unconstitutional individual mandate, along with the ACA itself, significantly harms and impacts the States as Medicaid and CHIP providers:

    a. The United States Congress created the Medicaid program in 1965. *See* Social Security Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 (1965). Medicaid is jointly funded by the United States and the States to provide healthcare to individuals with insufficient income and resources. *See generally* 42 U.S.C. §§ 1396-1396w. To participate in Medicaid, States must provide coverage to a federally-mandated category of individuals and according to a federally-approved State plan. *See* 42 U.S.C. § 1396a; 42 C.F.R. §§ 430.10–430.12. All 50 States participate in the Medicaid program.[12]

    b. The United States Congress created the Children's Health Insurance Program ("CHIP") in 1997. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, Title IV, Subtitle J, 111 Stat. 251 (Aug. 5, 1997). The federal government and the States jointly fund CHIP to provide healthcare for uninsured children that do not qualify for Medicaid. *See* 42 U.S.C. § 1397aa. CHIP covers children in families who have too much income to qualify for Medicaid, but cannot afford to buy private insurance. CHIP provides basic primary health care services to children, as well as other medically necessary services, including dental care. All States now participate in CHIP since its creation in

---

[12] *Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2014 through September 30, 2015*, 79 Fed. Reg. 3385 (Jan. 21, 2014).

1997.

c. Because Medicaid and CHIP are entitlement programs, States cannot limit the number of eligible people who can enroll, and Medicaid and CHIP must pay for all services covered under the program. Providing health care to individuals with insufficient income or resources through the Medicaid or CHIP programs is a significant function of state government.

d. One avenue for individuals to comply with Section 5000A's individual mandate is to apply for Medicaid or CHIP. 26 U.S.C. § 5000A(f)(1)(A)(iii). Thus, because of the individual mandate and the ACA, many individuals became eligible for Medicaid, or may have been previously eligible but opted not to enroll. Either way, the individual mandate requires millions more to enroll in Medicaid, imposing additional costs on the States. This reality does not represent "unfettered choices made by independent [state] actors," *ASARCO Inc. v. Kadish,* 490 U.S. 605, 615 (1989), but is rather a direct consequence of the individual mandate and the ACA, leaving Medicaid as the only option through which numerous individuals may comply.

e. As the CBO explained before both the enactment of ACA and the enactment of the Tax Cuts and Jobs Act of 2017, at least some individuals will obtain health insurance because of the mandate, even absent any tax penalty. *See* CBO 2017 Report 1.

f. The mandate forcing more individuals onto Medicaid or CHIP causes significant monetary injuries to the States, because these programs obligate the States to share the expenses of coverage with the federal government.

39.     Pursuant to 26 U.S.C. § 4980H, the ACA harms the States as large employers:

   a.  The ACA requires States, as large employers, to offer their employees health-insurance plans with minimum essential benefits defined solely by the Federal Government.

   b.  If a State wished to pursue other health-insurance policies for its employees, perhaps by offering insurance with a different assortment of coverage benefits, the Federal Government will tax or penalize the State. 26 U.S.C. § 4980H.

   c.  The ACA imposes a 40% "[e]xcise tax" on "high cost employer-sponsored health coverage." 26 U.S.C. § 4980I. As an employer, Wisconsin must do "considerable work" restructuring its health-insurance offerings to avoid this costly measure. [13] This work "may have a significant effect on future plan design and maximum benefit limitations." [14]

   d.  Because of the costs of the ACA, a major Wisconsin health insurer, Assurant Health, ceased its Wisconsin operations. [15] This cost Wisconsin approximately 1,200 jobs. [16]

   e.  The ACA resulted in the repeal of Wisconsin's high-risk pool, the Health Insurance Risk-Sharing Plan, which effectively managed the health-insurance needs of high-risk individuals before the full

---

[13] Segal Consulting, Second Report—Observations and Recommendations for 2017 and Beyond, prepared for Wisconsin Group Insurance Board Department of Employee Trust Funds, at p. 141 (Nov. 17, 2015), http://etf.wi.gov/boards/agenda-items-2015/gib1117/item3ar.pdf.
[14] *Id*. at 142.
[15] *See* Guy Boulton, Milwaukee-Based Assurant Health To Be Sold Of Or Shut Down, Milwaukee Journal Sentinel (Apr. 28, 2015), http://archive.jsonline.com/business/assurant-considering-sale-of-milwaukee-based-assurant-health-b99490422z1-301614251.html.
[16] *Id*.

implementation of the ACA. Wis. Stat. §§ 149.10–.53 (2011–12) (statutory framework for Wisconsin Health Insurance Risk-Sharing Plan), *repealed by* 2013 Wis. Act 20, § 1900n; *see generally* Wis. Legislative Audit Bureau, Report 14-7 Health Insurance Risk-Sharing Plan Authority at p.1 (June 2014) (describing history of Wisconsin's HIRSP, including dissolution and repeal).

f.   If state employees obtain subsidized insurance from an exchange instead of from a state plan, the Federal Government will tax or penalize the State.

g.   More employees will join state-sponsored plans because of the mandate, imposing additional costs upon the States. *See* CBO 2017 Report 1. In Texas, for example, from FY13–FY17, the Texas Group Benefits Program, administered by the Employees Retirement System of Texas, spent $487 million on ACA-related costs. *2016 Group Benefits Program Comprehensive Annual Report*, Employees Retirement System of Texas (Feb. 2017).[17]

h.   Nebraska, for example, has borne significant new costs at the behest of the ACA. Nebraska, like other States, must offer non-full time employees (*i.e.*, employees working 30–39 hours per week) health insurance plans with premiums identical to those offered to full time employees.

i.   In Missouri, revenue is drained by faster-than-projected growth in health care expenditures, driven in part by the impact of the ACA. Accordingly, Governor Greitens's budget for Fiscal Year 2018 includes

---

[17]   *See*   https://ers.texas.gov/About-ERS/Reports-and-Studies/Reports-and-Studies-on-ERS-administered-Benefit-Programs/FY16-GBP-Comprehensive-Annual-Report.pdf.

more than $572 million in cuts across Missouri state government and reduces the State's workforce by 188 positions. Mo. Office of Admin., Summary, The Missouri Budget, (2018).[18] For Fiscal Year 2019, the problems continue. "Health care costs paid by the government continue to skyrocket. Obamacare has still not been repealed, and the cost of health care continues to rise. Taxpayers pay more and more for government health care every year with little or no improvement in results." Mo. Office of Admin., Fiscal Year 2019 Budget Priorities, The Missouri Budget.[19]

j.  In South Dakota, the estimated cost impact of the ACA upon the South Dakota State Employee Benefits Program for FY 2015–2018 is as follows: $10,400 for the review of denied appeals; $19,140,252 for the elimination of the lifetime maximum; $4,575,200 for the expanded preventive services paid only by the plan; $3,202,942 for the Transitional Reinsurance Program fee (fee imposed on self-funded plans); $172,141 for the Patient Centered Outcomes Research Institute fee (fee imposed on self-funded plans); $1,514,205 for the expanded health plan eligibility  for part-time employees who did not meet the pre-ACA eligibility definition; $100,000 for the Form 1095-C administration. To date, South Dakota is unable to accurately estimate the cost of the pre-existing conditions exclusion or the expanded eligibility for adult dependent children to age 26, though upon information and belief, those qualifiers have increased the costs for South Dakota's taxpayers.

---

[18] *See* https://oa.mo.gov/sites/default/files/FY_2018_Budget_Summary_Abridged.pdf.
[19] *See* https://oa.mo.gov/sites/default/files/FY_2019_Budget_Summary.pdf.

## IV. CLAIMS FOR RELIEF

## <u>COUNT ONE</u>

### Declaratory Judgment That the Individual Mandate of the ACA Exceeds Congress's Article I Constitutional Enumerated Powers

40.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 39 as if fully set forth herein.

41.    Section 5000A's individual mandate exceeds Congress's enumerated powers.

42.    As a majority of the Supreme Court concluded, the "most straightforward reading of" Section 5000A "is that it commands individuals to purchase insurance." *NFIB*, 567 U.S. at 562–63 (Roberts, C.J.); *id.* at 663–65 (Dissenting Op.). Thus, Congress lacks authority under the Commerce Clause and Necessary and Proper Clause to command individuals to purchase health insurance.

43.    In *NFIB*, a different majority of the Supreme Court saved Section 5000A from unconstitutionality by interpreting it not as a mandate enforced by a separate tax penalty, but by combining the mandate with the tax penalty and treating those provisions as a single tax on individuals who chose to go without insurance. 567 U.S. at 563 (Roberts, C.J.).

44.    The Constitution grants to Congress the "Power to lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

45.    A provision that raises no revenue is not a tax because it does nothing to "pay the Debts" or "provide for the common Defense and general Welfare of the United States." Indeed, "the essential feature of any tax" is the "produc[tion] [of] at least some revenue for the Government." *NFIB*, 567 U.S. at 564–65, 574.

46.    The Tax Cuts and Jobs Act of 2017 reduced Section 5000A's tax

penalty to $0. Pub. L. No. 115-97, § 11081. Accordingly, Section 5000A no longer possesses "the essential feature of any tax"; it no longer "produces at least some revenue for the Government."

47.    Therefore, after Congress amended Section 5000A, it is no longer possible to interpret this statute as a tax enacted pursuant to a valid exercise of Congress's constitutional power to tax. Rather, the only reading available is the most natural one; Section 5000A contains a stand-alone legal mandate.

48.    No other provision of the Constitution supports Congress's claimed authority to enact Section 5000A's individual mandate. Accordingly, Section 5000A's individual mandate is unconstitutional.

49.    The remainder of the ACA is non-severable from the individual mandate, meaning that the Act must be invalidated in whole.

50.    Alternatively, and at the very minimum, as even the Obama Administration conceded in its briefing in *NFIB*, the guaranteed-issue and community-rating provisions are non-severable from the mandate and must be invalidated along with the individual mandate.

51.    Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, irreparable injury.

52.    Plaintiffs are entitled to a declaration that the individual mandate of the ACA exceeds Congress's Article I constitutionally enumerated powers. Plaintiffs also are entitled to a permanent injunction against Defendants from implementing, regulating, or otherwise enforcing any part of the ACA because its requirements are unlawful and not severable from the unconstitutional individual mandate.

## COUNT TWO

### Declaratory Judgment That the ACA Violates the Due Process Clause of the Fifth Amendment to the Constitution

53.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 52 as if fully set forth herein.

54.    The Due Process Clause of the Fifth Amendment provides "nor shall any person . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

55.    The Fifth Amendment contains an "implicit" "equal protection principle" binding the federal Government. *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 (2017).

56.    Legislation that imposes irrational requirements violates the Due Process Clause.

57.    Given that Section 5000A's individual mandate is unconstitutional, the rest of the ACA is irrational under Congress's own findings.

58.    The ACA lacks a rational basis now that the individual mandate's tax penalty has been repealed.

59.    Section 18091(2)(I), the chief legislative finding in the ACA, explains that "[t]he requirement [to buy health insurance] is *essential* to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." 42 U.S.C. § 18091(2)(I).

60.    Given that the ACA's "essential" feature—the individual mandate—is unconstitutional, the law now imposes irrational requirements, in violation of the Due Process Clause.

61.    Because of Defendants' actions, Plaintiffs have suffered, and continue

to suffer, irreparable injury.

62. Plaintiffs are entitled to a declaration that the ACA violates the Due Process Clause to the Fifth Amendment. Plaintiffs also are entitled to a permanent injunction against Defendants from implementing, regulating, or otherwise enforcing any part of the ACA because its requirements are unlawful and not severable from the unconstitutional individual mandate.

## COUNT THREE

### Declaratory Judgment That the ACA Violates the Tenth Amendment to the United States Constitution

63. Plaintiffs incorporate the allegations contained in paragraphs 1 through 62 as if fully set forth herein.

64. The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

65. Legislation that is irrational is outside the powers delegated to the United States by the Constitution.

66. Under Congress's own findings, the ACA lacks a rational basis now that the individual mandate's tax penalty has been repealed and the individual mandate is unconstitutional. *See supra* ¶¶ 53–62.

67. The ACA is therefore not within the powers delegated to the United States.

68. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, irreparable injury.

69. Plaintiffs are entitled to a declaration that the ACA violates the Tenth Amendment to the United States Constitution. Plaintiffs also are entitled to a permanent injunction against Defendants from implementing, regulating, or

otherwise enforcing any part of the ACA because its requirements are unlawful and not severable from the unconstitutional individual mandate.

## COUNT FOUR

**Declaratory Judgment Under 5 U.S.C. § 706 that Agency Rules Promulgated Pursuant to the ACA Are Unlawful**

70.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 69 as if fully set forth herein.

71.    The Administrative Procedure Act requires the Court to hold unlawful and set aside any agency action that is, among other things, (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; and (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706(2).

72.    The Department and Service are both "agenc[ies]" under the Administrative Procedures Act, 5 U.S.C. § 551(1), and the regulations and rules promulgated pursuant to the ACA are "rules" under the Administrative Procedures Act, 5 U.S.C. § 551(4).

73.    Because the ACA exceeds Congress's Article I Constitutional enumerated powers and violates the Fifth and Tenth Amendments to the Constitution for the reasons described in prior paragraphs, all regulations promulgated pursuant to, implementing, or enforcing, the ACA are arbitrary and capricious, contrary to law, and in excess of agency authority.

74.    Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, irreparable injury.

75.    Plaintiffs are entitled to a declaration that regulations promulgated pursuant to, implementing, or enforcing the ACA violates the Administrative

Procedure Act. Plaintiffs also are entitled to a permanent injunction against Defendants from implementing, regulating, or otherwise enforcing any part of the ACA because its requirements are unlawful and not severable from the unconstitutional individual mandate.

## COUNT FIVE

### Injunctive Relief Against Federal Officials from Implementing, Regulating, or Otherwise Enforcing the ACA

76.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 75 as if fully set forth herein.

77.    Plaintiffs are entitled to a permanent injunction against Defendants from implementing, regulating, or otherwise enforcing any part of the ACA because its requirements are unlawful and not severable from the unconstitutional individual mandate.

## V. PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

A.    Declare the ACA, as amended by the Tax Cuts and Jobs Act of 2017, to be unconstitutional either in part or in whole.

B.    Declare unlawful any and all rules or regulations promulgated pursuant to, implementing, regulating, or otherwise enforcing the ACA.

C.    Enjoin, preliminarily and permanently, Defendants and their employees, agents, successors, or any other person acting in concert with them, from implementing, regulating, enforcing, or otherwise acting under the authority of the ACA.

D.    Award Plaintiffs their reasonable costs, including attorneys' fees.

E.    Grant Plaintiffs any and all such other and further relief to which they are justly entitled at law and in equity.

Respectfully submitted this the 26th day of February, 2018,

BRAD SCHIMEL
Attorney General of Wisconsin

STEVE MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

MARK BRNOVICH
Attorney General of Arizona

PAM BONDI
Attorney General of Florida

CHRISTOPHER CARR
Attorney General of Georgia

CURTIS HILL
Attorney General of Indiana

DEREK SCHMIDT
Attorney General of Kansas

JEFF LANDRY
Attorney General of Louisiana

JOSH HAWLEY
Attorney General of Missouri

DOUG PETERSON
Attorney General of Nebraska

WAYNE STENEHJEM
Attorney General of North Dakota

ALAN WILSON
Attorney General of South Carolina

MARTY JACKLEY
Attorney General of South Dakota

HERBERT SLATERY, III
Attorney General of Tennessee

SEAN REYES
Attorney General of Utah

PATRICK MORRISEY
Attorney General of West Virginia

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

*/s/ Darren McCarty*
DARREN McCARTY
Special Counsel for Civil Litigation
Texas Bar No. 24007631
darren.mccarty@oag.texas.gov

AUSTIN R. NIMOCKS
Special Counsel for Civil Litigation

Attorney General of Texas
P.O. Box 12548, Mail Code 001
Austin, Texas 78711-2548
Tel: 512-936-1414

*ATTORNEYS FOR PLAINTIFFS*