**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| TEXAS, WISCONSIN, ALABAMA, ARKANSAS, ARIZONA, FLORIDA, GEORGIA, INDIANA, KANSAS, LOUISIANA, PAUL LePAGE, Governor of Maine, MISSISSIPPI, by and through Governor Phil Bryant, MISSOURI, NEBRASKA, NORTH DAKOTA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, UTAH, and WEST VIRGINIA,<br><br>                                        Plaintiffs,<br><br>       v.<br><br>UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ALEX AZAR, in his Official Capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, UNITED STATES INTERNAL REVENUE SERVICE, and DAVID J. KAUTTER, in his Official Capacity as Acting COMMISSIONER OF INTERNAL REVENUE,<br><br>                                        Defendants.<br><br>CALIFORNIA, CONNECTICUT, DISTRICT OF COLUMBIA, DELAWARE, HAWAII, ILLINOIS, KENTUCKY, MASSACHUSETTS, MINNESOTA, NEW JERSEY, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, and WASHINGTON,<br><br>             [Proposed] Intervenors-Defendants. | Civil Action No. 4:18-cv-00167-O |

**MOTION TO INTERVENE AND MEMORANDUM IN SUPPORT THEREOF**

The Intervenor States respectfully move pursuant to Federal Rule of Civil Procedure 24 to intervene as defendants in this action. Intervention as of right is warranted because the States' interests in preserving the Patient Protection and Affordable Care Act diverge from and will not be adequately represented by the federal defendants, and those interests will be gravely impaired if these States are not permitted to intervene. Fed. R. Civ.

P. 24(a)(2).  Alternatively, the Intervenor States move for permissive intervention on similar grounds.  Fed. R. Civ. P. 24(b).

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 1

    A.    The ACA Is Central to America's Healthcare System .................. 1

    B.    Preservation of the ACA is Necessary to Prevent Grievous
Harm to the States and Their Residents ........................................ 6

    C.    The Courts Have Repeatedly Rejected Attempts to Strike
Down the ACA ................................................................................ 8

    D.    Congress Chose Not to Repeal the ACA and Instead
Maintained It as Federal Law ....................................................... 8

    E.    The Plaintiff States File This Action, and Ask this Court to
Strike Down the ACA "In Whole" ................................................ 9

ARGUMENT ...................................................................................................... 9

  I.    THE INTERVENOR STATES ARE ENTITLED TO INTERVENE AS A
MATTER OF RIGHT UNDER RULE 24(A)(2)................................................. 9

    A.    The Intervenor States' Motion Is Timely Because It Was
Filed Six Weeks After this Action Was Initiated, Long
Before Any Prejudice or Unusual Circumstances Could
Arise ............................................................................................. 10

    B.    The Intervenor States Have Direct, Substantial, and Legally
Protectable Interests That May Be Impaired by this
Litigation ...................................................................................... 11

        1.    A decision striking down the ACA would deprive
the States of hundreds of billions of dollars.................... 12

        2.    A decision striking down the ACA would likely
require increased State spending on healthcare for
the uninsured ................................................................... 15

        3.    These interests are legally protectable under Rule
24..................................................................................... 16

    C.    This Suit Will Impair the Intervenor States' Ability to
Protect Their Interests in the Proper Functioning of the
ACA .............................................................................................. 17

    D.    Neither the Plaintiff States nor the Federal Defendants
Adequately Represent the Intervenor States' Interests ................ 18

# TABLE OF CONTENTS
## (continued)

**Page**

    II.      THE STATES SHOULD BE GRANTED PERMISSIVE INTERVENTION ............. 22

CONCLUSION ............................................................................................................. 23

CERTIFICATE OF CONFERENCE .............................................................................. 26

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alfred L. Snapp & Son v. Puerto Rico*
    458 U.S. 592 (1982)................................................................17

*Association of Professional Flight Attendants v. Gibbs*
    804 F.2d 318 (5th Cir. 1986) ..............................................11

*Brumfield v. Dodd*
    749 F.3d 339 (5th Cir. 2014) ............................................. *passim*

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co. et al.*
    386 U.S. 129 (1967)................................................................16

*City of Houston v. American Traffic Solutions, Inc.*
    668 F.3d 291 (5th Cir. 2012) ..............................................12

*Coons v. Lew*
    762 F.3d 891 (9th Cir. 2014) ................................................8

*Edwards v. City of Houston*
    78 F.3d 983 (5th Cir. 1996) (en banc) ............................10, 18

*Entergy Gulf States La., LLC v. EPA*
    817 F.3d 198 (5th Cir. 2016) ...........................................18, 21

*Fund for Animals, Inc. v. Norton*
    322 F.3d 728 (D.C. Cir. 2003) ........................................17, 19

*House v. Burwell*
    185 F.Supp.3d 165 (D.D.C 2016) .......................................22

*In re Lease Oil Antitrust Litig.*
    570 F.3d 244 (5th Cir. 2009) ..............................................10

*John Doe No. 1 v. Glickman*
    256 F.3d 371 (5th Cir. 2001) ..............................................11

*King v. Burwell*
    576 U.S. __ (2015)..............................................................5, 8

# TABLE OF AUTHORITIES
## (continued)

**Page**

*League of United Latin American Citizens, District 19 v. City of Boerne*
  659 F.3d 421 (5th Cir. 2011) ..................................................................................11

*Massachusetts v. E.P.A*
  549 U.S. 497 (2007)................................................................................................17

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
  567 U.S. 519 (2012)......................................................................................... *passim*

*Oklahoma ex rel. Pruitt v. Sebelius*
  2013 U.S. Dist. LEXIS 113232 ................................................................................8

*Sierra Club v. Espy*
  18 F.3d 1202 (5th Cir. 1994) ......................................................................... *passim*

*Sissel v. U.S. Dep't of Health & Human Servs.*
  760 F.3d 1 (D.C. Cir. 2014) ....................................................................................8

*Stallworth v. Monsanto Co.*
  558 F.2d 257 (5th Cir. 1977) ..........................................................................10, 11

*Texas v. United States*
  805 F.3d 653 (5th Cir. 2015) ......................................................................... *passim*

*United States v. League of United Latin American Citizens*
  793 F.2d 636 (5th Cir. 1986) ................................................................................22

*United States House of Representatives v. Price*, 2017 U.S. App. LEXIS
  14178, 2017 WL 3271445 at *7-8 (D.C. Cir. Aug, 1, 2017)......................................16

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Commission*
  834 F.3d 562 (5th Cir. 2016) ......................................................................... *passim*

**STATUTES**

42 United States Code
  42 U.S.C. § 300gg-94(a)(1) .....................................................................................5
  42 U.S.C. § 300u-11(a), (b)(6)................................................................................13
  42 U.S.C. § 1395dd...............................................................................................6, 15
  42 U.S.C. § 1396a...................................................................................................14
  42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) .......................................................................3
  42 U.S.C. § 1396a(e)(14)(I)(i) ..................................................................................3

# TABLE OF AUTHORITIES
## (continued)

**Page**

42 U.S.C. § 1396d(y)(1) ...............................................................................3, 16

42 U.S.C. § 1396n(k) ...........................................................................................14

42 U.S.C. § 1397j-1 ..............................................................................................13

42 U.S.C. § 18031(b)-(e) .......................................................................................5

42 U.S.C. § 18051 ................................................................................................14

42 U.S.C § 18051(d) ............................................................................................16

42 U.S.C. § 18204 ................................................................................................16

Cal. Welf. & Inst. Code §§ 17000, 17600 ..........................................................15

N.Y. Public Health Law § 2807-k ......................................................................15

Patient Protection anhd Affordable Care Act .......................................... *passim*

## COURT RULES

Federal Rule of Civil Procedure

Rule 24 ........................................................................................................10, 16

Rule 24(a) .............................................................................................................11

Rule 24(a)(2) ....................................................................................................9, 11

Rule 24(b) ............................................................................................................22

Rule 24(b)(1)(B) ..................................................................................................22

## OTHER AUTHORITIES

Code of Federal Regulations

45 C.F.R. §§ 154.200-154.230...............................................................................5

45 C.F.R. § 154.301 ...............................................................................................5

45 C.F.R. §§ 155.1000-155.1010...........................................................................5

45 C.F.R. § 156.20 .................................................................................................5

45 C.F.R. § 156.200 ...............................................................................................5

82 C.F.R. 8351 .....................................................................................................22

82 C.F.R. 483385 .................................................................................................22

Centers for Disease Control and Prevention, "Accomplishing CDC's
Mission with Investments from the Prevention & Public Health Fund,
FY 2010-FY 2016," https://www.cdc.gov/funding/documents/CDC-
PPHF-Funding-Impact.pdf.................................................................................14

# TABLE OF AUTHORITIES
## (continued)

**Page**

Congressional Research Service, "Legislative Actions in the 112[th], 113th, and 114th Congresses to Repeal, Defund, or Delay the Affordable Care Act," February 7, 2017, https://fas.org/sgp/crs/misc/R43289.pdf ...............................9

Department of Health & Human Services, Office of the Actuary, Centers for Medicare & Medicaid Services, "2016 Actuarial Report on the Financial Outlook for Medicaid," p. 65, https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2016.pdf .........................................................................................................................13

Executive Orders
Order No. 13765 ..................................................................................................22
Order No. 13813 ..................................................................................................22

House of Representatives
H.R. 45, 113th.......................................................................................................8
H.R. 1628, 115th...................................................................................................9
H.R. 3762, 114th...................................................................................................8
H.R. 6079, 112th...................................................................................................8

https://www.aarp.org/politics-society/advocacy/aarp-fights-for-your-health/..................................................................................................................................4

Kaiser Family Foundation, "Medicaid Expansion Spending," FY 2015, https://www.kff.org/medicaid/state-indicator/medicaid-expansion-spending ................................................................................................................4

Medicaid.gov, *Basic Health Program*, https://www.medicaid. gov/basic-health-program/index.html (last visited May 17, 2017) .............................................14

Office of the Attorney General Letter to the U.S. Department of Treasury and U.S. Department of Health & Human Services regarding *House v. Burwell*, 185 F.Supp.3d 165 (D.D.C 2016) at https://www.hhs.gov/sites/default/files/csr-payment-memo.pdf .................................22

PL 115-97, 2017 HR 1, at *2092 (Dec. 22, 2017) ("Tax Cuts and Jobs Act")..................................................................................................................................22

# TABLE OF AUTHORITIES
## (continued)

**Page**

Rachel Wolfe, Read the Full Text of Trump's CPAC Speech, Vox
(Feb. 23, 2018, 2:30 p.m.), https://www.vox.com/policy-and-
politics/2018/2/23/17044760/transcript-trump-cpac-speech-snake-
mccain ..................................................................................................................................21

## INTRODUCTION

The plaintiff States seek to eliminate the Patient Protection and Affordable Care Act (ACA), a remedy that would dismantle the nation's healthcare system, harm millions of people, and deprive the Intervenor States of hundreds of billions of dollars that they use to provide healthcare and coverage to their residents.[1]  As recipients of this federal funding, and as the governmental entities responsible for administering health insurance programs dependent on ACA funding, the Intervenor States each have their own interests in protecting their states' unique healthcare infrastructures.  Each Intervenor State has committed significant state funds and resources to implement the ACA.  And each Intervenor State has an interest in the health and well-being of its citizens, who would be gravely harmed by the loss of the ACA.  Therefore, the Intervenor States ask this Court to grant their motion to intervene as of right, or alternatively for permissive intervention, and allow them to participate as defendants to protect their own distinct fiscal, economic, sovereign, and quasi-sovereign interests in this litigation.

## BACKGROUND

### A.     The ACA Is Central to America's Healthcare System

In 2010, Congress enacted the ACA to "increase the number of Americans covered by health insurance and decrease the cost of healthcare."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (*NFIB*).  The ACA has delivered on these promises by strengthening consumer protections in private insurance; making the individual insurance market accessible and affordable; expanding and improving the Medicaid program; modifying Medicare's payment systems while filling in benefit gaps; increasing funding and prioritization of prevention and public health; and supporting infrastructure such as community health centers, the National Health Service Corps, and the Indian Health Service.  *See generally* Declaration of Henry J.

---

[1] The District of Columbia, which is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government of the United States, shall be included herein as a "State" for ease of reference.

Aaron (Aaron Dec.) ¶¶ 4-41, Appx. 002-058; *see also* Declaration of Frederick Isasi (Isasi Dec.) ¶ 16, ID Appx. 107-108.  As a result of these and other reforms adopted by the ACA, an additional 20 million people across the United States now have access to health coverage, representing a 43 percent drop in the uninsured rate.  Aaron Dec. ¶ 5, Appx. 003; *see also* Declaration of Benjamin Barnes (Barnes Dec.) ¶ 4, Appx. 062-063; Declaration of Alfred J. Gobeille (Gobeille Dec.) ¶ 4, Appx. 095-096; Declaration of Jennifer Kent (Kent Dec.) ¶ 2, Appx. 112-113; Declaration of Dr. Jennifer Lee (Lee Dec.) ¶ 4, Appx. 120-121; Declaration of Judy Mohr Peterson (Peterson Dec.) ¶ 4, Appx. 132-133; Declaration of Thea Mounts (Mounts Dec.) ¶¶ 6, 8, Appx. 136-137; Declaration of Claudia Schlosberg (Scholsberg Dec.) ¶ 4, Appx. 143-144; Declaration of Zachary Sherman (Sherman Dec.) ¶ 3, Appx. 155-156; Declaration of Kara Odom Walker (Walker Dec.) ¶ 4, Appx. 163; Declaration of Dr. Howard Zucker (Zucker Dec. ¶ 5), Appx. 170-172.  The ACA has lowered hospitals' uncompensated care by $10.4 billion in 2015 alone; and in States that expanded Medicaid, uncompensated care costs dropped by around half.  Aaron Dec. ¶ 10, Appx. 006; Declaration of Matthew David Eyles (Eyles Dec.) ¶ 9, Appx. 090-091.  Consequently, States have realized substantial budget savings.  Aaron Dec. ¶¶ 11, 25, Appx. 006-007, 015-016; Isasi Dec. ¶ 14, Appx. 106-107; Mounts Dec. ¶¶ 13-16, Appx. 137-138; Barnes Dec. ¶ 5, Appx. 063-064; Gobeille Dec. ¶ 5, Appx. 096; Walker Dec. ¶ 5, Appx. 164; Declaration of Dr. John Jay Shannon (Shannon Dec.) ¶ 7, Appx. 151-152; Schlosberg Dec. ¶ 5, Appx. 144-145.

In addition to increasing access to healthcare, many of the ACA's reforms also address quality of care.  ACA policies have improved care coordination, payment system efficiency, overall medical care quality, and consumer protections, leading to better overall health.  Aaron Dec. ¶ 12, Appx. 007; Isasi Dec. ¶¶ 4, 17, Appx. 100-101, 108-109; Mounts Dec. ¶¶ 17-29, Appx. 138-140; Eyles Dec. ¶ 8, Appx. 89.  The ACA's "guaranteed-issue" and "community-rating" provisions give peace of mind to the 133 million Americans with a pre-existing health condition, including the parents of 17 million children with such conditions, and has increased and improved healthcare access for women, young adults, veterans, and persons with disabilities.

Aaron Dec. ¶¶ 13-16, 26, Appx. 008-010, 016; Isasi Dec. ¶¶ 4-5, 12, 15, Appx. 100-103, 105, 107; Declaration of Peter Berns (Berns Dec.) ¶¶ 3-6, Appx. 072-075.[2]

The States are directly involved in implementing many of the ACA's reforms—particularly its expansion of affordable health coverage to lower-income residents. Aaron Dec. ¶¶ 21-26, Appx. 013-016; Declaration of Sharon Boyle (Boyle Dec.) ¶¶ 4, 6, Appx. 077. The ACA expanded Medicaid, which the States administer, making additional segments of the population eligible to receive benefits. *See* 42 U.S.C. §§ 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14)(I)(i) (childless adults with incomes of up to 138% of the federal poverty level may receive Medicaid). And it obligates the federal government to pay the States for at least 90% of the cost of this expansion. *See* 42 U.S.C. § 1396d(y)(1). To date, thirty-three states have chosen to expand Medicaid coverage under the ACA. Isasi Dec. ¶ 7, Appx. 103-104; Aaron Dec. ¶¶ 21-22, Appx. 013-014.[3] Nationwide, over 11.8 million newly qualified low-income individuals were receiving health coverage through Medicaid at the end of 2016 in these expansion States, and the proportion of adults without insurance in those States dropped by 9.2 percentage points between 2014 and 2016. Isasi Dec. ¶¶ 7-8, Appx. 103-104. Medicaid expansion enrollment is 3,700,000 in California, 240,000 in Connecticut, 11,000 in Delaware, 16,000 in the District of Columbia, 33,000 in Hawaii, 340,000 in Illinois, 151,000 in Kentucky, 350,000 in

---

[2] "Guaranteed-issue" and "community-rating" are provisions of the ACA that work together to bar insurers from denying coverage because of a person's medical history and from charging individuals with medical conditions higher premiums than healthy individuals. *See NFIB*, 567 U.S. at 547-548.

[3] Of the 33 jurisdictions that expanded Medicaid through the ACA, 7 are plaintiffs in this litigation and represent 1,282,554 expansion enrollees, including: Arizona (109,723 expansion enrollees); Arkansas (316,483); Indiana (278,610); Louisiana (376,668); North Dakota (19,965); and West Virginia (181,105). Maine, the seventh plaintiff state, adopted Medicaid expansion through a ballot initiative in November 2017 but has not yet implemented it. The remaining 26 expansion states are: Alaska, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and the District of Columbia. Eyles Dec. ¶ 6.

Massachusetts, 194,000 in New Jersey, 301,721 in New York, 313,000 in North Carolina, 159,000 in Oregon, 77,846 in Rhode Island, 3,000 in Vermont, 55,000 in Washington, and is projected to be 179,000 in Virginia if the state enacts an expansion.  Aaron Dec. ¶¶ 71, 85, 92, 106, 121, 127, 141, 148, 155, Appx. 033, 037, 039, 043, 047, 049, 053, 055, 057; Kent Dec. ¶ 2, Appx. 112-113; Barnes Dec. ¶ 4, Appx. 062-063; Walker Dec. ¶ 4, Appx. 163; Peterson Dec. ¶ 4, Appx. 132-133; Boyle Dec. ¶ 6, Appx. 077; Zucker Dec. ¶ 5, Appx. 170-172; Sherman Dec. ¶ 3, Appx. 155-156.

Both the federal and State governments have invested substantial monetary resources into Medicaid expansion.[4]  The Medicaid expansion has led to documented savings for people, States, and the overall healthcare system.  Aaron Dec. ¶ 25, Appx. 015-016; Isasi Dec. ¶ 14, Appx. 106-107.

The ACA also provides opportunities for States to participate in new and expanded programs that increase access to better-coordinated and high-quality care for low-income seniors and people with disabilities, reduce healthcare spending, and improve community health.  *See* Aaron Dec. ¶¶ 26, 27, 39, Appx. 016-017, 021-022; Isasi Dec. ¶ 15, Appx. 107; Berns Dec. ¶¶ 5-6, Appx. 074-075; Sherman Dec. ¶ 4, Appx. 156; Schlosberg Dec. ¶¶ 3, 6-7, Appx. 142, 145-147; Peterson Dec. ¶¶ 5-6, Appx. 133-134; Lee Dec. ¶ 5, Appx. 121; Gobeille Dec. ¶ 6, Appx. 096-097; Barnes Dec. ¶¶ 6-7, Appx. 064-067; Zucker Dec. ¶ 4, 169-170; Walker Dec ¶ 6, Appx. 164; Mounts Dec. ¶ 5, Appx. 136.[5]

---

[4] For example, in fiscal year 2015, the federal government spent $68.8 billion and States spent $4.28 billion to provide Medicaid coverage to the expansion population.  Kaiser Family Foundation, "Medicaid Expansion Spending," FY 2015, https://www.kff.org/medicaid/state-indicator/medicaid-expansion-spending.  Spending in FY 2015 does not take into full account those states that expanded Medicaid after October 1, 2014, including Pennsylvania (expanded January 1, 2015), Indiana (expanded February 1, 2015), Alaska (expanded September 1, 2015), Montana (expanded January 1, 2016), and Louisiana (expanded July 1, 2016).  Over the same timeframe, based on the federal government's promise to pay the bulk of the costs at a 90/10 match rate, States invested over $4.2 billion to expand their Medicaid programs.  *Id.*

[5] *See also* https://www.aarp.org/politics-society/advocacy/aarp-fights-for-your-health/.

The ACA also authorized creation of government-sponsored health insurance marketplaces (also known as exchanges) that allow consumers "to compare and purchase insurance plans." *King v. Burwell*, 576 U.S. __, 135 S.Ct. 2480, 2485 (2015); *see also* Aaron Dec. ¶¶ 17-20, Appx. 010-013.  The ACA provides subsidies to individuals between 100 and 400 percent of the federal poverty line to purchase healthcare, but those subsidies can only be used in the marketplaces. *King*, 135 S. Ct. at 2487.  The ACA affords each State the choice to establish its own exchange, while providing that the federal government will establish one if the State opts out.  *Id.* at 2485. The States play a critical role in delivering plans offered through the exchanges.  As of 2018, twelve States (including Intervenor States California, Connecticut, District of Columbia, Massachusetts, New York, Rhode Island, Vermont, and Washington) had established and are currently running their own exchanges (state-based exchanges), twenty-eight States used the federal government's website, HealthCare.Gov (federally-facilitated exchanges), and eleven States run exchanges in partnership with the Department of Health and Human Services (partnership exchanges).  Aaron Dec. ¶ 17.  Among other responsibilities, the States approve premium rates and review the plans offered on their exchanges to ensure that the cost and quality of the plans' health benefits are reasonable and compliant with the minimum requirements of both state and federal law.  *See* 42 U.S.C. §§ 300gg-94(a)(1), 18031(b)-(e); 45 C.F.R. §§ 154.200-154.230, 154.301, 155.1000-155.1010, 156.20, 156.200.  Nationally, 10.3 million people obtained health coverage through these exchanges in 2017, and 84 percent of this group—over 8 million people—receive ACA-funded subsidies (also known as premium tax credits) to help them pay for insurance premiums.  Aaron Dec. ¶ 18, Isasi Dec. ¶ 6.  Marketplace enrollment is 1,389,886 in California, 98,260 in Connecticut, 24,171 in Delaware, 17,808 in the District of Columbia, 16,711 in Hawaii, 673,000 in Illinois, 71,585 in Kentucky, 242,221 in Massachusetts, 243,743 in New Jersey, 207,083 in New York, 450,822 in North Carolina, 137,305 in Oregon, 29,065 in Rhode Island, 29,088 in Vermont, 410,726 in Virginia, and 184,070 in Washington.  Aaron Dec. ¶¶ 49, 56, 63, 91, 98, 105, 112, 119, 126, 133, 140, 154;

Declaration of Mila Kofman (Kofman Dec.) ¶ 3; Peterson Dec. ¶ 4; Declaration of Chris Maley (Maley Dec.) ¶ 7; Lee Dec. ¶ 4.

**B. Preservation of the ACA is Necessary to Prevent Grievous Harm to the States and Their Residents**

Eliminating the ACA would cause immediate and long-term harm to the Intervenor States and to their residents' health and financial security, to state healthcare systems, and to state budgets. Aaron Dec. ¶¶ 42-46; Isasi Dec. ¶ 18; Eyles Dec. ¶ 12. The law is so interwoven into the U.S. health system that its elimination would even damage Medicare and other programs that pre-date the ACA. Aaron Dec. ¶¶ 42-43. Millions of Americans would lose their insurance coverage. *Id.* ¶ 44. That loss in turn would lead to downstream costs to state-funded hospitals, which must provide emergency care regardless of a patient's insurance status or ability to pay. 42 U.S.C. § 1395dd. Thus, the impact on the Intervenor States would be profound and widespread. Aaron Dec. ¶¶ 47-172. Most directly, the States themselves would lose over half a trillion dollars of anticipated federal funds used to provide health care to their residents, including:

- California $160.2 billion (Aaron Dec. ¶ 53),
- Connecticut $14.8 billion (*Id.* ¶ 60),
- Delaware $3.6 billion (*Id.* ¶ 67),
- District of Columbia $1.7 billion (*Id.* ¶ 74),
- Hawaii $4.3 billion (*Id.* ¶ 81),
- Illinois $49.9 billion (*Id.* ¶ 88),
- Kentucky $ 49.7 billion (*Id.* ¶ 95),
- Massachusetts $22.5 billion (*Id.* ¶ 102),
- New Jersey $59.7 billion (*Id.* ¶ 109),
- New York $57.2 billion (*Id.* ¶ 116),
- North Carolina $59.0 billion (*Id.* ¶ 123),

- Oregon $38.4 billion (*Id.* ¶ 130),

- Rhode Island $7.4 billion (*Id.* ¶ 137),

- Vermont $2.9 billion (*Id.* ¶ 144),

- Virginia $18 billion (*Id.* ¶ 151), and

- Washington $42.8 billion (*Id.* ¶ 158).

Moreover, without the ACA, individuals will face devastating losses in healthcare, security, and financial stability.  Isasi Dec. ¶ 5; Eyles Dec. ¶ 8; *see also e.g.* Mounts Dec. ¶ 27; Sherman Dec. ¶ 5 (2016 Rhode Island Health Insurance Survey showed a decrease from 2012 in respondents reporting difficulties in paying medical bills.); Schlosberg Dec. ¶ 5 Zucker Dec. ¶ 6. For example, an individual in Illinois predicted she and her spouse would have to forgo medically necessary—but very expensive—medicine without the coverage provided by the ACA.  Isasi Dec. ¶ 5(b).  And millions of people with pre-existing conditions may not be able to continue receiving insurance coverage.  *Id.* at ¶ 5(c), (d), (e); *see also* Berns Dec. ¶ 4.  Essential health benefits of ACA-compliant insurance guarantee coverage for mental health care. Declaration of Ryan Smith ¶ 2; Berns Dec. ¶ 4; Aaron Dec. ¶ 12.  Additionally, children born with conditions such as heart defects and diabetes would lose guaranteed access to coverage and care.  Declaration of Angela Eilers ¶¶ 3-4; Declaration of Kim Lufkin ¶¶ 4-5.  People with intellectual and developmental disabilities would lose crucial protections from lifetime and annual limits, which are especially important to a population that often experiences complicated and lifelong medical needs.  Berns Dec. ¶ 4.  The ACA has allowed individuals to continue to run small businesses without worrying about insurance costs.  Declaration of Sherry White ¶ 7. Finally, the Medicaid expansion has allowed parents to care for seriously ill children without the threat of losing coverage in the case of a lost job.  Declaration of Margaret Chism ¶¶ 5-8.

**C.     The Courts Have Repeatedly Rejected Attempts to Strike Down the ACA**

Since its adoption, the ACA has been the subject of intense litigation, including review by
the United States Supreme Court twice.  *NFIB*, 567 U.S. at 540-43; *King*, 135 S.Ct. 2480
(upholding ACA authorization of tax credits for purchases on federal health exchange).  But
courts have routinely rejected claims that would have gutted its key reforms.  In the landmark
*NFIB* decision, the Supreme Court upheld the constitutionality of the individual mandate—a
requirement that certain people pay a penalty for not obtaining health insurance.  *Id*. at 574-75.
The Court concluded that Congress had the power to impose a tax on those without health
insurance, and had exercised that power in enacting the ACA.  *Id*.  Since *NFIB*, numerous
litigants have attempted to undermine the ACA's core provisions, but time and again, courts
have rebuffed those efforts, avoiding a "calamitous result."  *King*, 135 S. Ct. at 2496 (rejecting
interpretation of ACA that would have "destroy[ed]" the health insurance markets created by the
ACA); *see also e.g. Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 3 (D.C. Cir.
2014), *cert. denied* 136 S. Ct. 925 (2016) (rejecting claim that ACA violated the Constitution's
Origination Clause); *Coons v. Lew*, 762 F.3d 891, 902 (9th Cir. 2014), as amended, (Sept. 2,
2014), *cert. denied*, __ U.S. ___, 135 S. Ct. 1699 (2015) (ACA preempted Arizona law that
allowed citizens to avoid minimum health insurance and abstain from paying mandate penalties);
*Oklahoma ex rel. Pruitt v. Sebelius*, 2013 U.S. Dist. LEXIS 113232, 2013 WL 4052610, **27-30
(State lacked standing to seek a declaratory judgment that a state constitutional provision
declaring an individual right for state residents not to be compelled to participate in certain
conduct remained valid as a protection against mandated purchases of health insurance).

**D.     Congress Chose Not to Repeal the ACA and Instead Maintained It as
          Federal Law**

The ACA has also been the subject of passionate political debate.  Since its passage in
2010, Congress has attempted to repeal the law in its entirety an estimated 70 times, yet all such
efforts have failed.  *See, e.g*., H.R. 3762, 114th Cong. (2015), H.R. 45, 113th Cong. (2013), H.R.

6079, 112th Cong. (2012).[6]  Indeed, in the past year alone, Congress attempted to "repeal and replace" the ACA at least three separate times, including rejecting a so-called "skinny repeal" that would have repealed substantial portions of the ACA.  H.R. 1628, 115th Cong. (2017).

In December 2017, as part of an overall revision to federal income tax laws, Congress amended the tax code by reducing the tax penalty for individuals failing to demonstrate health insurance coverage, which is based on a percentage of the taxpayer's household income, from "2.5%" to "zero percent," and the applicable dollar penalty from "$695" to "$0."  *See* PL 115-97, 2017 HR 1, at *2092 (Dec. 22, 2017) ("Tax Cuts and Jobs Act").  This change, effective in 2019, did not repeal any statutory provision of the ACA.  *Id.*  Yet, plaintiffs rely on this change to ask this Court to strike down the entire ACA.

### E.   The Plaintiff States File This Action, and Ask this Court to Strike Down the ACA "In Whole"

Approximately two months after the President signed the Tax Cuts and Jobs Act, the plaintiff States filed this action.  ECF No. 1.  They claim that because that law made the tax penalty for failing to purchase health insurance $0, the ACA's individual mandate is no longer constitutional under *NFIB*.  They further assert that the individual mandate is not severable from the rest of the ACA, and ask this Court to invalidate the Act "in whole."  Comp. ¶ 49.  In the alternative, they ask this Court to strike down the ACA's "guaranteed issue" and "community-rating" provisions.  Comp. ¶ 50.

## ARGUMENT

### I.   THE INTERVENOR STATES ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT UNDER RULE 24(A)(2)

A party is entitled to intervene as a matter of right if: (1) its motion is timely; (2) it has an interest "relating to the property or transaction which is the subject of the action;" (3) the outcome of the action may, "as a practical matter, impair or impede his ability to protect that

---

[6] For a list of efforts, see Congressional Research Service, "Legislative Actions in the 112[th], 113th, and 114th Congresses to Repeal, Defund, or Delay the Affordable Care Act," February 7, 2017, https://fas.org/sgp/crs/misc/R43289.pdf.

interest;" and (4) the existing parties cannot adequately represent that interest. *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Commission*, 834 F.3d 562, 565 (5th Cir. 2016). This test applies whether a party seeks to intervene as a plaintiff or a defendant. *See Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015).

Rule 24 is "liberally construed" in favor of intervention. *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014). "[D]oubts [are] resolved in favor of the proposed intervenor." *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 248 (5th Cir. 2009). Intervention as a matter of right "must be measured by a practical rather than a technical yardstick," and the inquiry is a "flexible one" focused on the "particular facts and circumstances" of each case. *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996) (en banc). "Federal courts should allow intervention where no one would be hurt and the greater justice could be obtained." *Texas*, 805 F.3d at 657; *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994) (same).

The Intervenor States satisfy all four requirements.

### A.   The Intervenor States' Motion Is Timely Because It Was Filed Six Weeks After this Action Was Initiated, Long Before Any Prejudice or Unusual Circumstances Could Arise

A court considers four factors when evaluating whether a motion to intervene is timely: (1) the length of time the applicants knew or should have known of their interest in the case; (2) prejudice to existing parties caused by the applicant's delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances. *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-66 (5th Cir. 1977). Each of these factors demonstrates that the Intervenor States' motion is timely under the circumstances of this case.

The first inquiry is contextual, as "absolute measures of timeliness should be ignored." *Espy*, 18 F.3d at 1205. The clock begins to run when the applicants knew or reasonably should have known of their interests, or from the time they became aware that their interests would no longer be protected by the existing parties to the lawsuit. *Edwards*, 78 F.3d at 1000; *Espy*, 18 F.3d at 1206. This motion was filed just six weeks after the plaintiff States filed their Complaint.

10

The Fifth Circuit has found motions to intervene to be timely even when filed at substantially later points in litigation.  *Wal-Mart*, 834 F.3d at 565-566 (intervention motion timely after denial of motion to dismiss, three months after answer was filed, and "before discovery progressed"); *John Doe No. 1 v. Glickman*, 256 F.3d 371, 377 (5th Cir. 2001) (application timely when filed one month after the applicant's stake materialized—when the applicant learned the central issue would not be decided in a stayed action, but in a related action filed eight months earlier); *Association of Professional Flight Attendants v. Gibbs*, 804 F.2d 318, 320-21 (5th Cir. 1986) (finding a five-month delay reasonable when all *Stallworth* factors considered).

Nor do any of the other *Stallworth* factors weigh against the Intervenor States.  Prejudice to the existing parties is measured by any delay in seeking intervention (of which there is none), not based on the inconvenience of permitting the intervenor to participate in the litigation.  *Espy*, 18 F.3d at 1206.  This action has not advanced to a stage where any existing party would be prejudiced.  Also, no unusual circumstances weigh against a finding of timeliness.

On the other hand, for the reasons described below, the Intervenor States would be gravely prejudiced if not permitted to intervene to advocate in favor of the constitutionality of the ACA and its vital impact on the public fisc of their respective states.  Courts should permit intervention "where no one would be hurt and the greater justice could be attained."  *Espy*, 18 F.3d at 1205.  The motion clearly satisfies Rule 24(a)(2)'s timeliness requirement.

### B.    The Intervenor States Have Direct, Substantial, and Legally Protectable Interests That May Be Impaired by this Litigation

The Intervenor States also satisfy Rule 24's requirement that intervenors must have a "'direct, substantial, legally protectable interest in the proceedings.'"  *Texas*, 805 F.3d at 657 (quoting *Edward*, 78 F3d. at 1004).  This requires a movant to show that it has a "stake in the matter" beyond a "generalized preference that the case come out a certain way."  *Id.*  Property or pecuniary interests are the "most elementary type[s] of right[s]" protected by Rule 24(a) and "are almost always adequate."  *Id.* at 658.  Rule 24(a) also safeguards less tangible interests, however, such as a right to vote.  *See League of United Latin American Citizens, District 19 v. City of*

11

*Boerne*, 659 F.3d 421, 434 (5th Cir. 2011); *see also City of Houston v. American Traffic Solutions, Inc.*, 668 F.3d 291, 294 (5th Cir. 2012) (finding sufficient the interests that the sponsors of a city charter amendment have in "cementing their electoral victory and defending the charter amendment itself.").

The Intervenor States meet this test. The plaintiff States ask this Court to invalidate the ACA "in whole." Compl. ¶ 49. The Intervenor States have a direct, pecuniary interest in ensuring that that does not happen, and the combined loss of more than $650 billion is a sufficiently adequate injury to establish that they have an interest in this litigation. *See, e.g.*, *Wal-Mart*, 834 F.3d at 568 ("[W]e have continued to hold that economic interests can justify intervention when they are directly related to the litigation."). The possibility that the numerous ACA funding streams could be lost demonstrates that the Intervenor States have a "concrete, personalized, and legally protectable interest" in this litigation. *Texas*, 805 F.3d at 658. Moreover, the Intervenor States have invested substantial time and energy towards altering their public health infrastructure to align with the ACA's requirements, and the loss of the ACA would destroy the foundation on which this new infrastructure was built, impede state-level legislative and administrative decision-making, and cause enormous disruption to health care insurers, providers, and consumers throughout the States.

> **1. A decision striking down the ACA would deprive the States of hundreds of billions of dollars**

A ruling declaring the ACA unconstitutional would immediately stop the flow of federal funding to the States, much to their detriment. Aaron Dec. ¶ 25, Appx. 015-016; Isasi Dec. ¶¶ 14, 18, Appx. 106-107, 109. The ACA directs hundreds of billions of dollars to the Intervenor States for a wide range of important programs, including:

- $592.1 billion to operate Marketplaces and expand their Medicaid programs. Aaron Dec. ¶¶ 25, 53, 60, 67, 74, 81, 88, 95, 102, 109, 116, 123, 130, 137, 144, 151, 158, Appx. 015-016, 027-028, 030, 031-032, 034, 036, 037-038, 039-040, 041-042, 043-044, 046, 048, 050, 052, 054, 056, 058; *see also* Boyle Dec. ¶ 6,

Appx. 077; Barnes Dec. ¶ 3, Appx. 060-062; Gobeille Dec. ¶ 3, Appx. 095; Kent Dec. ¶ 3, Appx. 113; Peterson Dec. ¶ 3, Appx. 132; Schlosberg Dec. ¶ 3, Appx. 142.

- $3.9 billion since 2010 to spend on programs funded by the Prevention and Public Health Fund ($650 million for fiscal year 2017). Aaron Dec. ¶ 34, Appx. 020; *see also* Peterson Dec. ¶ 3, Appx. 132; Lee Dec. ¶ 3, Appx. 120; Gobeille Dec. ¶ 3, Appx. 095; Barnes Dec. ¶ 3, Appx. 060-062; Schlosberg Dec. ¶ 3, Appx. 142; Zucker Dec. ¶ 4, Appx. 169-170.[7] Through the Prevention Fund, the Centers for Disease Control and Prevention (CDC) provided over $620 million in grants to States in fiscal year 2016 for preventive health goals including immunization, prevention of lead poisoning, and preventing infectious diseases. Aaron Dec. ¶¶ 35-37, Appx. 020-021; Zucker Dec. ¶ 9, Appx. 177-178 (New York has also used the Fund for prevention of tobacco use, to enhance water quality, and for rape crisis and sexual violence prevention).[8] The Fund has been critical in expanding and sustaining the capacity of state and local health departments to meet the needs of their communities, in particular through annual funding of the Preventive Health and Health Services Block Grant ($160 million a year) and Epidemiology and Laboratory Grants ($40 million a year). Aaron Dec. ¶ 37, Appx. 021. The two grants combined have put over $1.1 billion into communities in fiscal years 2010 through 2017. *Id.* In addition, the Fund helps provide funding for the Elder Justice Act—ACA provision that authorized efforts aimed at preventing, detecting, and treating elder abuse. 42 U.S.C. § 1397j-1.

---

[7] Created by the ACA, this Fund allocates $2 billion each year to "provide for expanded and sustained national investment in prevention and public health programs" that improve health and restrain healthcare costs. 42 U.S.C. § 300u-11(a), (b)(6).

[8] Department of Health & Human Services, Office of the Actuary, Centers for Medicare & Medicaid Services, "2016 Actuarial Report on the Financial Outlook for Medicaid," p. 65, https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ActuarialStudies/Downloads/MedicaidReport2016.pdf.

- Substantial funding for other optional Medicaid improvements, such as the Community First Choice Option, a program created by the ACA that has allowed some of the Intervenor States to provide better home and community-based attendant services for persons with disabilities.  42 U.S.C. §1396n(k); Aaron Dec. ¶ 26, Appx. 016; Zucker Dec. ¶ 4, Appx. 169-170.  In fiscal year 2015 alone, the federal government paid $617 million for care through the on-going Community First Choice program, and States paid $436 million.[9]

- $1.5 billion invested in the Maternal, Infant, and Early Childhood Home Visiting Grants to support state-level expansion of the Nurse-Family Partnership.  Aaron Dec. ¶ 38, Appx. 021; Lee Dec. ¶ 3, Appx. 120.  This program has had a dramatic impact on medical care, child welfare, special education, and criminal justice system involvement by the families served by the program, with a savings to government programs of 1.9 times the cost.  *Id.*

- $3.5 billion (New York) to the two States that chose to establish Basic Health Programs (BHPs)—New York and Minnesota.  Zucker Dec. ¶ 5, Appx. 170-172. Under the ACA, States can choose to operate these programs, which provide alternative health coverage options to certain low-income individuals.  *See* 42 U.S.C. § 18051.[10]

- The ACA expanded the Money Follows the Person program, 42 U.S.C. § 1396a, giving adults with disabilities more of their personal care.  Isasi Dec. ¶ 15, Appx. 107.  Through this program, States receive federal financial assistance to move elderly nursing home residents out of nursing homes and back into their own homes or into the homes of their loved ones.  *See* Sherman Dec. ¶ 4, Appx. 156;

---

[9] Centers for Disease Control and Prevention, "Accomplishing CDC's Mission with Investments from the Prevention & Public Health Fund, FY 2010-FY 2016," https://www.cdc.gov/funding/documents/CDC-PPHF-Funding-Impact.pdf.

[10] *See also* Medicaid.gov, *Basic Health Program*, https://www.medicaid. gov/basic-health-program/index.html (last visited May 17, 2017).

14

Gobeille Dec. ¶ 6, Appx. 096-097; Barnes Dec. ¶ 3, Appx. 060-062; Lee Dec. ¶ 5, Appx. 121; Peterson Dec. ¶ 5, Appx. 133; Schlosberg Dec. ¶ 6, Appx. 145-146; Zucker Dec. ¶ 4, Appx. 169-170.  This grant allowed Rhode Island, for example, to expand its program to assist individuals in managing their care outside of a nursing home, thus decreasing institutional care costs.  Sherman Dec. ¶ 4, Appx. 156.

### 2. A decision striking down the ACA would likely require increased State spending on healthcare for the uninsured

The Intervenor States also have a concrete and particularized interest in ensuring that their residents are not stripped of the high-quality, affordable health insurance guaranteed by the ACA.  The ability of individuals to obtain quality, affordable health insurance through the ACA has conferred meaningful and tangible benefits on the Intervenor States, over and above the benefits to their residents.  Both state and federal law require state-funded hospitals to provide emergency care, regardless of a patient's insurance status or ability to pay.  42 U.S.C. § 1395dd; *see also*, *e.g.*, Cal. Welf. & Inst. Code §§ 17000, 17600; N.Y. Public Health Law § 2807-k.  When the uninsured rate goes down, so too does state spending on healthcare—as demonstrated by the Intervenor States' experiences under the ACA.  Aaron Dec. ¶ 44, Appx. 024.  Eighty-four percent of individuals enrolled in the marketplaces receive subsidies that make purchase of health insurance affordable for them.  Isasi Dec. ¶ 6, Appx. 103.  If these individuals were to lose their subsidies because of the elimination of the ACA, many, if not most, would no longer be able to afford to purchase insurance on the individual market, and would subsequently again seek uncompensated care, driving up the States' costs.  Aaron Dec. ¶¶ 49, 53 (California), 56, 60 (Connecticut), 63, 67 (Delaware), 70, 74 (District of Columbia), 77, 81 (Hawaii), 84, 88 (Illinois), 91, 95 (Kentucky), 98, 102 (Massachusetts), 105, 109 (New Jersey), 112, 116 (New

York), 119, 123 (North Carolina), 126, 130 (Oregon), 133, 137 (Rhode Island), 140, 144 (Vermont), 147, 151 (Virginia), 154, 158 (Washington), Appx. 026-058.[11]

### 3. These interests are legally protectable under Rule 24

Thus, striking the ACA down would cause the Intervenor States to lose direct funding of billions of dollars, reduce the ability of more than 80 percent of consumers to purchase insurance in their marketplaces, undermine the public-health infrastructure that the States have established in reliance on the ACA's continuing operation, and saddle the States with increased uncompensated care costs. The Intervenor States thus have strong, legally protectable interests in this litigation; indeed, they have an actual legal entitlement to funds under the ACA. 42 U.S.C. § 1396d(y)(1) (federal share for Medicaid expansion); 42 U.S.C § 18051(d) (transfer of federal funds to States establishing Basic Health Programs); 42 U.S.C § 18051(d) (Prevention and Public Health Fund); 42 U.S.C. § 18204 (Pregnancy Assistance Fund). These interests are sufficient to meet Rule 24's requirements. *See Wal-Mart*, 834 F.3d at 568; *Espy,* 18 F.3d at 1207 (timber purchasers had a protectable property interest in existing timber contracts thus entitling them to intervene in a lawsuit by the Sierra Club against the U.S. Forest Service to curtail logging practices); *Cascade Natural Gas Corp. v. El Paso Natural Gas Co. et al*., 386 U.S. 129, 132-136 (1967) (error to deny California intervention to contest merger that would stifle competition for natural gas available to Californians); *United States House of Representatives v. Price*, 2017 U.S. App. LEXIS 14178, 2017 WL 3271445 at *7-8 (D.C. Cir. Aug, 1, 2017) (States had legally protectable interest in guaranteeing that residents have healthcare because it would decrease the "number of uninsured individuals form whom the States will have to provide healthcare"). And even without a legal entitlement, the Intervenor States should still be granted

---

[11] Loss of the ACA also threatens the financial security of the States' residents. Aaron Dec. ¶ 9. One study found consumer concerns "about the cost of health care dropped at a greater rate in two States that expanded Medicaid relative to one that did not." *Id*. Research shows that after the enactment of the ACA, the number of people having trouble paying medical bills dropped by 9.4 million people, while another study found that the amount of debt sent to collection was reduced by over $1,000 per person in areas where Medicaid was expanded compared to States that did not expand. *Id*.

intervention.  *See Texas*, 805 F.3d at 661 (allowing intervention where the parties lacked a legal entitlement to agency action, but had an interest in the "opportunity" for such action).  Here, like the intervenors in *Texas*, the Intervenor States, and their residents, are among the "intended beneficiaries of the [law] being challenged." *Texas*, 805 F.3d at 660-61.  Finally, the Supreme Court has recognized that States have a quasi-sovereign interest in the physical and economic well-being of their residents.  *See e.g.*, *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607-08 (1982), *Massachusetts v. E.P.A*, 549 U.S. 497, 519-20 (2007).  The Intervenor States have amply demonstrated the extensive harm to themselves and their residents that would flow from plaintiff States' successful prosecution of this lawsuit.

### C.    This Suit Will Impair the Intervenor States' Ability to Protect Their Interests in the Proper Functioning of the ACA

It is also beyond dispute that, if plaintiffs were to prevail, the outcome of this suit will "impair or impede" the Intervenor States' ability to protect the interests detailed above.  *Wal-Mart*, 834 F.3d at 565.  A decision eliminating the ACA "in whole" would abruptly cut off hundreds of billions in federal funds to the Intervenor States.[12]  It would devastate their insurance marketplaces and harm millions of their residents.  It would increase the number of people without insurance, which would force the States to expend funds when the uninsured seek care at state-run facilities.

The Intervenor States should not be forced to "wait on the sidelines" while a court decides issues "contrary to their interests." *Brumfield*, 749 F.3d at 344-45.  Rather, the "very purpose of intervention is to allow interested parties to air their views so that a court may consider them *before* making potentially adverse decisions."  *Id*. at 345 (emphasis added).  Indeed, the mere "'*stare decisis* effects of the district court's judgment'" sufficiently impairs the Intervenor States' interests to allow them to intervene now.  *Espy*, 18 F.3d at 1207; *see also Fund*

---

[12]    For example, under Illinois law, if the federal Medicaid matching rate falls below 90%, coverage for persons eligible through the Medicaid expansion will cease within three months.  Shannon Dec. ¶ 8; Declaration of Chris Maley (Maley Dec.) ¶ 5.

*for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (even if intervenors "could reverse an unfavorable ruling by bringing a separate lawsuit, there is no question that the task of reestablishing the status quo if [the plaintiffs] succeed … will be difficult and burdensome").

**D.      Neither the Plaintiff States nor the Federal Defendants Adequately Represent the Intervenor States' Interests**

Finally, no current party adequately represents the Intervenor States' interests. This requirement is "minimal," and is satisfied upon a showing that representation of the intervenors' interests "may be inadequate." *Edwards*, 78 F.3d at 1005 (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (quotation marks omitted)). In assessing this factor, the Fifth Circuit has "created two presumptions of adequate representation." *Id.* One presumption arises when an existing party is a "governmental body or officer charged by law" with representing the intervenors' interests. *Id.* The second arises when the "would-be intervenor has the same ultimate objective" as a party to the lawsuit. *Id.*

Neither presumption precludes the Intervenor States from participating in this lawsuit. First, the federal defendants are not "charged by law" with representing the interests of the States. *See Entergy Gulf States La., LLC v. EPA*, 817 F.3d 198, 203 (5th Cir. 2016) (holding that the EPA is not "a representative of the Sierra Club by law . . ."). Second, even assuming that the Intervenor States share the federal defendants' "ultimate objective," this presumption is overcome when a proposed intervenor demonstrates an "adversity of interest, collusion, or nonfeasance on the part of the existing party." *Id.*[13] "In order to show adversity of interest, an intervenor must demonstrate that its interests diverge from the putative representative's interests in a manner germane to the case." *Texas*, 805 F.3d at 662. This is not a high bar: intervenors need only show that "their interests may not align precisely" with one of the existing parties. *Brumfield*, 749 F.3d at 345. The Fifth Circuit has repeatedly held that "the lack of unity in *all* objectives, combined with real and legitimate additional or contrary arguments, is sufficient to

---

[13] The Fifth Circuit has left open the possibility that these are not the "only three circumstances that would make representation inadequate...". *Texas*, 805 F.3d at 662 n.5.

18

demonstrate that the representation *may* be inadequate." *Id.* at 346 (emphasis added); *see also Texas*, 805 F.3d at 663.

That is the case here.  The Intervenor States seek to protect hundreds of billions of dollars to which they are entitled under the ACA, and to make sure that their residents have access to high-quality healthcare.  Beyond that, the States have a strong interest in protecting their existing healthcare infrastructure and the orderly operation of their healthcare systems, which would be thrown into disarray if the ACA were ruled unconstitutional.  Aaron Dec. ¶¶ 42-45, Appx. 023-025.  The federal defendants, on the other hand, represent the "broad public interest," *Espy*, 18 F.3d at 1208, not the Intervenor States' state treasuries or budgets.  Nor do the defendants have an interest in the States' particularized decisions about how to operate their individual healthcare systems.  Indeed, as the source of the funding flowing to the Intervenor States, the federal defendants cannot represent the States' interest in receiving those funds.  And as the Fifth Circuit has already noted, the federal defendants' concerns include "'maintaining [their] working relationship with the [Plaintiffs] States, who often assist [them]'" in implementing various health care programs.  *Texas*, 805 F.3d at 663.  Even if the federal government's "more extensive interests will [not] *in fact* result in inadequate representation," they "surely … might, which is all that the rule requires."  *Brumfield*, 749 F.3d at 346 (emphasis in original); *see also Fund for Animals, Inc.*, 322 F.3d at 736 (allowing intervention due to distinct sovereign interests).  This "minimal" criterion is met.

Moreover, the Intervenor States' legal positions are "significantly different" from the federal defendants.  *Brumfield*, 749 F.3d at 346; *see also Texas*, 805 F.3d at 663 (adversity of interest shown when intervenor identifies ways in which its interests will "impact[] the litigation").  First, the federal government has an "institutional interest in shielding its actions from state intervention through the courts," while the Intervenor States do not.  *Texas*, 805 F.3d at 663.  Second, the plaintiff States argue that the individual mandate is not severable from the entire ACA, and ask this Court to strike the Act down "in whole."  Compl. ¶ 49.  In the alternative, they argue that the "guaranteed-issue and community-rating provisions are non-

19

severable from the mandate" and must therefore be invalidated.  Compl. ¶ 50.  As the Complaint

alleges, the federal government has already stated that it *agrees* with the latter point.  *Id.*  In

*NFIB*, the federal government conceded that if the individual mandate is found unconstitutional,

then the community-rating and guaranteed-issue provisions of the ACA could not stand, and it

has not subsequently repudiated this position.  *NFIB*, 567 U.S. at 558-59; *see also* Brief for

Respondents (Severability), Supreme Court docket no. 11-393 and 11-400, at 26 (filed January

27, 2012).  The Intervenor States, on other hand, disagree with that position and have a strong

interest in ensuring that these provisions are upheld because they enable the States' residents to

maintain insurance regardless of health status.

Because the Intervenor States have specified the "particular ways in which their interests

diverge" from the federal government's, they are entitled to intervene here.  *Texas*, 805 F.3d at

663.  Indeed, over the past four years, the Fifth Circuit has repeatedly held that parties were

entitled to intervene as a matter of right under materially indistinguishable circumstances.  For

example, in *Brumfield*, the Fifth Circuit held that parents whose children received school

vouchers under a Louisiana law were entitled to intervene as defendants in a lawsuit brought by

the federal government to stop the voucher program.  749 F.3d at 346.  Although the State of

Louisiana and the parents both "vigorously oppose[d] dismantling the voucher program," the

court concluded that the parents had overcome the "ultimate objective" presumption because the

State had more extensive interests to take into consideration, and because it had already made

legal concessions that the parents contested.  *Id.*  In *Texas*, the Fifth Circuit held that individuals

who would have been eligible for benefits under the challenged federal program were entitled to

intervene.  805 F.3d at 663.  The Court recognized that the federal government's interests were

broader than those of the individuals, including the government's "interests in securing an

expansive interpretation of executive authority, efficiently enforcing immigration law, and

maintaining its working relationship with the States, who often assist it in detaining immigrants"

like the intervenors.  *Id.*  In addition, the federal government took a legal position on the ability

of States to issue drivers' licenses to benefit recipients adverse to the intervenors.  *Id.*  Similarly,

in *Entergy Gulf States*, the Sierra Club demonstrated adversity of interest with the EPA by showing that it held different positions on case management, including whether to stay or bifurcate the case, and how to best protect confidential information and cooperate with the opposing party to identify such information.  817 F.3d at 204-205.  Finally, in *Wal-Mart*, a trade group representing liquor retailers demonstrated adversity of interest with the defendant regulatory commission because the intervenors intended to seek a declaratory judgment that the regulatory scheme was constitutional, while the commission merely sought to defend the action and would have "accept[ed] a procedural victory."  834 F.3d at 569.

These cases make clear that intervention is appropriate here.  In each case, the Fifth Circuit held intervention was required where (1) the defendant was a governmental entity; (2) the putative intervenor(s) sought to intervene as a defendant(s); and (3) the putative intervenor(s) rebutted the presumption of adequate representation and met the adversity of interest standard by showing divergent interests and legal arguments from the governmental entity defendants.

In sum, the different interests and positions of the Intervenor States and the federal defendants demonstrate the need for the Intervenor States' participation in this litigation.  These States have concrete economic, sovereign, and quasi-sovereign interests at stake that cannot be represented by the federal government and which are material to this litigation.  In addition, should plaintiff States prevail, the Intervenor States and their residents will suffer grave and direct economic consequences.  Finally, the goals and interests of the Intervenor States and the federal defendants do not match, even if they both seek to uphold the ACA—an assumption that is in no way certain.[14]  For these reasons, the Intervenor States seek to participate in the case as defendants, and respectfully request that the Court grant them intervention as a matter of right.

---

[14] Indeed, it is unclear whether the federal government shares the Intervenor States' objective of preserving the ACA.  The President, for example, has stated that he wants to dismantle the ACA "[p]iece by piece by piece."  *See* Rachel Wolfe, Read the Full Text of Trump's CPAC Speech, Vox (Feb. 23, 2018, 2:30 p.m.), https://www.vox.com/policy-and-politics/2018/2/23/17044760/transcript-trump-cpac-speech-snake-mccain.  That comment underscores the far-reaching actions that this administration has taken to undermine the ACA.

## II.   THE STATES SHOULD BE GRANTED PERMISSIVE INTERVENTION

Alternatively, the Intervenor States are entitled to permissive intervention under Federal Rule of Civil Procedure 24(b)(1)(B).  This rule authorizes permissive intervention on a timely motion, where the applicant "has a claim or defense that shares with the main action a common question of law or fact."  *Id*.  The proposed intervenor must demonstrate that: (1) the motion to intervene is timely; (2) an applicant's claim or defense has a question of law or fact in common with the existing action; and (3) intervention will not delay or prejudice adjudication of the existing parties' rights.  *Id*.; *see United States v. League of United Latin American Citizens*, 793 F.2d 636, 644 (5th Cir. 1986) ("Although the court erred in granting intervention as of right, it might have granted permissive intervention under Rule 24(b) because the intervenors raise common questions of law and fact.").

The Intervenor States easily satisfy these conditions.  The motion is timely, having been filed six weeks after the plaintiff States filed their Complaint.  The Intervenor States' defenses that the ACA remains constitutional and the plaintiff States fail to state a claim in their Complaint share multiple common questions of law with the "main action."  Finally, the States' intervention will assure that there is a robust defense of plaintiffs' claims, as already demonstrated by the declarations submitted by the Intervenor States in support of their motion to intervene.  At the same time, there will be no delay or prejudice to the adjudication of the existing parties' rights.  This action has not advanced to a stage where any existing party would be prejudiced by permitting the requested intervention due to delay or for any other reason. Where, as here, there is no prejudice at this early juncture of the litigation, intervention should be

---

President Trump has already signed two Executive Orders designed to weaken the ACA.  Exec. Order No. 13765, Minimizing the Economic Burden of the Patient Protection and Affordable Care Act Pending Repeal, 82 Fed. Reg. 8351 (Jan. 20, 2017); Exec. Order No. 13813, 82 C.F.R. 48385 (October 17, 2017).  The federal government has also previously refused to defend key components of the law in court.  *See* October 11, 2017, Office of the Attorney General Letter to the U.S. Department of Treasury and U.S. Department of Health & Human Services regarding *House v. Burwell*, 185 F.Supp.3d 165 (D.D.C 2016) (deciding that it would no longer defend the Executive Branch's authority to make "cost-sharing reduction" payments without further congressional appropriations) at https://www.hhs.gov/sites/default/files/csr-payment-memo.pdf.

permitted so that greater justice could be attained.  *Espy*, 18 F.3d at 1205.  By allowing Intervenor States to raise additional legal defenses in support of the ACA in order to protect their public fisc, as well as the physical and economic well-being of their citizens, the States will greatly contribute to the just resolution of the issues presented in this action.

## CONCLUSION

For the foregoing reasons, the Intervenor States respectfully urge this Court to grant their motion to intervene as of right, or alternatively for permissive intervention, allowing them to intervene in this lawsuit as defendants.

Dated:  April 9, 2018

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
NIMROD ELIAS
Deputy Attorney General

/s/ Neli N. Palma
NELI N. PALMA
Deputy Attorney General
California State Bar No. 203374
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA  94244-2550
Telephone: (916) 210-7522
Fax: (916) 322-8288
E-mail: Neli.Palma@doj.ca.gov

*Attorneys for Intervenor-Defendants*

GEORGE JEPSEN
Attorney General of Connecticut
JOSEPH R. RUBIN
Associate Attorney General
*Attorneys for Intervenor-Defendant the State of Connecticut*

23

MATTHEW P. DENN
Attorney General of Delaware
ILONA KIRSHON
Deputy State Solicitor
DAVID J. LYONS
Deputy Attorney General
*Attorneys for Intervenor-Defendant the*
*State of Delaware*

RUSSELL A. SUZUKI
Attorney General of Hawaii
HEIDI M. RIAN
Deputy Attorney General
ROBERT T. NAKATSUJI
Deputy Solicitor General
*Attorneys for Intervenor-Defendant the*
*State of Hawaii*

LISA MADIGAN
Attorney General of Illinois
DAVID F. BUYSSE
Deputy Chief, Public Interest Division
ANNA P. CRANE
Public Interest Counsel
MATTHEW V. CHIMIENTI
Assistant Attorney General, Special Litigation Bureau
*Attorneys for Intervenor-Defendant the*
*State of Illinois*

ANDY BESHEAR
Attorney General of Kentucky
LA TASHA BUCKNER
Executive Director, Office of Civil and
Environmental Law
S. TRAVIS MAYO
TAYLOR PAYNE
Assistant Attorneys General
*Attorneys for Intervenor-Defendant*
*the Commonwealth of Kentucky*

MAURA HEALEY
Attorney General of Massachusetts
STEPHEN P. VOGEL
Assistant Attorney General
*Attorneys for Intervenor-Defendant the*
*Commonwealth of Massachusetts*

24

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota
SCOTT IKEDA
Assistant Attorney General
*Attorneys for Intervenor-Defendant the State of
Minnesota by and through its Department of
Commerce*

GURBIR S. GREWAL
Attorney General of New Jersey
JEREMY M. FEIGENBAUM
Assistant Attorney General
ANGELA JUNEAU BEZER
Deputy Attorney General
*Attorneys for Intervenor-Defendant the
State of New Jersey*

ERIC T. SCHNEIDERMAN
Attorney General of New York
STEVEN C. WU
Deputy Solicitor General
LISA LANDAU
Bureau Chief, Health Care Bureau
ELIZABETH CHESLER
Assistant Attorney General, Health Care Bureau
*Attorneys for Intervenor-Defendant the
State of New York*

JOSHUA H. STEIN
Attorney General of North Carolina
SRIPRIYA NARASIMHAN
Deputy General Counsel
*Attorneys for Intervenor-Defendant the
State of North Carolina*

ELLEN F. ROSENBLUM
Attorney General of Oregon
HENRY KANTOR
Special Counsel to the Attorney General
SCOTT KAPLAN
Assistant Attorney General
*Attorneys for Intervenor-Defendant the
State of Oregon*

PETER KILMARTIN
Attorney General of Rhode Island
MICHAEL W. FIELD
Assistant Attorney General
MARIA R. LENZ
Special Assistant Attorney General
*Attorneys for Intervenor-Defendant the*
*State of Rhode Island*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
BENJAMIN D. BATTLES
Solicitor General
*Attorneys for Intervenor-Defendant the*
*State of Vermont*

MARK R. HERRING
Attorney General of Virginia
TOBY J. HEYTENS
Solicitor General
MATTHEW R. MCGUIRE
Deputy Solicitor General
*Attorneys for Intervenor-Defendant the*
*Commonwealth of Virginia*

ROBERT W. FERGUSON
Attorney General of Washington
JEFFREY G. RUPERT
Chief, Complex Litigation Division
JEFFREY T. SPRUNG
Assistant Attorney General
*Attorneys for Intervenor-Defendant the*
*State of Washington*

KARL A. RACINE
Attorney General for the District of Columbia
ROBYN R. BENDER
Deputy Attorney General
VALERIE M. NANNERY
Assistant Attorney General
*Attorneys for Intervenor-Defendant the*
*District of Columbia*

26

## CERTIFICATE OF CONFERENCE

I hereby certify that on April 6, 2018, my Supervising Deputy Attorney General,

Kathleen Boergers, conferred with Darren McCarty, counsel for the Plaintiff States, concerning

the Intervenor States' (1) Motion to Intervene, and (2) Motion for Leave to Appear without Local

Counsel.  During that conference, Mr. McCarty indicated that while he had no opposition to the

Motion for Leave to Appear without Local Counsel, he would oppose the Motion to

Intervene.  No conference was held with counsel for the Defendants to determine their position

as to the motions since they have not yet appeared.

Dated:  April 9, 2018                                Respectfully submitted,

XAVIER BECERRA
Attorney General of California
JULIE WENG-GUTIERREZ
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
NIMROD P. ELIAS
Deputy Attorney General


/s/ Neli N. Palma
NELI N. PALMA
Deputy Attorney General
California State Bar No. 203374
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA  94244-2550
Telephone: (916) 210-7522
Fax: (916) 322-8288
E-mail: Neli.Palma@doj.ca.gov

*Attorneys for Intervenors-Defendants*

27

***Certificate of Service***

On April 9, 2018, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

***s/Michelle Schoenhardt***
Michelle Schoenhardt