No. 4:18-cv-00167-O

# In the United States District Court
## FOR THE NORTHERN DISTRICT OF TEXAS

———————

TEXAS, WISCONSIN, ALABAMA, ARKANSAS, ARIZONA, FLORIDA, GEORGIA, INDIANA, KANSAS, LOUISIANA, PAUL LEPAGE, *Governor of Maine*, GOVERNOR PHIL BRYANT OF THE STATE OF MISSISSIPPI, MISSOURI, NEBRASKA, NORTH DAKOTA, SOUTH CAROLINA, TENNESSEE, UTAH, WEST VIRGINIA, NEILL HURLEY, *and* JOHN NANTZ,

PLAINTIFFS,

*v.*

UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ALEX AZAR, *in his Official Capacity as* SECRETARY OF HEALTH AND HUMAN SERVICES, UNITED STATES INTERNAL REVENUE SERVICE, *and* DAVID J. KAUTTER, *in his Official Capacity as Acting* COMMISSIONER OF INTERNAL REVENUE,

DEFENDANTS.

———————

## BRIEF OF PLAINTIFFS IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION

———————

[*Counsel listed on next page*]

No. 4:18-cv-00167-O

BRAD D. SCHIMEL
Wisconsin Attorney General

MISHA TSEYTLIN
Wisconsin Solicitor General

KEVIN M. LEROY
Wisconsin Deputy Solicitor General

State of Wisconsin
Department of Justice
17 West Main Street
P.O. Box 7857
Madison, Wisconsin 53707-7857
Tel: (608) 267-9323

*Attorneys for Wisconsin*

ROBERT HENNEKE
Texas Public Policy Foundation
901 Congress Avenue
Austin, Texas 78701
Tel: (512) 472-2700

*Attorney for Individual-Plaintiffs*

KEN PAXTON
Texas Attorney General

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney
General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

DARREN MCCARTY
Special Counsel for Civil Litigation
*Counsel of Record*

AUSTIN R. NIMOCKS
Special Counsel for Civil Litigation

DAVID J. HACKER
Special Counsel for Civil Litigation

Attorney General of Texas
P.O. Box 12548, Mail Code 001
Austin, Texas 78711-2548
Tel. 512-936-1414

*Attorneys for Texas*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

STATEMENT OF THE CASE................................................................ 3

    A. Legal Background.................................................................. 3

        1.  The Affordable Care Act and the Individual Mandate ........................... 3

        2.  *NFIB v. Sebelius*............................................................. 10

        3.  The Tax Cuts and Jobs Act of 2017 ...................................... 15

    B. Factual Background ............................................................ 16

        1.  The States.................................................................... 16

        2.  The Individual Plaintiffs................................................. 20

STANDARD FOR GRANTING APPLICATION ..................................... 21

ARGUMENT ...................................................................................... 21

  I.  The States Are Likely to Succeed on the Merits Because the Individual Mandate Exceeds Congress' Enumerated Powers........................................... 21

    A. *NFIB* Already Held That the Commerce Clause and the Necessary and Proper Clause Do Not Permit Congress to Mandate the Purchase of Health Insurance. ..................................................................... 21

    B. In Light of the Tax Cuts and Jobs Act of 2017, It Is No Longer "Fairly Possible" to Save the Mandate's Constitutionality Under Congress' Taxing Power. ........................................................................ 22

    C. The Unconstitutional Individual Mandate Is Inseverable From the Remainder of the ACA............................................................. 27

        1.  As the United States Conceded in *NFIB*, the Community-Rating and Guaranteed-Issue Provisions Are Inseverable. ........................... 30

        2.  As the *NFIB* Dissenting Justices Concluded, the Major Provisions of the ACA are Inseverable. ................................................ 35

        3.  As the *NFIB* Dissenting Justices Concluded, the ACA's Minor Provisions are Inseverable. ................................................ 39

  II. The States and Individual Plaintiffs Will Suffer Irreparable Harm Absent an Injunction............................................................... 40

    A. The Individual Mandate Irreparably Harms the Individual Plaintiffs and the States by Mandating That They Spend Unrecoverable Funds............................................................................... 41

B. The ACA's Inseverable Provisions Force the States to Spend Substantial Funds That Can Never Be Recovered. ................................... 43

C. The ACA Irreparably Harms the States By Preventing Them From Enforcing Their Own Laws and Policies...................................................... 44

D. The ACA Irreparably Harms the States by Forcing Them to Take Actions to Solve Problems Created by the ACA. ........................................ 47

III. The Balance of the Equities Favors Injunctive Relief.................................... 48

IV. A Preliminary Injunction Against the Entire ACA and Its Associated Regulations Is in the Public Interest. .............................................................. 49

CONCLUSION............................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Airlines, Inc. v. Brock,*
480 U.S. 678 (1987) ....................................................................*passim*

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
458 U.S. 592 (1982) ................................................................ 45

*ASARCO Inc. v. Kadish,*
490 U.S. 605 (1989) ................................................................ 42

*Awad v. Ziriax,*
670 F.3d 1111 (10th Cir. 2012) ............................................. 50

*Bowsher v. Synar,*
478 U.S. 714 (1986) ................................................................ 29

*California v. Trump,*
267 F. Supp. 3d 1119 (N.D. Cal. 2017) ................................. 44

*Canal Auth. of State of Fla. v. Callaway,*
489 F.2d 567 (5th Cir. 1974) ................................................. 41

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.,*
779 F.3d 258 (5th Cir. 2015) ................................................. 44

*Exec. Benefits Ins. Agency v. Arkison,*
134 S. Ct. 2165 (2014) ...................................................... 29, 30

*Fla. ex rel. Att'y. Gen. v. U.S. Dep't of Health & Human Servs.,*
648 F.3d 1235 (11th Cir. 2011) ............................................... 8

*Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Ed. & Welfare,*
601 F.2d 199 (5th Cir. 1979) ................................................. 21

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
561 U.S. 477 (2010) .......................................................... 27, 35

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,*
23 F.3d 1071 (6th Cir. 1994) ................................................. 50

*Gibbons v. Ogden,*
22 U.S. (9 Wheat) 1 (1824) ................................................... 21

*Glossip v. Gross,*
    135 S. Ct. 2726 (2015) ........................................................................... 21

*Hill v. Wallace,*
    259 U.S. 44 (1922) ......................................................................... 27, 30

*Ill. Dep't of Transp. v. Hinson,*
    122 F.3d 370 (7th Cir. 1997) ............................................................... 45

*Kimble v. Marvel Entm't LLC,*
    135 S. Ct. 2401 (2015) ........................................................................ 26

*King v. Burwell,*
    135 S. Ct. 2480 (2015) ............................................... 6, 10, 33, 34, 37

*In re Kollock,*
    165 U.S. 526 (1897) ............................................................................ 23

*Koog v. United States,*
    79 F.3d 452 (5th Cir. 1996) ................................................................ 29

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) .............................................................. 21

*Liberty Univ., Inc. v. Geithner,*
    671 F.3d 391 (4th Cir. 2011) .............................................................. 25

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................ 40

*Marks v. United States,*
    430 U.S. 188 (1977) .............................................................. 10, 22, 26

*Maryland v. King,*
    567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ............................. 45

*Med. Ctr. Pharmacy v. Mukasey,*
    536 F.3d 383 (5th Cir. 2008) ........................................................ 27, 28

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
    526 U.S. 172 (1999) ...................................................................... 28, 38

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983) ................................................................. 10, 22, 26

*Murphy v. Smith,*
    138 S. Ct. 784 (2018) ............................................................................ 41

*National Federation of Independent Business v. Sebelius,*
    567 U.S. 519 (2012) ........................................................................*passim*

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) (Rehnquist, J., in chambers)............................... 45

*New York v. United States,*
    505 U.S. 144 (1992) ........................................................ 28, 36, 48, 50

*Paulsson Geophysical Servs., Inc. v. Sigmar,*
    529 F.3d 303 (5th Cir. 2008) (per curiam)............................................ 41

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
    734 F.3d 406 (5th Cir. 2013) ................................................................. 45

*Sonzinsky v. United States,*
    300 U.S. 506 (1937) .................................................................... 22, 23, 24

*Tex. Office of Pub. Util. Counsel v. F.C.C.,*
    183 F.3d 393 (5th Cir. 1999) ................................................................. 45

*Texas v. United States,*
    201 F. Supp. 3d 810 (N.D. Tex. 2016)................................................... 45

*Texas v. United States,*
    787 F.3d 733 (5th Cir. 2015) ................................................................. 47

*Texas v. United States,*
    95 F. Supp. 3d 965 (N.D. Tex. 2015)..................................................... 45

*Texas v. United States,*
    No. 7:15-cv-00151-O (N.D. Tex.) ........................................................... 40

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ............................................................................... 41

*United States v. Jacobsen,*
    466 U.S. 109 (1984) .................................................................... 10, 22, 26

*United States v. Kahriger,*
    345 U.S. 22 (1953) ..................................................... 11, 23, 24, 25

*Valdez v. Cockrell,*
   274 F.3d 941 (5th Cir. 2001) ................................................................. 41

*Williams v. Std. Oil Co. of La.,*
   278 U.S. 235 (1929) ............................................................. 35, 37, 39, 40

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................. 21

*Wyoming ex rel. Crank v. United States,*
   539 F.3d 1236 (10th Cir. 2008) ........................................................... 45

*Zobel v. Williams,*
   457 U.S. 55 (1982) ......................................................................... 29, 30

**Constitutional Provisions, Statutes, and Rules**

U.S. Const. art. I
   § 8, cl. 1 ....................................................................... 11, 22, 23
   § 8, cl. 3 ............................................................................... 21

21 U.S.C. § 343 ...................................................................................... 39

26 U.S.C.
   § 30D .................................................................................. 23
   § 36B .................................................................................... 7
   § 1402(g) ............................................................................ 4, 5
   § 1501(b) ............................................................................. 42
   § 3102 ................................................................................. 22
   § 4191(a) .......................................................................... 8, 39
   § 4980H ................................................................................ 7
   § 4980I ............................................................................. 7, 36
   § 5000A(a) ........................................................... 4, 9, 15, 41
   § 5000A(b) ....................................................................... 4, 15
   § 5000A(c) ............................................................................. 4
   § 5000A(d) ................................................................... 4, 5, 25
   § 5000A(e) ........................................................... 5, 6, 25, 26
   § 5000A(f)(1)(A) ................................................. 5, 26, 42

42 U.S.C.
   § 300gg ................................................................................. 6
   § 300gg-1 .......................................................................... 6, 34
   § 300gg-4 .......................................................................... 6, 34
   § 300gg-11 ............................................................................ 6
   § 300gg-13 .......................................................................... 46

§ 1303 .................................................................................................. 29
§ 1315 ............................................................................................... 8, 39
§ 1395ww ................................................................................................ 8
§ 1396w ................................................................................................. 42
§ 1396 ..................................................................................................... 8
§ 1396a .......................................................................................... 7, 8, 42
§ 1396c ................................................................................................... 7
§ 1396u ................................................................................................... 8
§ 1397aa ............................................................................................... 42
§ 18021 ................................................................................................... 6
§ 18022 .......................................................................................... 6, 7, 8
§ 18091 ...................................................................................... 8, 26, 30
§ 18091(2)(I) ..........................................4, 5, 6, 9, 26, 30, 31, 32, 34, 37
§ 18091(2)(A) ......................................................................................... 5
§ 18091(2)(A) ....................................................................................... 26
§ 18091(2)(D) ..................................................................................... 3, 6
§ 18091(2)(E) ......................................................................................... 9
§ 18091(2)(F) ........................................................................... 4, 5, 9, 26
§ 18091(2)(H) ......................................................................................... 9
§ 18091(2)(J) ..................................................................................... 9, 31

2013 Wis. Act 20, § 1900n ..................................................................... 46

Health Care and Education Reconciliation Act of 2010,
    Pub. L. 111-152, 124 Stat. 1029 ..................................................... 3

Patient Protection and Affordable Care Act,
    Pub. L. 111-148, 124 Stat. 119-1045 ............................................... 3

Tax Cuts and Jobs Act of 2017,
    Pub. L. 115-97, § 11081, 131 Stat. 2054 ............................... 15, 23, 32

Wis. Stat.
    §§ 149.10-.53 (2011-2012) ........................................................ 45, 46
    § 149.14 ........................................................................................ 46
    § 632.76(2)(ac) .............................................................................. 46
    § 632.895 ...................................................................................... 46

Tex. Ins. Code
    §§ 1506.001-.305 .......................................................................... 45
    § 1506.155 .................................................................................... 46

## Other Authorities

79 Fed. Reg. 8544 (Feb. 12, 2014) ........................................................... 7

Act of May 21, 2013, 83d Leg., R.S., ch.615, 2013 Tex. Gen Laws 1640 .................. 46

Addressing Insurance Market Reform: Hearing Before the S. Comm.
    on Health, Education, Labor & Pensions, 111th Cong. 22 (2009)........................ 34

CBO, *An Analysis of Health Insurance Premiums Under the Patient
    Protection and Affordable Care Act*, at 6 (Nov. 30, 2009),
    *available at* https://tinyurl.com/ CBO2009Report........................................... 35, 42

CBO, *The Budget and Economic Outlook: 2018 to 2028* (April 2018),
    *available at* https://tinyurl.com/CBOEconOutlook2018-2028 ............................ 19

CBO, *Repealing the Individual Health Insurance Mandate: An
    Updated Estimate* (Nov. 8, 2017),
    *available at* https://tinyurl.com/CBO2017Report.......................... 15, 16, 24, 35, 42

CBO, *Key Issues in Analyzing Major Health Insurance Proposals* (Dec.
    2008),
    *available at* https://tinyurl.com/CBO2008Report......................................... 5, 6, 16

*Continuation of the Open Executive Session to Consider an Original
    Bill Providing for Health Care Reform of the S. Comm. on Finance*,
    111th Cong. 21-22 (Oct. 1, 2009)............................................................................. 34

H.B. 2539, 99th Gen. Assem., 2d R.S. (Mo. 2017) ...................................................... 47

H.B. 2539, 99th Gen. Assem., 2d Reg. Sess. (Mo. 2017),
    *available at* https://tinyurl.com/Mo-HB2539-2017................................................ 19

H.R. Rep. No. 115-466 ................................................................................................... 24

Health Care and Education Reconciliation Act (H.R. 4872, 111th
    Cong.) ......................................................................................................................... 3

Mo. Office of Admin., Summary, The Missouri Budget Fiscal Year 2018
    Summary, 1 (2018) (Governor's proposed budget),
    *available at* https://tinyurl.com/Mo-BudgetFY2018 ............................................. 47

Robert Pear, *Health Insurers Offer to Accept All Applicants, on
    Condition*, N.Y. Times, Nov. 19, 2008,
    *available at* http://www.nytimes.com/2008/11/20/us/20health.html ................... 34

Segal Consulting, *First Report—Observations and 2016
    Recommendations* (March 25, 2015),
    *available at* http://etf.wi.gov/boards/agenda-items-
    2015/gib0325/item4c1.pdf......................................................................................... 7

## INTRODUCTION

In *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) (hereinafter "*NFIB*"), a majority of the Supreme Court concluded that when Congress enacted the Affordable Care Act's ("ACA") central provision—the individual mandate—it sought to accomplish something unconstitutional: impose a legal requirement that most Americans buy health insurance of the particular type that the federal government dictates. *Id.* at 558-61 (Roberts, C.J.); *id.* at 657 (dissenting op.). Rather than declare this mandate unconstitutional, however, a different majority of the Court adopted a saving construction, interpreting the mandate as part-and-parcel of a tax penalty that applies to many individuals failing to comply with the mandate, even though the penalty did not apply to many individuals who are subject to the mandate (for example, those who cannot afford coverage and can be expected to comply with the mandate by signing up for Medicaid). This reinterpretation of the ACA to save the law's constitutionality was only possible because the judicially combined individual-mandate-and-tax-penalty had the "essential feature of any tax"—the raising of at least "some revenue"—and thus could be enacted constitutionally under Congress' taxing power. *Id.* at 563-64.

In 2017, however, Congress enacted the Tax Cuts and Jobs Act, which eliminates entirely the tax penalty that was the linchpin of the Supreme Court's saving construction in *NFIB*, but leaves the mandate in place. In other words, Congress has now left in the ACA *only* the standalone mandate that the Supreme Court has already held Congress cannot constitutionally adopt.

Given that Congress has eliminated the only constitutional basis upon which the ACA's central provision survived judicial review in *NFIB*, the States respectfully request that this Court preliminarily enjoin Defendants from enforcing the mandate itself, the community-rating and guaranteed-issue provisions that the United States in *NFIB* conceded were inseverable from the mandate, and, ultimately, the entire

ACA. The injunction against the mandate is appropriate because the States have a clear likelihood of success on the mandate's unconstitutionality, given the conclusion of the *NFIB* majority that Congress has no authority to require the purchase of health insurance. Extending the injunction to cover the community-rating and guaranteed-issue provisions follows directly from concessions that the United States made during the *NFIB* litigation, based upon explicit statutory text that the mandate is "essential" to those provisions' operations. And extending that injunction to the rest of the ACA is appropriate for precisely the same reasons offered by the four dissenting Justices in *NFIB*.

Beyond the likelihood of success on the merits, the States and individual plaintiffs will suffer numerous irreparable harms absent an injunction. Most directly, the individual mandate will irreparably harm the States and individual plaintiffs. Without an injunction, the individual plaintiffs will be forced to continue to purchase ever-more-expensive, ACA-compliant insurance to comply with the mandate, instead of purchasing insurance that they believe, in their judgment, fits their needs. And the States—even those that did not opt into the so-called Medicaid Expansion—will be forced to pay significantly more in Medicaid reimbursements because, as the Congressional Budget Office ("CBO") has repeatedly concluded, people will enroll in Medicaid simply to satisfy the individual mandate, without regard to whether there is a tax penalty. These are financial injuries, but they are irreparable because once the money is spent, it is forever lost, as there is no known avenue for recovery through the courts.

Having to comply with the remainder of the ACA causes further irreparable financial harm to the States because they must spend hundreds of millions of dollars to offer additional health-insurance benefits to their employees or else face debilitating tax penalties under the employer mandate, and must provide benefits to

hundreds of thousands of additional Medicaid enrollees. And leaving the ACA in place will prevent the States as sovereigns from enforcing their own regulations of the health care market—a quintessential irreparable harm. When the States had the ability to regulate, they allowed individuals to choose whether to buy health insurance, established high-risk insurance pools to help individuals in ill health, enabled cost-sharing, and instituted many other policies that the ACA now preempts or functionally displaces. Enjoining the ACA will allow the States once again to exercise their sovereign authority.

The equities and the public interest also strongly favor an injunction. Put simply, the United States has no legitimate interest in enforcing a provision of the ACA that a majority of the Supreme Court has already said is unconstitutional. And once that provision is enjoined, the remainder of the ACA must be enjoined along with it to prevent the collapse of the insurance market that Congress itself predicted.

## STATEMENT OF THE CASE

### A.   Legal Background

#### 1.   The Affordable Care Act and the Individual Mandate

In 2010, Congress sought to transform this Nation's healthcare system with the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119-1045, and the Health Care and Education Reconciliation Act of 2010, Pub. L. 111-152, 124 Stat. 1029. (Hereinafter, collectively, "the Affordable Care Act," "the ACA," or "the Act.") President Obama signed the Patient Protection and Affordable Care Act (H.R. 3590, 111th Cong.) into law on March 23, 2010, and the Health Care and Education Reconciliation Act (H.R. 4872, 111th Cong.) on March 30, 2010. Congress designed the ACA to achieve three express statutory goals: "near-universal [health-insurance] coverage," 42 U.S.C. § 18091(2)(D), "lower health insurance premiums," *id.*

§ 18091(2)(F), and the "creat[ion] [of] effective health insurance markets," *id.* § 18091(2)(I).

As relevant here, the ACA has three "closely interrelated" features, almost all located within Title I of the Act, *NFIB*, 567 U.S. at 691 (dissenting op.):

*The Individual Mandate and Tax-Penalty Applicable to Most of Those Who Do Not Comply With the Individual Mandate.* Subsection (a) of section 5000A imposes an individual mandate on most individuals, whom the Act calls "applicable individual[s]." 26 U.S.C. § 5000A(a). The statutory text provides: "An applicable individual shall . . . ensure that the individual . . . is covered under minimum essential coverage." *Id.* The statutory title of this subsection reiterates that it imposes a "requirement" on applicable individuals "to maintain minimum essential coverage." *Id.* (capitalization altered).

Subsection (b) imposes a tax penalty on many "applicable individual[s]" who fail to comply with the individual mandate. *Id.* § 5000A(b). Congress titled this tax penalty a "Shared [R]esponsibility [P]ayment," *id.* § 5000A(b), providing: "If a taxpayer who is an applicable individual . . . fails to meet the requirement of subsection (a) . . . then . . . there is hereby imposed on the taxpayer a penalty with respect to such failure[ ]." *Id.* § 5000A(b)(1).

Subsection (c) determines the tax penalty amount with a multi-step formula. *Id.* § 5000A(c). The penalty would increase gradually through 2016, reaching 2.5 percent of household income or $695 per year (up to a maximum of three times that amount) per family, whichever is greater. 26 U.S.C. § 5000A(c). After 2016, the tax penalty would increase annually based on a cost-of-living adjustment. *Id.*

Congress excluded three categories of people from the definition of "applicable individuals" and thus from the individual mandate entirely. *See id.* § 5000A(d)(2)-(4); *id.* § 1402(g)(1). Religious individuals who are "conscientiously opposed to acceptance

of the benefits of any private or public insurance," *id.* § 1402(g)(1); *see id.* § 5000A(d)(2)(A), and "member[s] of a health care sharing ministry," *id.* § 5000A(d)(2)(B). "[I]ndividual[s]" who are "not [ ] citizen[s] or national[s] of the United States or [ ] alien[s] lawfully present in the United States." *Id.* § 5000A(d)(3). And "individual[s]" who are "incarcerated." *Id.* § 5000A(d)(4).

Other numerous people who *are* subject to the mandate are nonetheless exempt from the tax penalty. *Id.* § 5000A(e)(1)-(5). Five classes of people fall into this category. First, "[i]ndividuals who cannot afford coverage." *Id.* § 5000A(e)(1). Second, "[t]axpayers with income below [the] [tax-return] filing threshold." *Id.* § 5000A(e)(2). Third, "member[s] of an Indian tribe." *Id.* § 5000A(e)(3). Fourth, those experiencing only "short coverage gaps" in health insurance. *Id.* § 5000A(e)(4). And fifth, those who receive a "hardship" exemption from "the Secretary of Health and Human Services." *Id.* § 5000A(e)(5). These individuals must obtain "minimum essential coverage" in order to "comply with [the] mandate, even in the absence of penalties." CBO, *Key Issues in Analyzing Major Health Insurance Proposals* 53 (Dec. 2008), *available at* https://tinyurl.com/CBO2008Report ("CBO 2008 Report").

Congress' policy basis for subjecting many individuals to the mandate, but not to the tax penalty, was sensible: for a large group of people—especially the poor—it would be inequitable to impose a tax penalty, but Congress still wanted to require them to sign up for ACA-compliant health insurance. A core purpose of the ACA was to prevent the emergency-room cost-shifting problem—where individuals without health insurance obtain uncompensated care via an emergency room, inevitably requiring medical providers to increase costs on those with insurance. *See* 42 U.S.C. § 18091(2)(A), (F), (I); *infra* at 26. So Congress (i) mandated that these individuals obtain coverage; (ii) offered them the means to satisfy the mandate through the Medicaid system, 26 U.S.C. § 5000A(f)(1)(A)(i)-(iii); *infra* at 25-26; but then (iii)

exempted them from the tax penalty if they nevertheless failed to comply with the mandate, § 5000A(e)(1). As the CBO found, "many individuals" who are subject to the mandate, but are not subject to the penalty, will obtain coverage because of the mandate "because they believe in abiding by the nation's laws." CBO 2008 Report at 53.

*Guaranteed Issue and Community Rating.* The ACA imposes voluminous regulations on health-insurance companies, with the most prominent being "guaranteed issue" and "community rating" requirements. 42 U.S.C. § 300gg to gg-4. Guaranteed-issue mandates that health-insurance companies "accept every employer and individual in the State that applies for [ ] coverage," regardless of preexisting conditions. *Id.* § 300gg-1. This prevents health-insurance insurance companies from completely denying coverage to individuals deemed too high-risk, *see NFIB*, 567 U.S. at 547-48 (Roberts, C.J.); *King v. Burwell*, 135 S. Ct. 2480, 2485-86 (2015), thus furthering the Act's goal of "near-universal coverage." 42 U.S.C. § 18091(2)(D). Community-rating prohibits health insurers from charging higher rates to individuals within a given geographic area on the basis of their age, sex, health status, or other factors. *See id.* § 300gg, 300gg-4(a)(1); *NFIB*, 567 U.S. at 547-48 (Roberts, C.J.). Together, these two provisions "are designed to make qualifying insurance available and affordable for persons with medical conditions that may require expensive care," *NFIB*, 567 U.S. at 685 (dissenting op.), furthering the Act's goal of "creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold," 42 U.S.C. § 18091(2)(I).

*Other Major Provisions.* The Act imposes numerous coverage requirements on all health-insurance plans, called "essential health benefits"; limits "cost-sharing" on all plans, *see* 42 U.S.C. §§ 18021-22; and eliminates coverage limits, *id.* § 300gg-11.

The "essential health benefits" "shall include" "ambulatory patient services, emergency services, hospitalization, maternity and newborn care, mental health and substance use disorder services," and numerous other costly services 42 U.S.C. § 18022(b)(1) (capitalization altered). "[T]he Secretary" has the statutory authority to "define [ ] essential health benefits" beyond those expressly listed. *Id*. § 18022(b)(1).

The Act contains an "employer mandate," which requires employers of 50 or more full-time employees to offer affordable health insurance if one employee qualifies for a subsidy to purchase health insurance on the ACA health-insurance exchanges. *See* 26 U.S.C. § 4980H. This necessarily includes municipalities and other smaller government employers. "Full time employees" are defined as those working "on average at least 30 hours [ ] per week." *Id*. § 4980H(c)(4)(B). An employer's failure to offer insurance results in a penalty of $2,000 per year per employee, *id*. § 4980H(a), (c)(1), while the failure to offer *affordable* insurance results in a penalty of $3,000 per year per employee, *id*. § 4980H(b); 79 Fed. Reg. 8544, 8544 (Feb. 12, 2014). Also related to employers, the Act levies a 40 percent excise tax on high-cost employer-sponsored health coverage, 26 U.S.C. § 4980I. Due to "medical inflation," "nearly every employer health plan" will eventually trigger the 40 percent excise tax unless the employer makes affirmative steps to modify plan offerings. Segal Consulting, *First Report—Observations and 2016 Recommendations*, at 61 (March 25, 2015), *available at* http://etf.wi.gov/boards/agenda-items-2015/gib0325/item4c1.pdf.

The Act authorizes refundable tax credits to individuals between 100% and 400% of the poverty line to make insurance purchased on the exchanges more affordable. *See* 26 U.S.C. § 36B.

The Act substantially expands Medicaid. Most significantly, as a condition for *all* Medicaid funding, 42 U.S.C. § 1396c, it requires States to cover all individuals under 65 earning income below 133 percent of the poverty line, *id.*

§ 1396a(a)(10)(A)(i)(VIII), and to provide a new, "[e]ssential health benefits" package, *id.* §§ 1396a(a)(k)(1), 1396u-7(b)(5), 18022(b). This is the so-called Medicaid Expansion. Apart from this, the ACA also altered Medicaid in two substantial ways. First it made two new populations eligible for the program: individuals under age 26 who were enrolled in federally-funded Medicaid when they aged out of foster care, 42 U.S.C. § 1396a(a)(10)(A)(i)(IX), and children ages 6 to 18 who were eligible for the Children's Health Insurance Program (CHIP) prior to the ACA, *id.* § 1396a(a)(10)(A)(i)(VII). Second, it restricted States to considering only one factor to determine eligibility for populations other than those who have a disability or who are elderly—Modified Adjusted Gross Income ("MAGI"), 42 U.S.C. § 1396a(e)(14)—thereby broadening the pool of persons who will meet Medicaid's income thresholds. In addition, the Act reduces federal reimbursement rates to hospitals. *See* 42 U.S.C. § 1395ww.

*Minor Provisions.* The Act contains a grab-bag of minor provisions. For example, it imposes a 2.3 percent tax on certain medical devices, 26 U.S.C. § 4191(a), and creates mechanisms for the Secretary to issue compliance waivers to States attempting to reduce costs through otherwise-prohibited means, 42 U.S.C. § 1315; *see generally NFIB*, 567 U.S. at 704-06 (dissenting op.) (describing other "[m]inor [p]rovisions"); *Fla. ex rel. Att'y. Gen. v. U.S. Dep't of Health & Human Servs.*, 648 F.3d 1235, 1249 (11th Cir. 2011), *aff'd in part, rev'd in part sub nom. NFIB*, 567 U.S. 519 (describing all titles of the ACA).

\*          \*          \*

According to Congress' own legislative findings, codified in the ACA, the individual mandate is critical to the functioning of the Act's major features. *See* 42 U.S.C. § 18091. These legislative findings identify the individual mandate itself—"[t]he *requirement*" to purchase health insurance, *id.* (emphasis added); *compare* 26

U.S.C. § 5000A(a) ("*Requirement* to maintain minimum essential coverage" (emphasis added))—making no mention of the separate tax penalty that attaches to some individuals' failure to comply with the mandate.

Central among these legislative findings is section 18091(2)(I), which explains that "if there were no requirement [to buy health insurance], many individuals would wait to purchase health insurance until they needed care," 42 U.S.C. § 18091(2)(I), since the guaranteed-issue and community-ratings provisions would guarantee those individuals coverage irrespective of their current medical status. So "[b]y significantly increasing health insurance coverage, the requirement [to buy health insurance], together with the other provisions of this Act, will minimize this adverse selection and broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums." *Id.* Thus "*[t]he requirement is essential* to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." *Id.* (emphases added).

Other legislative findings reinforce this point: "By significantly reducing the number of the uninsured, the requirement, together with the other provisions of th[e] [ACA], will significantly reduce [health care's] economic cost," *id.* § 18091(2)(E), "lower health insurance premiums," *id.* § 18091(2)(F), and "reduce administrative costs," *id.* § 18091(2)(J). "The *requirement* is *an essential part* of [the Government's] regulation of economic activity, and the absence of the requirement would undercut Federal regulation of the health insurance market." *Id.* § 18091(2)(H) (emphases added). "The *requirement* is *essential* to creating effective health insurance markets that do not require underwriting and eliminate its associated administrative costs." *Id.* § 18091(2)(J) (emphases added).

In sum, Congress specifically found in the statutory text that the provisions of the ACA's provisions are "closely intertwined," such that "the guaranteed issue and community rating requirements *would not work* without the coverage requirement [i.e., the individual mandate]." *King*, 135 S. Ct. at 2487 (emphasis added); *NFIB*, 567 U.S. at 547-48 (Roberts, C.J.). Upsetting the balance between these core provisions "would destabilize the individual insurance market" in the manner "Congress designed the Act to avoid." *King*, 135 S. Ct. at 2493.

### 2. *NFIB v. Sebelius*

In *NFIB*, 26 States—including 15 of the plaintiff-States here—challenged the constitutionality of the ACA. They argued: (1) that the individual mandate "exceeded Congress's powers under Article I of the Constitution," and (2) that, if the Court invalidated the mandate, it should enjoin the entire ACA because the mandate could not be severed from the rest of the Act. *NFIB*, 567 U.S. at 540-41.

A controlling majority of Justices—via the opinion of Chief Justice Roberts and the joint dissenting opinion of Justices Scalia, Kennedy, Thomas, and Alito—agreed with the States that the individual mandate exceeded Congress' power under the Commerce Clause. *Id.* at 558-561 (Roberts, C.J.) (also concluding that the Necessary and Proper Clause did not alter this conclusion); *id.* at 657 (dissenting op.); *see United States v. Jacobsen*, 466 U.S. 109, 115-17 & n.12 (1984) (binding Supreme Court precedent derived from combining two-Justice plurality and four-Justice dissent); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 17 (1983) (similar); *see generally Marks v. United States*, 430 U.S. 188, 193 (1977). Both the Chief Justice and the four-Justice dissent explained that, although the Court had construed the Commerce Clause to give Congress "broad authority" over both interstate and intrastate economic activity, its precedents "uniformly describe the power as reaching 'activity,'" *NFIB*, 567 U.S. at 548-49, 551 (Roberts, C.J.); *id.* at 653 (dissenting op.)

("The lesson of [the Court's] cases is that the Commerce Clause . . . is not *carte blanche* for doing whatever will help achieve the ends Congress seeks by the regulation of commerce."). "The individual mandate, however, does not regulate existing commercial activity," "instead" it "compels individuals to *become* active in commerce by purchasing a product." *Id.* at 552 (Roberts, C.J.); *id.* at 650 (dissenting op.) ("[the individual mandate] provides that (nearly) all citizens must buy an insurance contract"). Therefore, "[s]uch a law cannot be sustained under [the] clause authorizing Congress to 'regulate Commerce.'" *Id.* at 558 (Roberts, C.J.); *id.* at 652-53, 657 (dissenting op.) ("If Congress can reach out and command even those furthest removed from an interstate market to participate in the market, then the Commerce Clause becomes a font of unlimited power[.]").

A different majority of Justices—via the opinion of Chief Justice Roberts and the concurring opinion of Justices Ginsburg, Breyer, Sotomayor, and Kagan—held that it was "fairly possible," under the doctrine of constitutional avoidance, to read the individual mandate and the tax-penalty provisions as a unified tax, supported by Congress' tax power. *Id.* at 563 (Roberts, C.J.). This majority could only adopt this saving construction because the combined operation of section 5000A contained "the essential feature of any tax: It produces at least some revenue for the Government." *Id.* at 563-64 (citing *United States v. Kahriger*, 345 U.S. 22 (1953)); *see* U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power to lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States."). "Indeed, the payment" of the tax penalty was "expected to raise about $4 billion per year by 2017." *NFIB*, 567 U.S. at 564 (Roberts, C.J.). Under this tax interpretation, section 5000A is no longer "a legal command to buy insurance" backed by a threat of paying a penalty (a threat applicable to many, but not all, individuals subject to the mandate). *Id.* at 563. "Rather, it makes going without insurance just

another thing the Government taxes, like buying gasoline or earning income." *Id.* Individuals who forgo purchasing insurance now must simply "pay money into the Federal Treasury." *Id.* at 574. They are left "with a lawful choice to do or not do a certain act, so long as [they are] willing to pay a tax levied on that choice." *Id.*

The four dissenting Justices rejected the majority's saving construction as not a "fairly possible" reading of the text. These Justices explained that section 5000A is "a mandate that individuals maintain minimum essential coverage [that is] *enforced by a penalty*." *Id.* at 662 (dissenting op.) (emphasis added). It is "a mandate to which a penalty is attached," not "a simple tax." *Id.* at 665. The structure of section 5000A supported this reading: Section 5000A mandates that individuals buy insurance in subsection (a), and then in subsection (b) it imposes the penalty for failure to comply with subsection (a). *Id.* at 663. Section 5000A "exempts [some] people" from the mandate, but not the penalty—"those with religious objections," who "participate in a health care sharing ministry," and "those who are not lawfully present in the United States." *Id.* at 665 (citations and internal quotation marks omitted). "If [section] 5000A were [simply] a tax" and "no[t] [a] requirement" to obtain health insurance, exempting anyone from the mandate provision, but not the penalty provision, "would make no sense." *Id.*

Importantly, the Chief Justice *agreed* that the "most straightforward reading of" section 5000A "is that it commands individuals to purchase insurance." *Id.* at 562 (Roberts, C.J.). As the Chief Justice explained, the "most natural interpretation of the mandate" is that it is a "command," not a tax. *Id.* at 563. "Congress thought it could enact such a command under the Commerce Clause, and the Government primarily defended the law on that basis." *Id.* Thus, the Chief Justice's only disagreement with the four dissenting Justices was whether the saving construction was "fairly possible." *Id.*

Since only the four dissenting Justices concluded that the mandate in the original ACA was unconstitutional, only their joint dissenting opinion considered whether the mandate was severable from the remainder of the ACA. *Id.* at 691-707 (dissenting op.). In conducting their severability analysis, the four dissenting Justices considered the ACA in parts: first, its "major provisions"—"insurance regulations and taxes," "reductions in reimbursements to hospitals and other Medicare reductions," the "exchanges and their federal subsidies," and "the employer-responsibility assessment"—and, second, the Act's "minor provisions." *Id.* at 697. The dissenting Justices concluded that each were nonseverable under either or both prongs of the Supreme Court's "well established" severability test. *Id.* at 691-708. As for the major provisions, they could "impose enormous risks of unexpected burdens on patients, the health-care community, and the federal budget" without the individual mandate. *Id.* at 697-98. Accordingly, these provisions no longer operate in the manner Congress intended and would not have been passed independently. *See id.* at 699-704. As for the minor provisions, they either fail to "operate in the manner Congress intended," because they were designed to supplement the ACA's major provisions, or Congress would never have enacted them without the ACA's core, because they "are ancillary to [the ACA's] central provisions" or were "the *quid pro quo* for [a legislator's] support" of the entire Act. *Id.* at 705. Therefore, the four dissenting Justices concluded "that all other provisions of the Act must fall" with the mandate. *Id.* at 691-93.

While the five-Justice majority (the Chief Justice, joined by Justices Ginsburg, Breyer, Sotomayor, and Kagan) that upheld the mandate did not analyze the severability of that provision, they did analyze the severability of the ACA's forced Medicaid Expansion, which the Court declared unconstitutional. *Id.* at 529, 581 (Roberts, C.J.); *id.* at 689 (dissenting op.). As mentioned above, the ACA substantially expanded Medicaid by "requir[ing] States . . . to cover *all* individuals under the age

- 13 -

of 65 with incomes below 133 percent of the federal poverty line" and to offer an expanded "'[e]ssential health benefits package.'" *Supra* at 7-8; *NFIB*, 567 U.S. at 575-76 (Roberts, C.J.). The Act attempted to coerce the States' compliance by "threaten[ing] to withhold [ ] existing Medicaid funds" from those States "unwilling [ ] to sign up for the dramatic expansion" of Medicaid under the Act. *Id.* at 579-80. Seven Justices concluded that the Medicaid expansion "accomplishes a shift in kind [from the pre-ACA Medicaid], not merely degree." *Id.* at 583. Yet Congress' spending power "does not include surprising participating States with post-acceptance or retroactive conditions" in the manner that Congress "attempt[ed] to do with the Medicaid expansion." *Id.* at 584-85 (citations omitted). Therefore, imposing these conditions, on pain of losing all existing funding, unconstitutionally commandeered the States in violation of the Tenth Amendment. *See id.* at 581 ("[T]he financial 'inducement' Congress has chosen is much more than 'relatively mild encouragement'—it is a gun to the head."); *id.* at 689 (dissenting op.) ("[I]t is perfectly clear . . . that the offer of the Medicaid Expansion was one that Congress understood no State could refuse.").

This five-Justice majority concluded that the remedy for this Tenth Amendment violation was to sever the forced-Medicaid expansion provisions from the "existing Medicaid program" and the "other provisions of the Affordable Care Act." *Id.* at 585-88 (Roberts, C.J.). As for "the existing Medicaid program," the *majority's severability analysis depended wholly on the presence of a severability clause*. The Chief Justice concluded that's since "[t]he chapter of the United States Code that contains [the expansion] contains a severability clause," this "explicit textual instruction to leave unaffected [provisions]" intact "confirm[s] that [the Court] need go no further" in its severability analysis. *Id.* at 586. Justice Ginsburg, concurring on this point and writing for four Justices, agreed with the Chief Justice. *Id.* at 645-46

(Ginsburg, J., concurring in part, concurring in the judgment in part, and dissenting in part) (hereinafter "concurring op."). Justice Ginsburg wrote that "the Medicaid Act's severability clause determines the appropriate remedy," so there was no need to engage in any further severability analysis. *Id.* at 645-46. As for the remainder of the ACA, this five-Justice majority concluded that "Congress would have wanted to preserve the rest of the Act" without the Medicaid expansion. *Id.* at 587 (Roberts, C.J.). The other provisions of the ACA "will remain fully operative as law and will still function in a way consistent with Congress' basic objectives" without the forced-expansion provisions, thus those provisions are severable from the ACA. *Id.* at 587-88 (citations omitted).

### 3.      The Tax Cuts and Jobs Act of 2017

In December 2017, Congress enacted, and President Trump signed into law, the Tax Cuts and Jobs Act of 2017, which reduced the operative parts of section 5000A(c)'s tax penalty formula to "[z]ero percent" and "$0." Pub. L. 115-97, § 11081, 131 Stat. 2054, 2092 (2017). This change applies after December 31, 2018. *Id.* After the Tax Cuts and Jobs Act, section 5000A(a) still contains the individual mandate in subsection (a), requiring "[a]n applicable individual" to "ensure that the individual . . . is covered under minimum essential coverage," 26 U.S.C. § 5000A(a), but subsection (b)'s tax "penalty" for an individual who "fails to meet th[is] requirement" is now $0, meaning that it is repealed, *id.* § 5000A(b). The ACA also still contains the express legislative findings that the individual mandate— subsection (a)—is "essential" to the operation of the ACA, as those findings were untouched by the Tax Cuts and Jobs Act.

The CBO Report for the Tax Cuts and Jobs Act explains that the Act "eliminate[s]" the "individual mandate penalty . . . *but [not] the mandate itself.*" CBO, *Repealing the Individual Health Insurance Mandate: An Updated Estimate*, at 1

(Nov. 8, 2017), *available at* https://tinyurl.com/CBO2017Report ("CBO 2017 Report") (emphasis added). The CBO report adds that at least "a small number of people who enroll in insurance because of the mandate under current law would continue to do so [post elimination of the individual mandate's penalty] solely because of a willingness to comply with the law." *Id.* Before the passage of the ACA in 2009, the CBO had concluded that "[m]any individuals" who are subject to the mandate, but are not subject to the penalty, will obtain coverage "because they believe in abiding by the nation's laws." CBO 2008 Report at 53.

## B.   Factual Background

### 1.   The States

The States primarily interact with the health care system and the ACA in three capacities: as Medicaid participants, as sovereigns that have traditionally regulated their local health insurance markets, and as large employers that provide health insurance coverage to their employees.

*Medicaid Participants.* The individual mandate has caused the States' Medicaid rolls and costs to increase substantially. Many individuals have met and will continue to meet their individual mandate obligations by participating in Medicaid, CBO 2017 Report at 1. This costs the States money because "Medicaid is funded by both the state and federal governments," and "cost is determined by the caseload—the volume or number of individuals served . . .—and cost per client." App.027, ¶¶2-3 (Tex.). Apart from the individual mandate, the ACA increases costs because it requires Medicaid to cover two new groups of people, and requires the States to use MAGI when determining Medicaid eligibility, a measurement that does not permit states to consider an individual's assets or income of certain types. *See supra* at 7-8. Additionally, rising health care costs caused by the ACA result in higher costs to the States through Medicaid.

*Regulating Health Insurance Markets.*  By fundamentally changing the health care and health insurance markets across the country, the ACA substantially affects how the States can regulate health insurance markets. Before the ACA, the States, as the primary regulators of health care and health insurance, carefully crafted programs that responded to public needs and preferences. For example, multiple States created high-risk pools that "operated as an insurer of last resort for people when private insurers refused to issue coverage to them due to expensive anticipated medical costs." App.134, ¶13 (Neb.). These programs "effectively managed the health-insurance needs of high-risk individuals," App.074-075,  ¶10(a) (Wis.), while "keep[ing] high-cost individuals from driving up premiums for insurance purchasers of average or good health."  App.134, ¶13 (Neb.); *see* App.043-44 ¶¶13-14 (Tex.); App.140, ¶11 (N.D.). Similarly, States explicitly addressed issues such as cost-sharing for preventative services, the treatment of preexisting conditions, and the ability to rescind health insurance contracts for false statements as part of their comprehensive effort to make their health care insurance markets work for everyone. *See* App.074-75,  ¶10(b)-(d) (Wis.). And because their regulatory effort was comprehensive, their decisions *not* to regulate—such as their decision *not* to mandate that individuals purchase health insurance coverage—reflected carefully considered policy choices, not an abdication of responsibility.

The ACA preempted, or effectively displaced, most of these policy choices, and the States have been dealing with the consequences ever since. They have spent countless hours ensuring ACA compliance by, for example, creating programs to help individuals navigate the ACA, App.042-43, ¶¶10-12 (Tex.), providing direction to insurers, App.075-76, ¶11(b) (Wis.), and "reading and enforcing thousands of pages of federal regulations [and] guidance." App.133, ¶10(Neb.).

But, at this point, simply ensuring compliance with the ACA is the least of the States' regulatory worries. "Because of the ACA's burdensome regulations, many insurers . . . have left the individual market, scaled back their offerings in the individual market, or otherwise limited their exposure in the individual market." App.072-73, ¶7 (Wis.). "[A] major Wisconsin health insurer, Assurant Health, ceased its Wisconsin operations because of the ACA," costing Wisconsin 1,200 jobs. App.073, ¶8(a) (Wis.). United Health Care "withdrew from participation in the Arkansas exchange" "as a result of ACA costs." App.093, ¶6 (Ark.). And "[i]n 2017, two major carriers"—Aetna and Blue Cross and Blue Shield—"exited Nebraska's individual market," because of significant financial losses, leaving only one major carrier in a State that had 30 major carriers offering coverage in 2010. App.132, ¶¶6-7 (Neb.); *see also* App.139 ¶6 (N.D.); *see also* App.087-89 ¶4 (Ala.) (explaining lack of competition).[1] Even those States without significant carrier losses have had to deal with the fact that major carriers are threatening to leave if the market continues to get worse. App.041-42, ¶¶6-9 (Tex.).

This flight of insurance carriers is part of a vicious cycle of rising premiums and healthcare costs. *See* App.073 ¶8(b) (Wis.) (loss of carriers "contributes to the harms to the individual markets"). "Premiums have consistently risen since the ACA was enacted," with the average premium rates rising 17% in 2017 and 42% in 2018. App.072, ¶7(a) (Wis.); *see also* App.092-93, ¶5 (Ark.) ("The embedded mandates . . . have added to health insurer costs in this market putting upward premium pressure on insurers in the Arkansas market."). Indeed, the CBO's April 2018 "Budget and

---

[1] Nebraska's healthcare-insurance market suffered heavily when health insurance co-ops created by the ACA as an alternative to commercial insurance became insolvent and other health-insurance providers were required as a matter of state law to "step in with funds to pay the claims of the more than 80,000 Nebraskans insured" by the co-op. App.134-135, ¶14 (Neb.) (noting that ACA co-ops have "cost taxpayers more than $1.8 billion").

Economic Outlook: 2018 to 2028" estimates that, under current law, federal outlays for health insurance subsidies and related spending will rise by about 60% over the next ten years. CBO, *The Budget and Economic Outlook: 2018 to 2028* at 51 (April 2018), *available at* https://tinyurl.com/CBOEconOutlook2018-2028. It is no surprise, then, that the only major carrier remaining in Nebraska's individual market raised premiums 31 percent in plan year 2018 alone. App.132, ¶7 (Neb.).

The States are now attempting to do what they can to mitigate the effects of the ACA, re-stabilize the markets, and make health insurance affordable. "[T]he Wisconsin Legislature passed a reinsurance program in February 2018 to stabilize the individual market"—a program that is expected to cost $200 million split between state and federal funds to stabilize the individual market. App.072-73, ¶7 (Wis.). And in Missouri, a bipartisan committee voted to create the "Missouri Reinsurance Plan"—a plan that, if instituted, would help stabilize the individual insurance market. *See* H.B. 2539, 99th Gen. Assem., 2d Reg. Sess. (Mo. 2017), *available at* https://tinyurl.com/Mo-HB2539-2017. Other States may find it necessary to enact similar programs in the future if the markets continue to destabilize.

*Large Employers.* The ACA also affects the States as large employers subject to the ACA's employer mandate. *See supra* at 7. Not only have States had to keep up with rising healthcare costs generally, but they have had to increase their plans' benefits to ensure that they meet the requirements for "minimum essential coverage." This has caused the States to spend significant sums of money—totaling in the hundreds of millions of dollars—providing employees with new benefits, such as coverage of dependents up to age 26 and no cost-share coverage for certain preventative-care services. *See* App.012-13, ¶¶8-9 (Tex.); App.096, ¶4 (Kan.); App.126, ¶34 (Mo.); App.142-43, ¶¶4-5 (S.C.). They have also had to allow employees who work between 30 and 40 hours per week to purchase insurance, thereby

increasing the number of individuals that the States must cover, and therefore, the States' costs. *See* App.014-15, ¶13 (Tex.); App.123, 124 ¶¶23, 26 (Mo.); App.133, ¶9 (Neb.). Moreover, due to medical inflation, the States may be liable to pay the ACA's 40 percent excise tax if they cannot adjust or reduce their plan costs. *See* App.082, ¶7 (Wis.); *see supra* at 7 (explaining excise tax).

### 2.   The Individual Plaintiffs

The individual plaintiffs have been and will continue to be affected by the ACA because it compels them to purchase expensive ACA-compliant health insurance instead of cheaper insurance coverage that better fits their needs.

Since 2014, plaintiff John Nantz has purchased minimum essential health insurance through the exchange because he has been ineligible for health insurance coverage through an employer, Medicare, Medicaid, or CHIP. App.003, ¶¶5, 8, 10 (Nantz). Purchasing this ACA-compliant health insurance, however, has "greatly increased [his] health insurance costs" because he cannot "purchase reasonably-priced insurance coverage that is consumer-driven in accordance with [his] actuarial risk." App.004, ¶13 (Nantz). As long as the mandate remains in place, he will "continue to maintain minimum essential health insurance coverage" to comply with the individual mandate, "even though doing so is a burden." App.004, ¶15 (Nantz).

The same is true for plaintiff Neill Hurley. Because of the individual mandate, he purchases minimum essential health insurance coverage through the federal exchange (where his premiums have increased every year) instead of purchasing non-ACA compliant health insurance coverage that would allow him to "obtain[] care from [his] preferred health care providers" at significantly less cost. App.007-008, ¶¶7-15 (Hurley).

## STANDARD FOR GRANTING APPLICATION

A plaintiff seeking a preliminary injunction must make four showings: (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Glossip v. Gross*, 135 S. Ct. 2726, 2736-37 (2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Court may employ a "sliding scale" approach, issuing the injunction upon a lesser showing of harm when the likelihood of success on the merits is especially high. *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979); *see also Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

## ARGUMENT

### I. The States Are Likely to Succeed on the Merits Because the Individual Mandate Exceeds Congress' Enumerated Powers.

#### A. *NFIB* Already Held That the Commerce Clause and the Necessary and Proper Clause Do Not Permit Congress to Mandate the Purchase of Health Insurance.

The Commerce Clause grants to Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. "The language of the Constitution" and the Court's Commerce Clause jurisprudence "presupposes the existence of commercial activity to be regulated" as a necessary requirement for Congress to act under the Commerce Clause. *NFIB*, 567 U.S. at 550 (Roberts, C.J.); *see id.* at 649 (dissenting op.). "To go beyond [this limitation], and to say that the failure to [act] . . . affects commerce so that [activity] can be federally compelled, is to extend federal power to virtually everything." *Id.* at 657 (dissenting op.). Accordingly, Congress' "power to regulate" under the Commerce Clause "assumes there is already something to be regulated." *Id.* at 550 (Roberts, C.J.) (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 188 (1824)); *id.* at 649 (dissenting op.).

A controlling majority of the Supreme Court has already held that Congress cannot enact the individual mandate under its Commerce Clause authority. "[T]he individual mandate does not regulate existing commercial activity;" rather, it "compels individuals to *become* active in commerce by purchasing a product," *NFIB*, 567 U.S. at 552 (Roberts, C.J.); *id.* at 649 (dissenting op.); *see Jacobsen*, 466 U.S. at 115-18 & n.12; *Moses H. Cone*, 460 U.S. at 17; *see generally Marks*, 430 U.S. at 193. The mandate "forces individuals into commerce precisely because they elected to refrain from commercial activity," *NFIB*, 567 U.S. at 558 (Roberts, C.J.); *id.* at 657 (dissenting op.). "If [the individual mandate] 'regulates' anything, it is the *failure* to maintain minimum essential coverage," "[b]ut that failure—that abstention from commerce—is not 'Commerce.'" *Id.* at 649 (dissenting op.). Therefore, the "law cannot be sustained under a clause authorizing Congress to 'regulate Commerce.'" *Id.* at 558 (Roberts, C.J.); *id.* at 657 (dissenting op.). While "Congress thought it could enact such a command" under the Commerce Clause, "[t]he Federal Government does not have the power to *order* people to buy health insurance." *Id.* at 562, 575 (Roberts, C.J.) (emphasis added); *id.* at 657 (dissenting op.); *see also id.* at 558-61 (Roberts, C.J.) (also holding that the Necessary and Proper Clause does not support individual mandate).

**B.    In Light of the Tax Cuts and Jobs Act of 2017, It Is No Longer "Fairly Possible" to Save the Mandate's Constitutionality Under Congress' Taxing Power.**

The Tax Clause grants to Congress the power to "lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress can use this authority to achieve a variety of goals consistent with its view of the "common Defence and general Welfare of the United States," like collecting funds for government programs, *e.g.*, 26 U.S.C. § 3102 (social-security taxes), discouraging undesirable activity, *e.g.*, *Sonzinsky v.*

*United States*, 300 U.S. 506, 514 (1937), or incentivizing purchases, *e.g.*, 26 U.S.C. § 30D. But no matter Congress' goals, a statute is only valid under the Tax Clause if it is "productive of some revenue" for the Government. *Sonzinsky*, 300 U.S. at 514.

The "some revenue" requirement for any valid exercise of the tax power is well-established and, so far as the States can determine, has never been subject to any exceptions. This requirement follows directly from the Tax Clause's constitutional text, given that only revenue-generating taxes could be "*collect[ed],*" be used to "*pay the Debts,*" or "*provide* for the common Defence." U.S. Const. art. I, § 8, cl. 1 (emphases added). This requirement is also deeply grounded in the Supreme Court's tax-power jurisprudence. For example, in *In re Kollock,* 165 U.S. 526, 536 (1897), the Supreme Court upheld a tax on "oleomargarine"—although one aim of the tax was "to prevent deception in the sale" of that product—because "its primary object" (the Court "assumed") was "the raising of revenue." Similarly, in *Sozinsky*, the Court upheld a "special excise tax of $200 a year" on "every dealer in firearms"—although the tax was designed to "interpose[ ] an economic impediment" on some firearms dealings—because the tax "produc[ed] some revenue." 300 U.S. at 511-14. And in *United States v. Kahriger*, 345 U.S. 22, 28 & n.4 (1953), *overruled in part on other grounds by Marchetti v. United States*, 390 U.S. 39 (1968), the Court upheld a tax on "wagering," although "the revenue obtained [from the tax]" was arguably "negligible," because even a "negligible" collection "produces revenue."

After the Tax Cuts and Jobs Act of 2017, Pub. L. 115-97, section 5000A no longer raises "some revenue" for the Government, thus the Tax Clause loses all relevance to the constitutional analysis. The Tax Cuts and Jobs Act reduced the operative parts of section 5000A's tax-penalty formula to "Zero percent" and "$0," Pub. L. 115-97, § 11081, meaning "the amount of the individual responsibility payment[ ] enacted as part of the Affordable Care Act" (i.e., subsection (b) of section

5000A) is now "reduce[d]" to "zero," H.R. Rep. No. 115-466, at 324. Importantly, the Act "eliminated" only the "individual mandate penalty . . . *but [not] the mandate itself*." CBO 2017 Report at 1 (emphasis added). So after this 2017 change, section 5000A(a) still requires "[a]n applicable individual" to "ensure that the individual . . . is covered under minimum essential coverage," but section 5000A(b)'s "penalty" for an individual who "fails to meet th[is] requirement" is now $0. *See* CBO 2017 Report 1 (explaining that some individuals will purchase insurance because of the mandate, even absent a tax penalty). Since section 5000A now fails to raise at least "some revenue," this provision cannot be justified under Congress' authority under the Tax Clause. *See Sonzinsky*, 300 U.S. at 514; *Kahriger*, 345 U.S. at 28 & n.4.

The conclusion that section 5000A, post-Tax Cuts and Jobs Act, no longer finds support in the Tax Clause follows directly from the reasoning in *NFIB*. In *NFIB*, a majority of the Court (Chief Justice Roberts, along with Justices Ginsburg, Breyer, Sotomayor, and Kagan) read section 5000A's individual mandate and associated tax penalty as a single tax on "going without insurance" as a matter of constitutional avoidance, *id.* 567 U.S. at 562-63 (Roberts, C.J.), because a different majority had concluded that the straightforward reading of section 5000A (a mandate to buy insurance, backed up for some by a tax penalty) exceeded Congress' Commerce Clause authority, *see id.* at 548, 562 (Roberts, C.J.); *id.* at 657 (dissenting op.). The Tax Clause's "some revenue" requirement was "essential" to the majority's ability to give section 5000A the combined mandate-tax-penalty saving construction. The Court explained that its combined reading of section 5000A(a) and section 5000A(b) was "fairly possible," *id.* at 563 (Roberts, C.J.), only because the combination "yields the essential feature of any tax: It produces a least some revenue for the Government." *Id.* at 564 (citing *Kahriger*, 345 U.S. at 28 n.4). The tax-penalty provision of section 5000A(b) was, at the time of *NFIB*, "expected to raise about $4 billion per year by

2017" for the Government. *Id.* The Government endorsed the "some revenue" requirement, citing the requirement in its brief to the Court in *NFIB* in support of the saving construction. *See* Br. for Fed. Gov't on Minimum Coverage Provision 54, *NFIB*, 567 U.S. 519 ("In short, the [originally enacted] minimum coverage provision will plainly be 'productive of some revenue' and thus satisfies a key attribute of taxation.").[2]

While the Chief Justice accepted the saving construction because, in his view, it was a "fairly possible" one, he made clear that "the statute reads more naturally as a command to buy insurance than as a tax." *Id.* at 574-75 (Roberts, C.J.). "The most straightforward reading of the mandate is that it commands individuals to purchase insurance," not that it taxes those who choose to forgo insurance. *Id.* at 562. The four dissenting Justices agreed with this reading of section 5000A, only parting ways with the Chief Justice on the availability of the Court's saving construction. Those dissenting Justices concluded that section 5000A was "a mandate that individuals maintain minimum essential coverage" that was (prior to the Tax Cuts and Jobs Act) "enforced by a penalty" for most individuals. *Id.* at 662 (dissenting op.). "What the statute says . . . is entirely clear": it is a "command[ ]" that applicable individuals acquire health insurance, a "legal requirement," and an "assertion of regulatory power"—not "a simple tax." *Id.* at 663-65.

The dissenting Justices looked further to the statutory structure of section 5000A as confirmation of their reading. *Id.* Section 5000A imposes the mandate and the tax penalty in separate subsections and exempts different categories of people from each. *Compare* 26 U.S.C. § 5000A(d)(2)-(4), *with id.* § 5000A(e)(1)-(5). This

---

[2] Similarly, when Judge Wynn addressed the constitutionality of the individual mandate, he explained that the "some . . . revenue" requirement was one of three "essential[ ]" features that a tax must exhibit to be "constitutional." *Liberty Univ., Inc. v. Geithner*, 671 F.3d 391, 418 (4th Cir. 2011) (Wynn, J., concurring).

exemption framework is perfectly logical, given Congress' express objectives with the ACA, *see generally* 42 U.S.C. § 18091, as best seen from the law's treatment of those who "cannot afford coverage," 26 U.S.C. § 5000A(e)(1). Congress wanted those who "cannot afford coverage" to obtain health-insurance coverage in order to eliminate the strain on the medical system from their uncompensated emergency-room care, *see* 42 U.S.C. § 18091(2)(A), (F), (I), so it included these individuals in the mandate. Congress also provided a means for these individuals to comply with the mandate through Medicaid. 26 U.S.C. § 5000A(f)(1)(A)(ii). But since these individuals are, by definition, of less financial means, Congress exempted these individuals from the tax penalty for noncompliance with the mandate. *Id.* § 5000A(e)(1).

After the Tax Cuts and Jobs Act, the Chief Justice and the four dissenting Justices' "most straightforward reading" of section 5000A as a mandate to purchase insurance is the now the *only* available reading. *NFIB*, 567 U.S. at 562 (Roberts, C.J.); *id.* at 661 (dissenting op.); *see Jacobsen*, 466 U.S. at 115-18 & n.12; *Moses H. Cone*, 460 U.S. at 17; *see generally Marks*, 430 U.S. at 193. Section 5000A no longer raises "some revenue," meaning it now lacks the "essential feature of any tax," *NFIB*, 567 U.S. at 564 (Roberts, C.J.), and renders the alterative saving construction no longer "fairly possible," *id.* at 563 (Roberts, C.J.), or constitutionally permissible. *The only reading that remains available is its "most natural interpretation," in the Chief Justice's words: it is "a command to buy insurance," a command that "[t]he Federal Government does not have the power" to impose. Id.* at 563, 574-75 (Roberts, C.J.); *id.* at 657, 662 (dissenting op.); *see generally Kimble v. Marvel Entm't LLC*, 135 S. Ct. 2401, 2409 (2015) (amended statutory language controls over a prior judicial interpretation of the unamended language). Accordingly, the individual mandate is unconstitutional.

**C.     The Unconstitutional Individual Mandate Is Inseverable From the Remainder of the ACA.**

When a court declares a portion "of a more comprehensive statute" unconstitutional, "the question arises" whether the appropriate remedy is to enjoin only the unconstitutional portion, a larger portion of the statute, or the entire statute itself. *NFIB*, 567 U.S. at 691 (dissenting op.); *see Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684-85 (1987). The scope of a court's injunctive remedy depends upon whether the unconstitutional provisions are "severable" from provisions that are constitutional; if they are, then the Court will enjoin only the specific unconstitutional provisions. *See Alaska Airlines*, 480 U.S. at 684-85. If the unconstitutional provisions are inseverable, the Court will enjoin all inseverable provisions of the statute. *See id.*

Typically, the severability inquiry proceeds in two steps, both of which must be satisfied for a provision to be severable. *See id.* at 684-85; *NFIB*, 567 U.S. at 692-94 (dissenting op.); *see generally Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 401 (5th Cir. 2008).

Beginning with the first part, provisions are inseverable if they would not "function in a *manner* consistent with the intent of Congress" after the unconstitutional provision is enjoined. *Alaska Airlines*, 480 U.S. at 685; *Med. Ctr. Pharmacy*, 536 F.3d at 401. If the operation of the unconstitutional provision is "so interwoven with" the intended operation of the other provisions "that they cannot be separated," then "[n]one of [the provisions] can stand." *Hill v. Wallace*, 259 U.S. 44, 70 (1922). In other words, this inquiry asks whether the constitutional provisions (standing without the unconstitutional provisions) are "fully operative as a law," *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 509 (2010); *see Med. Ctr. Pharmacy*, 536 F.3d at 403-05, not whether they would simply "operate in some coherent way" not designed by Congress, *NFIB*, 567 U.S. at 692 (dissenting op.).

Provisions that clear the first part of the severability standard must then clear the second inquiry. Under this inquiry, provisions are inseverable if "the Legislature would not have enacted [them] . . . independently of" the provisions found unconstitutional, even if those provisions operated in some otherwise meaningful way. *Alaska Airlines*, 480 U.S. at 684; *NFIB*, 567 U.S. at 692-93 (dissenting op.). Courts look to whether the statute at issue "embodie[s] a single, coherent policy" or a "predominant purpose," and if the unconstitutional provisions were necessary to that purpose. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999); *see Med. Ctr. Pharmacy*, 536 F.3d at 403 ("Severing [a provision] would leave [ ] other considerable [provisions] intact, *and* they would continue to effect Congress's purpose." (emphasis added)). If so, then the other provisions—which would be "operati[onal]" under part one of the test, but would not by themselves further Congress' "predominant purpose" for the broader statute—would be inseverable. *See Mille Lacs Band*, 526 U.S. at 191. If the "purpose of the Act is [ ] defeated by the invalidation" of an unconstitutional provision, the Court "may [not] leave the remainder of the Act in force." *New York v. United States*, 505 U.S. 144, 187 (1992).

Given that both parts of the severability standard are "essentially an inquiry into legislative intent," *Mille Lacs Band*, 526 U.S. at 191, a textual instruction in the statute as to severability carries presumptive, or even dispositive, sway without need to resort to the full-blown, two-part inquiry. In *NFIB*, for example, after the seven-Justice majority held the forced Medicaid expansion provision unconstitutional, the Chief Justice concluded that the provision was severable from the existing Medicaid regime solely because that regime "includes a severability clause." 567 U.S. at 585-86 (Roberts, C.J.). This "explicit textual instruction" "confirm[ed]" that the Court "need go no further" on the question of whether "to leave unaffected" the remainder of the Medicaid program in light of its holding on the forced-expansion provision:

- 28 -

Congress already provided that all other provisions "'shall not be affected.'" *Id.* at 586 (quoting 42 U.S.C. § 1303). Justice Ginsburg—writing for four Justices—agreed with this severability-clause-only approach: "the Medicaid Act's severability clause determines the appropriate remedy," so there was no need to engage in any further severability analysis. *Id.* at 645-46 (concurring op.). This focus on textual indications of Congress' intent as to severability, *see, e.g.*, *Alaska Airlines*, 480 U.S. at 686 ("The [severability] inquiry is eased when Congress has explicitly provided for severance by including a severability clause in the statute."), or non-severability, *see, e.g.*, *Zobel v. Williams*, 457 U.S. 55, 65 (1982) ("we need not speculate as to the intent of the [ ] Legislature; the legislation expressly provides that invalidation of any portion of the statute renders the whole invalid"), appears in many Supreme Court decisions, *see Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173 (2014) ("the statutory text" may make "'evident' . . . that Congress would have preferred no statute at all" if the Court were to declare one part of the statute invalid); *Bowsher v. Synar*, 478 U.S. 714, 735 (1986) (the Court "need not enter" the severability-analysis "thicket" when "the language of the [statute] itself settles the issue"); *accord Koog v. United States*, 79 F.3d 452, 462 (5th Cir. 1996) ("Where Congress itself has provided the [severability] answer . . . [this answer] may be overcome only by 'strong evidence.'" (emphasis added)).

In the present case, because the ACA's individual mandate is unconstitutional, the question becomes what portions, if any, of the ACA can survive a severability analysis. Given the complexity of the ACA, it is useful to divide the law's remaining provisions into three tranches: (1) the community-rating and guaranteed-issue provisions, (2) the ACA's remaining major provisions, and (3) the ACA's minor provisions. *See generally NFIB*, 567 U.S. at 697-706 (dissenting op.). Each tranche is

inseverable from the unconstitutional individual mandate under either the explicit statutory text, the two-part severability inquiry, or both. *See id.*

      **1.**     **As the United States Conceded in *NFIB*, the Community-Rating and Guaranteed-Issue Provisions Are Inseverable.**

a. As the United States conceded in *NFIB*, "the guaranteed-issue and community-rating provisions of the Act are inseverable from the minimum-coverage provision[s]," Br. for Fed. Gov't on Severability 11, *NFIB v. Sebelius*, 567 U.S. 519, because of the specific findings that Congress inserted into the statutory text, and *which remain in the statutory text today*, *see* 42 U.S.C. § 18091(2). That point cannot be understated and is dispositive of the severability analysis. Although Congress removed the tax penalty in 2017, Congress retained the express, statutory findings that the individual mandate is central to the viability of the community-rating and guaranteed-issue provisions.

These findings make plain that Congress believed that the community-rating and guaranteed-issue provisions are "so interwoven" with the mandate "that they cannot be separated" or "stand" alone, *Hill*, 259 U.S. at 70, providing reason enough to declare those provisions inseverable based upon Congress' explicit statutory text, *see NFIB*, 567 U.S. at 586 (Roberts, C.J.); *id.* at 645-46 (concurring op.); *Exec. Benefits*, 134 S. Ct. at 2173; *Zobel*, 457 U.S. at 65.

The ACA's statutory text states that "[t]he requirement [to buy health insurance] is *essential* to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." 42 U.S.C. § 18091(2)(I) (emphasis added). As the United States conceded in *NFIB*, "the minimum coverage provision is necessary to make effective the Act's guaranteed-issue and community-rating insurance market reforms." Br. for Fed. Gov't on Severability 26. The Government explained that "Congress's findings expressly state that enforcement of [community

rating and guaranteed issue] without a minimum coverage provision would *restrict* the availability of health insurance and make it *less* affordable—the opposite of Congress's goals in enacting the Affordable Care Act." *Id.* at 44-45. This is so because, "in a market with guaranteed issue and community rating, but without a minimum coverage provision, 'many individuals would wait to purchase health insurance until they needed care.'" *Id.* at 45 (quoting 42 U.S.C. § 18091(2)(I)). This "adverse selection" problem would cause premiums to "go up, further impeding entry into the market by those currently without acute medical needs, risking a 'marketwide adverse-selection death spiral.'" *Id.* at 46; 42 U.S.C. § 18091(2)(J). This is why Congress "twice described" minimum coverage "as 'essential'" to "the guaranteed-issue and community-rating reforms" in the ACA's text. Br. for Fed. Gov't on Severability 46-47. In sum, "without a minimum coverage provision, the guaranteed-issue and community-rating provisions would drive up costs and reduce coverage, the opposite of Congress's goals." *Id.* at 26.

"Congress had firm empirical support for its conclusion that the minimum coverage provision is essential to make the guaranteed-issue and community-rating reforms effective." *Id.* at 47. Prior to the ACA, "a number of States had enacted guaranteed-issue and community-rating requirements without a minimum coverage provision." *Id.* Overall, "premiums increased and coverage decreased" in these States, the very adverse-selection problem the text of the ACA identifies. *Id.* at 48-50 (discussing experiences in Washington, Kentucky, New Hampshire, Maine, and Massachusetts). Indeed, Congress was gravely warned, prior to the ACA, that "'if [it] put' . . . guaranteed issue and community rating [on the insurance industry, it] 'must also mandate the individual to be insured or the market will blow up.'" *Id.* at 47 (citing Congressional Record).

Other findings in the ACA memorialize this exact warning. Guaranteed issue and community rating without the mandate would create an "adverse selection" problem where "many individuals [ ] wait to purchase health insurance until they need[ ] care," since insurance companies may no longer deny coverage to such individuals, or charge those individuals more than other covered individuals. 42 U.S.C. § 18091(2)(I). To correct for the increased costs imposed on the insurance companies from those individuals, insurance companies would either raise premiums on everyone or dilute the quality of their health-insurance plans. *See id.* To eliminate the need for that corrective action, the coverage requirement forces "healthy individuals" into the health insurance market, "broaden[ing] the health insurance risk pool" to create "effective health insurance . . . products." *Id.*

None of the foregoing conclusions change in light of the Tax Cuts and Jobs Act of 2017. The only change that the Tax Cuts and Jobs Act makes to the ACA is to reduce the individual mandate's associated tax-penalty formula to "[z]ero percent" and "$0." Pub. L. 115-97, § 11081. This change does not alter the structure of the ACA: After this single change, the individual mandate of section 5000A(a) still requires "[a]n applicable individual" to "ensure that the individual . . . is covered under minimum essential coverage." Moreover, all of the ACA's express statutory findings—including, notably, the finding that mandate to purchase insurance is "essential" to the Act's operation, 42 U.S.C. § 18091(2)(I)—also remain. Therefore, all of the considered severability concessions made by the United States during *NFIB*— that the individual mandate is inseverable from (at least) guaranteed-issue and community rating—retain their full force.

b. Even if this Court were to look beyond this statutory text to uncover congressional intent under the more open-ended two-part severability inquiry, the

guaranteed-issue and community-rating provisions would fail both parts of that analysis, providing two independent bases for finding inseverability.

As for the first part—whether those two provisions would not "function in a *manner* consistent with the intent of Congress" after the individual mandate is enjoined—Congress declared its intent with an inseverability clause included within the ACA. *Alaska Airlines*, 480 U.S. at 685-86. Further, there was ample empirical support from the experiences of many States that had enacted community rating and guaranteed issue, but not a mandate. *Infra* at 31. In those States, premiums rose and coverage became less accessible—the exact opposite of the intent of the Affordable Care Act. *Id.* Indeed, the Supreme Court has twice recognized Congress' design here: "[G]uaranteed-issue and community-rating reforms . . . sharply exacerbate" the problem of "healthy individuals" forgoing coverage "until they become sick"; "[t]he individual mandate was Congress's solution to th[is] problem[ ]." *NFIB*, 567 U.S. at 548 (Roberts, C.J.). "The[ ] three reforms" of the Affordable Care Act—community rating, guaranteed issue, and an individual mandate—are "closely intertwined," such that "the guaranteed issue and community rating requirements would not work without the coverage requirement." *King*, 135 S. Ct. at 2486-87. In sum, they are inseverable from the mandate.

The second part of the severability analysis renders the community-rating and guaranteed-issue provisions inseverable from the mandate as well. Congress' "design of the Act [was] to balance the costs and benefits affecting each set of regulated parties": "individuals, insurers, governments, hospitals, and employers." *NFIB*, 567 U.S. at 694-95 (dissenting op.). Yet "without a minimum coverage provision, the guaranteed-issue and community-rating provisions would drive up costs and reduce coverage, *the opposite of Congress's goals*." Br. for Fed. Gov't on Severability 26 (emphasis added); *compare Alaska Airlines*, 480 U.S. at 684; *NFIB*, 567 U.S. at 693

(dissenting op.). Put another way, enforcing the community-rating and guaranteed-issue provisions in the absence of the mandate would upset the balance Congress struck in the ACA, *id.* at 694-95 (dissenting op.), causing the very access and affordability problems that "Congress designed the Act to avoid," *King*, 135 S. Ct. at 2493. As the Supreme Court later explained in *King v. Burwell*, the "guaranteed issue and community rating requirements *would not work* without the coverage requirement [i.e., section 5000A]." *Id.* at 2487 (emphasis added). The mandate is a direct subsidy to insurance companies to "balance the costs" imposed by community rating and guaranteed issue, necessary because those latter provisions force these companies to cover all individuals, no matter their health status, without charging higher rates. *See* 42 U.S.C. § 300gg-1 to gg-4. Without the mandate, "individuals would wait to purchase health insurance until they needed care." *King*, 135 S. Ct. at 2486 (quoting 42 U.S.C. § 18091(2)(I)). This "adverse selection" problem, *id.*, would in turn "impose risks on insurance companies and their customers," *NFIB*, 567 U.S. at 698 (dissenting op.), requiring the raising of premiums to prohibitively expensive levels, 42 U.S.C.§ 18091(2)(I).[3] Indeed, around the time of the ACA's enactment, the CBO estimated that guaranteed issue and community rating, in isolation from the mandate, would raise premiums in the individual market by 27 to 30 percent. *See* CBO, *An Analysis of Health Insurance Premiums Under the Patient Protection and*

---

[3] Many insurance companies and industry groups conditioned their endorsement of the ACA on its inclusion of a mandate. *See, e.g.*, Addressing Insurance Market Reform: Hearing Before the S. Comm. on Health, Education, Labor & Pensions, 111th Cong. 22 (2009) (submission of Ronald A. Williams, Chairman & CEO, Aetna Inc.) ("[W]e at Aetna have been speaking out in support of an individual coverage requirement[.]"); Robert Pear, *Health Insurers Offer to Accept All Applicants, on Condition*, N.Y. Times, Nov. 19, 2008, at A3012, *available at* http://www.nytimes.com/2008/11/20/us/20health.html. And Congress could not have enacted the law without these groups' support. As one of the Act's main architects said: removing the mandate would "gut[ ] and kill[ ] health reform." *Continuation of the Open Executive Session to Consider an Original Bill Providing for Health Care Reform of the S. Comm. on Finance*, 111th Cong. 21-22 (Oct. 1, 2009) (statement of Sen. Baucus).

*Affordable Care Act*, at 6 (Nov. 30, 2009), *available at* https://tinyurl.com/ CBO2009Report ("CBO 2009 Report"). And in 2017, the CBO estimated that, "repealing the mandate and . . . making no other changes to current law," would result in premiums rising by 10 percent per year relative to "baseline projections." CBO 2017 Report at 1. Such an unmitigated spike in costs is directly contrary to the "manner" in which Congress designed the ACA to "function," meaning community rating and guaranteed issue cannot stand without the mandate. *Alaska Airlines*, 480 U.S. at 685; *compare Free Enter. Fund*, 561 U.S. at 509 (regulatory board could operate in manner Congress intended without unconstitutional tenure provision, since it retained all its powers); *Williams v. Std. Oil Co. of La.*, 278 U.S. 235, 243 (1929) ("division" could not operate in manner legislature intended since its sole duty of fixing gasoline prices was unconstitutional).

### 2. As the *NFIB* Dissenting Justices Concluded, the Major Provisions of the ACA are Inseverable.

As the dissenting Justices explained in *NFIB*, the major provisions of the ACA—beyond community rating and guaranteed issue—are inseverable under either or both prongs of the severability test. 567 U.S. at 691-703 (dissenting op.).[4] These major provisions are the "insurance regulations and taxes," "reductions in reimbursements to hospitals and other Medicare reductions," the "exchanges and their federal subsidies," and "the employer responsibility assessment." *See id* at 697. They are predominantly located in Title I, and failing to invalidate them would "impose significant risks and real uncertainties on insurance companies, their customers, all other major actors in the system, and," inevitably, "the government treasury"—all in "absolute conflict with the ACA's design of 'shared responsibility.'" *Id.* at 698-99.

---

[4] Only the four dissenting Justices had occasion to fully consider these severability questions, since only they would have struck down the mandate. *See supra* at 13.

*Insurance Regulations And Taxes.* The ACA's insurance regulations and taxes (beyond the mandate, community rating, and guaranteed issue) include the "essential health benefits" coverage requirements, the limits on "cost-sharing" on all plans, and the elimination of coverage limits. These regulations impose "higher costs for insurance companies" that could "dwarf the industry's current profit margin." *NFIB*, 567 U.S. at 698 (dissenting op.). Congress intended the individual mandate—along with the forced Medicaid expansion, invalidated in *NFIB*—to offset these increased costs. *See id.* Thus, without the mandate, maintaining these regulations and taxes "would impose significant risks and real uncertainties on insurance companies, their customers, all other major actors in the system, and the government treasury." *Id.* at 699. This "undermine[s] Congress' scheme of 'shared responsibility'" within the ACA. *Id.* (quoting 26 U.S.C. § 4980I); *compare Alaska Airlines*, 480 U.S. at 685; *New York*, 505 U.S. at 187.

*Reductions In Reimbursements To Hospitals And Other Reductions In Medicare Expenditures.* The ACA "reduces [Medicare and Medicaid] payments by the Federal Government to hospitals," because the mandate compels individuals to obtain coverage to "reduce uncompensated care, which will increase hospitals' revenues," which will then "offset" the "reductions" and "reimbursements." *NFIB*, 567 U.S. at 699 (dissenting op.) ("This is typical of the whole dynamic of the Act."). So "[i]nvalidating the key mechanisms for expanding insurance coverage . . . without invalidating the reductions in Medicare and Medicaid, distorts the ACA's design of 'shared responsibility.'" *Id.; compare Alaska Airlines*, 480 U.S. at 685.

*Health Insurance Exchanges and Their Federal Subsidies.* "The ACA requires each State to establish a health-insurance 'exchange'" where individuals may purchase individual health-insurance policies. *NFIB*, 567 U.S. at 701 (dissenting op.). The Act then "allocate[s] billions of federal dollars" to issue subsidies to purchase

plans on the exchanges, subsidies which are valued according to the cost of premiums on the exchanges. *Id.* Without the individual mandate, community rating, and guaranteed issue, neither the subsidies nor the exchanges will function as Congress intended. *Compare Alaska Airlines*, 480 U.S. at 685. Congress designed those provisions to keep the cost of premiums on the exchanges in check; without them, the Government would have to increase drastically the federal subsidies in lock step with the rising premiums. *NFIB*, 567 U.S. at 701 (dissenting op.). "The result would be an unintended boon to insurance companies, an unintended harm to the federal fisc, and a corresponding breakdown of the 'shared responsibility' between the industry and the federal budget that Congress intended." *Id.* at 702; *see King*, 35 S. Ct. at 2493-94 (describing interconnectedness of the exchanges with other ACA provisions). Indeed, if the exchanges and tax subsidies operated without community rating, the end result would be the federal government *paying* insurance companies to charge higher rates to individuals with preexisting conditions: the very practice Congress sought to end with the ACA. *See* § 18091(2)(I); *compare Alaska Airlines*, 480 U.S. at 685. As for the exchanges themselves, "[i]n the absence of federal subsidies to purchasers, insurance companies will have little incentive to sell insurance on the exchanges." *NFIB*, 567 U.S. at 702 (dissenting op.). Without participating insurance companies, operating the exchanges would be futile—a market with nothing for sale. *Compare Williams*, 278 U.S. at 238, 243; *Alaska Airlines*, 480 U.S. at 684.

 *Employer-Responsibility Provisions.* The Act requires employers "to make a payment to the Federal Government if they do not offer insurance to employees and if insurance is bought on an exchange by an employee who qualifies for the exchange's federal subsidies." *NFIB*, 567 U.S. at 703 (dissenting op.). Since the operation of the employer-responsibility provisions is keyed to whether an employee buys insurance "on an exchange" and "qualifies for the exchange's federal subsidies," if the Court

- 37 -

invalidates the subsidies and the exchanges, then no employee could purchase on the exchange or qualify for a subsidy, so "there [would be] nothing to trigger the employer-responsibility" provisions. *Id.*; *compare Alaska Airlines*, 480 U.S. at 684. Further, "the preservation of the employer-responsibility assessment" in the face of the above-described invalidations "would upset the ACA's design of 'shared responsibility,'" leaving "employers as the only parties bearing any significant responsibility." *NFIB*, 567 U.S. at 703 (dissenting op.). "That was not the congressional intent." *Id.*; *compare Alaska Airlines*, 480 U.S. at 685; *Mille Lacs Band*, 526 U.S. at 191.

*Medicaid Expansion.* Finally, the ACA substantially expanded Medicaid by "requir[ing] States . . . to cover *all* individuals under the age of 65 with incomes below 133 percent of the federal poverty line" and to offer an expanded "'[e]ssential health benefits' package." *NFIB*, 567 U.S. at 575-80 (Roberts, C.J.). While in *NFIB* a seven-Justice majority held the forced state-expansion unconstitutional, a five-Justice majority concluded that an optional state-expansion, without the danger of losing existing funds, was constitutional. *Id.* at 587-88. Nevertheless, this optional expansion is still inseverable from the individual mandate. The goal of the ACA is "'near-universal' health insurance coverage" via "'shared responsibility.'" *Id.* at 694, 696 (dissenting op.). "The whole design of the Act is to balance the costs and benefits affecting each set of regulated parties," not "to impose the inevitable costs on any one [group]." *Id.* at 694. Leaving *only* the optional Medicaid expansion operative, while all other major regulations fall, upsets this "shared responsibility." *Accord id.* at 704 (similar conclusion for employer-responsibility payment); *compare Alaska Airlines*, 480 U.S. at 685. Further, Congress designed this Medicaid expansion to "offset the cost to the insurance industry imposed by the ACA's insurance regulations and taxes." *NFIB*, 567 U.S. at 689-90 (dissenting op.). Because those regulations and taxes

are inseverable, *see supra* at 34-36, the corresponding Medicaid-expansion benefits should also be inseverable, because a contrary conclusion would not comport with Congress' intent to enact a regime that "balance[d] the costs and benefits." *NFIB*, 567 U.S. at 694 (dissenting op.); *compare Williams*, 278 U.S. at 238, 243; *Alaska Airlines*, 480 U.S. at 684.

> ### 3.      As the *NFIB* Dissenting Justices Concluded, the ACA's Minor Provisions are Inseverable.

Should the Court enjoin the major provisions (or enjoin just Title I) of the ACA, it should also declare inseverable all other minor provisions scattered throughout the ACA and enjoin them. *See NFIB*, 567 U.S. at 704-06 (dissenting op.). The Act's minor provisions include, for example, a tax on medical devices, 26 U.S.C. § 4191(a), a mechanism for the Secretary to issue compliance waivers to States, 42 U.S.C. § 1315, regulations on the display of nutritional content at restaurants, 21 U.S.C. § 343(q)(5)(H), and "a number of provisions that provide benefits to the State of a particular legislator"—which were "[o]ften . . . the price paid for [the legislator's] support of a major provision," *NFIB*, 567 U.S. at 704 (dissenting op.) ("The ACA is over 900 pages long."). Each of the Act's minor provisions fails at least one part of this standard.

The first part of the severability analysis—whether the provisions would "function in a *manner* consistent with the intent of Congress" absent the invalid provisions, *Alaska Airlines*, 480 U.S. at 685—renders inseverable all miscellaneous "tax increases," like the medical-device tax, *NFIB*, 567 U.S. at 705 (dissenting op.). Without the main provisions of the Act, "the tax increases no longer operate to offset costs, and they no longer serve the purpose in the Act's scheme of 'shared responsibility' that Congress intended." *Id*. This part also invalidates the Act's lingering administrative measures, like the provisions for States to obtain compliance waivers from the Secretary of HHS, *see* 42 U.S.C. § 1315, since these remaining

administrative provisions would serve no meaningful purpose. *Compare Williams*, 278 U.S. at 238, 243.

The second part of the standard—"whether Congress would have enacted the remaining provisions standing alone"—renders inseverable all other minor provisions, like the regulation of nutritional displays and the "provisions that provide benefits to the State of a particular legislature." *NFIB*, 567 U.S. at 693, 704 (dissenting op.). "There is no reason to believe that Congress would have enacted them independently," *id.* at 705, given that they are "mere adjuncts of the [main] provisions of the law," *Williams*, 278 U.S. at 243, and only (if at all) tangentially further the law's main purpose of near-universal affordable care.

## II.   The States and Individual Plaintiffs Will Suffer Irreparable Harm Absent an Injunction.[5]

Since the day it was enacted, the ACA has irreparably harmed the States and many individuals across the country: the individual mandate has caused many individuals either to purchase insurance they do not need or to enroll in programs for which the States bear a tremendous financial burden; States are spending millions of dollars as employers and as sovereigns to comply with the ACA's provisions; States are prevented from enforcing their own laws and policies despite being the traditional regulator of insurance markets; and multiple States have been compelled to exercise their sovereignty to ameliorate the problem of skyrocketing insurance costs.

These harms are significant but mostly lawful under *NFIB*[6]—at least until January 1, 2019. At that point, they are unlawfully borne, necessitating injunctive relief. Even if the ACA is considered the "status quo" in 2019, there is no "particular

---

[5] These irreparable harms also provide the States' standing to bring this suit. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

[6] Some of the plaintiff States have challenged various parts of the ACA on separate grounds. *See, e.g., Texas v. United States*, No. 7:15-cv-00151-O (N.D. Tex.).

magic in [that] phrase." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). Because "the currently existing status quo itself is causing . . . irreparable injury, it is necessary to alter the situation so as to prevent [that] injury." *Id.* And the sooner an order issues enjoining the ACA, the better, both so that all States and individuals can prepare to operate and live without the ACA and so that there is time for any party to obtain appellate review.

**A.    The Individual Mandate Irreparably Harms the Individual Plaintiffs and the States by Mandating That They Spend Unrecoverable Funds.**

It is well established that spending money to comply with a law constitutes irreparable harm when there is no established avenue through which that money can later be recovered. *See Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 312 (5th Cir. 2008) (per curiam) ("The absence of an available remedy by which the movant can later recover monetary damages may be sufficient to show irreparable injury." (cleaned up)); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring) ("[A] regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs."). Both the individual plaintiffs and the States face this irreparable harm if the individual mandate is not enjoined.

The individual plaintiffs will be forced to purchase—with no hope of later recovery—health insurance that they neither need nor want. This is because, even without an accompanying tax, the individual mandate is just that—a mandate. The statutory text provides: "An applicable individual *shall* . . . ensure that the individual . . . is covered under minimum essential coverage." 26 U.S.C. § 5000A(a) (emphasis added). And as the Supreme Court recently reiterated, "the word 'shall' usually creates a *mandate*, not a liberty," *Murphy v. Smith*, 138 S. Ct. 784, 787 (2018) (emphasis added); *see also Valdez v. Cockrell*, 274 F.3d 941, 950 (5th Cir. 2001) ("The

word 'shall' is mandatory in meaning."). That is why each of the individual plaintiffs has purchased health care insurance and will continue to do so until unless and until the individual mandate is enjoined, at which point they will switch to alternative, less expensive plans that do not provide "minimum essential coverage." *See* App.004, ¶¶13, 15 (Nantz); App.008, ¶¶13, 15 (Hurley).

The States, on the other hand, will have to pay substantial and unrecoverable amounts in Medicaid and CHIP reimbursements because the individual mandate forces people into these programs. As the CBO has twice explained, at least some people obtain health insurance solely out of a "willingness to comply with the law," whether or not they are threatened with a tax penalty for non-compliance.  CBO 2017 Report at 1; *see also* CBO 2009 Report at 6 ("many individuals" will comply with the mandate despite not being subject to a penalty). And the ACA specifically provides that enrolling in Medicaid—a program for which the States share coverage expenses for enrollees—complies with the mandate. ACA § 5000A(f)(1)(A)(ii). It necessarily follows that many individuals will do just what Congress expected and comply with the mandate by applying for and enrolling (if eligible) in either Medicaid or CHIP. *See generally* 42 U.S.C. §§ 1396-1396w (Medicaid); 42 U.S.C. § 1397aa (CHIP). That inevitability, which substantially increases the States' Medicaid and CHIP costs, is not a product of "unfettered choices made by independent actors," *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989), but is a necessary and intended consequence of the ACA, which requires covered individuals to secure health insurance, and leaves these programs as the *only* practical mechanisms for many poor individuals to comply with the mandate, *see* ACA § 1501(b); 26 U.S.C. § 5000A(f)(1)(A).

**B.    The ACA's Inseverable Provisions Force the States to Spend Substantial Funds That Can Never Be Recovered.[7]**

The ACA's inseverable provisions, if not enjoined, will only add to the irreparable financial harm that the individual mandate inflicts on the States.

For one, unless the "employer mandate" is enjoined, the States will continue to spend millions of dollars on expanded employee health-insurance coverage. Under the employer mandate, the States must offer their full-time employees (and qualified dependents) "minimum essential coverage under an eligible employer-sponsored plan," or else pay a substantial tax penalty. *See supra* at 7. The States have complied with this mandate and will continue to do so after January 1, 2019 to avoid the penalty—but at significant cost. Texas has already spent $473.2 million in fiscal years 2011 through 2017 to provide ACA-mandated health insurance benefits to its employees that it had not previously provided.  App.017, ¶19 (Tex.); *cf. id.* (noting that during this same time, Texas received only $241.9 million in off-setting benefits). Indeed, in fiscal year 2017 alone Texas paid $19.2 million to cover newly eligible dependent children and $27.2 million to provide new, no-cost-share coverage for certain preventative care services. *See* App.012-13, ¶¶8, 9 (Tex.). Missouri is in the same boat. Apart from the millions it has already spent, Missouri estimates that keeping its Consolidated Health Care Plan compliant with the ACA will cost "nearly $3 million" in 2019.  App.126, ¶34 (Mo.). And other states are no different. *See* App.143, ¶5 (S.C.) (net financial impact to South Carolina from providing expanded ACA coverage from 2011 through 2017 was $29.2 million); App.096, ¶4 (Kan.); App.147-51, ¶¶4-11 (S.D.);  App.080-83, ¶¶4-8 (Wis.). These costs—for these states and others—will continue to pile up, with no ability to recover them later.

---

[7] Harms caused by provisions inseverable from an unconstitutional provision are both directly relevant to the proper scope of the injunction under traditional equitable principles, and support a party's standing to bring the lawsuit. *See Alaska Airlines*, 480 U.S. at 683.

For another, unless the ACA's mandatory Medicaid provisions are enjoined, the States will spend millions of dollars providing Medicaid to individuals who would not be eligible for Medicaid but for the ACA. The requirement that States determine Medicaid eligibility using MAGI, 42 U.S.C. § 1396a(e)(14), alone imposes substantial costs by adding hundreds of thousands of individuals to the States' Medicaid rolls. *See* App.024, ¶7 (Tex.); App.033-038, ¶¶4-14 (Tex.); App.112-114, ¶¶8-15 (Mo.); App.102-106, ¶¶5-12, 15-16 (Miss.). The same is true—though to an admittedly lesser extent—with the ACA's command that the States open up Medicaid to individuals that were previously in foster care and to individuals that were previously in CHIP. *See, e.g.*, App.021, App.024, ¶¶2, 7 (Tex.).

And pulling back from these specific, inseverable provisions, it is critical that the States must spend significant time, effort, and money to ensure that they meet *all* of the ACA's vast and complex rules and regulations. *See* App.075-076, ¶11 (Wis.); App.133, ¶10 (Neb.); App.112-113, ¶¶7, 13 (Mo.); App.151-152, ¶¶12-14 (S.D.). This "increased regulatory burden" and the costs associated with meeting it are both irreparable injuries that will continue unless this Court enters an injunction. *See Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement." (citation omitted)); *California v. Trump*, 267 F. Supp. 3d 1119, 1133 (N.D. Cal. 2017) (holding that a State "incurring significant administrative costs" to respond to federal action suffers irreparable harm).

### C.   The ACA Irreparably Harms the States By Preventing Them From Enforcing Their Own Laws and Policies.

The ACA, both its core individual mandate and the rest of its inseverable provisions, irreparably harm the States as sovereigns because it prevents them from applying their own laws and policies governing their own health-care markets. It is well-established that "[S]tates have a sovereign interest in 'the power to create and

enforce a legal code.'" *Tex. Office of Pub. Util. Counsel v. F.C.C.*, 183 F.3d 393, 449 (5th Cir. 1999) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982)). Thus, whenever "a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)); *see also Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws").

That irreparable injury is no less real when a federal law—not a federal court— prevents a State from administering its own law and policy preferences. *See Ill. Dep't of Transp. v. Hinson*, 122 F.3d 370, 372 (7th Cir. 1997) (holding that a State has standing where it "complains that a federal regulation will preempt one of the state's laws"); *see also Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (holding that a State has standing to defend the efficacy of its expungement statute from threatened federal preemption). As this Court has held, federal law that "conflict[s] with [a States'] policies and practices," *Texas v. United States*, 201 F. Supp. 3d 810, 834-35 (N.D. Tex. 2016), is a quintessential irreparable harm. *See Texas v. United States*, 95 F. Supp. 3d 965, 981-82 (N.D. Tex. 2015) (finding irreparable injury where federal rule would require State of Texas to act contrary to State law).

The ACA's myriad requirements do just that. Both Wisconsin and Texas, among other States, for example, established and operated high-risk insurance pools that "effectively managed the health-insurance needs of high-risk individuals." App.074-075, ¶10 (Wis.) (citing Wis. Stat. §§ 149.10-.53 (2011-2012)); *see also* Tex. Ins. Code §§ 1506.001-.305. These pools explicitly addressed difficult and contentious

issues such as the treatment of preexisting conditions, *see* Tex. Ins. Code § 1506.155, and the appropriate scope of coverage, *see* Wis. Stat. § 149.14. But after the Supreme Court's decision in *NFIB v. Sebelius* holding the ACA lawful, both Texas and Wisconsin had to repeal their high-risk pool laws because they could no longer serve any functional purpose. *See* Act of May 21, 2013, 83d Leg., R.S., ch.615, 2013 Tex. Gen Laws 1640, 1640 (abolishing Texas Health Insurance Pool); Wis. Stat §§ 149.10-.53 (2011-2012), *repealed by* 2013 Wis. Act 20, § 1900n; App.074-075, ¶10 (Wis.); App.043-044, ¶¶13-14(Tex.). *See also* App.134, ¶13 (Neb.) (explaining Nebraska's high-risk pool). Without injunctive relief from this Court, the States are prevented from reinstating these high-risk pools and regulating the insurance market as they—and not the federal government—see fit.

The same is true for other laws that are still on the books and would immediately draw new breath with an injunction. Wisconsin, for instance, chose to permit cost-sharing for preventative services, *see* App.075, ¶10(b) (Wis.) (citing Wis. Stat. § 632.895)—but is now preempted from continuing this policy because the ACA limits "cost sharing," *see* 42 U.S.C. 300gg-13. Similarly, Wisconsin addressed the problem of insurance coverage for individuals with preexisting conditions by permitting insurers to apply preexisting condition exclusions only for a 12-month period. *See* App.075, ¶10(c) (Wis.) (citing Wis. Stat. § 632.76(2)(ac)). Once again, though, the ACA chose a different path that preempts Wisconsin from continuing its established policy to prevent runaway health insurance costs. Simply put, each State regulated the health insurance markets as it saw fit before the ACA, and many of those laws will spring back into action as soon as the ACA is enjoined. *See* App.133, ¶11 (Neb.) ("[T]he ACA harms Nebraska because it has preempted Nebraska law, preventing Nebraska from regulating health insurance in the manner it sees fit."); App.093, ¶7 (Ark.) (similar); App.139, ¶9 (N.D.); App.087-089, ¶4 (Ala.).

**D.     The ACA Irreparably Harms the States by Forcing Them to Take Actions to Solve Problems Created by the ACA.**

Multiple States are being forced to take actions to fix problems, including market instability and rising health care costs, that are directly caused by the ACA. Wisconsin was recently compelled to enact a reinsurance program estimated to cost $200 million (split between state and federal funds) because the ACA's regulations of the individual market have caused health-insurance premiums to rise substantially. App.072-073, ¶7 (Wis.) ("In 2017, average premium rates rose 17%, and in 2018 they increased by 42%."). "Without Wisconsin's intervention, plans in the individual market would either not be offered, or would be prohibitively expensive." App.073, ¶7 (Wis.). Missouri is on its way to doing something very similar. A bipartisan committee there voted unanimously to create the "Missouri Reinsurance Plan" that would also help stabilize the markets and lower insurance costs, H.B. 2539, 99th Gen. Assem., 2d R.S. (Mo. 2017)—an urgently needed step considering that the State appears likely to have to make more than $572 million in cuts across its budget due to faster-than-projected growth in health-care expenditures that are at least partially attributable to the ACA, Mo. Office of Admin., Summary, The Missouri Budget Fiscal Year 2018 Summary, 1 (2018) (Governor's proposed budget), *available at* https://tinyurl.com/Mo-BudgetFY2018.

Of course, the ACA did not mandate that States ameliorate the ACA's adverse effects. But the Fifth Circuit has held that a "forced choice between incurring costs" and changing the law is "itself an injury." *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015). And that is exactly what is happening here. The States are "being pressured," *id.*, to stave off runaway healthcare costs, *see* App.072-074, ¶¶7-8 (Wis.), counter the threat of major insurance companies leaving the market, *see*, *e.g.*, App.042, ¶¶9 (Tex.) (noting increase in insurer threats to leave the market), and otherwise minimize the ACA's harmful effects. The States may do nothing and bear

the full budgetary brunt of ACA, or they may enact new laws at substantial cost that they would not enact but for effects of the ACA, *cf. New York*, 505 U.S. at 188. Either way, they are irreparably harmed by the ACA.

## III.     The Balance of the Equities Favors Injunctive Relief.

The core of this case is the individual mandate, and there should be no question that the equities of enjoining that provision overwhelmingly favor plaintiffs. The United States has no cognizable interest in enforcing a provision that a majority of the Supreme Court has already found unconstitutional absent a saving construction that is no longer available as of January 1, 2019. The plaintiffs, on the other hand, have a significant interest in enjoining the individual mandate. Every day that the mandate stays in place despite its unconstitutionality is a day that individuals are forced to carry insurance against their will, that the States are prevented from regulating in a way that affords individuals' choice, and that the States lose money due to increased Medicaid enrollment. *See supra* at 41-42.

Enjoining only the individual mandate—while permitting the rest of the ACA to operate until final judgment—would be inconsistent with Congress' intent because Congress made clear through its findings, enshrined in the United States Code and preserved in the 2017 amendments, that it did not intend for the ACA's other provisions—including the community-rating and guaranteed-issue provision as well as the Act's other major and minor provisions—to survive independent of the individual mandate. *See supra* at 27-40. Because the ACA is not designed to operate without the individual mandate, the United States has no equitable interest in keeping these provisions in place during the pendency of this litigation, once the individual mandate is enjoined. Indeed, keeping these provisions in place for the time it would take to conclude this litigation is sure to do more harm than good because, without healthy individuals being compelled to buy insurance to offset the costs

associated with the guaranteed-issue, community-rating, and other provisions, the ACA will "drive up costs and reduce coverage," Br. for Fed. Gov't on Severability 26—causing even further financial harm to the States as sovereigns and employers. Put another way, if this Court agrees with the States that some or all of the other provisions of the ACA is inseverable from the mandate, no public good could possibly come from leaving those provisions in place during the pendency of this litigation.

The balance of the equities favors an injunction that is issued promptly, even though the injunction cannot be effective until January 1, 2019. An injunction, for example, issued on December 31, 2018 will be far less effective than an injunction issued promptly after briefing is complete, both because individuals will make insurance decisions during fall open-enrollment periods and because the States cannot turn their employee insurance plans and Medicaid operations on a dime. *See* App.126, ¶33 (Mo.) ("Missouri Consolidated Health Care Plan is currently structuring the benefits and policies for the 2019 plan year and bases its activities on knowledge of whether the ACA is still federal law."); App.096, ¶6 (Kan.) (stating that the State "is currently in its design stage for the 2019 Plan year"). Nor can they begin to work in earnest on retaking their role as the chief regulator of their local insurance markets until they are reasonably sure that they will prevail on the merits of their claim. And the same is true for those States that wish to remain under the ACA—to the extent they would assert that they are harmed by an order enjoining the ACA, they should be afforded sufficient time to prepare for that eventuality. Time to prepare is key, necessitating an injunction sooner rather than later.

## IV.   A Preliminary Injunction Against the Entire ACA and Its Associated Regulations Is in the Public Interest.

Just as the States have a strong interest in enjoining the ACA's individual mandate, so too does the public. Courts have held that "it is always in the public

interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). And, "[a]s Alexander Hamilton put it, 'the Constitution is itself, in every rational sense, and to every useful purpose, A BILL OF RIGHTS.'" *NFIB*, 567 U.S. at 535 (Roberts, C.J.) (quoting The Federalist No. 84, at 515 (C. Rossiter ed., 1961)). So Congress' mandate that every American— with few exceptions—purchase health insurance is not some amorphous violation of a powers provision, but rather is a violation of the public's right not to have the federal government exceed the powers delegated to it by the People. It is *always* in the public interest to prevent this violation.

And, once again, the United States' own admissions and Congress' own findings that the ACA will not function without the individual mandate conclusively demonstrate that enjoining the entire Act is in the public interest. *See supra* at 27-40. If that were not sufficient—and it is—failing to enjoin the entire ACA would also harm the public interest because it would prevent the States from exercising (or deciding not to exercise) their sovereignty in an area that they traditionally regulate. As Chief Justice Roberts articulated in *NFIB*, this is not merely a harm to the States because "State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *NFIB*, 567 U.S. at 536 (quoting *New York*, 505 U.S. at 181). Enjoining the ACA effective January 1, 2019, will prevent unlawful federal regulation of healthcare markets and re-establish state sovereignty.

## CONCLUSION

The Court should issue a preliminary injunction, enjoining Defendants from enforcing the Affordable Care Act and its associated regulations.

Dated, April 26, 2018

BRAD D. SCHIMEL
Wisconsin Attorney General

MISHA TSEYTLIN
Wisconsin Solicitor General

KEVIN M. LEROY
Wisconsin Deputy Solicitor General

State of Wisconsin
Department of Justice
17 West Main Street
P.O. Box 7857
Madison, Wisconsin 53707-7857
Tel: (608) 267-9323

*Attorneys for Wisconsin*


*/s/ Robert Henneke*
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
Texas Public Policy Foundation
901 Congress Avenue
Austin, Texas 78701
Tel: (512) 472-2700

*Attorney for Individual-Plaintiffs*

Respectfully Submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney
General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

*/s/ Darren McCarty*
DARREN MCCARTY
Special Counsel for Civil Litigation
Texas Bar No. 24007631
darren.mccarty@oag.texas.gov

AUSTIN R. NIMOCKS
Special Counsel for Civil Litigation

DAVID J. HACKER
Special Counsel for Civil Litigation

Attorney General of Texas
P.O. Box 12548, Mail Code 001
Austin, Texas 78711-2548
Tel: 512-936-1414

*Attorneys for Texas*

## Additional Counsel

STEVE MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

MARK BRNOVICH
Attorney General of Arizona

PAM BONDI
Attorney General of Florida

CHRISTOPHER M. CARR
Attorney General of Georgia

CURTIS HILL
Attorney General of Indiana

DEREK SCHMIDT
Attorney General of Kansas

JEFF LANDRY
Attorney General of Louisiana

JOSH HAWLEY
Attorney General of Missouri

DOUG PETERSON
Attorney General of Nebraska

WAYNE STENEHJEM
Attorney General of North Dakota

ALAN WILSON
Attorney General of South Carolina

MARTY JACKLEY
Attorney General of South Dakota

HERBERT SLATERY, III
Attorney General of Tennessee

SETH REYES
Attorney General of Utah

PATRICK MORRISEY
Attorney General of West Virginia