**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| TEXAS, WISCONSIN, ALABAMA, ARKANSAS, ARIZONA, FLORIDA, GEORGIA, INDIANA, KANSAS, LOUISIANA, PAUL LePAGE, Governor of Maine, Governor Phil Bryant of the State of MISSISSIPPI, MISSOURI, NEBRASKA, NORTH DAKOTA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, UTAH, WEST VIRGINIA, NEILL HURLEY, and JOHN NANTZ,<br><br>                              Plaintiffs,<br><br>        v.<br><br>UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ALEX AZAR, in his Official Capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, UNITED STATES INTERNAL REVENUE SERVICE, and DAVID J. KAUTTER, in his Official Capacity as Acting COMMISSIONER OF INTERNAL REVENUE,<br><br>                              Defendants. | Civil Action No. 4:18-cv-00167-O |
| CALIFORNIA, CONNECTICUT, DISTRICT OF COLUMBIA, DELAWARE, HAWAII, ILLINOIS, KENTUCKY, MASSACHUSETTS, MINNESOTA by and through its Department of Commerce, NEW JERSEY, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, and WASHINGTON,<br><br>                              Intervenor-Defendants. | |

**INTERVENOR-DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS'**

**APPLICATION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................... 1

Factual Background ................................................................................. 3

    A.    The ACA is Central to America's Healthcare
System ........................................................................................... 3

        1.    The ACA increases access to affordable and
quality healthcare.................................................... 3

        2.    Through the ACA's Medicaid expansion,
States have provided coverage to millions of
people and reduced healthcare costs. ................... 7

        3.    Federal subsidies and State-sponsored
exchanges facilitate the purchase of
healthcare................................................................. 8

    B.    Preservation of the ACA is Necessary to Prevent
Grievous Harm to the States and Their Residents ........ 10

    C.    Courts Have Repeatedly Rejected Attempts to
Strike Down the ACA.................................................. 11

    D.    Congress Declined to Repeal the ACA and It
Remains Federal Law .................................................. 13

LEGAL STANDARD................................................................................ 13

SUMMARY OF ARGUMENT ................................................................... 15

ARGUMENT .......................................................................................... 16

    I.    THE MINIMUM COVERAGE PROVISION REMAINS A
CONSTITUTIONALLY VALID EXERCISE OF CONGRESS'S
TAXING POWER ...................................................................... 16

        A.    The Minimum Coverage Provision Remains
Constitutional............................................................. 17

        B.    The Production of Revenue at All Times is Not a
Constitutional Requirement for a Lawful Tax.............. 18

i

**TABLE OF CONTENTS**
**(continued)**

Page

C.     Plaintiffs' Claims Are Not Ripe Because the
       Shared Responsibility Payment Will Produce
       Revenue for Years to Come........................................... 21

II.    IF ZEROING OUT THE TAX MAKES THE MINIMUM
       COVERAGE REQUIREMENT UNCONSTITUTIONAL, THE
       REMEDY IS TO STRIKE THE RECENT AMENDMENT AND
       REINSTATE THE PRIOR TAX AMOUNT....................................... 22

III.   EVEN IF THE MINIMUM COVERAGE REQUIREMENT IS NOW
       UNCONSTITUTIONAL, THE REST OF THE ACA IS
       SEVERABLE ............................................................. 24

       A.     Plaintiffs Carry a Heavy Burden in Asking This
              Court to Strike Down Hundreds of Perfectly
              Lawful Provisions ......................................... 25

       B.     Severability Clauses Are Unnecessary and There is
              No Presumption Against Severability From Failing
              to Include Them ........................................... 27

       C.     The ACA's Remaining Provisions Are Severable
              from the Minimum Coverage Provision ....................... 28

              1.     The Congress that passed the TCJA
                     deliberately left the rest of the ACA in
                     place................................................ 28

              2.     The Congress that passed the ACA would
                     have wanted the rest of the ACA to stand.......... 30

                     a.     The majority of the ACA's provisions
                            went into effect years before the
                            minimum coverage requirement. ............. 31

                     b.     Most of the ACA has nothing to do
                            with the individual insurance market. ...... 32

                     c.     The ACA's community-rating and
                            guaranteed-issue provisions are also
                            severable from the mandate. .................... 33

**TABLE OF CONTENTS**
**(continued)**

Page

(1) Congress independently sought to end discriminatory underwriting practices and to lower administrative costs. ............ 34

(2) It is not "evident" that Congress would want to discard these important consumer protections in the absence of the minimum coverage provision. ....................................... 36

(3) The adverse selection concern from 2010 is no longer a concern today. ................................. 39

IV. PLAINTIFFS HAVE NOT MET THEIR BURDEN OF DEMONSTRATING IRREPARABLE INJURY ................................. 43

A. The Individual Plaintiffs Will Not Suffer Any Injury From a $0 Tax .................................................... 43

B. None of the Harms Identified by the Plaintiff States Flow from Zeroing Out the Shared Responsibility Payment ................................................. 44

C. Plaintiffs Mischaracterize Their Costs and Obligations Under the ACA to Exaggerate Their Alleged Harm................................................................. 45

V. A PRELIMINARY INJUNCTION IS AGAINST THE PUBLIC INTEREST .................................................................................. 47

A. The Alleged Harm to Plaintiffs is Far Outweighed by the Devastating Harm to Defendant States and Their Citizens................................................................. 48

B. Issuing a Preliminary Injunction is Also Against the Public Interest Because It Would Upend the Status Quo .................................................................... 49

**TABLE OF CONTENTS**
**(continued)**

**Page**

C.   Any Injunction Issued by the Court Should Only
Apply to the Individual Plaintiffs ................................. 50

CONCLUSION............................................................................................. 50

# TABLE OF AUTHORITIES
## (continued)

**Page**

CASES

*Alaska Airlines, Inc. v. Brock*
480 U.S. 678 (1987) ........................................................................... *passim*

*Ayotte v. Planned Parenthood of N. New England*
546 U.S. 320 (2006) ........................................................................... *passim*

*Booker v. U.S.*
543 U.S. 220 ........................................................................ 25, 26, 38, 39

*Canal Authority of State of Fla. v. Callaway*
489 F.2d 567 (5th Cir. 1974) ............................................................ 14, 48

*Coons v. Lew*
762 F.3d 891 (9th Cir. 2014) ................................................................... 12

*Davis v. FEC*
554 U.S. 724 (2008) .................................................................................. 22

*Florida ex rel. Atty. Gen. v. U.S. Dep't of Health and Human
    Services*
648 F.3d 1235 (11th Cir. 2011) ......................................................... *passim*

*Franks Inv. Co. v. Union Pac. R.R. Co.*
534 F.3d 443 (5th Cir. 2008) ................................................................... 44

*Frost v. Corp. Com. of Oklahoma*
278 U.S. 515 (1928) .......................................................................... *passim*

*Hotze v. Burwell*
784 F.3d 984 (5th Cir. 2015) ................................................................... 44

*Jones v. Cain*
600 F.3d 527 (5th Cir. 2010) .................................................................... 1

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Karaha Bodas Co. v. Negara*
    335 F.3d 357 (5th Cir. 2003) ............................................................ 14, 48

*King v. Burwell*
    576 U.S. __ (2015).............................................................. *passim*

*Leavitt v. Jane L.*
    518 U.S. 137 (1996)............................................................................ 26

*Machete Productions, L.L.C. v. Page*
    809 F.3d 281 (5th Cir. 2015) ................................................................ 44

*Martinez v. Mathews*
    544 F.2d 1233 (5th Cir. 1976) .............................................................. 14

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*
    760 F.2d 618 (5th Cir. 1985) ................................................................ 14

*Morgan v. Fletcher*
    518 F.2d 236 (5th Cir. 1975) ................................................................ 49

*Murphy v. Nat'l Collegiate Athletic Ass'n*
    138 S.Ct. 1461 (2018)................................................................ 32, 33, 39

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
    567 U.S. 519 (2012)........................................................... *passim*

*New York v. United States*
    505 U.S. 144 (1992)...................................................................... 27, 31

*Nichols v. Alcatel USA, Inc.*
    532 F.3d 364 (5th Cir. 2008) .......................................................... 14, 43

*ODonnell v. Harris Cty., Texas*
    882 F.3d 528 (5th Cir. 2018) ................................................................ 50

*Regan v. Time*
    468 U.S. 641 (1984)........................................................ 25, 26, 28, 29

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Ross v. Goshi*
351 F. Supp. 949 (D. Hawaii 1972)........................................................... 23

*Sissel v. U.S. Dep't of Health & Human Servs.*
760 F.3d 1 (D.C. Cir. 2014).................................................................... 12

*State v. Standard Oil Co.*
107 S.W.2d 550 (Tex. 1937) ................................................................... 23

*Tate v. American Tugs, Inc.*
634 F.2d 869 (5th Cir. 1981) ........................................................... 14, 49

*Trump v. Int'l Refugee Assistance Project*
137 S. Ct. 2080 (2017)............................................................................ 48

*U.S. v. Jackson*
390 U.S. 570 (1968)................................................................................ 27

*U.S. v. Tufti*
542 F.2d 1046 (9th Cir. 1976) ................................................................ 23

*United States v. Ross*
458 F.2d 1144 (5th Cir. 1972) ................................................................ 19

*United States v. Sanchez*
340 U.S. 42 (1950).................................................................................. 19

*Weissinger v. Boswell*
330 F. Supp. 615 (M.D. Ala. 1971)......................................................... 23

*Wenner v. Texas Lottery Comm'n*
123 F.3d 321 (5th Cir. 1997) .................................................................. 14

*White v. Carlucci*
862 F.2d 1209 (5th Cir. 1989) ......................................................... 14, 50

# TABLE OF AUTHORITIES
## (continued)

**Page**

**STATUTES**

Internal Revenue Code
   § 5000A(a)-(b) ..................................................................................28

Patient Protection and Affordable Care Act .................................................. *passim*

Public Law
   Pub. L. No. 111-148, 124 Stat, 119 (2010) ...............................................19, 20
   Pub. L. No. 111-152, 124 Stat. 1029 (2010) .............................................19, 20
   Pub. L. No. 114-113, 129 Stat. 2242 (2016) ............................................19, 20
   Pub. L. No. 115-120, H.R. 190 (2018) ...........................................................20
   Pub. L. No. 115-120, H.R. 195 (2018) .....................................................19, 20

18 United States Code
   § 3553(b)(1) ..............................................................................................38, 39

26 United States Code
   § 36B ......................................................................................................32, 41
   § 45R ......................................................................................................31, 32
   § 4191 ...........................................................................................................20
   § 4980I ..........................................................................................................19
   § 5000A ...................................................................................................2, 17
   § 5000A(d) ....................................................................................................12
   § 6072(a) .......................................................................................................21
   § 6402(a) .......................................................................................................21

29 United States Code
   § 207(r) .........................................................................................................32

42 United States Code
   § 280h-5 ..........................................................................................................6
   § 280k .............................................................................................................6
   § 280k-1 ..........................................................................................................6
   § 280k-2 ..........................................................................................................6
   § 280k-3 ..........................................................................................................6
   § 294e-1 ..........................................................................................................6
   § 299b-33 ........................................................................................................6
   § 299b-34 ........................................................................................................6
   § 300u-13 ........................................................................................................6
   § 300u-14 ........................................................................................................6
   § 300gg(a) ......................................................................................................33

# TABLE OF AUTHORITIES
## (continued)

Page

§ 300gg(a)(1) ................................................................................34
§ 300gg-1 ...............................................................................4, 33
§ 300gg-1(b)(1) ...........................................................................41
§ 300gg-2 .......................................................................................4
§ 300gg-3 .........................................................................4, 31, 33
§ 300gg-4 ...............................................................................4, 34
§ 300gg-4(b) ................................................................................33
§ 300gg-11 .............................................................................4, 31
§ 300gg-12 .............................................................................4, 31
§ 300gg-13 .............................................................................4, 31
§ 300gg-14 .............................................................................4, 31
§ 300gg-21(a)(2) .........................................................................47
§ 300gg-94(a)(1) ...........................................................................9
§ 300u–11 .....................................................................................6
§ 300u–13 .....................................................................................6
§ 300u–14 .....................................................................................6
§ 710 ...........................................................................................32
§ 1315a .........................................................................................6
§ 1315b .........................................................................................6
§ 1395f ..........................................................................................6
§ 1395w–4 .....................................................................................6
§ 1395w-4(e)(1)(H) .....................................................................31
§ 1395w-44(p) .............................................................................33
§ 1395cc ........................................................................................6
§ 1395dd .....................................................................................11
§ 1395ww .......................................................................................6
§ 1396a ..........................................................................................6
§ 1396a(a)(10)(A)(i)(VIII) ......................................................7, 32
§ 1396a(e)(14)(I)(i) .......................................................................7
§ 1396d(y)(1) ................................................................................8
§ 8031(b)-(e) .................................................................................9
§ 18022 ..........................................................................................4
§ 18031 ........................................................................................32
§ 18091(1) ...................................................................................37
§ 18091(2)(C) ..............................................................................35
§ 18091(2)(I) ...............................................................................40
§ 18091(2)(J) ...............................................................................36
§ 18091 (a)(2)(C), (F) & (G) .........................................................3

## CONSTITUTIONAL PROVISIONS

United States Constitution
    Article I, § 8, cl. 1 ..................................................................19

ix

# TABLE OF AUTHORITIES
## (continued)

**Page**

**COURT RULES**

Federal Rules of Civil Procedure
    65(b) ............................................................................................45
    65(c) ............................................................................................50
    80C ................................................................................................8

**OTHER AUTHORITIES**

Code of Federal Regulations
    42 C.F.R. § 435.150(c) ..............................................................46
    45 C.F.R. §§ 154.200-154.230 ....................................................9
    45 C.F.R. § 154.301 ....................................................................9
    45 C.F.R. §§ 155.1000-155.1010 ................................................9
    45 C.F.R. § 156.20 ......................................................................9
    45 C.F.R. § 156.200 ....................................................................9

Congressional Record
    155 Cong. Rec. S13020 (daily ed. Dec. 11, 2009) ....................35
    155 Cong. Rec. S13692 (daily ed. Dec. 21, 2009) ....................35
    155 Cong. Rec. S13851 (daily ed. Dec. 23, 2009) ....................35
    163 Cong. Rec. S7383 (daily ed. Nov. 29, 2017) ......................29
    163 Cong. Rec. S7666 (daily ed. Dec. 1, 2017) ........................30
    163 Cong. Rec. S7672 (daily ed. Dec. 1, 2017) ........................13

*Continuation of the Open Executive Session to Consider an Original*
    *Bill Entitled the Tax Cuts and Jobs Act Before the S. Comm. on*
    *Fin.,* Senate, 115th Congress, Nov. 15, 2017 ......................29

House Reports
    H.R. 1 (Dec. 22, 2017) ..............................................................13
    H.R. 45, 113th ............................................................................13
    H.R. Rep. No. 111-443, pt. 2 (2010) ........................................35
    H.R. Rep. No. 299, 111 Cong., 1st Sess. pt. 3 (2009)................34
    H.R. Rep. No. 443, 111th Cong. 2d Sess. pt. 2 (2010) ..........34, 39
    H.R. 3762, 114th ........................................................................13
    H.R. 6079, 112th ........................................................................13

Legislative Counsel, U.S. H.R., *House Legislative Counsel's*
    *Manual on Drafting Style* § 328 (1995) ................................27

# TABLE OF AUTHORITIES
## (continued)

**Page**

Office of the Legislative Counsel, U.S. Senate, *Legislative Drafting*
  *Manual* § 131 (1997) ...........................................................................................27

United States Department of Treasury Publications
  Pub. No. 1304 ....................................................................................................21
  Pub. No. 1415 ....................................................................................................21

# INTRODUCTION

Plaintiffs ask this Court to preliminarily enjoin the entire Patient Protection and Affordable Care Act (ACA), a landmark piece of legislation that has enabled more than 20 million Americans to gain health coverage, has restructured nearly one-fifth of the national economy, and has become central to the healthcare system of our country over the past eight years.[1]  It is not an overstatement to say that issuing a preliminary injunction—which the Fifth Circuit has called an "extraordinary and drastic remedy"— would cause catastrophic harm to tens of millions of Americans.  To date, over 11.8 million Americans have gained health insurance through the ACA's Medicaid expansion, another over 8 million receive ACA-funded tax credits to purchase health insurance through the newly-created exchanges, and 133 million Americans (including 17 million children) with preexisting health conditions cannot be discriminated against by insurance companies because of their poor health.  There is no legal or equitable justification for depriving tens of millions of Americans of the benefits of these vital healthcare programs.

The remedy that Plaintiffs seek is also profoundly undemocratic.  Plaintiffs ask this Court to impose an outcome by judicial fiat that Congress rejected through the legislative process.  Since the ACA became law in 2010, ACA opponents in Congress have tried— unsuccessfully—to repeal it at least 70 times.  But the fact that Congress (through the Senate) voted down each of those efforts leads to one unavoidable conclusion: the Congress that passed the ACA, the Congress that passed the Tax Cuts and Jobs Act (TCJA), and every Congress in between, has decided to leave nearly every provision of the ACA in place, choosing instead to modify one provision reducing the future tax penalty for individuals who do not maintain health insurance.  That reflects the will of the

---

[1] Plaintiffs do not raise their Fifth and Tenth Amendment claims or their Administrative Procedures Act claims (Counts Two-Five in their Amended Complaint) as grounds for seeking a preliminary injunction.  *See* ECF. No. 40.  They have thus waived any reliance on those causes of action as a basis for the pending motion.  *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010).

people, as expressed through their democratically elected representatives over multiple election cycles.

And while courts are vested with the authority to interpret the Constitution and enforce its limits, they are not empowered to evaluate "the wisdom of the Affordable Care Act." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 588 (2012) (*NFIB*). "Under the Constitution, that judgment is reserved to the people." *Id.* Congress's repeated policy judgment against repeal makes sense given the Congressional Budget Office's (CBO) forecast that repeal would strip millions of Americans of their healthcare coverage, dramatically increase the federal deficit, and lead to Medicare Trust Fund insolvency. Aaron Dec. ¶¶ 43-44, Appx. 024-025; Corlette Dec. ¶¶ 53, 60, Appx. 100-104. And it is well-established that courts may not use their remedial powers to circumvent congressional intent, which is precisely what Plaintiffs are requesting.

Plaintiffs have not established any—let alone all—of the four prerequisites for obtaining the extraordinary relief that they seek. First, Plaintiffs are unlikely to succeed on the merits of their legal claims because the U.S. Constitution does not require a lawful tax to produce revenue at all times, and in any event, the ACA's "minimum essential coverage"[2] requirement will continue to produce revenue for years to come and therefore Plaintiffs' claims are not ripe. And if the Congress's recent amendment to the ACA were unconstitutional, the appropriate remedy would be to strike that amendment and revert back to the prior statutory provision which was upheld by the Supreme Court in *NFIB*.

Second, Plaintiffs cannot show irreparable harm. The individual Plaintiffs will not suffer any harm because it is perfectly lawful for them to pay a tax of $0 instead of obtaining ACA-compliant insurance. And the Plaintiff States cannot possibly be harmed

---

[2] For ease of reference, we refer to the "requirement to maintain minimum essential coverage" under 26 U.S.C. § 5000A as the "minimum coverage" requirement. This requirement is sometimes referred to as the "individual mandate," and the "shared responsibility payment" under this same provision as the "individual mandate penalty."

by the reduction of a tax that never applied to them in the first place.  Third, any injury to Plaintiffs is far outweighed by the devastating harm to the Defendant States and their citizens from enjoining the ACA.  The Defendant States stand to lose over half a trillion dollars in federal funds for healthcare, uncompensated care costs would rise by over a trillion dollars, six million of their residents would be kicked off of their Medicaid coverage, tens of billions of dollars in tax credits to subsidize purchasing health insurance would disappear, and millions of residents with preexisting health conditions would become unable to purchase or access health coverage.  There would be an enormous human cost from invalidating the ACA.  Lastly, a preliminary injunction would also disserve the public interest because it would upend the status quo and wreak havoc on the healthcare market for patients, providers, insurance carriers, and the federal and state governments.  Plaintiffs' request for a preliminary injunction should be denied.

## FACTUAL BACKGROUND

### A.    The ACA is Central to America's Healthcare System

#### 1.    The ACA increases access to affordable and quality healthcare.

The parties agree that the ACA is a landmark piece of legislation through which Congress sought to fundamentally transform the nation's healthcare system by increasing access to affordable, quality health care.  Its purpose was to increase the number of Americans with health insurance, lower health insurance costs, and improve financial security and wellbeing for families.  *NFIB*, 567 U.S. at 538; 42 U.S.C § 18091 (a)(2)(C), (F) & (G).  Congress aimed to do so through a series of reforms, including strengthening consumer protections in the private insurance market, expanding the traditional Medicaid program, providing subsidies to lower premiums, and creating effective state health insurance Exchanges.  *King v. Burwell*, 576 U.S. __, 135 S.Ct. 2480, 2482 (2015).

The ACA has delivered on these promises by making the individual insurance market more accessible and affordable; expanding and improving Medicaid; modifying and strengthening the Medicare program; increasing funding and prioritization of

prevention and public health; and supporting healthcare infrastructure such as community health centers and the National Health Service Corps. *See generally* Aaron Dec. ¶¶ 4-41, Appx. 003-023; Corlette Dec. ¶¶ 23-43, Appx. 092-098.

In the ACA, "Congress addressed the problem of those who [could] not obtain insurance coverage because of pre-existing conditions or other health issues." *NFIB*, 567 U.S. at 547. Congress placed new requirements on insurers that guarantee more affordable coverage regardless of health status, age, gender or geographic location. The ACA's "guaranteed-issue" and "community-rating" provisions bar insurers from denying coverage because of medical history and from charging unhealthy individuals higher premiums than healthy individuals. *NFIB*, 567 U.S. at 547-48. These two provisions are important ACA consumer protections. Sherman Dec. ¶¶ 3-4, Appx. 417-418; Aaron Dec. ¶¶ 48, 55, 62, 69, 76, 83, 90, 97, 104, 111, 118, 125, 132, 139, 146, 153, 160, Appx. 026-059.[3] And these provisions have given peace of mind to the millions of Americans with preexisting health conditions, while improving healthcare access for women, young adults, veterans, and persons with disabilities.[4] Aaron Dec. ¶¶ 13-16, 26, Appx. 008-016; Isasi Dec. ¶¶ 4-5, 12, 15, ECF No. 15-2 at 7-14; Berns Dec. ¶¶ 3-6, Appx. 077-079; Corlette Dec. ¶ 9-12, 15-16, 19, 20, Appx. 087-091.

---

[3] Key protections of the ACA that would be impacted by the requested relief include (among others); guaranteed issue (42 U.S.C. § 300gg-1); guaranteed renewability (42 U.S.C. § 300gg-2); prohibition of preexisting condition exclusions (42 U.S.C. § 300gg-3); prohibition of discrimination based on health status (42 U.S.C. § 300gg-4); prohibition on excessive waiting periods (more than 90 days) (42 U.S.C. § 300gg-11); prohibition of lifetime or annual limits (42 U.S.C. § 300gg-11); prohibition on recessions once covered (42 U.S.C. § 300gg-12); coverage of preventative health services (42 U.S.C. § 300gg-13); extension of dependent coverage to 26 years of age (42 U.S.C. § 300gg-14); and the coverage of essential health benefits, including ambulatory patient services, emergency services, hospitalization, maternity and newborn care, mental health and substance abuse treatment, prescription drugs, laboratory services, preventative services and chronic disease management, and pediatric services, including oral and vision care. 42 U.S.C. § 18022.

[4] Examples of preexisting conditions include cancer, diabetes, asthma, heart attack and heart disease, stroke, high blood pressure, and pregnancy. *See* The Commonwealth Fund, "Access to Coverage and Care for People with Preexisting Conditions: How it Changed Under the ACA." Appx. 155-161.

As a result of the ACA's reforms, the rate of uninsured Americans dropped by 43 percent, resulting in 20 million Americans gaining access to health coverage because of this law.  Aaron Dec. ¶ 5, Appx. 003; Barnes Dec. ¶ 4, Appx. 065-067; Corlette Dec. ¶ 28, Appx. 093; Gobeille Dec. ¶ 4, Appx. 109-110; Johnson Dec. ¶¶ 5-7. Appx. 116; Kent Dec. ¶ 3, Appx. 119-120; Lee Dec. ¶ 5, Appx. 131-132; Peterson Dec. ¶ 4, 6, Appx. 369-372; Mounts Dec. ¶¶ 7, 9, Appx. 144; Scholsberg Dec. ¶ 4, Appx. 375; Sherman Dec., ¶ 3, Appx. 417-418; Walker Dec. ¶ 5, Appx. 386-387; Zucker Dec. ¶ 5, Appx. 398-400; Allen ¶ 5, Appx. 411.  Fewer uninsured individuals have helped healthcare providers and the Defendant States save money.  The ACA lowered hospitals' costs of providing uncompensated care by $10.4 billion in 2015 alone; and in States that expanded Medicaid, uncompensated care costs dropped by around half.  Aaron Dec. ¶ 10, Appx. 006; Corlette Dec. ¶ 34, Appx. 095; Eyles Dec. ¶ 9, ECF No. 15-1 at 96-97.  As States have realized substantial budget savings accordingly.  Aaron Dec. ¶¶ 11, 25, Appx. 006-016; Isasi Dec. ¶ 14 n.15, ECF No. 15-2 at 13-14; Mounts Dec. ¶¶ 14-17, Appx. 145; Barnes Dec. ¶ 5, Appx. 067; Gobeille Dec. ¶ 5, Appx. 111; Walker Dec. ¶ 6, Appx. 387; Shannon Dec. ¶ 7, Appx. 423-424; Schlosberg Dec. ¶ 5, Appx. 375-376; Zucker Dec. ¶ 6, Appx. 400-401; Johnson Dec. ¶ 10, Appx. 117; Kofman Dec. ¶ 5, Appx. 125-126; Allen ¶ 6, Appx. 411-412 Bohn ¶ 7, Appx 428.  There are even documented ACA savings amongst the Plaintiff States, including Arkansas ($35.5 million in state fiscal year (SFY) 2014 and $131 million in SFY15) and West Virginia ($3.8 million in SFY14).  Isasi Dec. ¶ 14, n.15 at 7 & 12, ECF No. 15-2 at 13-14.

And despite Plaintiffs' claims to the contrary, the ACA slowed the growth of insurance premiums in the group employer market.  ECF No. 40 at 20 & 42.  During the initial years of the ACA (from 2010 to 2016), employer-based health care premiums and out-of-pocket costs grew more slowly than they did in the 10 years before the ACA was enacted.  Aaron Dec. ¶¶ 10, 19, Appx. 006-012; Corlette Dec. ¶¶ 42-43, Appx. 097-098.

The ACA also improved patients' quality of care.  ACA reforms have developed care coordination, payment system efficiency, overall medical care quality, and consumer protections, leading to better health outcomes and delivery of care.  Aaron Dec. ¶ 12, Appx. 007-008; Barnes ¶ 8, Appx. 72-74; Corlette Dec. ¶ 31, Appx. 094; Isasi Dec. ¶¶ 4, 17, ECF No. 15-2 at 7-8 & 15-16; Mounts Dec. ¶¶ 18-31, Appx. 145-148; Eyles Dec. ¶ 8, ECF No. 15-1 at 96; Kofman Dec. ¶ 6, Appx. 126-127; Allen ¶¶ 8-9, Appx. 412-415.  ACA-authorized initiatives have enhanced quality of care by holding hospitals accountable for quality and safety (42 U.S.C. § 1395w–4, § 1395ww, § 1395f, § 1395cc); allowing providers to receive Medicare payments based on quality and care coordination (42 U.S.C. § 1395ww); and funding efforts to states, public health officials, educational institutions, and medical providers to improve treatment of chronic illnesses, reduce health disparities, improve efficiency and value, and to provide comprehensive care, including preventive care, and mental health and substance use disorder services (42 U.S.C. § 299b-33, § 299b-34, § 280h-5, § 280k, § 280k-1, § 280k-2, § 280k-3, § 1396a, § 300u-13, § 300u-14, 42 U.S.C. 294e-1).  As a result of ACA reforms that improved the quality of care, fewer patients became sicker or died in the hospital due to hospital-acquired conditions in 2015 compared to 2010, saving approximately $28 billion in care costs over this period.  Aaron Dec. ¶ 8, Appx. 005.

The ACA also provides new statutory authorization and funding for States to choose to participate in new and expanded programs that increase access to better-coordinated and high-quality care for low-income seniors and people with disabilities through federal programs, improve community health, and otherwise reduce healthcare spending.  ACA § 2405, 42 U.S.C. §§ 300u–11, 300u–13, 300u–14, 1315a, and 1315b; *see also* Aaron Dec. ¶¶ 26, 27, 39, Appx. 016-022; Isasi Dec. ¶ 15, ECF No. 15-2 at 14; Berns Dec. ¶ 6, Appx. 079; Sherman Dec. ¶ 5, Appx. 419; Schlosberg Dec. ¶¶ 4, 7-8, Appx. 375-380; Peterson Dec. ¶ 7, Appx. 372; Lee Dec. ¶ 6, Appx. 132; Gobeille Dec.

¶¶ 6-7, Appx. 111-112; Barnes Dec. ¶¶ 6-7, Appx. 067-072; Zucker Dec. ¶¶ 7-9, Appx. 401-406; Walker Dec ¶ 7, Appx. 387; Mounts Dec. ¶ 6, Appx. 144.

### 2. Through the ACA's Medicaid expansion, States have provided coverage to millions of people and reduced healthcare costs.

The States are directly involved in implementing many of the ACA's policy reforms—particularly through its expansion of health coverage to lower-income residents.  Aaron Dec. ¶¶ 21-26, Appx. 013-016; Boyle Dec. ¶¶ 4, 6, Appx. 082, 083. The ACA expanded Medicaid, which the States administer, making additional segments of the population eligible to receive coverage.  *See* 42 U.S.C. §§ 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14)(I)(i) (childless adults with incomes of up to 138% of the federal poverty level may receive Medicaid).  Nationwide, over 11.8 million newly qualified low-income individuals were receiving health coverage through Medicaid at the end of 2016 in the 33 states that have expanded Medicaid coverage, and the percentage of adults without insurance in those States dropped by 9.2 percentage points between 2014 and 2016.  Isasi Dec. ¶¶ 7-8, ECF No. 15-2 at 10-11; Aaron Dec. ¶¶ 21-22, Appx. 013-014.  Medicaid expansion allowed the Defendant States to provide healthcare for around six million low-income people.  Aaron Dec. ¶¶ 85, 92, 106, 127, 134, 148, 155, 162, Appx. 037-059; Kent Dec. ¶ 3, Appx. 119-120; Barnes Dec. ¶ 4, Appx. 065-067; Walker Dec. ¶ 5, Appx. 386-387; Schlosberg Dec. ¶ 5, Appx. 375-376; Peterson Dec. ¶ 6, Appx. 370-372; Boyle Dec. ¶ 6, Appx. 083; Johnson Dec. ¶ 6, Appx. 116; Zucker Dec. ¶ 5, Appx. 398-400; Sherman Dec. ¶¶ 3-4, Appx. 417-418.[5]

Of the 33 states that expanded Medicaid through the ACA, seven are Plaintiffs in this litigation and represent 1,282,554 expansion enrollees, including: Arizona (109,723);

---

[5] The numbers are 3,700,000 in California, 240,000 in Connecticut, 11,000 in Delaware, 93,184 in the District of Columbia, 33,000 in Hawaii, 340,000 in Illinois, 151,000 in Kentucky, 350,000 in Massachusetts, 36,000 in Minnesota, 555,000 in New Jersey, 301,721 in New York, 159,000 in Oregon, 77,846 in Rhode Island, 3,000 in Vermont, 55,000 in Washington, 313,000 in North Carolina (estimated) if the state enacts an expansion, and 179,000 in Virginia when its expansion goes into effect.  *Id.*

Arkansas (316,483); Indiana (278,610); Louisiana (376,668); North Dakota (19,965); and West Virginia (181,105). Eyles Dec. ¶ 6, ECF No. 15-1 at 95. Maine adopted Medicaid expansion through a ballot initiative in November 2017, but has not yet implemented it; however, state officials are under court order to begin implementation.[6]

States have benefitted from federal matching funds which incentivize States to expand Medicaid through the ACA. The ACA obligates the federal government to pay for all or almost all of the cost of this investment: 100% for years 2014-2016, 95% in 2017, 94% in 2018, 93% in 2019, and 90% in 2020 and beyond. *See* 42 U.S.C. § 1396d(y)(1). Based on the government's promise to pay the bulk of the costs, States invested over $4.28 billion to expand their Medicaid programs in fiscal year 2015, compared to the $68.8 billion expended by the federal government in matching funds.[7] Expansion states benefit from reduced spending on uncompensated care and additional revenue from insurer and/or provider taxes. Aaron Dec. ¶ 25, Appx. 015-016; Isasi Dec. ¶ 14, ECF No. 15-2 at 13-14. A recent study found no significant increase in state Medicaid spending, nor a decrease in education, transportation, or other state spending as a result of Medicaid expansion. Aaron Dec. ¶ 25, Appx. 015-016.

### 3. Federal subsidies and State-sponsored exchanges facilitate the purchase of healthcare.

The ACA also the authorized creation of state government-run health insurance marketplaces (also known as exchanges) that allow consumers "to compare and purchase insurance plans." *King*, 135 S.Ct. at 2485; *see also* Aaron Dec. ¶¶ 17-20, Appx. 010-013. Unlike the smaller, high-risk pools that some states operated before the ACA, access to

---

[6] *See* Order on M.R. Civ. P. 80C Appeal of Agency Action, Business and Consumer Court Civil Action, Doc. No. BCD-AP-18-02. Appx. 163-175.

[7] Kaiser Family Foundation, "Medicaid Expansion Spending," FY 2015. Appx. 177-178. Spending in FY 2015 does not take into full account those states that expanded Medicaid after October 1, 2014, including Pennsylvania (expanded January 1, 2015), Indiana (expanded February 1, 2015), Alaska (expanded September 1, 2015), Montana (expanded January 1, 2016), and Louisiana (expanded July 1, 2016); Allen Dec. ¶ 4, Appx. 410.

ACA marketplace coverage is broad-based and affordable.  Aaron Dec. ¶¶ 17-20, Appx. 010-013.  "[S]tate high-risk pools covered only a fraction of people with preexisting conditions who lacked insurance, they charged significantly higher premiums than the individual market, and they excluded coverage for preexisting conditions for a period of time."[8]  The ACA provides refundable tax credits to individuals with household incomes between 100 and 400 percent of the federal poverty line, but these tax credits can only be used in the marketplaces.  *King*, 135 S.Ct. at 2487.  States may establish their own exchanges, or use the federal government's exchange.  *Id*. at 2485.

As of 2018, twelve States (including Defendants California, Connecticut, District of Columbia, Massachusetts, Minnesota, New York, Rhode Island, Vermont, and Washington) operate their own state-based exchanges, twenty-eight States rely on federally-facilitated exchanges, and eleven States partner with the Department of Health and Human Services to run hybrid exchanges (the latter two use HealthCare.Gov).  Aaron Dec. ¶ 17, Appx. 010-011.  States approve premium rates and review the plans to ensure that the cost and quality of benefits are reasonable and comply with state and federal law. *See* 42 U.S.C. §§ 300gg-94(a)(1), 18031(b)-(e); 45 C.F.R. §§ 154.200-154.230, 154.301, 155.1000-155.1010, 156.20, 156.200.  Nationally, 10.3 million people obtained coverage through these exchanges in 2017, and 84 percent of this group—over 8 million people— receive ACA tax credits to help them pay for premiums.  Aaron Dec. ¶ 18, Appx. 011; Isasi Dec. ¶ 6, ECF No. 15-2 at 10.[9]

---

[8] Kaiser Family Foundation, "High-Risk Pools for Uninsurable Individuals," February 22, 2017.  Appx. 180-190; *See also* White Dec. ¶¶ 1-9; Appx. 388-390.

[9] Exchange enrollment is 1,417,248 in California (as of March 2018), 98,260 in Connecticut, 24,171 in Delaware, 17,808 in the District of Columbia, 16,711 in Hawaii, 673,000 in Illinois, 71,585 in Kentucky, 242,221 in Massachusetts, 90,146 in Minnesota, 274,000 in New Jersey, 207,083 in New York, 519,803 in North Carolina, 137,305 in Oregon, 29,065 in Rhode Island, 29,088 in Vermont, 410,726 in Virginia, and 184,070 in Washington.  Aaron Dec. ¶¶ 56, 63, 91, 98, 105, 119, 133, 140, 147, 161, Appx. 029-059; DeBenedetti Dec. ¶ 3, Appx. 106; Kofman Dec. ¶ 4, Appx. 124-125; Peterson Dec. ¶ 6, Appx. 370-372; Maley Dec. ¶ 8, Appx. 139; Johnson Dec. ¶ 7, Appx. 116; Wilson Dec. ¶ 3, Appx. 392-394; Lee Dec. ¶ 4, Appx. 131.

**B.     Preservation of the ACA is Necessary to Prevent Grievous Harm to the States and Their Residents**

Eliminating the ACA would cause immediate and long-term harm to the Defendant States' healthcare systems and state budgets, and to their residents' health and financial security.  Aaron Dec. ¶¶ 42-46, Appx. 023-026; Corlette Dec. ¶¶ 52-60, Appx. 100-104; Isasi Dec. ¶ 18; ECF No. 15-2 at 16; Eyles Dec. ¶ 12, ECF No. 15-1 at 98-99. The ACA is so interwoven into the health system that its elimination would damage Medicare, Medicaid, and other programs that pre-date—but were reformed by—the ACA.  Aaron Dec. ¶¶ 42-43, Appx. 023-024; Corlette Dec. ¶ 60, Appx. 103-104.  For example, Medicare probably could not make payments to Medicare Advantage plans because the ACA replaced the payment system; 19 million beneficiaries could lose their plans and publicly traded insurers' stocks could plummet.  *Id*. at ¶ 42, Appx. 023-024. Public health programs, including those that help combat outbreaks and emerging public health threats such as the opioid epidemic, and which are now funded only through ACA programs, would likely cease to operate.  *Id*.

Between 24 and 30 million Americans stand to lose their healthcare coverage, of whom the vast majority would be in working families.[10]  Aaron Dec. ¶ 44, Appx. 024-025; Corlette Dec. ¶ 53, 55, Appx. 100, 101.  Americans would face devastating losses in healthcare and financial stability gains attained under the ACA.  Corlette Dec. ¶ 32-33, 59, Appx. 094-103; Isasi Dec. ¶¶ 5, 11, ECF No. 15-2 at 9; Eyles Dec. ¶ 8, ECF No. 15-1 at 96; Aaron Dec. ¶ 7, Appx. 004-005; Mounts Dec. ¶ 28, Appx. 147; Sherman Dec. ¶ 6, Appx. 419-420 (discussing less reported difficulty in paying medical bills); Schlosberg Dec. ¶ 6, Appx. 376-378; Zucker Dec. ¶ 10, Appx. 406-407. Smith Dec. ¶¶ 2-6, Appx. 382-383; Berns Dec. ¶¶ 4-5, Appx. 077-079; Gobeille Dec. ¶ 8, Appx. 112-113; Aaron Dec. ¶ 12, Appx. 007-008.  Families with children born with conditions such as heart

---

[10] For example, an estimated 3 million New Yorkers will lose health coverage if the ACA is invalidated.  Zucker Dec. ¶ 1; Appx. 395-397.

defects and diabetes would lose guaranteed access to coverage, and would face financial difficulties paying for life-saving care.  Eilers Dec. ¶¶ 3-4, ECF No. 15-1 at 89; Lufkin Dec. ¶¶ 4-5, Appx. 135.  Parents who leave the workplace in order to care for seriously ill children will once again fear loss of coverage, placing the health and financial stability of such families at risk.  Chism Dec. ¶¶ 5-8, ECF No. 15-1 at 86-87.

The impact on the Defendant States would be profound and widespread.  Aaron Dec. ¶¶ 42-165, Appx. 023-060.  The loss of coverage by millions of Americans would lead to downstream costs to state-funded hospitals, which must provide emergency care regardless of insurance status or ability to pay.  42 U.S.C. § 1395dd.  A dramatic increase in the number of uninsured would increase the cost of uncompensated care by an estimated $1.1 trillion over a decade, which would put stress on the financial market, state budgets and their healthcare systems, and medical providers.  Aaron Dec. ¶¶ 44, 53, 60, 67, 74, 81, 88, 95, 102, 109, 116, 123, 130, 137, 144, 151, 158, 165, Appx. 024-060.

Most directly, Defendant States would collectively lose $608.5 billion dollars of anticipated federal funds used to provide healthcare to their residents, including: California $160.2 billion; Connecticut $14.8 billion; Delaware $3.6 billion; District of Columbia $1.7 billion; Hawaii $4.3 billion; Illinois $49.9 billion; Kentucky $ 49.7 billion; Massachusetts $22.5 billion; Minnesota $16.4 billion; New Jersey $59.7 billion; New York $57.2 billion; North Carolina $59.0 billion; Oregon $38.4 billion; Rhode Island $7.4 billion; Vermont $2.9 billion; Virginia $18 billion; and Washington $42.8 billion.  Aaron Dec. ¶ 53, 60, 67, 74, 81, 88, 95, 102, 109, 116, 123, 130, 137, 144, 151, 158, 165, Appx. 028-060; Barnes ¶ 3, Appx. 64-65; Peterson ¶ 5, Appx. 370; Maley ¶ 7, Appx. 139; Kent Dec. ¶ 4, Appx. 120-121; Bohn ¶ 9, Appx. 429.

**C.   Courts Have Repeatedly Rejected Attempts to Strike Down the ACA**

Since its adoption, the ACA has been the subject of intense litigation, including review by the United States Supreme Court twice.  *NFIB*, 567 U.S. at 540-43; *King*, 135 S.Ct. at 2480 (upholding ACA authorization of tax credits for purchases on the federally-

11

facilitated exchange).  The Supreme Court has rejected claims that would have gutted its key reforms (striking down only the mandatory component of Medicaid expansion) and provided lower courts ample guidance in resolving challenges to the ACA.  In *King*, the high court concluded: "Congress passed the Affordable Care Act to improve health insurance markets, not to destroy them.  If at all possible, we must interpret the Act in a way that is consistent with the former and avoids the latter."  135 S.Ct. at 2496.

In *NFIB*, the Supreme Court provided similar guidance stating: "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  567 U.S. at 521.  The Court upheld the constitutionality of the minimum coverage provision,[11] concluding that Congress had the power to impose a tax on those without health insurance.  *Id.* at 574-75.  It also found that States could decide whether to participate in Medicaid expansion.  *Id.* at 587, 645-646.[12]  Since *NFIB*, numerous litigants have attempted to undermine the ACA's core provisions, but time and again, courts have rebuffed those efforts, avoiding a "calamitous result."  *King*, 135 S. Ct. at 2496 (rejecting interpretation of ACA that would have "destroy[ed]" the health insurance markets created by the ACA); *see also e.g. Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 3 (D.C. Cir. 2014), *cert. denied* 136 S. Ct. 925 (2016) (rejecting claim that ACA violated the Constitution's Origination Clause); *Coons v. Lew*, 762 F.3d 891, 902 (9th Cir. 2014), as amended, (Sept. 2, 2014), *cert. denied*, __ U.S. ___, 135 S.Ct. 1699 (2015) (ACA preempted Arizona law that allowed citizens to avoid coverage and mandate penalties).

---

[11] The minimum coverage requirement exempts certain individuals, such as prisoners and "individuals not lawfully present."  26 U.S.C. § 5000A(d).

[12] *NFIB* left untouched other ACA changes to Medicaid, such as a new mandatory eligibility category for former foster youth up to age 26, as well as a shift of children ages 6 and 18, with incomes beneath 133% of the federal poverty level, from CHIP to Medicaid.  These provisions form a basis for the Plaintiffs' alleged "harm." Ghasemi Decl. ¶ 2, ECF No. 41 at 021.

### D.   Congress Declined to Repeal the ACA and It Remains Federal Law

Since its passage in 2010, Congress has voted on attempts to repeal the law an estimated 70 times, yet all such efforts have been voted down.  *See, e.g.*, H.R. 3762, 114th Cong. (2015), H.R. 45, 113th Cong. (2013), H.R. 6079, 112th Cong. (2012).[13]  In avoiding any repeal (partial or full), Congress has repeatedly made a policy judgment to avoid stripping millions of Americans of their federally-entitled healthcare coverage.  Aaron Dec. ¶¶ 43-44, Appx. 024-025 (discussing 2015-2017 CBO reports finding that a partial or full repeal of the ACA would result in 24-29.8 million people becoming uninsured, an increase in the federal deficit, and lead to Medicare Trust Fund insolvency).

In December 2017, as part of an overall revision to federal income tax laws, Congress amended the tax code by reducing the shared responsibility payment to zero dollars for individuals failing to maintain health insurance coverage.  *See* P.L. 115-97, 2017 H.R. 1, at *2092 (Dec. 22, 2017).  By design, this change did not repeal any statutory provision of the ACA.  *Id.*  As Senator Pat Toomey (R-PA) emphasized, "We don't change any of the subsidies.  They are all available to anyone who wants to participate.  We don't change the rules.  We don't change eligibility.  We don't change anything else."[14]  Additional floor debate prior to passage of the TCJA (as discussed further below) demonstrates a clear congressional intent to preserve the remainder of the ACA.  Nevertheless, based on this single change, Plaintiffs ask this Court to strike down the entire ACA in direct contravention of Congress's stated intent.

### LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy, not granted routinely, but only when the movant, by a clear showing, carries the burden of

---

[13] For a list of efforts, see Cong. Research Serv., "Legislative Actions in the 112th, 113th, and 114th Congresses to Repeal, Defund, or Delay the Affordable Care Act," February 7, 2017, Appx. 192-219.

[14] 163 Cong. Rec. S7672 (daily ed. Dec. 1, 2017).
https://www.congress.gov/crec/2017/12/01/CREC-2017-12-01-senate.pdf.

persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).  In the Fifth Circuit, the "four prerequisites for the extraordinary relief" of a preliminary injunction are: (1) a substantial likelihood that plaintiff will prevail on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and (4) that granting the preliminary injunction will not disserve the public interest.  *Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

Relief should only be granted if the movant has clearly carried the burden of persuasion on all four requirements; failure to establish any element is grounds for denial. *Nichols v. Alcatel USA, Inc.,* 532 F.3d 364, 372 (5th Cir. 2008).  The "decision to grant a preliminary injunction is treated as the exception rather than the rule." *Karaha Bodas Co. v. Negara*, 335 F.3d 357, 363-64 (5th Cir. 2003).  Even when a plaintiff establishes each of the four elements, the decision remains discretionary with the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co*., 760 F.2d 618, 621 (5th Cir. 1985).

Plaintiffs carry an especially heavy burden when they seek a mandatory (as opposed to a prohibitory) injunction.[15]  "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo *pendente lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).  Because "[a]n indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable injury, [o]nly in rare instances is the issuance of a mandatory preliminary injunction proper." *Tate v. American Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. 1981).

---

[15] "[T]he issuance of a prohibitory injunction freezes the status quo, and is intended to preserve the relative positions of the parties until a trial on the merits can be held." *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997).

## SUMMARY OF ARGUMENT

The Court should deny Plaintiffs' request for a preliminary injunction because Plaintiffs have not established any—let alone all—of the four prerequisites for obtaining such extraordinary relief. First, Plaintiffs are unlikely to prevail on the merits. Continuous production of revenue is not a constitutional requirement for a tax, and the minimum coverage requirement will continue to produce revenue for years to come. If the Court nevertheless concludes that the minimum coverage requirement will become unconstitutional once it ceases to generate revenue, under long-standing and controlling Supreme Court precedent, the proper remedy is to strike the unconstitutional amendment and revert back to the prior statutory provision which was upheld in *NFIB*.

If the Court reaches the severability question, it should sever the unconstitutional provision and leave the remainder of the ACA intact, as the Supreme Court has done in almost every case over the past century. The touchstone for any decision about remedy is legislative intent, which a court cannot use its remedial powers to circumvent. Here, the Congress that passed the TCJA expressly and intentionally left the rest of the ACA untouched. Striking down the entire ACA would disregard that intent and impose an outcome that Congress chose not to achieve through the legislative process. Even if the severability inquiry turned on the intent of the Congress that enacted the ACA (and it does not), Plaintiffs have not come close to demonstrating that it is "evident" that Congress would have wished for the entire ACA to be struck down just because a later Congress reduced the tax for not maintaining health insurance to $0.

Second, Plaintiffs cannot demonstrate that they will suffer irreparable injury in the absence of injunctive relief. The individual Plaintiffs will suffer no harm whatsoever because it is perfectly lawful for them to pay a tax of $0 instead of obtaining ACA-compliant insurance. And because the shared responsibility payment does not apply to the States, they cannot possibly be harmed by its reduction.

15

Third, the alleged harm to Plaintiffs is far outweighed by the devastating harm to the Defendant States and their citizens that enjoining the ACA would cause. The Defendant States stand to lose over half a trillion dollars in federal funds for healthcare; six million of their residents would be kicked off of Medicaid; billions of dollars in tax credits to subsidize health insurance would disappear, and millions with preexisting health conditions would become unable to purchase affordable health insurance.

Fourth, a preliminary injunction is not in the public interest as it will inflict catastrophic harm on millions of Americans. The request is also a misuse of the preliminary injunction doctrine which is intended to preserve the status quo until the merits of a case are decided. Here, Plaintiffs do not seek to preserve the status quo, but to upend it. Their preferred remedy would uproot a complex and far-reaching law that has touched almost every facet of our healthcare system. Enjoining the ACA would completely disrupt the healthcare market at every level: for patients, providers, insurance carriers, and the federal and state governments. The application for a preliminary injunction should be denied.

## ARGUMENT

### I. THE MINIMUM COVERAGE PROVISION REMAINS A CONSTITUTIONALLY VALID EXERCISE OF CONGRESS'S TAXING POWER

Plaintiffs challenge the constitutionality of the minimum coverage provision once the shared responsibility payment is reduced to $0 in 2019. Specifically, Plaintiffs claim that the minimum coverage provision will exceed Congress's authority under the Taxation Clause because it will cease generating revenue for the federal government. For a number of reasons, Plaintiffs are mistaken. First, the minimum coverage provision still maintains the tax-like features identified in *NFIB*. Second, the production of revenue at all times is not a constitutional requirement for a lawful tax. Congress routinely enacts taxes with delayed effective dates, taxes that are suspended for periods of time, and otherwise structures taxes in ways which may not raise revenue for periods of time. The ACA itself includes several such taxes. Third, even if raising revenue at all times was an

ironclad constitutional requirement, the shared responsibility payment *will* continue to raise revenue for years to come because liability from 2018 is not due until April 2019, and many individuals pay their taxes late and the federal government will collect them through offsets years after they come due. Plaintiffs' claims are therefore not ripe.

## A.  The Minimum Coverage Provision Remains Constitutional

The minimum coverage provision continues to meet the *NFIB* factors and therefore remains constitutional. In *NFIB*, the Supreme Court explained that the shared responsibility payment "looks like" a tax in several respects. *NFIB*, 567 U.S. 563-64. First, the requirement to pay is found in the Internal Revenue Code and enforced by the IRS which must assess and collect it "in the same manner as taxes." *Id*. The payment is based on "such familiar factors as taxable income, number of dependents, and joint filing status." *Id*. at 563. Second, the shared responsibility payment produces "at least some revenue for the Government." *Id*. at 564. Third, the payment is a tax and not a penalty because the tax amount would be far less than the cost of purchasing health insurance for those who make the "financial decision" to pay rather than purchase coverage. *Id.* at 566. The Court thus concluded that because it had a "duty to construe a statute to save it, if fairly possible, that § 5000A can be interpreted as a tax." *Id.* at 574.

The fact that the shared responsibility payment raised revenue was just one of several factors that caused it to resemble a tax, and the generation of revenue was not central to the Court's constitutional determination. The Court noted that "[a]lthough the payment will raise considerable revenue, it is plainly designed to expand health insurance coverage," which is a perfectly valid exercise of Congress's taxing powers.[16] *NFIB*, 567

---

[16] Although the Supreme Court noted that the "essential feature of any tax" was that it "produces at least some revenue for the Government," it did not hold that the ACA's shared responsibility provision *had* to raise revenue in order for it to be constitutional—much less that it had to raise revenue every year that the provision remains in effect. *NFIB*, 567 U.S. at 564-67. To the contrary, the Supreme Court concluded that the ACA's shared responsibility provision was a tax based on a coterie of other characteristics. *Id.*

U.S. at 567.  In fact, if all non-exempt taxpayers made the "financial decision" to purchase insurance, the provision would not raise any revenue whatsoever.  *Id*. at 566.

The shared responsibility payment continues to maintain these tax-like characteristics.  Because only the dollar amount of the shared responsibility payment was changed (and could be changed again), its provisions are still contained within the Internal Revenue Code and tied to household income and filing status, and non-exempt households can continue to make a "financial decision" as to whether to purchase insurance coverage.[17]  And as discussed below, the tax penalty will generate revenue beyond January 1, 2019, because this year's tax is not due until April 15, 2019, and the IRS can collect the tax for 2018 by way of offsets until all sums due are collected.

**B.     The Production of Revenue at All Times is Not a Constitutional Requirement for a Lawful Tax**

The production of revenue at all times is a not a constitutional requirement for a tax to be lawful.  Congress routinely enacts taxes with delayed effective dates and/or taxes that may not raise revenue in all calendar years, including numerous examples found in the ACA itself such as the so called "Cadillac Tax," the Medical Device Tax, and the Health Insurance Providers Tax.  The shared responsibility payment has now joined that list of ACA taxes for which Congress has suspended collection, but retains the option of increasing in future years.  The shared responsibility payment has not been rendered unconstitutional merely because it will be $0 in 2019.

Congress's authority to levy taxes is contained in the United States Constitution, which provides that "Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare

---

[17] Although still a lawful tax, in the alternative, the minimum coverage provision may now be sustained under the Commerce Clause.  In *NFIB*, the Court held that the minimum coverage provision exceeded Congress's Commerce Clause powers because it "compels individuals to *become* active in commerce by purchasing a product."  *NFIB*, 567 U.S. at 552.  But with a tax of zero dollars, there is no compulsion.  The constitutional problem—*compelling* the purchase of insurance—is no longer present absent any penalty for failing to do so.

of the United States." U.S. Const. art I, § 8, cl. 1. These taxing and spending powers give the federal government "considerable influence even in areas where it cannot directly regulate." *NFIB*, 567 U.S. at 537. A tax does not cease to be valid because it discourages or deters the activities taxed. *United States v. Sanchez*, 340 U.S. 42, 44 (1950). A taxing statute is also valid "even though the revenue obtained is obviously negligible . . . or the revenue purpose of the tax may be secondary." *Id*. As the Fifth Circuit has stated, the "motives that move Congress to impose a tax are no concern of the courts . . . that an act accomplishes another purpose than raising revenue does not invalidate it." *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972).

In light of the broad taxing power afforded by the Constitution, it is not unusual for Congress to enact taxes with delayed effective dates or which are suspended for periods of time, including the shared responsibility payment that did not become effective until 2014. *NFIB*, 567 U.S. at 539. The ACA itself contains several examples of such taxes. The ACA's "Cadillac Tax" is a 40% excise tax on employer-sponsored healthcare coverage plans with premiums above specified thresholds. 26 U.S.C. § 4980I. When first enacted as part of the ACA, it had an effective date of 2013. Pub. L. No. 111-148, 124 Stat. 119 (2010). Since then, it has been amended three times to delay its start date.[18] In light of these delays, the "Cadillac Tax" has not yet raised any revenue, unlike the billions already generated by the shared responsibility payment.

The Medical Device Tax, which imposes a 2.3% excise tax on taxable medical devices, was enacted as part of Section 1405(c) of the Health Care and Education Reconciliation Act (HCERA) in 2010. Pub. L. No. 111-152, 124 Stat. 1029 (2010). It

---

[18] On March 30, 2010, Section 1401(b) of the HCERA changed the effective date of the tax to 2018. Pub. L. No. 111-152, 124 Stat. 1029 (2010). Section 101 of the Consolidated Appropriations Act of 2016, enacted December 18, 2015, further delayed the start date to 2020. Pub. L. No. 114-113, 129 Stat. 2242 (2016). And on January 22, 2018, Section 4002 of the continuing appropriations act pushed the effective date back to 2022. Pub. L. No. 115-120, H.R. 195 (2018).

was effective for sales after December 31, 2012, and was collected for calendar years 2013-2015.  The Consolidated Appropriations Act of 2016 amended 26 U.S.C. § 4191 to impose a moratorium on the tax for sales between January 1, 2016 and December 31, 2017.  Pub. L. No. 114-113, 129 Stat. 2242 (2015).  This tax is again subject to a further moratorium through December 31, 2019 that is retroactive for sales after December 31, 2017.  Pub. L. No. 115-120, H.R. 195 (2018).  The Health Insurance Providers Tax was enacted as part of ACA Section 9010, and imposes an annual fee on large health insurance providers.  Pub. L. No. 111-148, 124 Stat. 119 (2010).  ACA Section 10905(f) made the tax effective for all premiums written after December 31, 2009.  *Id.*  Section 1406(a)(6) of the HCERA delayed the tax until 2014.  Pub. L. No. 111-152, 124 Stat. 1029 (2010).  The tax was collected from 2014-2016, then suspended for 2017.  Pub. L. No. 114-113, 129 Stat. 2242 (2015).  It will again be collected in 2018.[19]  Most recently, this tax was suspended for 2019.  Pub. L. No. 115-120, H.R. 190 (2018).

These ACA taxes demonstrate how Congress routinely suspends or delays impositions of taxes.  By merely zeroing out the shared responsibility payment while leaving the minimum coverage provision in place, Congress intentionally left open the possibility that it will increase that tax in future years.  With the stroke of a pen, Congress can increase the shared responsibility payment through the budget reconciliation process, just as it zeroed it out through that process.  The fact that Congress reduced the shared responsibility payment to $0 commencing in 2019 is no different than these other ACA taxes which have not generated revenue each tax year since enactment.  There is no constitutional infirmity here.

---

[19] Internal Revenue Serv., Affordable Care Act Provision 9010 - Health Insurance Providers Fee, (Rev. Mar. 2018).  Appx. 221-227.

### C.     Plaintiffs' Claims Are Not Ripe Because the Shared Responsibility Payment Will Produce Revenue for Years to Come

Even if Plaintiffs were correct that a constitutionally-valid tax must produce revenue at all times, it will be years before the shared responsibility payment ceases to do so.  Plaintiffs' claims are therefore not ripe.  Since the shared responsibility payment is not decreased to zero until 2019, non-exempt taxpayers will still be liable for this penalty as part of taxes due on April 15, 2019.  *See* 26 U.S.C. § 6072(a).  The shared responsibility payment will yield revenue for the federal government in the range of $3 to $5 billion for 2018, based on the most recent data available.[20]

And much of that revenue will flow into the federal government's coffers after April 15, 2019.  Like other taxes, the IRS may collect on any unpaid penalty from 2018 (or prior years) via offsets under 26 U.S.C. § 6402(a).  And approximately 26% of individuals do not file their taxes on time, underreport their assets, or pay too little tax when they initially file.[21]  Accordingly, the federal government will likely continue to collect shared responsibility payments owed from 2018 until 2020 or beyond.  The shared responsibility payment will thus "produce at least some revenue for the Government" long after January 1, 2019.  *NFIB*, 567 U.S. 564.  Therefore, even if Plaintiffs' theory were legally sound, the Court could not enjoin the minimum coverage requirement until it ceased producing any revenue for the government several years down the road.  Plaintiffs' claims are therefore not ripe, and this Court lacks jurisdiction to consider them.

---

[20] In 2015, the last IRS reported year, the shared responsibility payment totaled $3.1 billion.  *See* Internal Revenue Serv., U.S. Department of the Treasury, Pub. No. 1304, Individual Income Tax Returns 2015 26 (Rev. Sept. 2017).  Appx. 229-230.  And CBO estimates that amount will be around $5 billion in 2018.  *See* Cong. Budget Off., Repealing the Individual Health Insurance Mandate: An Updated Estimate 2, Appx. 233.

[21] In 2016, the IRS reported that for tax years 2008-2010, the estimated voluntary compliance rate (VCR) of individual tax filers was 74%, reflecting a noncompliance rate (including nonfiling, underreporting, and underpayment) of approximately a quarter of taxpayers.  Internal Revenue Serv., Research, U.S. Dep't of the Treasury, Pub. No. 1415, Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2008–2010 11 (2016), Appx. 254.

A plaintiff's standing to bring a cause of action is assessed at the time the suit was filed. *Davis v. FEC,* 554 U.S. 724, 734 (2008) ("While the proof required to establish standing increases as the suit proceeds…the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."). "A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Id.* But here, the government will earn revenue from the shared responsibility payment at least through 2019, and likely for years afterwards; therefore, any injury that might occur once the shared responsibility payment ceases producing any revenue is plainly not "real, immediate, and direct." *Id.* Plaintiffs' claims are not ripe, and the Court cannot consider them at this time. *Id.*

In sum, the shared responsibility payment remains a constitutionally valid exercise of Congress's taxing power, and this Court lacks jurisdiction to consider this challenge.

## II. IF ZEROING OUT THE TAX MAKES THE MINIMUM COVERAGE REQUIREMENT UNCONSTITUTIONAL, THE REMEDY IS TO STRIKE THE RECENT AMENDMENT AND REINSTATE THE PRIOR TAX AMOUNT

If the Court nevertheless concludes that the ACA's minimum coverage requirement is unconstitutional once the tax penalty becomes $0 in 2019, the correct remedy is to declare only that amended provision unconstitutional. Under long-standing principles of statutory construction, when a legislature purports to amend an existing statute in a way that would render the statute (or part of the statute) unconstitutional, the *amendment* is void, and the statute continues to operate as it did before the invalid amendment was enacted. *See Frost v. Corp. Com. of Oklahoma*, 278 U.S. 515, 525-527 (1928) (holding that when a valid statute is amended and the amendment is unconstitutional, the amendment "is a nullity and, therefore, powerless to work any change in the existing statute, that [existing] statute must stand as the only valid expression of legislative intent"). The proper remedy is to strike the amendment that reduced the tax liability to $0 and revert back to the prior tax penalty found constitutional in *NFIB*.

In *Frost*, the Supreme Court ruled that an amendment to an Oklahoma licensing statute—passed ten years after the original statute was enacted—violated the Constitution's equal protection clause. *Frost*, 278 U.S. at 521-22. The Court then explained that the remedy for addressing an unconstitutional *amendment* to a statute was fundamentally different than the one used to cure an unconstitutional provision in the original statute. *Id*. at 525-26. If the licensing law "as originally passed had contained the proviso, the effect would be to render the entire section invalid." *Id*. at 525. However, "the proviso here in question was not in the original section" and "since the amendment is void for unconstitutionality, it cannot be given that effect, 'because an existing statute cannot be recalled or restricted by anything short of a constitutional enactment.'" *Id*. at 526 (citing *Davis v. Wallace*, 257 U.S. 478, 485 (1922)).

In other words, when "the statute, before the amendment, was entirely valid" and "a different Legislature" passes an unconstitutional amendment, that amendment "is a nullity and, therefore, *powerless to work any change in the existing statute*, that [existing] statute must stand as the only valid expression of the legislative intent." *Id*. at 526-27 (emphasis added). Under such circumstances—which mirror the situation here—only the recent amendment is invalidated and the statute reverts back to its original form. *Id*.

The courts have consistently applied this principle over the past century. *See, e.g., U.S. v. Tufti*, 542 F.2d 1046, 1047 (9th Cir. 1976) ("we applied the fundamental principle of statutory construction that a void act cannot operate to repeal a valid existing statute"); *Ross v. Goshi*, 351 F. Supp. 949, 954 (D. Hawaii 1972) ("it is a general rule of application that, where an act purporting to amend and re-enact an existing statute is void, the original statute remains in force); *Weissinger v. Boswell*, 330 F. Supp. 615, 625 (M.D. Ala. 1971) ("The elementary rule of statutory construction is without exception that a void act cannot operate to repeal a valid existing statute, and the law remains in full force and operation as if the repeal had never been attempted."); *State v. Standard Oil Co.*, 107

23

S.W.2d 550, 557 (Tex. 1937) ("[W]here an amendment to an act has been declared invalid, the original [a]ct remains in full force and effect").

In light of these authorities, even if the Court were to agree with Plaintiffs that the ACA's minimum coverage requirement—as amended by the TCJA—becomes unconstitutional because it will cease raising revenue at some point in the future, and that Plaintiffs' contentions are ripe for resolution, the proper response is to strike down the unconstitutional amendment. *Frost*, 278 U.S. at 526-27. And the previous tax penalty— passed years earlier by a prior Congress and upheld by the Supreme Court—"must stand as the only valid expression of legislative intent." *Id*. at 527.

### III.   EVEN IF THE MINIMUM COVERAGE REQUIREMENT IS NOW UNCONSTITUTIONAL, THE REST OF THE ACA IS SEVERABLE

For the reasons outlined above, the Court should conclude that the ACA's minimum coverage requirement, even with a $0 tax penalty beginning next year, is fully constitutional. And if not, the remedy is to strike down the recent amendment and reinstate the prior payment. But even if Plaintiffs could overcome these significant hurdles, they still cannot meet their heavy burden of demonstrating that the entire ACA should be struck down because a single provision is unconstitutional. The ACA's many goals are still advanced even without the minimum coverage requirement.

Plaintiffs have not identified a single instance—and Intervenor-Defendants are not aware of one—in which the Supreme Court has struck down the entirety of a federal statute with the breadth and scope of the ACA based on a *single* provision being unconstitutional. The ACA contains 10 titles, stretches over 900 pages, contains hundreds of provisions, and has been the law for over eight years. *NFIB*, 567 U.S. at 538-39. Striking down the entire statute, including hundreds of perfectly lawful provisions—most of which have nothing to do with the individual insurance market— would be an extraordinary result. As the Eleventh Circuit explained when it declined to invalidate the entire ACA, "in the overwhelming majority of cases, the Supreme Court

has opted to sever the constitutionally defective provision from the remainder of the statute." *Florida ex rel. Atty. Gen. v. U.S. Dep't of Health and Human Services*, 648 F.3d 1235, 1320-21 (11th Cir. 2011) (holding that the minimum coverage requirement was unconstitutional but could be severed from the rest of the ACA), *reversed in part by NFIB*, 567 U.S. 519 (holding that the minimum coverage requirement was a constitutionally valid tax and therefore not addressing its severability from the rest of the ACA). The result that Plaintiffs seek is truly unprecedented, fundamentally undemocratic, and should be soundly rejected by the Court.

### A. Plaintiffs Carry a Heavy Burden in Asking This Court to Strike Down Hundreds of Perfectly Lawful Provisions

It is well-established that when "review[ing] the constitutionality of a legislative act, a federal court should act cautiously" because a "ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Regan v. Time*, 468 U.S. 641, 652 (1984); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006). It is a "settled premise that severability is fundamentally rooted in a respect for separation of powers and notions of judicial restraint." *Florida ex rel. Atty. Gen.*, 648 F.3d at 1320-21. A court "must refrain from invalidating more of the statute than is necessary." *Booker v. U.S.*, 543 U.S. 220, 258. "Whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987).

Accordingly, "when confronting a constitutional flaw in a statute," courts "sever its problematic portions while leaving the remainder intact." *Ayotte*, 546 U.S. at 328-29. Simply put, "[t]he presumption is in favor of severability." *Regan*, 468 U.S. at 653; *see also Florida ex rel. Atty. Gen.*, 648 F.3d at 1241 (concluding that the minimum coverage

requirement is severable from the rest of the ACA "because of the Supreme Court's strong presumption of severability and as a matter of judicial restraint").[22]

Determining "[w]hether an unconstitutional provision is severable from the remainder of the statute . . . is largely a question of legislative intent . . ." *Regan*, 468 U.S. at 653. But those seeking to overcome the presumption of severability face a heavy burden, one Plaintiffs cannot carry. "Unless it is *evident* that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines*, 480 U.S. at 684 (emphasis added); *see also NFIB*, 567 U.S. at 587 ("Unless it is 'evident' that the answer is no, we must leave the rest of the Act intact."). It is axiomatic that the "touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature." *Ayotte*, 546 U.S. at 330; *see also NFIB*, 567 U.S. at 586 (same). As long as the rest of the statute is: (1) constitutionally valid; (2) capable of "functioning independently"; and (3) consistent with Congress's basic objectives in enacting the statute, the Court severs the unconstitutional provision and leaves the rest intact. *Booker*, 543 U.S. at 258-59.

Under these well-settled precedents, if a court finds a statutory provision unconstitutional, the court asks a simple question, "[w]ould the legislature have preferred what is left of its statute to no statute at all?" *Ayotte*, 546 U.S. at 330; *see also Leavitt v. Jane L.*, 518 U.S. 137, 143 (1996) ("The relevant question, in other words, is not whether the legislature would prefer (A+B) to B, because by reason of the invalidation of A that

---

[22] Plaintiffs flip the presumption of severability on its head, asserting that "the severability inquiry proceeds in two steps, both of which must be satisfied for a provision to be severable." ECF No. 40 at 27. But no case says that. Plaintiffs cite *Alaska Airlines*, but that decision confirms that a court *must sever* the unconstitutional provision from the rest of the statute "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not" so long as "what is left is fully operative as a law." *Alaska Airlines*, 480 U.S. at 684. Like every other Supreme Court case, *Alaska Airlines* affirms the strong presumption in favor of severability.

choice is no longer available.  The relevant question is whether the legislature would prefer not to have B if it could not have A as well.").  As shown below, there can be little doubt that the Congress that passed the ACA *and* the Congress that zeroed out the shared responsibility payment would have wanted the remainder of the ACA to stand.  Plaintiffs have not come close to meeting their burden of proving that it is "evident" that Congress would have wanted Medicaid expansion, tax credits, consumer protections for 133 million Americans with preexisting conditions, and hundreds of other provisions to disappear along with the minimum coverage requirement.

### B.    Severability Clauses Are Unnecessary and There is No Presumption Against Severability From Failing to Include Them

As a preliminary matter, Plaintiffs' emphasis on the lack of a severability clause in the ACA is misplaced.  *See* ECF No. 40 at 28-29.  Plaintiffs claim that "a textual instruction in the statute as to severability carries presumptive, or even dispositive, sway without need to resort to the full-blown, two-part inquiry."  *Id*. at 28.  The Supreme Court has said precisely the opposite.  In *Alaska Airlines*, it explained that "[i]n the absence of a severability clause, however, Congress' silence is just that—silence—and *does not raise a presumption against severability*."  *Alaska Airlines*, 480 U.S. at 686 (emphasis added); *see also New York*, 505 U.S. at 186 (same).

Both the House and Senate drafting manuals, moreover, expressly provide that severability clauses are "unnecessary" and need not be included in legislation.  *See* Office of the Legis. Counsel, U.S. Senate, *Legislative Drafting Manual* § 131, at 49 (1997); Office of the Legislative Counsel, U.S. H.R., *House Legislative Counsel's Manual on Drafting Style* § 328, at 33 (1995).  The failure to include an "unnecessary" clause is immaterial, and the Supreme Court has said that "the ultimate determination of severability will rarely turn on the presence or absence of such a clause."  *U.S. v. Jackson*, 390 U.S. 570, 585 n.27 (1968).  Congress also placed the requirement to maintain minimum coverage or pay a shared responsibility payment in the Internal Revenue Code,

which *does* contain a severability provision.  *See* I.R.C., § 5000A(a)-(b) (outlining the requirement to maintain minimum essential coverage or pay a penalty) and § 7852(a) (severability clause).  For all of these reasons, the absence of a severability clause in the ACA does not rebut the long-established principle that "[t]he presumption is in favor of severability."  *Regan*, 468 U.S. at 653.  Plaintiffs' claims to the contrary are unfounded.

## C.   The ACA's Remaining Provisions Are Severable from the Minimum Coverage Provision

Plaintiffs assert that if the minimum coverage requirement is unconstitutional, every one of the ACA's hundreds of additional provisions must be invalidated because otherwise "the ACA's design of 'shared responsibility'" would be upset.  ECF No. 40 at 35.  In essence, Plaintiffs assert that invalidating the minimum coverage provision could create a chain reaction that might eventually cause some of the ACA's other provisions to operate differently than Congress intended, and thus the ACA must be struck down in its entirety.  There is no merit to this argument.

### 1.   The Congress that passed the TCJA deliberately left the rest of the ACA in place.

Striking down the entire ACA is improper because it would contravene congressional intent.  *See NFIB*, 567 U.S. at 586 (the "touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature").  In seeking to enjoin the entire ACA based on the TCJA's recent amendment, Plaintiffs overlook the intent of the Congress that *passed* that amendment.[23]  There can be no doubt that the current Congress—which zeroed out the shared responsibility payment—wanted the rest of the ACA to remain in place.  That judgment represents the will of the people as expressed through their democratically

---

[23] Plaintiffs focus exclusively on the intent of the Congress that passed the ACA.  But that is the wrong focal point.  None of Plaintiffs' cases involved a statutory provision amended by a *subsequent* Congress in a manner that purportedly makes the amended provision unconstitutional.  Under these circumstances, the intent of the Congress that amended the provision should govern.

elected representatives, and courts may not impose a severability remedy that directly contradicts congressional intent. *Regan*, 468 U.S. at 653; *NFIB*, 567 U.S. at 586.

The legislative history of the TCJA conclusively demonstrates that Congress intended to preserve every aspect of the ACA other than eliminating the tax penalty for failing to comply with the minimum coverage requirement. For example, in the Senate Finance Committee hearing, Senator Toomey (R-PA) emphasized that:

> There are no cuts to Medicaid. There are no changes to the program. There are no reimbursement differences. There are no disqualifications for people to participate. None of that. We are simply saying if you cannot afford these ill designed plans, with respect to your family anyway, you are not going to have to pay this penalty.[24]

Senator Shelly Moore Capito (R-WV) remarked that: "No one is being forced off of Medicaid or a private health insurance plan by the elimination of the individual mandate. By eliminating the individual mandate, we are simply stopping penalizing and taxing people who either cannot afford or decide not to buy health insurance plans."[25]

Senator Orrin Hatch (R-UT) similarly asserted:

> Let us be clear, repealing the tax does not take anyone's health insurance away. No one would lose access to coverage or subsidies that help them pay for coverage unless they chose not to enroll in health coverage once the penalty for doing so is no longer in effect. No one would be kicked off of Medicare. No one would lose insurance they are currently getting from insurance carriers. Nothing—nothing—in the modified mark impacts Obamacare policies like coverage for preexisting conditions or restrictions against lifetime limits on coverage.[26]

He further emphasized that "[t]he bill does nothing to alter Title I of Obamacare, which includes all of the insurance mandates and requirements related to preexisting conditions and essential health benefits." *Id.* at 286.

Senator Tim Scott (R-SC) also declared from the Senate floor that "[a]nyone who doesn't understand and appreciate that the individual mandate and its effects in our bill take nothing at all away from anyone who needs a subsidy, anyone who wants to

---

[24] *See Continuation of the Open Executive Session to Consider an Original Bill Entitled the Tax Cuts and Jobs Act Before the S. Comm. On Fin.*, Senate, 115th Congress, Nov. 15, 2017.
[25] 163 Cong. Rec. S7383 (daily ed. Nov. 29, 2017).
[26] *See supra* n.22 at 106.

continue their coverage—it does not have a single letter in there about preexisting conditions or any actual health feature."[27]  There are many more examples in the record. Congress intentionally retained the community-rating and guaranteed-issue provisions that prevent discrimination on the basis of preexisting conditions, maintained federal subsidies for purchasing health insurance, and left Medicaid expansion untouched.  That is the congressional intent that governs the outcome here.  *See Ayotte*, 546 U.S. at 330 ("Would the legislature have preferred what is left of its statute to no statute at all?"). The answer is yes, because Congress made this unequivocally clear.

Congressional intent to keep the rest of the ACA intact is also demonstrated by the many times that Congress considered, but ultimately rejected, attempts to repeal this landmark legislation.  Since its passage in 2010, some members of Congress have attempted to repeal the law an estimated 70 times, yet all such efforts have been rebuffed.[28]  It would be difficult to imagine a more robust record of congressional intent to maintain the ACA as federal law.  The Court should decline Plaintiffs' invitation to circumvent clear congressional intent in order to impose a result that Congress repeatedly declined to enact through the legislative process.  *See NFIB*, 567 U.S. at 586.

### 2.    The Congress that passed the ACA would have wanted the rest of the ACA to stand.

For the reasons outlined above, the Court's severability analysis should be governed by the 2017 Congress's stated intent to leave the rest of the ACA in place.  But even if it were proper to consider the legislative intent of the 2010 Congress that passed the minimum coverage provision in its original (and fully constitutional) form—and to graft that intent onto a statutory amendment passed by a *different* Congress—that would still be of no assistance to Plaintiffs.  For the many reasons outlined below, the Congress that

---

[27] *See* 163 Cong. Rec. S7666 (daily ed. Dec. 1, 2017).
[28] *See* C. Stephen Redhead & Janet Kinzer, Cong. Research Serv., R43289, "4002112th, 113th, and 114th Congresses to Repeal, Defund, or Delay the Affordable Care Act" (2017), Appx. 192-219.

passed the ACA would not have wanted wholesale invalidation of this groundbreaking legislation just because a later Congress reduced the shared responsibility payment to $0.

### a.    The majority of the ACA's provisions went into effect years before the minimum coverage requirement.

For starters, there is no reason to believe that the Congress that adopted the ACA would have wished to invalidate the *majority* of the ACA's provisions which it effectuated years before the minimum coverage requirement took effect in 2014. For example, since January 1, 2010, the ACA has provided tax credits for small businesses to subsidize employee health coverage. *See* 26 U.S.C. § 45R. That same year, Congress prohibited insurers from imposing lifetime dollar limits on the value of coverage, from denying children coverage based on preexisting medical conditions, and from rescinding coverage except in the case of fraud. *See* 42 U.S.C. §§ 300gg-3, 300gg-11, 300gg-12. In 2011, numerous sections of the ACA implemented more efficient Medicare payment rates, which have been used to make millions of provider payments. *See, e.g.*, 42 U.S.C. § 1395w-4(e)(1)(H). Other major reforms effectuated in 2010-11 include: requiring individual and group health plans to cover preventive services without cost sharing; allowing children to stay on their parents' health insurance until age 26; and awarding funds to establish state-based Exchanges. 42 U.S.C. § 300gg-13 & 14; § 18031. By implementing most of the ACA years before the minimum coverage requirement, Congress made clear that it did not consider them dependent upon one another.

It is inconceivable that the Congress that passed the ACA would have wished to nullify tax credits for small businesses, eliminate important consumer protection reforms (including protections for children with preexisting conditions), and unwind millions of completed Medicare payments years later just because the minimum coverage provision was struck down. *See New York*, 505 U.S. at 186 ("the invalidation of one of the [statute's] incentives should not ordinarily cause Congress' overall intent to be frustrated.") Here, as the Eleventh Circuit found, excising the minimum coverage

provision "does not prevent the remaining provisions from being 'fully operative as a law.'" *Florida ex rel. Atty. Gen.*, 648 F.3d at 1322. All of the ACA's provisions, and especially those implemented years earlier, are severable from that requirement.

> **b.    Most of the ACA has nothing to do with the individual insurance market.**

The severability of the rest of the ACA is also shown by the fact that the "lion's share of the Act has nothing to do with private insurance, much less the mandate that individuals buy insurance." *Id.* at 1322. In light of the ACA's numerous stand-alone provisions addressing a vast array of diverse topics, it is not remotely "evident" that Congress would want the extraordinary disruption that would be caused by eliminating Medicaid expansion for millions of Americans, wiping out billions of dollars in premium tax credits that help low-income Americans purchase health insurance, reversing vital and long overdue changes to Medicare payment rates, eliminating tax credits for small businesses, and undoing numerous other wholly unrelated statutory provisions such as canceling reasonable break times for nursing mothers and restored funding for abstinence education. *See*, *e.g.*, 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII); 26 U.S.C. § 36B; 42 U.S.C. § 1395w-44(p); 26 U.S.C. § 45R; 29 U.S.C. § 207(r); 42 U.S.C. § 710.

The extraordinarily varied array of issues addressed by the ACA distinguishes it from the Professional and Amateur Sports Protection Act (PASPA), which was invalidated in the Supreme Court's latest decision to address severability. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S.Ct. 1461 (2018). The Court held that PASPA's provision prohibiting States from authorizing sports gambling was unconstitutional. *Id.* at 1478-81. It then went on to hold that the statute's remaining, closely related provisions—which prohibited: (1) state-run sports lotteries; (2) private sports gambling schemes operated pursuant to state authorization; and (3) the advertising of sports gambling—had to fall as well. *Id.* at 1482-84. This result flowed from PASPA's narrow, single-subject nature, and the Court's conclusions, grounded in an inquiry into legislative

intent, that: (1) legalizing sports gambling in private casinos while prohibiting state-run lotteries would get things "exactly backwards," *Id*. at 1483; (2) it would be a "weird result" for Congress to prohibit private arrangements that operated pursuant to now-lawful state authorization, i*d*. at 1484; and (3) it would be incongruous for federal law to prohibit the advertising of sports gambling once States were free to authorize that activity. *Id*. By contrast, a finding of total inseverability here would invalidate scores of provisions that have nothing to do with the minimum coverage requirement.

Such a result would be radically at odds with "the overwhelming majority of cases," in which "the Supreme Court has opted to sever the constitutionally defective provision from the remainder of the statute." *Florida ex rel. Atty. Gen.*, 648 F.3d at 1321 (citing historical examples). Wholesale invalidation of a statute is strongly disfavored and exceedingly rare. *See, e.g.*, *Ayotte*, 546 U.S. at 328-31. This case is no exception. If the Court concludes that the minimum coverage requirement is unconstitutional and declines to remedy that infirmity by striking down only the unconstitutional amendment itself (contrary to *Frost*), it should sever the minimum coverage provision from the rest of the ACA. *See Ayotte*, 546 U.S. at 328-29 ("when confronting a constitutional flaw in a statute," courts "sever its problematic portions while leaving the remainder intact.")

> **c. The ACA's community-rating and guaranteed-issue provisions are also severable from the mandate.**

The result is no different when considering the ACA's "community-rating" and "guaranteed-issue" provisions, which are also severable from the minimum coverage requirement. The guaranteed-issue provision bars insurers from denying coverage to any individual because of the medical condition or medical history of that individual and/or his dependents. *See* 42 U.S.C. §§ 300gg-1, 300gg-3, 300gg-4. The community-rating requirement prohibits insurers from charging higher premiums because of their preexisting medical conditions. *Id*. at §§ 300gg(a), 300gg-4(b). These provisions ensure that 133 million Americans with preexisting conditions have access to affordable health

care.  Aaron Dec. ¶¶ 13-16, Appx. 8-10.  It is far from "evident" that the Congress that ushered in these important consumer protections would want them invalidated simply because a later Congress reduced the shared responsibility payment to $0.

To determine whether the Congress that passed the ACA would have wanted the community-rating and guaranteed-issue provisions to remain in place even without a minimum coverage requirement, it is essential to understand how the health insurance market operated at the time that the ACA passed.  A decade ago, as a result of the medical underwriting practices of private insurers, between 9 and 12.6 million uninsured Americans "voluntarily sought health coverage in the individual market but were denied coverage, charged a higher premium, or offered only limited coverage that excludes a preexisting condition."  *Florida ex rel. Atty. Gen.*, 648 F.3d at 1245; *see also NFIB*, 567 U.S. at 596-97 (Ginsburg, J. dissenting) (Before the ACA, "insurers routinely refused to insure" individuals with preexisting medical conditions "or offered them only limited coverage that did not include the preexisting illness").

Congress was concerned about these discriminatory industry practices, which prevented millions with preexisting conditions from obtaining affordable health insurance.  Corlette Dec. ¶¶ 8-15, Appx. 087-090.  A House Report discussing a 2009 health care bill that pre-dated final passage of the ACA stated that "health insurers—particularly in the individual market—have adopted discriminatory, but not illegal, practices to cherry-pick healthy people and to weed out those who are not as healthy."  H.R. Rep. No. 111-299, Pt. 3, at 92 (2009).

### (1)   Congress independently sought to end discriminatory underwriting practices and to lower administrative costs.

One of Congress's main objectives in passing the ACA was to end these discriminatory insurance industry practices which denied affordable health insurance to millions of unhealthy individuals.  *See* H.R. Rep. No. 111-443, Pt 2, at 975-76 (2010)

("To protect families struggling with health care costs and inadequate coverage, the bill ensures that insurance companies can no longer compete based on risk selection.")  The legislative history of the ACA shows that this was a paramount concern of Congress, part and parcel of its ultimate goal of "increas[ing] the number and share of Americans who are insured."  42 U.S.C. § 18091(2)(C).

For example, Senator Dick Durbin (D-Illinois) stated during the Senate debate: "What we provide in this bill is protection against the ratings which discriminate against people because they are elderly or because they are women. We put limits to the rating differences that will be allowed in health insurance policies."[29]  Senator Tim Johnson (D-South Dakota) explained that: "Under the Senate reform bill, all health insurers will be prohibited from using preexisting conditions to deny health care and it will be illegal for them to drop coverage when illness strikes."[30]  Senator Russ Feingold (D-Wisconsin) averred that: "Because of this bill, lifetime and annual limits on coverage will be prohibited.  Premiums cannot increase due to medical needs or illness.  Insurers cannot charge women more than men for the same insurance policy.  Restricting or denying coverage based on preexisting conditions is prohibited for all Americans, beginning with children effective 6 months after final passage of this bill."[31]  This is just a small sample of the legislative history, which demonstrates that Congress passed the guaranteed-issue and community-rating provisions to ensure that everyone has access to affordable health insurance regardless of their health status.

In addition to protecting consumers with preexisting medical conditions, Congress also enacted the guaranteed-issue and community-rating provisions to reduce administrative costs and lower premiums.  *Florida ex rel. Atty. Gen.*, 648 F.3d at 1323 (citing 42 U.S.C § 18091(a)(2)(J)).  Congress found that insurers incurred $90 billion in

---

[29] 155 Cong. Rec. S13020 (daily ed. Dec. 11, 2009).
[30] 155 Cong. Rec. S13692 (daily ed. Dec. 21, 2009).
[31] 155 Cong. Rec. S13851 (daily ed. Dec. 23, 2009).

annual underwriting costs, representing 26%-30% of consumers' premium costs.  *Id.*  The community-rating and guaranteed-issue provisions were intended to "reduce the number of the uninsured and underwriting costs" to the benefit of consumers.  *Id*; *see also* § 18091(2)(J) (the ACA's provisions, collectively, are intended to create "effective health insurance markets that do not require underwriting and eliminate its associated administrative costs.").  These provisions will further these congressional purposes even in the absence of a shared responsibility payment.  Congress would not wish to revert back to a situation where millions of Americans with preexisting conditions are denied access to affordable healthcare.

### (2) It is not "evident" that Congress would want to discard these important consumer protections in the absence of the minimum coverage provision.

Plaintiffs assert that the Congress that enacted the ACA would not have wanted the community-rating and guaranteed-issue provisions to stand without a minimum coverage provision because: (1) the ACA states that all three provisions are "essential" to creating effective health insurance markets; and (2) adverse selection would cause premium rates would spike and a death spiral in the market may occur, which would be the opposite of Congress's goals in passing the ACA.  ECF No. 40 at 30-35.  But these arguments are overstated and ultimately insufficient to meet Plaintiffs' heavy burden of proving that it is "evident" that Congress would prefer that outcome.  *NFIB*, 567 U.S. at 587.

Plaintiffs first assert that the community-rating and guaranteed-issue provisions are not severable "because of the specific findings that Congress inserted into the statutory text."  ECF No. 40 at 30.  Plaintiffs point to language stating that "[t]he requirement [to maintain minimum coverage] is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of preexisting conditions can be sold."  *Id*. (citing 42 U.S.C. § 18091(2)(I)).

Based on this language, Plaintiffs claim that these provisions are "so interwoven" with the minimum coverage requirement that they must be invalidated too. *Id.*

There are a number of flaws with this argument. For starters, these congressional findings were designed to show that the requirement to maintain minimum essential coverage "is commercial and economic in nature, and substantially *affects interstate commerce . . .*" 42 U.S.C. § 18091(1) (emphasis added). In other words, these findings were drafted to demonstrate that Congress had constitutional authority under the Commerce Clause to require that most Americans purchase health insurance. *Id.* They do *not* reflect Congress's judgment as to whether the community-rating and guaranteed-issue provisions should cease to exist if the minimum coverage requirement were invalidated. And in light of *NFIB*—which held that Congress lacked authority under the Commerce Clause to require individuals to purchase insurance—these congressional findings are no longer relevant to the constitutional analysis for which they were crafted.

To be sure, Congress intended that the requirement to purchase health insurance, along with the community-rating and guaranteed-issue provisions, would work together harmoniously to increase the number of insured Americans and lower premiums. And it is true that without the minimum coverage provision, the community-rating and guaranteed-issue provisions will be less effective in achieving those goals. But contrary to Plaintiffs' assertions, severability does not turn on whether these remaining provisions will "function" in precisely the same "manner" that Congress intended.[32] ECF No. 40 at

---

[32] Plaintiffs repeatedly pluck the word "manner" from the *Alaska Airlines* decision and suggest that any time remaining statutory provisions do not function in the "manner" that Congress originally intended, they are not severable. *See* ECF No. 40 at 27. That is incorrect for two reasons. First, no subsequent Supreme Court decision has used the word "manner" when discussing severability principles, and it is doubtful that this one-time usage was intended to change the well-established legal standard. Second, at the end of the paragraph in *Alaska Airlines* which uses the word "manner," the Court affirmed that "the unconstitutional provision *must be severed* unless the statute created in its absence is legislation that Congress would not have enacted." *Alaska Airlines*, 480 U.S. at 685 (emphasis added). That is the traditional test that the Supreme Court has consistently followed, and which this Court should also follow.

35.  That cannot be the correct legal standard; after all, presumably Congress never adopts any provision unless it believes it will help achieve its legislative objectives in a more efficient or effective manner.  Framed properly, the question before the Court is whether Congress would "have preferred what is left of its statute to no statute at all[.]" *Ayotte*, 546 U.S. at 330.  And as long as the community-rating and guaranteed-issue provisions are: (1) constitutionally valid; (2) capable of "functioning independently"; and (3) consistent with Congress's basic objectives in enacting the statute, the Court severs the unconstitutional provision and leaves the rest intact.  *Booker*, 543 U.S. at 258-59.

The *Booker* factors are readily met.  First, Plaintiffs do not assert that the community-rating and guaranteed-issue provisions are unconstitutional.  Second, they "function independently" of the minimum coverage requirement because there is no functional dependency—or even any textual cross-reference—between these provisions. When considering this issue, the Eleventh Circuit explained:

> It is also telling that none of the insurance reforms, including even the guaranteed issue and coverage of preexisting conditions, contain any cross-reference to the individual mandate or make their implementation dependent on the mandate's continued existence.

*Florida ex rel. Atty. Gen.*, 648 F.3d at 1324 (citing *Booker*, 543 U.S. at 260.)[33]

*Booker* describes the necessary functional and textual intertwining of statutory provisions that must be present in order to strike down more than just the unconstitutional provision.  In that case, the Court held that 18 U.S.C. § 3553(b)(1), which made the Federal Sentencing Guidelines mandatory, violated the Sixth Amendment and therefore had to be excised from the Sentencing Reform Act of 1984.  *Booker*, 543 U.S. at 245, 259. The Court left the remainder of the law intact, with one exception.  *Id.* at 259.  That exception was a statutory provision that "depends upon the Guidelines' mandatory nature"

---

[33] The Eleventh Circuit also noted that the prohibition on preexisting condition exclusions with respect to enrollees under 19 was implemented in 2010, four years *before* the minimum coverage requirement took effect in 2014.  *Id.* at 1324.  That is yet another reason why these provisions are not inherently dependent on one another.

and "contains critical cross-references to the (now-excised) § 3553(b)(1) and consequently must be severed and excised for similar reasons." *Id.* at 260; *see also Murphy*, 138 S. Ct. at 1482-84 (explaining the functional interdependence of PASPA's provisions concerning sports gambling). Aside from striking that single additional provision that was functionally and textually dependent on the unconstitutional provision that made the guidelines mandatory, the Court upheld the remainder of the statute. *Id.*

Unlike the single additional provision invalidated in *Booker*, nothing in the text of the ACA makes the community-rating and guaranteed-issue provisions functionally dependent on the existence of the minimum coverage provision. Nor do these provisions contain any "critical [textual] cross-references" to the minimum coverage provision. *Florida ex rel. Atty. Gen.*, 648 F.3d at 1324. The community-rating and guaranteed-issue provisions "can fully operate as a law" even without the minimum coverage requirement. *Id.*; *see also Booker*, 543 U.S. at 259 ("The remainder of the Act functions independently.") The second *Booker* factor is also met here.

Under the final *Booker* factor, the community-rating and guaranteed-issue provisions must stand if they are "consistent with Congress's basic objectives in enacting the statute." *Booker*, 543 U.S. at 259. As discussed previously, these requirements are fully consistent with Congress's desire to ensure that consumers with preexisting medical conditions have access to affordable health insurance. *See, e.g.*, H.R. Rep. No. 443, 111th Cong. 2d Sess. Pt 2, at 975-76 (2010) ("to protect families struggling with health care costs and inadequate coverage, the bill ensures that insurance companies can no longer compete based on risk selection.") All of the *Booker* factors are readily met.

### (3) The adverse selection concern from 2010 is no longer a concern today.

Despite the overwhelming evidence demonstrating that severing the unconstitutional provision would be "consistent with Congress's basic objectives," Plaintiffs raise the "adverse selection problem." ECF No. 40 at 31. It is true that

Congress expressed concern that without the minimum coverage requirement, "many individuals would wait to purchase health insurance until they needed care and thus Congress wished to "minimize this adverse selection and broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums." 42 U.S.C. § 18091(2)(I).  Because of this, in *NFIB* the federal government conceded that the community-rating and guaranteed-issue provisions are not severable from the minimum coverage requirement.

Any concern about adverse selection is not well founded in 2018.  First, as Congress stated at the time, the three-prong approach that it adopted was intended to assist in "*creating* effective health insurance markets. . ." 42 U.S.C. § 18091(2)(I) (emphasis added).  Congress was attempting to create brand new insurance markets from scratch, a major undertaking that involved tremendous uncertainty.  But those markets were successfully created years ago, and even Plaintiffs do not assert that the minimum coverage provision is essential to *maintaining* those already-created health insurance markets.  In fact, Plaintiffs themselves acknowledge that the "death spiral" scenario is far-fetched when they cite a 2017 CBO report about the effect of eliminating the shared responsibility payment.  ECF No. 40 at 35.[34]  CBO found that repealing the minimum coverage requirement would cause average premiums in the nongroup market to rise by about 10%, but that "nongroup insurance markets would continue to be stable in almost all areas of the country throughout the coming decade."[35]  CBO 2017 Report at 1.

CBO recently released a new report confirming that even with the elimination of the tax penalty for the individual mandate: (1) the individual market will remain stable in most of the country over the next decade (though that stability may be fragile in some

---

[34] *See* Cong. Budget Off., Repealing the Individual Health Insurance Mandate: An Updated Estimate 2, Appx. 233.

[35] Although the CBO was assessing repeal of the individual mandate, it confirmed that "the results would be very similar" if the tax penalty was simply eliminated, but not repealed.  *Id.*

places); (2) after the first year, premium increases will average only about 7% between 2019 and 2028; and (3) between 12 and 13 million Americans will continue to enroll in the individual insurance market.[36]  Whatever the theoretical concern in 2010, Plaintiffs have offered no evidence suggesting that zeroing out the shared responsibility payment in 2019 will cause the individual insurance market to completely collapse because of adverse selection.

Second, the ACA itself contains many provisions that mitigate the risk of adverse selection.  For example, the ACA permits insurance companies to "restrict enrollment in coverage . . . to open or special enrollment periods."  42 U.S.C. § 300gg-1(b)(1).  Uninsured individuals, therefore, "cannot literally purchase insurance on the way to the hospital."  *Florida ex rel. Atty. Gen.*, 648 F.3d at 1324 n.139.  The ACA allows up to a 90-day waiting period for group coverage eligibility, and imposes no limit on the waiting period that insurers can impose in the individual market.  *Id.*  Uninsured individuals who forgo health insurance because they are currently healthy run a serious risk of becoming ill and requiring medical treatment prior to the next enrollment period.

Third, millions of healthy individuals will continue to purchase insurance because the ACA provides *billions* of dollars in premium tax credits to subsidize those purchases.  *See* 26 U.S.C. § 36B; CBO August 2017 report at 13 (estimating that the federal government would spend $247 billion on the ACA's subsidies between 2017-2026).[37]  In fact, nearly 12 million Americans purchased health insurance through the ACA's exchanges for 2018, and the vast majority of them (83%) did so with the help of premium tax credits.[38]  And the CBO expects that number to *increase* over the coming decade even

---

[36] *See* Cong. Budget Off., Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2018 to 2028, 2-3, 5 (2018).  Appx. 275-276, 278.

[37] Cong. Budget Off., The Effects of Terminating Payments for Cost-Sharing Reductions 13 (2017).  Appx. 316.

[38] *See* Ctrs. for Medicare & Medicaid Servs., Health Insurance Exchanges 2018 Open Enrollment Period Final Report (2018).  Appx. 319-322.

without a shared responsibility payment.[39]  Millions of healthy Americans will continue to purchase subsidized health insurance, which undercuts the concern that only the sick will buy insurance without a tax penalty for not doing so.  It is also worth noting that the shared responsibility payment by itself was a weak incentive to purchase health insurance, even before the penalty was reduced to zero.[40]  As the Eleventh Circuit explained, the scope and effect of the shared responsibility payment was seriously constrained by "its three exemptions, its five exceptions to the penalty, and its stripping the IRS of tax liens, interests, or penalties and leaving virtually no enforcement mechanism."  *Florida ex rel. Atty. Gen.*, 648 F.3d at 1326.

For all of these reasons, the decade-old and entirely theoretical risk of excessive adverse selection causing the individual market to collapse cannot rebut the strong presumption of severability today.  As the Eleventh Circuit correctly concluded, eliminating the minimum coverage provision may make the community-rating and guaranteed-issue provisions "*less desirable*," but "it does not ineluctably follow that Congress would find the two reforms *so* undesirable without the mandate as to prefer not enacting them at all."  *Florida ex rel. Atty. Gen.*, 648 F.3d at 1327.  In light of the "heavy burden needed to rebut the presumption of severability" and the "duty to refrain from invalidating more of a statute than is necessary," that Court "sever[ed] the individual mandate from the remaining sections of the Act."  *Id.* at 1323, 1327-28.  If this Court reaches the severability question, it should do the same.

For all of these reasons, even if the minimum coverage requirement were found to be unconstitutional, and even if the Court declined to follow *Frost* and enjoin only the

---

[39] *See* Cong. Budget Off., Federal Subsidies for Health Insurance Coverage for People Under Age 65: 2018 to 2028 5 (2018).  Appx. 278.

[40] *See, e.g., Examining the Effectiveness of the Individual Mandate under the Affordable Care Act: Hearing before the H. Comm. on Ways and Means Subcommittee on Oversight*, 115th Cong. (2017) (Statement of Thomas Miller, Resident Fellow, American Enterprise Institute). Appx. 324-335.

recent amendment, the rest of the ACA is fully severable and should be left in place.

## IV.  PLAINTIFFS HAVE NOT MET THEIR BURDEN OF DEMONSTRATING IRREPARABLE INJURY

For the reasons outlined above, Plaintiffs are unlikely to prevail on the merits of their legal claims.  That is reason enough to deny the preliminary injunction.  *See Nichols*, 532 F.3d at 372.  But Plaintiffs also cannot demonstrate that they will suffer irreparable injury in the absence of injunctive relief.  The individual Plaintiffs will suffer no harm because it is perfectly lawful for them to pay a tax of $0 instead of obtaining ACA-compliant insurance.  And the shared responsibility payment that Congress zeroed out applies to *individuals*, not to States.  Plaintiff States, therefore, cannot possibly be harmed by the reduction of a tax that never applied to them in the first place.  The harms they complain of flow from other ACA provisions whose constitutionality is not being challenged here.  Plaintiff States also mischaracterize the nature and extent of their costs, benefits, and obligations under the ACA.  None of the Plaintiffs have come close to demonstrating the type of irreparable injury that would support a preliminary injunction.

### A.    The Individual Plaintiffs Will Not Suffer Any Injury From a $0 Tax

The individual Plaintiffs assert that they will suffer harm because they "value compliance with [their] legal obligations" and will "continue to maintain minimum essential health insurance coverage because [they] are obligated to comply with the Affordable Care Act's individual mandate."  ECF No. 41 at 4, 8.  But the notion that it is unlawful to pay a tax instead of obtaining ACA-compliant health insurance is incorrect as a matter of law.  As Chief Justice Roberts explained in *NFIB*, "imposition of a tax nonetheless leaves an individual with a *lawful choice* to do or not do a certain act, so long as he is willing to pay a tax levied on that choice."  *NFIB*, 567 U.S. at 574 (emphasis added); *see also id*. at n.11 ("Those subject to the individual mandate may lawfully forgo health insurance and pay higher taxes, or buy health insurance and pay lower taxes.").

Beginning next year, the individual Plaintiffs can fully comply with their legal obligations by declining to purchase health insurance and paying a tax penalty of $0. *NFIB*, 567 U.S. at 574. They will suffer no harm from that lawful choice, and therefore they will not suffer any injury—and will actually benefit—from the zeroing out of shared responsibility payment.[41] Where a party seeks to enjoin government action pursuant to a regulatory scheme, courts should not intervene unless the need for equitable relief is real and immediate. *Machete Productions, L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015). The individual Plaintiffs have thus failed to produce clear and convincing evidence that they will suffer irreparable harm if the requested injunction is denied.

### B. None of the Harms Identified by the Plaintiff States Flow from Zeroing Out the Shared Responsibility Payment

The Plaintiff States contend that they are harmed because they are required to spend state funds to comply with the ACA's employer mandate, to implement parts of the Medicaid expansion, and because the ACA prevents them from enforcing their own laws and policies, among other alleged harms.[42] *See* ECF No. 40 at 43-50. But the States' claim of irreparable injury fails at the outset because none of their purported injuries are caused by the requirement that most *individuals* maintain insurance coverage. The shared responsibility payment applies to individuals, not to States. Plaintiff States, therefore, are not harmed by the reduction of a tax that never applied to them in the first place. And harm allegedly caused by other, non-challenged provisions has no legal

---

[41] To the extent that Plaintiffs contend that the ACA caused rising health premiums, they lack standing to assert such generalized grievances. *See Hotze v. Burwell*, 784 F.3d 984, 995 (5th Cir. 2015) (holding that a generic claim concerning health insurance premiums purportedly resulting from the ACA's minimum coverage requirement is insufficient to constitute cognizable injury for standing purposes, nor is it "fairly traceable" to that provision.)

[42] Plaintiffs also claim that the ACA harms the States as sovereigns because it "prevents them from applying their own laws and policies governing their own healthcare markets." ECF No. 40 at 44. But as long as Congress acts within its constitutional authority, it may preempt state law. "It is axiomatic that, under the Supremacy Clause, state laws that interfere with, or are contrary to the laws of [C]ongress, made in pursuance of the [C]onstitution are invalid." *Franks Inv. Co. v. Union Pac. R.R. Co.*, 534 F.3d 443, 445 (5th Cir. 2008).

relevance.  Plaintiffs may not bootstrap alleged harm into the preliminary injunction analysis that is unrelated to the actual legal claims before the Court.

Recognizing this major flaw in their argument, Plaintiffs insert a footnote claiming that "[h]arms caused by provisions inseverable from an unconstitutional provision are both directly relevant to the proper scope of the injunction under traditional equitable principles, and support a party's standing to bring the lawsuit."  ECF No. 40 at 43 (citing *Alaska Airlines*, 480 U.S. at 683).  But *Alaska Airlines* says nothing of the sort.  Indeed, the words "harm," "standing," and "injunction" do not appear *anywhere* in the decision, let alone any actual discussion about harms caused by provisions that are purportedly not severable.  *Alaska Airlines*, 480 U.S. at 678-697.  And in *Alaska Airlines*, the Supreme Court unanimously held that a legislative veto provision *was* severable from the rest of the federal statute.  *Id*. at 697.  The outcome in that case is precisely the same outcome that should occur here if the Court reaches the severability question.

Moreover, Plaintiffs must demonstrate by specific facts that there is a credible threat of immediate harm.  Fed. R. Civ. P. 65(b).  Here, even if Plaintiff States' alleged harm flowed from a $0 shared responsibility payment (which even they do not claim), the tax is not zeroed out until 2019, and will not cease generating revenue until 2020 or later.  As such, the imminent harm needed to justify the requested relief is lacking.  Plaintiff States have not shown that they will suffer any injury—let alone irreparable and imminent injury—from the reduction of a tax that never applied to them in the first place.

### C.    Plaintiffs Mischaracterize Their Costs and Obligations Under the ACA to Exaggerate Their Alleged Harm

Even if the Court's authority to issue a preliminary injunction turned on the broad policy debate over whether the ACA has been good or bad for the States (and it does not), Plaintiffs mischaracterize the nature and extent of their costs, benefits, and obligations under the ACA to exaggerate their purported harm.  While repeatedly claiming that they are harmed because the ACA "forces" them to spend money, Plaintiffs fail to disclose the

many voluntary steps that they have taken to expand access to coverage for their residents by taking advantage of the federal dollars available under the ACA.  For example, seven Plaintiff States elected to expand access to Medicaid pursuant to the ACA;[43] ten chose to expand access to CHIP for children of state employees pursuant to Section 10203(b)(2)(D) of the ACA and Dear State Health Official Letter No. 11-002 (Apr. 4, 2011);[44] four chose, pursuant to 42 C.F.R. § 435.150(c), to extend the new ACA eligibility group of former foster youth to cover youth from other states;[45] and three decided to take advantage of ACA Section 2202 to further extend presumptive eligibility for Medicaid and CHIP, among other examples.[46]

In addition, Texas decided to use Community First Choice (CFC), a new Medicaid option made possible by Section 2401 of the ACA, to expand access to home and community-based care.[47]  As the Texas Human Services Commission explained to the state legislature in a report evaluating the CFC program, "[c]alculating the actual cost effectiveness […] requires not only information about costs, but also information about outcomes."  It went on to explain that the program was a cost-effective choice because it allows Texas to draw down additional federal dollars, and because the up-front payments may obviate the need for the state to spend money on more expensive home and community-based Medicaid waiver or institutional care.[48]  Plaintiff States' investments in healthcare on behalf of their residents belie their current litigation position that the

---

[43] Eyles Dec. ¶ 6, ECF No. 15-1 at 95.
[44] Kaiser Family Found., Medicaid and CHIP Eligibility, March 2018 Enrollment, Renewal, and Cost Sharing Policies as of January 2018: Findings from a 50-State Survey 2-9 (2018).  Appx. 338-345.
[45] *Id*. at 346.
[46] *Id*. at 347.
[47] *See* Tex. Health and Hum. Servs., Community First Choice.  Appx. 349-355.
[48] Tex. Health and Hum. Serv.s Comm'n, Report on the Cost-Effectiveness of Community First Choice in Star+Plus 2 (2017).  Appx. 360.  The Texas Commission also noted that some of the CFC outcomes were not as easily captured on a balance sheet, "such as increased independence, integration into the greater community, employment, and improved health and wellness."  *Id.* at 364.

46

ACA's supposedly non-severable positions "will only add" to their alleged harm. ECF No. 40 at 43. Nor can any state resources devoted to implementing these *voluntary* choices be fairly characterized as "harm."[49]

Plaintiffs' complaints about the ACA's costs also fail to acknowledge the value of ACA covered services in preventing future medical costs, and improperly includes various sunk costs without any evidence that these costs would otherwise be redressed by an injunction. Plaintiffs claim that they have been harmed by ACA requirements to cover preventive health services, such as comprehensive tobacco cessation services for women. Muth Dec. ¶ 4, ECF No. 41 at 027-028. Yet the States never account for the long-term benefits of preventive health care, including improvements to children's learning, adults' productivity, seniors' quality of life, and overall improved financial, physical and mental wellbeing. Aaron Dec. ¶¶ 7, 9, Appx 004-006. And to the extent that the States complain about the expenditure of resources relating to initial ACA implementation,[50] there is no evidence that these costs are ongoing or will be redressed by a forward-looking injunction. Aaron Dec. ¶¶ 46-165, Appx. 025-060.[51]

In sum, Plaintiffs will not be injured in any way when the ACA's shared responsibility payment is reduced to $0 in 2019. No preliminary injunction should issue.

## V.   A PRELIMINARY INJUNCTION IS AGAINST THE PUBLIC INTEREST

As a final matter, the last two preliminary injunction factors—whether the threatened injury to Plaintiffs outweighs the threatened harm to Defendants from issuing the injunction and whether granting the injunction is against the public interest—strongly

---

[49] Plaintiffs also state that they must offer their full-time employees and their dependents minimum essential coverage or a tax penalty. ECF No. 40 at 43. But they fail to explain that self-insured plans, such as Texas' Health Select, may exempt themselves from the ACA's minimum coverage requirement. 42 U.S.C. §300gg-21(a)(2); Duran Dec. ¶ 5, ECF No. 41, 012.

[50] *See, e.g.*, Muth Dec. ¶ 7, ECF No. 41 at 029.

[51] Plaintiffs improperly include other ACA-related expenses that sun-set and would not be affected by prospective relief. Duran Dec. ¶ 14 (PCOR fees which sunset in FY2019), and ¶ 15 (Transitional Reinsurance Program which ended in FY 2017). ECF No. 41 at 015.

tip the scales against issuing any injunction.  *See Canal Auth. of State of Fla.*, 489 F.2d at 572.  The alleged injuries to Plaintiffs are far outweighed by the devastating harm to the Defendant States and their citizens that enjoining the ACA would cause.  Damaging this country's healthcare system, completely upending a sector that constitutes almost 1/5 of the national economy, and depriving tens of millions of Americans of health insurance is not in the public interest.

### A.   The Alleged Harm to Plaintiffs is Far Outweighed by the Devastating Harm to Defendant States and Their Citizens

There can be little doubt that that the alleged harm to Plaintiffs is far outweighed by the devastating harm to Defendants.  Reducing the shared responsibility payment to $0 actually benefits the individual Plaintiffs, and does not affect the Plaintiff States.  In contrast, Intervenor-Defendants stand to lose over half a *trillion* dollars in federal funds to provide healthcare for their citizens; approximately six million newly enrolled beneficiaries residing in their States would be kicked off of Medicaid; their state-run exchanges would be wiped out; and millions of the Defendants' residents would lose access to billions of dollars in tax credits for purchasing health insurance and protections from being discriminated against on the basis of preexisting health conditions.  *See supra* at 3-12.  By any objective measure—and even accepting Plaintiffs' alleged injuries at face value—the harm that would occur from enjoining the ACA far outstrips the purported injury to Plaintiffs.

The Supreme Court recently reiterated that the purpose of interim injunctive relief is "not to conclusively determine the rights of the parties," but instead to "balance the equities as litigation moves forward."  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).  Here, the equities weigh heavily in favor of Defendants and counsel against wholesale invalidation of the ACA—especially on a preliminary basis.  Plaintiffs have not shown—and cannot show—that their alleged injury *outweighs* the devastating harm that an injunction would cause.  *Karaha Bodes Co.*, 335 F.3d at 363.

### B.   Issuing a Preliminary Injunction is Also Against the Public Interest Because It Would Upend the Status Quo

Even setting aside the fact that the equities tip strongly against issuing an injunction, entering such interim relief is also against the public interest because it would upend the status quo.  The underlying purpose of a preliminary injunction "is merely to preserve the status quo until the merits of a case can be adjudicated." *Morgan v. Fletcher*, 518 F.2d 236, 239 (5th Cir. 1975).  Here, Plaintiffs are not seeking to preserve the status quo; they are seeking to completely disrupt it without any analysis or even discussion as to the immediate, nationwide consequences.  Plaintiffs have not come close to showing that this case is one of the "*rare instances* [where] the issuance of a mandatory preliminary injunction [is] proper." *Tate*, 634 F.2d at 870 (emphasis added).

The relief that Plaintiffs seek would unravel nearly a decade of building healthcare systems around the ACA's landmark reforms that strengthened consumer protections, made insurance markets more accessible and affordable to millions of Americans, expanded and improved Medicaid, modified and improved Medicare payments and benefits, and enhanced prevention and public health programs, among the many other ACA reforms from which all States have benefitted.  The reliance interests that have formed over the past eight years that the ACA has been in existence are enormous. Corlette Dec. ¶¶ 52-60, Appx. 100-104; Eyles Dec. ¶¶ 4-12, ECF No. 15-1 at 94-99. Defendant States would experience serious harm and increased costs from the dismantling of their state administrative structures, created to work in conjunction with the ACA.  Zucker Dec. ¶ 1, Appx. 395-397; Wilson Dec. ¶ 3, Appx. 392-394; Johnson Dec. ¶¶ 4, 8, Appx. 115-116; Lee Dec. ¶ 2, Appx. 130; Kent ¶ 2, Appx. 119; Kofman ¶ 1, Appx. 122-123; DeBenedetti Dec. ¶ 4, Appx. 106-107; Allen Dec. ¶¶ 2-9, Appx. 410-415; Bohn ¶¶ 4-5, 7-8, 10, Appx. 427-429.  New York, for example, would need to rebuild its electronic eligibility systems based on new criteria, impacting millions of its residents who would need to be provided notice and given due process through an appeal; at an

estimated cost of nearly $900 million.  Zucker Dec. ¶ 1, Appx. 395-397; *see also* Sherman Dec. ¶ 3; Appx. 417-418.  It is against the public interest to provide relief that is typically intended to *freeze* the status quo in order to impose chaos and havoc on the *actual* status quo.  The Court should not impose the "extraordinary and drastic remedy" of a preliminary injunction under these circumstances.  *White*, 862 F.2d at 1211.

### C.   Any Injunction Issued by the Court Should Only Apply to the Individual Plaintiffs

If the Court is inclined to issue a preliminary injunction, it should limit that injunction to any unconstitutional application of the ACA to the individual Plaintiffs themselves.  "A district court abuses its discretion if it issues an injunction that 'is not *narrowly tailored* to remedy the specific action which gives rise to the order as determined by the substantive law at issue.'"  *ODonnell v. Harris Cty., Texas*, 882 F.3d 528, 537 (5th Cir. 2018) (emphasis added).  If a $0 tax penalty makes the minimum coverage requirement unconstitutional, the Court should enjoin that requirement as it applies to the individual Plaintiffs but go no further.  A sweeping, nationwide injunction is not warranted when precisely two individuals subjected to that provision have sued.

Finally, if the Court wishes to issue a nationwide injunction that would enjoin the entire ACA, it should require Plaintiffs to provide a security that is sufficient to "pay the costs and damages sustained by any part found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  As discussed previously, the Defendant States would collectively lose $608.5 billion dollars in ACA funds to provide healthcare to their residents.  *See* Aaron Dec. ¶¶ 53, 60, 67, 74, 81, 88, 95, 102, 109, 116, 123, 130, 137, 144, 151, 158, 165, Appx. 028-060.  The Court should require Plaintiffs to post a bond in that amount so that Defendants can be made whole should the injunction be reversed.

## CONCLUSION

Plaintiffs' application for a preliminary injunction should be denied.

Dated:  June 7, 2018     Respectfully submitted,

Xavier Becerra
Attorney General of California
Julie Weng-Gutierrez
Senior Assistant Attorney General
Kathleen Boergers
Supervising Deputy Attorney General

**/s/ Neli N. Palma**

Neli N. Palma
Nimrod P. Elias
Deputy Attorneys General
California State Bar No. 203374
California State Bar No. 251634
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA  94244-2550
Telephone: (916) 210-7522
Fax: (916) 322-8288
E-mail: Neli.Palma@doj.ca.gov
*Attorneys for Intervenors-Defendants*

GEORGE JEPSEN
Attorney General of Connecticut
JOSEPH RUBIN
Associate Attorney General
*Attorneys for Intervenor-Defendant the State of Connecticut*

MATTHEW P. DENN
Attorney General of Delaware
ILONA KIRSHON
Deputy State Solicitor
DAVID J. LYONS
Deputy Attorney General
*Attorneys for Intervenor-Defendant the State of Delaware*

RUSSELL A. SUZUKI
Attorney General of Hawaii
HEIDI M. RIAN
Deputy Attorney General
ROBERT T. NAKATSUJI
Deputy Solicitor General
*Attorneys for Intervenor-Defendant the State of Hawaii*

LISA MADIGAN
Attorney General of Illinois
David F. Buysse
Deputy Chief, Public Interest Division
Anna P. Crane
Public Interest Counsel
Matthew V. Chimienti
Assistant Attorney General, Special Litigation
Bureau
*Attorneys for Intervenor-Defendant the*
*State of Illinois*

ANDY BESHEAR
Attorney General of Kentucky
LA TASHA BUCKNER
Executive Director, Office of Civil and
Environmental Law
S. TRAVIS MAYO
TAYLOR PAYNE
Assistant Attorneys General
*Attorneys for Intervenor-Defendant*
*the Commonwealth of Kentucky*

MAURA HEALEY
Attorney General of Massachusetts
STEPHEN P. VOGEL
Assistant Attorney General
*Attorneys for Intervenor-Defendant the*
*Commonwealth of Massachusetts*

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota
SCOTT IKEDA
Assistant Attorney General
*Attorneys for Intervenor-Defendant the State of*
*Minnesota by and through its Department of*
*Commerce*

GURBIR S. GREWAL
Attorney General of New Jersey
JEREMY M. FEIGENBAUM
Assistant Attorney General
ANGELA JUNEAU BEZER
Deputy Attorney General
*Attorneys for Intervenor-Defendant the*
*State of New Jersey*

BARBARA D. UNDERWOOD
Acting Attorney General of New York
STEVEN C. WU
Deputy Solicitor General
LISA LANDAU
Bureau Chief, Health Care Bureau
ELIZABETH CHESLER
Assistant Attorney General, Health Care Bureau
*Attorneys for Intervenor-Defendant the*
*State of New York*

JOSHUA H. STEIN
Attorney General of North Carolina
SRIPRIYA NARASIMHAN
Deputy General Counsel
*Attorneys for Intervenor-Defendant the*
*State of North Carolina*

ELLEN F. ROSENBLUM
Attorney General of Oregon
HENRY KANTOR
Special Counsel to the Attorney General
SCOTT KAPLAN
Assistant Attorney General
*Attorneys for Intervenor-Defendant the*
*State of Oregon*

PETER KILMARTIN
Attorney General of Rhode Island
MICHAEL W. FIELD
Assistant Attorney General
MARIA R. LENZ
Special Assistant Attorney General
*Attorneys for Intervenor-Defendant the*
*State of Rhode Island*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
BENJAMIN D. BATTLES
Solicitor General
*Attorneys for Intervenor-Defendant the*
*State of Vermont*

MARK R. HERRING
Attorney General of Virginia
TOBY J. HEYTENS
Solicitor General
MATTHEW R. MCGUIRE
Deputy Solicitor General
*Attorneys for Intervenor-Defendant the*
*Commonwealth of Virginia*

ROBERT W. FERGUSON
Attorney General of Washington
JEFFREY G. RUPERT
Chief, Complex Litigation Division
JEFFREY T. SPRUNG
Assistant Attorney General
*Attorneys for Intervenor-Defendant the*
*State of Washington*

KARL A. RACINE
Attorney General for the District of Columbia
ROBYN R. BENDER
Deputy Attorney General
VALERIE M. NANNERY
Assistant Attorney General
*Attorneys for Intervenor-Defendant the*
*District of Columbia*

## *Certificate of Service*

On _____June 7, 2018_____ I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

s/ M. Schoenhardt