**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| TEXAS, *et al.*,<br><br>       Plaintiffs,<br><br> v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>       Defendants,<br><br> and<br><br>CALIFORNIA, *et al.*,<br><br>       Intervenors-Defendants. | Civil Action No. 4:18-cv-00167-O |

**FEDERAL DEFENDANTS'**
**MEMORANDUM IN RESPONSE TO PLAINTIFFS' APPLICATION**
**FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 3

    A.   The Affordable Care Act .......................................................................... 3

    B.   The Supreme Court's Decision in *NFIB v. Sebelius* ..................................... 6

    C.   The Tax Cuts and Jobs Act ........................................................................ 7

    D.   This Case ................................................................................................. 7

LEGAL STANDARDS ...................................................................................................... 8

ARGUMENT .................................................................................................................... 9

I.     THE INDIVIDUAL MANDATE IS UNCONSTITUTIONAL AFTER THE TCJA. ......... 9

II.    THE INDIVIDUAL MANDATE IS NOT SEVERABLE FROM THE GUARANTEED-ISSUE AND COMMUNITY-RATING PROVISIONS, BUT THOSE THREE PROVISIONS ARE SEVERABLE FROM THE REST OF THE ACA. ......................... 12

    A.   The Guaranteed-Issue and Community-Rating Requirements Are Not Severable ... 13

    B.   The ACA's Other Provisions Are Severable ............................................. 16

III.   PRELIMINARY INJUNCTIVE RELIEF IS NOT WARRANTED AT THIS TIME, BUT A DECLARATORY JUDGMENT WOULD BE APPROPRIATE. ....................... 20

CONCLUSION ................................................................................................................ 21

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alaska Airlines, Inc. v. Brock*,
    480 U.S. 678 (1987) ........................................................... 12

*Aransas Project v. Shaw*,
    775 F.3d 641 (5th Cir. 2014) ........................................... 20

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979) ........................................................... 20

*EEOC v. Hernando Bank, Inc.*,
    724 F.2d 1188 (5th Cir. 1984) ........................................... 15

*Fla. ex rel. Bondi v. U.S. Dep't of Health & Human Servs.*,
    780 F. Supp. 2d 1256 (N.D. Fla. 2011) .............................. 20

*Harris v. United States*,
    536 U.S. 545 (2002) ........................................................... 11

*Jordan v. Fisher*,
    823 F.3d 805 (5th Cir. 2016) ........................................... 8, 9

*King v. Burwell*,
    135 S. Ct. 2480 (2015) ....................................................... 13

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ........................................................... 12

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999) ........................................................... 12

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) .................................................. 12, 17

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ..................................................... *passim*

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) ........................................................... 16

*New York v. United States*,
    505 U.S. 144 (1992) ........................................................... 19

*Nixon v. United States*,
    506 U.S. 224 (1993) ........................................................... 12

*Printz v. United States*,
    521 U.S. 898 (1997) ........................................................... 12

*R.R. Retirement Bd. v. Alton R. Co.*,
   295 U.S. 330 (1935) ................................................................ 12

*Rodriguez v. United States*,
   480 U.S. 522 (1987) ................................................................ 10

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) ............................................................ 12

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ................................................................ 10

*United States v. Booker*,
   543 U.S. 220 (2005) ................................................................ 16

*United States v. Fausto*,
   484 U.S. 439 (1987) ................................................................ 10

*Williams v. Standard Oil Co. of Louisiana*,
   278 U.S. 235 (1929) ................................................................ 19

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................ 8

## **Statutes**

21 U.S.C. § 343 ................................................................................ 19

26 U.S.C. § 36B ............................................................................ 3, 4

26 U.S.C. § 45R .............................................................................. 3

26 U.S.C. § 106 ............................................................................... 5

26 U.S.C. § 162 ............................................................................... 5

26 U.S.C. § 4980H ........................................................................ 3, 4

26 U.S.C. § 4980I ............................................................................ 5

26 U.S.C. § 5000A .................................................................. *passim*

26 U.S.C. § 6055 ............................................................................. 5

26 U.S.C. § 6056 ............................................................................. 5

42 U.S.C. § 300gg ........................................................................... 3

42 U.S.C. § 300gg-1 ........................................................................ 3

42 U.S.C. § 300gg-3 ........................................................................ 3

42 U.S.C. § 300gg-4 ........................................................................ 3

42 U.S.C. § 300gg-11 ...................................................................... 3

42 U.S.C. § 300gg-12 ................................................................................ 3

42 U.S.C. § 300gg-14 ................................................................................ 3

42 U.S.C. § 300gg-18 ................................................................................ 3

42 U.S.C. § 1396a ...................................................................................... 4

42 U.S.C. § 18011 ...................................................................................... 4

42 U.S.C. § 18022 ...................................................................................... 3

42 U.S.C. § 18091 .............................................................................. *passim*

42 U.S.C. §§ 18031–18044 ........................................................................ 3

Pub. L. No. 111-148, 124 Stat. 119 (2010) ........................................... *passim*

Pub. L. No. 112-240, 126 Stat. 2313 (2013) ............................................. 5

Pub. L. No. 114-113, 129 Stat. 2242 (2015) ............................................. 5

Pub. L. No. 115-96, 131 Stat. 2044 (2017) .............................................. 18

Pub. L. No. 115-97, 131 Stat. 2054 (2017) ................................................ 1

Pub. L. No. 115-120, 132 Stat. 28 (2018) .................................................. 5

Pub. L. No. 115-123, 132 Stat. 64 (2018) ................................................ 18

## Legislative Materials

H.R. Rep. No. 443, 111th Cong., 2d Sess. Pt. 2 (2010) ........................... 17

H.R.1, 115th Cong., "An Act to provide for reconciliation pursuant to titles II and V of the concurrent resolution on the budget for fiscal year 2018" ........................................... 16

## Other Authorities

Cong. Research Serv., Bill Heniff Jr., The Budget Reconciliation Process: The Senate's "Byrd Rule" (Nov. 22, 2016),
https://fas.org/sgp/crs/misc/RL30862.pdf ............................................. 16

## INTRODUCTION

In the Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119 (2010), Congress fundamentally altered the American health-insurance system by imposing a "[r]equirement" for most Americans "to maintain minimum essential coverage." 26 U.S.C. § 5000A(a). In light of the basis on which the Supreme Court previously held that this "individual mandate" survived constitutional scrutiny, the United States agrees with the Plaintiffs that Section 5000A(a) must now be struck down as unconstitutional in light of the amendments that were made to it in the Tax Cuts and Jobs Act (TCJA), Pub. L. No. 115-97, 131 Stat. 2054 (2017).

Two years after the ACA's passage, the Supreme Court held that the individual mandate in Section 5000A(a) exceeded the scope of Congress's commerce power. *National Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 572 (2012) ("The Court today holds that our Constitution protects us from federal regulation under the Commerce Clause so long as we abstain from the regulated activity."). The Court nevertheless held that the provision "may reasonably be characterized as a tax" because, among other things, it "yields the essential feature of any tax" in that "[i]t produces at least some revenue for the Government." *Id.* at 564; *see id.* at 574. Chief Justice Roberts' controlling opinion made clear, however, that "the statute reads more naturally as a command to buy insurance than as a tax," and that "it is only because [courts] have a duty to construe a statute to save it, if fairly possible, that [the provision] can be interpreted as a tax" given the revenue raised. *Id.* at 574; *accord id.* at 562–63 (opinion of Roberts, C.J.) ("The most straightforward reading of the mandate is that it commands individuals to purchase insurance," but there is a savings construction under which it "can be regarded as establishing a condition . . . that triggers a tax" in light of "the required payment to the IRS.").

Critically, however, the Supreme Court's saving construction of the individual mandate as a tax is no longer available. The TCJA eliminated the penalty for failing to purchase minimum

1

essential coverage (starting in 2019), but left untouched the statutory "[r]equirement to maintain minimum essential coverage" in Section 5000A(a).  *See* Pub. L. No. 115-97, § 11081, 131 Stat. at 2092.  The individual mandate thus still exists, but it will no longer be fairly possible to describe it as a tax because it will no longer generate any revenue.

As of 2019, therefore, the individual mandate will be unconstitutional under controlling Supreme Court precedent holding that "[t]he Federal Government does not have the power to order people to buy health insurance."  *NFIB*, 567 U.S. at 574–75 (opinion of Roberts, C.J.); *accord id.* at 547–561; *id.* at 649–60 (opinion of Scalia, Kennedy, Thomas, Alito, JJ. ("joint dissent")). Because the TCJA eliminated the basis for the Court's saving construction in *NFIB*, the individual mandate is untethered to any source of constitutional authority.  Furthermore, as the United States explained to the Court in *NFIB*, Congress's own "findings establish that the guaranteed-issue and community-rating provisions are inseverable from the minimum coverage provision."  Br. for Resp't (Severability) at 45, *NFIB*, No. 11-393 (citing 42 U.S.C. § 18091(2)(I)).  The remainder of the ACA, however, can stand despite the invalidation of those provisions.  *See id.* at 26–44.

Although Plaintiffs are likely to succeed in part on the merits, they are not entitled to a preliminary injunction.  As Plaintiffs agree that the mandate will not become unconstitutional until the tax is eliminated in 2019, immediate relief is not warranted.  That said, because this is a pure question of law on which the Plaintiffs and Defendants do not disagree, this Court should consider construing Plaintiffs' motion as a request for summary judgment and then entering a declaratory judgment that the ACA's provisions containing the individual mandate as well as the guaranteed-issue and community-rating requirements will all be invalid beginning on January 1, 2019.

# BACKGROUND

## A.     The Affordable Care Act

The ACA established a framework of economic regulations and incentives concerning the health-insurance and healthcare industries.  It spans more than 900 pages of the session laws and is divided into nine titles.  Many of the ACA's more familiar major provisions relating to the regulation of health insurance are in Titles I and II.  There, among other things, Congress:

- *Required certain individuals to maintain insurance*.  As detailed below, the ACA required most Americans to maintain health insurance meeting specified standards, subject to a monetary exaction for failure to do so.  26 U.S.C. § 5000A.
- *Subjected certain employers to tax consequences concerning sponsorship of insurance*.  The ACA imposed tax liabilities under certain circumstances on large employers that do not offer a minimum mandated level of coverage to full-time employees, 26 U.S.C. § 4980H—a provision sometimes referred to as the "employer mandate"—and established tax incentives for eligible small businesses to purchase health insurance for their employees, 26 U.S.C. § 45R.
- *Created health insurance exchanges*.  The ACA created health insurance "exchanges" where qualified health plans could be purchased by individuals and small businesses. 42 U.S.C. §§ 18031–18044.  A State may choose whether or not to set up an exchange; if it elects not to, the federal government will establish one.  *Id*. § 18041(b), (c).
- *Imposed numerous insurance-market regulations*.  Two of the insurance market regulations prohibit insurers from either denying coverage because of an enrollee's medical condition or history ("guaranteed issue"), *id*. §§ 300gg-1, 300gg-3, 300gg-4(a), or charging higher premiums because of an applicant's or enrollee's medical condition or history ("community rating"), *id*. §§ 300gg(a)(1), 300gg-4(b).  Among other requirements, the ACA also:
    - Required insurers providing family coverage to continue covering adult children until age 26.  *Id*. § 300gg-14(a).
    - Barred insurers from placing lifetime dollar caps on benefits.  *Id*. § 300gg-11.
    - Prohibited insurers from canceling insurance absent fraud or intentional misrepresentation.  *Id*. § 300gg-12.
    - Established medical loss ratios for insurers—*i.e.*, minimum percentages of premium revenues that insurers must spend on clinical services and activities that improve health-care quality.  *See id*. § 300gg-18(b).
    - Required plans to cover certain "essential health benefits."  *Id*. § 18022.
- *Provided tax incentives to subsidize certain individuals' purchase of insurance*.  The ACA established a system of tax credits for eligible individuals (*i.e.*, those with income between 100% and 400% of the federal poverty level) to purchase health insurance.  26 U.S.C. § 36B.

- *Expanded the scope of the Medicaid program.* The newly eligible are primarily non-elderly adults without dependent children with income below a certain threshold.  42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).[1]

Perhaps foremost among the ACA's provisions is the individual mandate to maintain insurance.  26 U.S.C. § 5000A.  Subsection (a) of that provision imposes a "[r]equirement to maintain minimum essential coverage" stating that certain individuals "shall . . . ensure" that they are "covered under minimum essential coverage."  *Id.* § 5000A(a).  Subsection (b) of that provision then imposes "a penalty," called a "shared responsibility payment," on certain taxpayers who "fail[] to meet the requirement of subsection (a)."  *Id.* § 5000A(b).  And subsection (c) provides "[t]he amount of the penalty imposed."  *Id.* § 5000A(c).  Notably, subsection (d) provides that certain individuals—*i.e.*, people with religious exemptions, individuals not lawfully present in the United States, and incarcerated individuals—are entirely exempt from the requirement to maintain minimum essential coverage, *id.* § 5000A(d), whereas subsection (e) provides that certain other individuals remain subject to that requirement but are exempt from the penalty for non-compliance, *id.* § 5000A(e) (*i.e.*, those who cannot afford coverage, taxpayers with income below the filing threshold, members of Indian tribes, those experiencing short coverage gaps, and individuals determined by the Secretary of Health and Human Services to have suffered a hardship with respect to obtaining coverage).  Finally, subsection (f) defines "minimum essential coverage" to mean various types of insurance coverage, including government-sponsored programs such as Medicare and Medicaid, *id.* § 5000A(f)(1)(A), as well as eligible employer-sponsored plans and plans offered in the non-group market, *id.* § 5000A(f)(1)(B)–(D); 42 U.S.C. § 18011.[2]

---

[1] The ACA as originally enacted required States either to expand their Medicaid programs in this manner or lose all federal Medicaid funding.  The Supreme Court in *NFIB* invalidated the requirement and held that States may elect to decline this expansion without jeopardizing funding for their existing Medicaid programs.  567 U.S. at 575–88.

[2] The definition of "minimum essential coverage" in Section 5000A(f) also serves a variety of other purposes throughout the Internal Revenue Code.  For example, a large employer that fails to offer its employees minimum essential coverage is in certain circumstances subject to a tax.  26 U.S.C. § 4980H(a), (b).  An individual's eligibility for minimum essential coverage governs his or her eligibility for a tax credit for the purchase of insurance.  *Id.* §

The ACA contains a specific finding by Congress that the "individual responsibility requirement" to maintain insurance is "essential" to "creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold," because "many individuals would wait to purchase health insurance until they needed care" "if there were no requirement." 42 U.S.C. § 18091(1), (2)(I). More generally, Congress found that "[t]he requirement is an essential part" of the ACA's "regulation of the health insurance market." *Id.* § 18091(2)(H); *see also id.* § 18091(2)(C)–(G), (J) (identifying other ways in which the requirement furthered the ACA's objectives).

Beyond Titles I and II, the ACA addresses numerous other issues. For example:

- Title III amended Medicare. Among other provisions, it revised the Medicare Part D prescription drug program, § 3301; modified certain Medicare reimbursement rates for hospitals, § 3133; and required quality reporting for long-term care hospitals, inpatient rehabilitation hospitals, and hospice programs, § 3004.
- Title IV funded existing prevention programs and created new prevention programs. For example, it created the National Prevention, Health Promotion and Public Health Council, §§ 4001, 4002; required that chain restaurants disclose nutritional information, § 4205; and funded school-based health clinics, § 4101.
- Title V sought to expand the supply of health care workers, including through modifications to the federal student loan program, § 5201, and a variety of subject-specific grants.
- Title VI enacted anti-fraud requirements for facilities participating in Medicare and Medicaid, including screening providers, § 6401, and programs to reduce elder abuse.
- Title VII expanded the 340B drug discount program, § 7101, and established a process for FDA licensing of biosimilar products, § 7002.
- Title VIII established a voluntary long-term care insurance program, § 8002 (which has since been repealed, *see* Pub. L. No. 112-240, § 642(a), 126 Stat. 2313, 2358 (2013)).
- Title IX addressed various taxes, including an excise tax on high-cost plans, § 9001, which has not yet taken effect due to postponements, *see* Pub. L. No. 114-113, § 101(a), 129 Stat. 2242, 3037 (2015); Pub. L. No. 115-120, § 4002, 132 Stat. 28, 38 (2018).

---

36B(b)(3). A "person who provides minimum essential coverage" is required to make an informational return with the IRS. *Id.* § 6055. Large employers must also make a return describing whether they offer minimum essential coverage to their employees. *Id.* § 6056. The taxability of certain health insurance reimbursement arrangements for employees depends on the definition of minimum essential coverage. *Id.* § 106(g). An excise tax on high-cost health coverage also turns on the concept of minimum essential coverage, *id.* § 4980I, as does the deductibility of certain business expenses by health insurance providers, *id.* § 162(m)(6)(C)–(D).

**B.      The Supreme Court's Decision in *NFIB v. Sebelius***

In the years immediately following the ACA's enactment, a variety of challenges to its constitutionality were filed in federal court, many of which focused on whether Congress had the power under Article I of the Constitution to enact Section 5000A.  That question was resolved by the Supreme Court in *NFIB*, a case brought by a small-business association and several individuals as well as 26 States, including 16 of the State Plaintiffs here.  *See* 567 U.S. at 520.

In *NFIB*, the Supreme Court held that although Section 5000A was not authorized by Congress's commerce power, it was a valid exercise of the taxing power.  As Chief Justice Roberts explained in his controlling opinion, in light of the statutory language that individuals "'shall'" maintain coverage, the "most straightforward reading of the mandate is that it commands individuals to purchase insurance."  567 U.S. at 562 (quoting 26 U.S.C. § 5000A(a)).  Furthermore, the Chief Justice agreed with the four dissenters that the "Commerce Clause does not authorize such a command," *id*. at 574; *accord id.* at 547–561; *id.* at 649–60 (joint dissent)—a holding of the Court that was acknowledged in the portion of the Chief Justice's opinion that was joined by a majority of the Court.  *Id.* at 572 ("The Court today holds that our Constitution protects us from federal regulation under the Commerce Clause so long as we abstain from the regulated activity.").  Nevertheless, because "[u]nder the mandate, if an individual does not maintain health insurance, the only consequence is that he must make an additional payment to the IRS when he pays his taxes," Chief Justice Roberts agreed with the government that "the mandate can be regarded as establishing a condition . . . that triggers a tax," given the obligation to adopt "a saving construction" "if fairly possible."  *Id*. at 562–63 (citing 26 U.S.C. § 5000A(b)), 574–75.  A majority of the Court agreed that Section 5000A so construed could be upheld under Congress's taxing power.  *Id.* at 570.  But critical to the Court's saving construction and constitutional holding

was the fact that the individual mandate's shared responsibility payment "yield[ed] the essential feature of any tax: [i]t produces at least some revenue for the Government." *Id.* at 564.

## C.     The Tax Cuts and Jobs Act

In the TCJA, Congress enacted a variety of amendments to the Internal Revenue Code.  As relevant here, the Act amended Section 5000A(c) by reducing to $0 the monetary exaction imposed for noncompliance with the "[r]equirement to maintain minimum essential coverage" for tax-years 2019 and beyond.  *See* Pub. L. No. 115-97, § 11081, 131 Stat. at 2092.  Under the ACA, the tax penalty for failing to maintain minimum essential coverage for those years was to be the greater of 2.5% of household income or $695.  The TCJA amended those figures to "Zero percent" and "$0."  *Id.*  The TCJA leaves the rest of Section 5000A intact, including the "[r]equirement" in subsection (a) that applicable individuals "shall … ensure" they are covered by "minimum essential coverage."  Congress also left untouched the congressional findings in Section 18091 that the "individual responsibility requirement" to maintain insurance was "essential" to the guaranteed-issue and community-rating insurance reforms.  *See* 42 U.S.C. § 18091(2)(H)–(I).

## D.     This Case

Plaintiffs are 20 States and two individuals.  Intervenors-Plaintiffs are two employers.  Among other things, the individual plaintiffs have declared that the individual mandate legally obligates them to maintain minimum essential coverage, but that they wish instead to purchase non-ACA-compliant insurance that better reflects their actuarial risks.  *See* App'x in Support of Application for Preliminary Injunction, Dkt. No. 41, at App.004 ("My preference would be to purchase reasonably-priced insurance coverage that is consumer-driven in accordance with my actuarial risk."); App.008 ("The ACA prevents me from obtaining care from my preferred health care providers and has greatly increased my health insurance costs. I would purchase reasonably priced insurance coverage that allowed me to access care locally from my preferred service

providers, were I not limited to the plans provided through the federal health insurance marketplace.").

The complaint and the complaint-in-intervention raise five claims.  Their central contention (Count 1) is that Section 5000A, as amended by the TCJA, falls outside of Congress's Article I powers and is inseverable from the rest of the ACA, which they claim is thus invalid in its entirety. Am. Compl., Dkt. No. 27, ¶¶ 55–57; Complaint-in-Intervention, Dkt. No. 81-1, ¶¶ 54–66.   In Count 2, Plaintiffs claim that if Section 5000A is unconstitutional, then "the rest of the ACA is irrational" and thus violates due process.  Am. Compl. ¶ 65; Complaint-in-Intervention ¶¶ 71.  In Count 3, they claim that if Section 5000A is unconstitutional, then the rest of the ACA "is outside the powers delegated to the United States by the Constitution" and thus violates the Tenth Amendment.  Am. Compl. ¶ 73; Complaint-in-Intervention ¶ 79.  In Count 4, Plaintiffs assert that if the ACA is invalid in its entirety, then "all regulations" issued under its authority must be declared invalid.  Am. Compl. ¶ 81; Complaint-in-Intervention ¶ 87.  In Count 5, Plaintiffs assert an entitlement to injunctive relief.  Am. Compl. ¶ 85; Complaint-in-Intervention ¶ 91.  Because Plaintiffs' preliminary injunction brief solely relies (pp. 21–40) on their Count 1 claim that Section 5000A as amended by the TCJA is unconstitutional and inseverable from the rest of the ACA, that is the only claim to which Defendants respond here.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A party seeking a preliminary injunction must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest."  *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir.

2016).  Due to its "extraordinary" nature, no preliminary injunction should be "granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."  *Id.* at 221 (citation omitted).

## ARGUMENT

The United States agrees with Plaintiffs that the ACA's individual mandate, as amended by the TCJA, is unconstitutional.  Because Section 5000A(a) can no longer fairly be described as a tax after the TCJA amendment takes effect in 2019, the saving construction adopted by *NFIB* will no longer be available.  Instead, Section 5000A(a) must be interpreted per its plain text as a freestanding legal mandate to maintain insurance, which *NFIB* squarely held exceeds the powers of Congress.  And as the United States explained in *NFIB*, the individual mandate cannot be severed from the guaranteed-issue and community-rating provisions, though those three provisions can be severed from the rest of the ACA.  Nonetheless, as explained below, preliminary injunctive relief should not be issued; instead, this Court should simply enter a declaratory judgment.

## I.     THE INDIVIDUAL MANDATE IS UNCONSTITUTIONAL AFTER THE TCJA.

Starting in 2019, the TCJA will eliminate the individual mandate's tax penalty under Section 5000A(b)–(c), but it will not alter the mandate's plain-text "[r]equirement to maintain minimum essential coverage" under Section 5000A(a).  The individual mandate will continue to provide that applicable individuals "shall . . . ensure" that they are "covered under minimum essential coverage."  26 U.S.C. § 5000A(a).  Yet the only available interpretation of that plain text will be that it mean what it says: there is a legal mandate to obtain insurance; the mandate can no longer instead fairly be interpreted as a tax because it will raise no revenue as Congress has eliminated the monetary penalty.

This plain-text interpretation is confirmed by the Supreme Court's decision in *NFIB*.  The Chief Justice's controlling opinion repeatedly acknowledged—and the four Justices in the joint

dissent asserted even more emphatically—that "[t]he most straightforward reading of the mandate is that it commands individuals to purchase insurance.  After all, it states that individuals 'shall' maintain health insurance." *NFIB*, 567 U.S. at 562 (quoting § 5000A(a)); *see also id.* at 574 ("the statute reads more naturally as a command to buy insurance than as a tax"); *id.* at 662–63 (joint dissent) (describing Section 5000A(a) as "unquestionably" a "mandate . . . enforced by a penalty" rather than a tax).   Although the Chief Justice concluded at the time that it was "fairly possible" to interpret the mandate as merely "establishing a condition—not owning health insurance—that triggers a tax—the required payment to the IRS," *id.* at 563, that saving construction is no longer available because, post-TCJA, the mandate no longer "yields the essential feature of any tax," which is that it must "produce[] at least some revenue for the Government."  *Id.* at 564 (opinion of the Court); *see also id.* at 574 (opinion of Roberts, C.J.) ("Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more.").

This plain-text interpretation is further confirmed by established canons of construction. *First*, it is "a cardinal principle" that a statute should be construed so that "no clause, sentence, or word shall be superfluous, void, or insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Here, in light of the elimination of the Section 5000A(b) penalty, Section 5000A(a) would be utterly meaningless unless it imposes a legal requirement that covered individuals shall maintain insurance, as would Section 5000A(d)'s exemption from that requirement.  *See* 26 U.S.C. § 5000A(d) (setting forth certain categories of individuals who are not subject to Section 5000A(a)'s "[r]equirement to maintain minimum essential coverage").  *Second*, "Congress is presumed to act with full awareness of existing judicial interpretations."  *United States v. Fausto*, 484 U.S. 439, 460 n.6 (1987) (citing *Rodriguez v. United States*, 480 U.S. 522, 525 (1987) (per curiam)).   Here, Congress was indisputably aware of *NFIB*'s saving construction of Section

10

5000A(a)'s individual mandate, and that it rested on the revenue raised by Section 5000A(b)'s penalty. Yet Congress eliminated the linchpin of that saving construction—the revenue-raising penalty—without altering the unambiguous language of the mandate itself. *Cf. Harris v. United States*, 536 U.S. 545, 556 (2002) (refusing to apply the canon of constitutional avoidance where doing so would contradict the "respect for Congress" upon which "[t]he avoidance canon rests").

This plain-text interpretation is also shared by at least some members of the public. *See* App'x in Support of Application for Preliminary Injunction at App.004 ("I value compliance with my legal obligations, and believe that following the law is the right thing to do. The repeal of the associated health insurance tax penalty did not relieve me of the requirement to purchase health insurance. I continue to maintain minimum essential health insurance coverage because I am obligated to comply with the Affordable Care Act's individual mandate, even though doing so is a burden to me."); App.008 (same).

In sum, once the associated financial penalty is gone, the "tax" saving construction will no longer be fairly possible and thus the individual mandate will be unconstitutional. As a majority of the Supreme Court held in *NFIB*, "[t]he Federal Government does not have the power to order people to buy health insurance. Section 5000A would therefore be unconstitutional if read as a command." *NFIB*, 567 U.S. at 575 (opinion of Roberts, C.J.); *see also id.* at 706–07 (joint dissent); *id.* at 572 (opinion of the Court). Because Section 5000A(a) must be read as a command once the TCJA's elimination of the penalty takes effect in 2019, it will exceed Congress's enumerated powers.

11

## II.  THE INDIVIDUAL MANDATE IS NOT SEVERABLE FROM THE GUARANTEED-ISSUE AND COMMUNITY-RATING PROVISIONS, BUT THOSE THREE PROVISIONS ARE SEVERABLE FROM THE REST OF THE ACA.

In addition to claiming that the individual mandate is unconstitutional in light of the TCJA, Plaintiffs claim that the rest of the ACA is not severable from the unconstitutional mandate.  A plaintiff seeking to invalidate provisions of a statute as inseverable must show that it is "evident that Congress would not have enacted those provisions which are within its power, independently of those which are not."  *Murphy v. NCAA*, 138 S. Ct. 1461, 1482 (2018); *see also Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684–85 (1987).  This inquiry reflects the fact that under our Constitution, the Judiciary "cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole."  *Murphy*, 138 S. Ct. at 1482 (quoting *R.R. Retirement Bd. v. Alton R. Co.*, 295 U.S. 330, 362 (1935)).  Although the Supreme Court's test for severability is "essentially an inquiry into legislative intent," *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999), "the enacted text is the best indicator of intent," *Nixon v. United States*, 506 U.S. 224, 232 (1993).[3]

---

[3] In addition, plaintiffs may only seek to invalidate statutory provisions as inseverable if those provisions themselves injure them.  The Supreme Court has held that it "ha[s] no business answering" questions about the inseverability of provisions that concern only "the rights and obligations of parties not before the court."  *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also Murphy*, 138 S. Ct. at 1485–87 (Thomas, J. concurring).  And that holding is consistent with basic limitations on Article III standing and equitable remedies.  *See, e.g.*, *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("[S]tanding is not dispensed in gross," and "a plaintiff must demonstrate standing . . . for each form of relief that is sought." (citations omitted)); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (explaining that equitable relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" (citation omitted)).  Here, the individual plaintiffs have adequately alleged injury from the ACA's guaranteed-issue and community-rating provisions.  *See, e.g.*, App'x in Support of Application for Preliminary Injunction at App.004 ("My preference would be to purchase reasonably-priced insurance coverage that is consumer-driven in accordance with my actuarial risk.").  By contrast, Plaintiffs have not argued and cannot argue that each and every other provision in the ACA also injures them.  Accordingly, regardless of whether other provisions of the ACA are inseverable and whether this Court may consider that question in analyzing the inseverability of the guaranteed-issue and community-rating provisions, it would be improper for this Court to enter judgment on the inseverability of any of the many ACA provisions that do not injure Plaintiffs.

Here, as the United States has consistently maintained, the individual mandate is not severable from the ACA's guaranteed-issue and community-rating requirements, but it is severable from the ACA's other provisions.

### A.      The Guaranteed-Issue and Community-Rating Requirements Are Not Severable

The United States contended in *NFIB* that "Congress's findings establish that the guaranteed-issue and community-rating provisions are inseverable from the minimum coverage provision."  Br. for Resp. (Severability) at 45, *NFIB*, No. 11-393.  And the Supreme Court has since essentially agreed, noting that these "three reforms are closely intertwined" and that "Congress found that the guaranteed issue and community rating requirements would not work without the coverage requirement."  *King v. Burwell*, 135 S. Ct. 2480, 2487 (2015).

That finding, set forth at 42 U.S.C. § 18091(2)(I), specifically and expressly explains why Congress believed that the individual mandate requirement is "essential" to the operation of the guaranteed-issue and community-rating provisions.  Namely, "if there were no requirement, many individuals would wait to purchase health insurance until they needed care."  *Id.*  But "[b]y significantly increasing health insurance coverage," the mandate, "together with the other provisions of this Act, will minimize this adverse selection and broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums."  *Id.*  Accordingly, the individual mandate "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold."  *Id.*  In short, Congress found that enforcing guaranteed-issue and community-rating requirements without an individual mandate would allow individuals to game the system by waiting until they were sick to purchase health insurance, thereby increasing

the price of insurance for everyone else—the polar opposite of what Congress sought in enacting the ACA.

Indeed, Congress's conclusions regarding the linkage between the individual mandate, guaranteed-issue, and community-rating requirements were agreed upon by all of the Justices in *NFIB*. *See* 567 U.S. at 548 (opinion of Roberts, C.J.) ("The guaranteed-issue and community-rating reforms … exacerbate" the "problem" of "healthy individuals who choose not to purchase insurance to cover potential health care needs," and "threaten to impose massive new costs on insurers[.] … The individual mandate was Congress's solution to these problems."); *id.* at 597–98 (Ginsburg, J., concurring in part and dissenting in part) ("[T]hese two provisions, Congress comprehended, could not work effectively unless individuals were given a powerful incentive to obtain insurance. … [G]uaranteed-issue and community-rating laws alone will not work."); *id.* at 695–96 (joint dissent) ("Insurance companies bear new costs imposed by a collection of insurance regulations and taxes, including 'guaranteed issue' and 'community rating' requirements . . . but the insurers benefit from the new, healthy purchasers who are forced by the Individual Mandate to buy the insurers' product.").

In expressly finding this link between these three provisions, Congress looked to experiences from prior state experiments in restructuring their laws governing health insurance. In some States, insurers were forced to cover everyone and charge the same rates regardless of health status, and chose to raise premiums for healthy individuals. *See* Br. of America's Health Insurance Plans and the Blue Cross Blue Shield Association as Amici Curiae in Support of Reversal of the Court of Appeals' Severability Judgment at 8–11, *NFIB*, No. 11-393. For example, after imposing guaranteed-issue and community-rating requirements without an individual mandate, New Hampshire experienced an increase in premiums and, ultimately, all but two

insurers withdrew from the State.  *See* Br. for Resp't (Severability) at 49, *NFIB*, No. 11-393; *see also id.* at 48–51 (collecting examples).  Thus, Congress acted on the assumption that severing the individual mandate from the guaranteed-issue and community-rating provisions "necessarily would impose significant risks and real uncertainties on insurance companies, their customers, all other major actors in the system, and the government treasury."  *NFIB*, 567 U.S. at 699 (joint dissent).  Although the empirical assumptions underlying this connection may be subject to dispute (*see, e.g.*, Br. for Court-Appointed Amicus Curiae Supporting Complete Severability at 35–41, *NFIB*, No. 11-393), what is indisputable is that *Congress* believed that these three provisions were interdependent in enacting the ACA.

    That conclusion is not affected by the fact that the TCJA eliminated the mandate's penalty.  It still remains the case that, in the complete absence of the mandate, retention of the guaranteed-issue and community-rating requirements would expose health insurers (and their customers) to unfettered adverse selection by individuals who can game the system by waiting until they are sick to purchase insurance, contrary to Congress's express intent.  42 U.S.C. § 18091(2)(I).  Nor is this conclusion undermined by the fact that the TCJA did not itself eliminate the guaranteed-issue and community-rating requirements at the same time it eliminated the mandate's penalty and thereby rendered the mandate unconstitutional.  The best evidence of Congress's intent is found in the legislative findings, which continue to remain part of the ACA after the TCJA.  These express findings continue to describe the mandate as "essential" to the operation of the guaranteed-issue and community-rating provisions.  *See EEOC v. Hernando Bank, Inc.*, 724 F.2d 1188, 1190–91 (5th Cir. 1984) (noting that in determining "whether Congress would have enacted the remainder of the statute in the absence of the invalid provision[,] … [c]ongressional intent and purpose are best determined by an analysis of the language of the statute in question").  Those findings cannot

be deemed to have been impliedly repealed by Congress's mere elimination of the financial penalty. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) (explaining that "'repeals by implication are not favored' and will not be presumed unless the 'intention of the legislature to repeal is clear and manifest'" (citation omitted)).[4]

## B. The ACA's Other Provisions Are Severable

As the United States also contended in *NFIB*, the remainder of the ACA is severable from the individual mandate and the guaranteed-issue and community-rating requirements. Br. for Resp't (Severability) at 44–54, *NFIB*, No. 11-393.

1. The ACA's other major provisions—concerning various insurance regulations, health insurance exchanges and associated subsidies, the employer mandate and Medicaid expansion, and reduced federal healthcare reimbursement rates for hospitals—are severable from the individual mandate. Although Congress made clear its belief that the mandate is not severable from the guaranteed-issue and community-rating requirements, *see* 42 U.S.C. § 18091(2)(I), Congress did not do so with respect to the ACA's other major provisions.

The ACA contains numerous mechanisms designed to expand health insurance coverage through federal regulation. Each of these provisions can independently operate "consistent with Congress' basic objectives in enacting the statute," and therefore, this Court "must retain" them. *United States v. Booker*, 543 U.S. 220, 258–59 (2005). Although Plaintiffs speculate (Br. at 35–39) as to a chain reaction of failed policymaking that could occur once the individual mandate is struck down, they cannot show that striking down the individual mandate, guaranteed-issue, and

---

[4] That is especially true given that Congress passed the TCJA by a majority vote under the restrictive reconciliation process, which limits congressional action to generally fiscal matters. *See* H.R.1, 115th Cong., "An Act to provide for reconciliation pursuant to titles II and V of the concurrent resolution on the budget for fiscal year 2018"; Cong. Research Serv., Bill Heniff Jr., The Budget Reconciliation Process: The Senate's "Byrd Rule" (Nov. 22, 2016), https://fas.org/sgp/crs/misc/RL30862.pdf (last visited June 7, 2018). Although Congress was able to revoke the tax penalty, it could not have revoked the guaranteed-issue or community-rating provisions through reconciliation.

community-rating requirements means that the ACA necessarily "ceases to implement any coherent federal policy." *Murphy*, 138 S. Ct. at 1483. Congress's other legislative findings in 42 U.S.C. § 18091(2) demonstrate that, instead, these other provisions are severable from the mandate. *See* 42 U.S.C. § 18091(2)(C), (E), (F) (finding that the "individual responsibility requirement," "together with the other provisions of this Act," will accomplish Congress's objectives of "increas[ing] the number and share of Americans who are insured" and "significantly reducing the number of the uninsured"). The other major provisions still serve the objectives that Congress had when enacting the ACA notwithstanding the elimination of the mandate (plus guaranteed-issue and community-rating)—especially given that Congress itself reduced the effect of the mandate by eliminating its penalty in the TCJA, and yet did not repeal the rest of the ACA despite repeated attempts to do so.

For example, Congress has repeatedly expanded the scope of Medicaid since the inception of the program over half a century ago. There is no reason why the ACA's particular expansion of Medicaid hinges on the individual mandate. The same can be said about the health insurance exchanges, which likewise can operate as functioning "marketplace[s] for the purchase of health insurance" without the individual mandate. H.R. Rep. No. 443, 111th Cong., 2d Sess. Pt. 2, at 976 (2010) (citation omitted); *see also* 42 U.S.C. § 18091(2)(J) ("By significantly increasing health insurance coverage and the size of purchasing pools, which will increase economies of scale, the requirement, together with the other provisions of this Act, will significantly reduce administrative costs and lower health insurance premiums."). This is not a case like *Murphy* in which the Court concluded that finding one provision severable from another would inherently bring about "a weird result." 138 S. Ct. at 1483–84 ("If the people of a State support the legalization of [an activity], federal law would make the activity illegal."). Instead, Plaintiffs rely on a chain of speculative

hypotheticals, which are not strong enough to justify invalidating these other parts of the ACA's insurance market regulations.

Congress has provided further proof of its intent that the bulk of the ACA would remain in place by amending the ACA on numerous occasions after the TCJA invalidated the individual mandate.  *See* Pub. L. No. 115-120, § 3002(g)(2), 132 Stat. at 35 (amending 26 U.S.C. § 5000A(f)(1) (revising definition of "minimum essential coverage," which is relevant to various insurance reforms besides the mandate, *see supra* at 7–8 n.2)); *id.* § 4002, 132 Stat. at 38 (amending ACA § 9001(c) (delaying implementation date of excise tax on high cost employer-sponsored health coverage)); *id.* § 4003 (amending ACA § 9010(j) (suspending annual fee on health insurance providers)); *see also* Pub. L. No. 115-123, §§ 50207, 50208, 50901(a), (c), 52001, 53103, 53119, 132 Stat. 64, 186–89, 283–88, 298, 300–01, 308–13 (2018); Pub. L. No. 115-96, §§ 3101, 3103, 131 Stat. 2044, 2048–49 (2017).  Congress likely would not have sought to amend a statute that it believed had been invalidated in total.

2.  If the ACA's major provisions besides guaranteed-issue and community-rating are severable from the mandate, then it follows that the remaining provisions are as well.  But even if some or all of the other major provisions were inseverable, this Court still should not hold "inseverable all other minor provisions scattered throughout the ACA."  Pltfs. Br. 39.  Many, if not all, of these "minor" provisions serve purposes far removed from the individual mandate, the guaranteed-issue and community-rating requirements, and the purchase of health insurance in general, as Plaintiffs appear to acknowledge.  *Cf. id.* at 40 (arguing that the "minor provisions" "only (if at all) tangentially further the law's main purpose of near-universal affordable care").  Thus, the presence or absence of three provisions of the ACA would not affect the functioning of,

for example, "regulations on the display of nutritional content at restaurants." *Id.* at 40 (citing 21 U.S.C. § 343(q)(5)(H)).

The cases that Plaintiffs cite, moreover, confirm that the tangential nature of these "minor" provisions weighs in favor of their severability.  For example, in *Williams v. Standard Oil Co. of Louisiana*, 278 U.S. 235 (1929), after holding a law fixing gasoline prices unconstitutional, the Supreme Court concluded that several other provisions (including a provision requiring permits to sell gasoline and providing for the issuing of the permits) were inseverable because they were "adjuncts" with the sole purpose of enabling the problematic price-fixing provision.  *Id.* at 242–43.  Here, in contrast, the "minor" provisions are not "adjuncts" with the sole purpose of effectuating Section 5000A—rather, they operate in a completely different sphere.

Plaintiffs also suggest (Br. at 40) that the "minor" provisions would not have garnered the requisite votes in Congress if they were not attached to the rest of the ACA.  But the severability analysis should be one of statutory construction, not parliamentary probabilities.  A court should not hypothesize about the motivations of individual legislators, or speculate about the number of votes available for any number of alternatives.  To the contrary, in *New York v. United States,* 505 U.S. 144 (1992), the Supreme Court recognized that the statute before it, "like much federal legislation, embodies a compromise among the States," but nonetheless held that the invalidated provision of the statute was severable from other provisions.  *See id.* at 183, 186–87.

Accordingly, this Court should hold that the individual mandate is severable from all but the ACA's guaranteed-issue and community-rating requirements.

### III.     PRELIMINARY INJUNCTIVE RELIEF IS NOT WARRANTED AT THIS TIME, BUT A DECLARATORY JUDGMENT WOULD BE APPROPRIATE.

Although Plaintiffs have demonstrated a substantial likelihood of success on the merits, at least in part, preliminary relief is nevertheless unwarranted here.  The individual mandate will not become unconstitutional under *NFIB* until the TCJA's elimination of the mandate's tax penalty goes into effect in 2019.   An injunction may "be issued only if future injury is 'certainly impending.'"  *Aransas Project v. Shaw*, 775 F.3d 641, 664 (5th Cir. 2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  Here, the injury imposed by the individual mandate is not sufficiently imminent to warrant preliminary injunctive relief, especially where final adjudication would be possible before that injury occurs.

Because Plaintiffs agree that the mandate will not become unconstitutional until the tax is eliminated in 2019, immediate relief is not warranted at this time.  That said, because this is a pure question of law on which the Plaintiffs and Defendants do not disagree, this Court should consider construing Plaintiffs' motion as a request for summary judgment and then entering a declaratory judgment that the ACA's provisions establishing the individual mandate as well as the guaranteed-issue and community-rating requirements will all be invalid as of January 1, 2019.  That would be adequate relief against the government.  *See, e.g.*, *Fla. ex rel. Bondi v. U.S. Dep't of Health & Human Servs.*, 780 F. Supp. 2d 1256, 1305 (N.D. Fla. 2011).

## CONCLUSION

For these reasons, this Court should hold that the ACA's individual mandate will be unconstitutional as of January 1, 2019, and that the ACA's guaranteed-issue and community-rating provisions are inseverable from the mandate.


Dated: June 7, 2018                    Respectfully submitted,

                                       CHAD A. READLER
                                       Acting Assistant Attorney General

                                       BRETT A. SHUMATE
                                       Deputy Assistant Attorney General

                                       BRENNA E. JENNY
                                       Counsel to the Assistant Attorney General

                                         /s/ *Daniel D. Mauler*
                                       DANIEL D. MAULER
                                       Virginia State Bar No. 73190
                                       Trial Attorney
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       20 Massachusetts Ave. NW
                                       Washington, DC  20530
                                       (202) 616-0773
                                       (202) 616-8470 (fax)
                                       dan.mauler@usdoj.gov

                                       *Counsel for the Federal Defendants*

21

**CERTIFICATE OF SERVICE**

I certify that on June 7, 2018, I filed the foregoing document with the Clerk of Court via the CM/ECF system, causing it to be served electronically on all counsel of record.

 /s/ *Daniel D. Mauler*
DANIEL D. MAULER
Virginia State Bar No. 73190
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
(202) 616-0773
(202) 616-8470 (fax)
dan.mauler@usdoj.gov

*Counsel for the Federal Defendants*