# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **TEXAS, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **UNITED STATES OF AMERICA, et al.,** | § | **Civil Action No. 4:18-cv-00167-O** |
| | § | |
| **Defendants,** | § | |
| | § | |
| | § | |
| **CALIFORNIA, et al.** | § | |
| | § | |
| **Intervenors-Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

The United States healthcare system touches millions of lives in a daily and deeply personal way. Health-insurance policy is therefore a politically charged affair—inflaming emotions and testing civility. But Article III courts, the Supreme Court has confirmed, are not tasked with, nor are they suited to, policymaking.[1] Instead, courts resolve discrete cases and controversies. And sometimes, a court must determine whether the Constitution grants Congress the power it asserts and what results if it does not. If a party shows that a policymaker exceeded the authority granted it by the Constitution, the fruit of that unauthorized action cannot stand.

Here, the Plaintiffs allege that, following passage of the Tax Cuts and Jobs Act of 2017 (TCJA), the Individual Mandate in the Patient Protection and Affordable Care Act (ACA) is unconstitutional. They say it is no longer fairly readable as an exercise of Congress's Tax Power

---

[1] *See Nat'l Fed'n of Indep. Businesses v. Sebelius (NFIB)*, 567 U.S. 519, 530–38 (2012) (noting the wisdom of legislative policy is entrusted to the Nation's elected leaders).

and continues to be unsustainable under the Interstate Commerce Clause. They further urge that, if they are correct, the balance of the ACA is untenable as inseverable from the Invalid Mandate.

Resolution of these claims rests at the intersection of the ACA, the Supreme Court's decision in *NFIB*, and the TCJA. In *NFIB*, the Supreme Court held the Individual Mandate was unconstitutional under the Interstate Commerce Clause but could fairly be read as an exercise of Congress's Tax Power because it triggered a tax. The TCJA eliminated that tax. The Supreme Court's reasoning in *NFIB*—buttressed by other binding precedent and plain text—thus compels the conclusion that the Individual Mandate may no longer be upheld under the Tax Power. And because the Individual Mandate continues to mandate the purchase of health insurance, it remains unsustainable under the Interstate Commerce Clause—as the Supreme Court already held.

Finally, Congress stated many times unequivocally—through enacted text signed by the President—that the Individual Mandate is "essential" to the ACA. And this essentiality, the ACA's text makes clear, means the mandate must work "together with the other provisions" for the Act to function as intended. All nine Justices to review the ACA acknowledged this text and Congress's manifest intent to establish the Individual Mandate as the ACA's "essential" provision. The current and previous Administrations have recognized that, too. Because rewriting the ACA without its "essential" feature is beyond the power of an Article III court, the Court thus adheres to Congress's textually expressed intent and binding Supreme Court precedent to find the Individual Mandate is inseverable from the ACA's remaining provisions.

Construing the Plaintiffs' Application for Preliminary Injunction, (ECF No. 39), as a motion for partial summary judgment, the Court therefore **DENIES** Plaintiffs' request for an injunction but **GRANTS** summary judgment on Count I of the Amended Complaint. *See* FED. R. CIV. P. 56(f); July 16, 2018 Order, ECF No. 176.

## I.      BACKGROUND

More than any factual developments, the background to this case involves the nuances of the ACA, *NFIB*, and the TCJA, which the Court traces below.

### A.      The ACA

The ACA became law on March 23, 2010. *See* Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119-1045 (2010). Congress intended the ACA to achieve "near-universal" health-insurance coverage and to "lower health insurance premiums" through the "creation of effective health insurance markets" and new statutory requirements for individuals and insurance companies. *See, e.g.*, 42 U.S.C. §§ 18091(2)(D), (2)(F), and (2)(I). It pursued these goals through a carefully balanced restructuring of the Nation's health-insurance ecosystem.

For starters, the ACA established a "[r]equirement to maintain minimum essential coverage"—commonly known as the "Individual Mandate." 26 U.S.C. § 5000A(a). To compel compliance with the Individual Mandate, Congress imposed a tax penalty on individuals who were subject to the requirement but chose to disobey it. *Id.* § 5000A(b). The ACA labeled this penalty the "[s]hared responsibility payment." It was originally to be assessed at either $695.00 or a 2.5 percent share of a family's household income—whichever was greater. *Id.* § 5000A(c).

From the start, Congress exempted some individuals from Individual Mandate. For example: those qualifying for a "[r]eligious exemption[]," *id.* § 5000A(d)(2)(A); "member[s] of a health care sharing ministry," *id.* § 5000(d)(2)(B); individuals who are "not . . . citizen[s] or national[s] of the United States . . . or alien[s] lawfully present in the United States," *id.* § 5000A(d)(3); and "[i]ncarcerated individuals," *id.* § 5000A(d)(4). At the same time, Congress exempted five categories of individuals from the shared-responsibility payment but not the Individual Mandate. *See id.* § 5000A(e). This means several classes of individuals are obligated

by § 5000A(a) to obtain minimum-essential coverage but are not subject to the tax penalty for failure to do so.[2]

Congress also wanted to ensure affordable health insurance for those with pre-existing conditions. *See* 42 U.S.C. § 18091(2)(I) ("By significantly increasing health insurance coverage, the [Individual Mandate], together with the other provisions of this Act, will minimize . . . adverse selection and broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums . . . [and] creat[e] effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold."). Congress therefore required insurers to cover high-risk individuals via the "guaranteed-issue" and "community-rating" provisions. The guaranteed-issue provision requires insurers to "accept every employer and individual in the State that applies for . . . coverage." *Id.* § 300gg-1. The community-rating provision prohibits insurers from charging higher rates to individuals based on age, sex, health status, or other factors. *Id.* § 300gg-4.

The ACA includes many other integral regulations and taxes as well. These include, among other things, an excise tax on high-cost insurance plans, 26 U.S.C. § 4980I; the elimination of coverage limits, 42 U.S.C. § 300gg-11; and a provision allowing dependent children to remain on their parents' insurance until age 26, *id.* § 300gg-14(a). The ACA also implemented an employer mandate and an employer-responsibility assessment. These provisions require employers with at least fifty full-time employees to pay the federal government a penalty if they fail to provide their employees with ACA-compliant health-plan options. *See* 26 U.S.C. § 4980H.

---

[2] These classes included "[i]ndividuals who cannot afford coverage," *id.* § 5000A(e)(1); taxpayers with income "less than 100 percent of the poverty line for the size of the family involved," *id.* § 5000A(e)(2); members of an Indian tribe, *id.* § 5000A(e)(3); individuals experiencing "short coverage gaps" in health insurance, *id.* § 5000A(e)(4); and individuals who have received a "hardship" exemption from the Secretary of Health and Human Services, *id.* § 5000A(e)(5).

But just as Congress funneled nearly all Americans into health-insurance coverage on the one hand—through the Individual Mandate and employer mandate, e.g.—it also significantly reduced reimbursements to hospitals by more than $200 billion over ten years on the other. 42 U.S.C. §§ 1395ww(b)(3)(B)(xi)–(xii), 1395ww(q), 1395ww(r), and 1396r-4(f)(7).

Notably, several ACA provisions are tied to another signature reform—the creation and subsidization of health-insurance exchanges. *See id.* §§ 18031–44. Through these and other provisions, the ACA allocated billions of federal dollars to subsidize the purchase of health insurance through government-run exchanges. Plus, the ACA expanded the scope of Medicaid, adding millions of people to the eligibility roster. *See id.* § 1396a(a)(10)(A)(i)(VIII).

The ACA also lays out hundreds of minor provisions, spanning the Act's 900-plus pages of legislative text, that complement the above-mentioned major provisions and others.

## B.   *NFIB*

After the ACA took effect, states, individuals, and businesses challenged its constitutionality in federal courts across the country.[3] One of those cases reached the Supreme Court in 2012. *See NFIB*, 567 U.S. at 519. In *NFIB*, twenty-six states, along with several individuals and an organization of independent businesses, challenged the ACA's Individual Mandate and Medicaid expansion as exceeding Congress's enumerated powers. In short, the Supreme Court held the Individual Mandate was beyond Congress's Interstate Commerce Power but salvageable under its Tax Power. The decision was highly splintered and warrants explanation.

---

[3] In the interest of brevity, a full history of the lower-court decisions leading up to *NFIB* is not included here. But legal scholars have documented that history to help explain this complex statutory scheme and the Supreme Court's decision in 2012. *See, e.g.*, JOSH BLACKMAN, UNPRECEDENTED: THE CONSTITUTIONAL CHALLENGE TO OBAMACARE 79–158 (2013) [hereinafter "BLACKMAN"].

1.      Chief Justice Roberts

Chief Justice Roberts authored a lengthy opinion considering several issues. *See id.* at 530–89. Only certain parts of that opinion garnered a majority of votes or otherwise reached a conclusion agreed to by a majority of the Supreme Court. Here are the pertinent parts.

In **Part III-A**, Chief Justice Roberts concluded the Individual Mandate is not a valid exercise of Congress's power under the Interstate Commerce Clause. *Id.* at 546–61 (Roberts, C.J.). The Government argued the Individual Mandate could be sustained under the Interstate Commerce Clause because individual decisions to not buy health insurance collectively "ha[ve] a substantial and deleterious effect on interstate commerce." *Id.* at 548–49 (citing Brief for United States). It also asserted insurance reforms without a mandate would create cost-shifting problems whereby insurers would increase premiums to cover the costs of high-risk individuals. *Id.* at 547–48.

The Chief Justice disagreed and held the Interstate Commerce Clause authorizes regulating "activity," not inactivity. *Id.* at 553. He warned the Government's theory would "extend[] the sphere of [Congress's] activity and draw[] all power into its impetuous vortex." *Id.* at 554 (quoting THE FEDERALIST NO. 48, at 309 (James Madison)). "The Framers gave Congress the power to *regulate* commerce," he reasoned, "not to *compel* it." *Id.* at 555 (emphasis in original).

Though no other Justice joined this part of the Chief Justice's opinion, the "joint dissent"—consisting of Justices Scalia, Kennedy, Thomas, and Alito—reached the same conclusion on the Interstate Commerce Clause question. *Id.* at 657 (joint dissent). Accordingly, a majority of the Supreme Court found the Individual Mandate is unconstitutional under the Interstate Commerce Clause,[4] and even the four Justices not reaching that conclusion recognized it as the holding of the

---

[4] The same five Justices also found that the Individual Mandate could not be upheld as an essential component of the ACA's insurance reforms under the Necessary and Proper Clause. *Id.* at 560 (Roberts, C.J.); *id.* at 654–55 (joint dissent).

Court. *See id.* at 572 (majority) ("The Court today holds that our Constitution protects us from federal regulation under the Commerce Clause so long as we abstain from the regulated activity.").

In **Part III-B**, the Chief Justice concluded that, because the Individual Mandate is impermissible under the Interstate Commerce Clause, the Supreme Court was obligated to entertain the Government's argument that the mandate could be upheld under the Tax Power. *Id.* at 561–63 (Roberts, C.J.). He noted that "[t]he most straightforward reading of the mandate is that it commands individuals to purchase insurance." *Id.* at 562. "But, for the reasons explained above, the Commerce Clause does not give Congress that power." *Id.*

In **Part III-C**, the Chief Justice wrote a majority opinion, joined by Justices Ginsburg, Breyer, Sotomayor, and Kagan, holding that 26 U.S.C. § 5000A—including the Individual Mandate and the shared-responsibility payment—was a constitutional exercise of Congress's Tax Power. *Id.* at 563–74 (majority). The Supreme Court's analysis in this section focused more on the shared-responsibility payment than on the Individual Mandate. *See, e.g.*, *id.* at 563 ("The exaction the Affordable Care Act imposes on those without health insurance looks like a tax in many respects. The '[s]hared responsibility payment,' as the statute entitles it, is paid into the Treasury . . . ."); *id.* at 566 ("The same analysis here suggests that the shared responsibility payment may for constitutional purposes be considered a tax."); *id.* at 568 (reasoning "the shared responsibility payment merely imposes a tax citizens may lawfully choose to pay in lieu of buying health insurance"); *id.* at 569 ("Our precedent demonstrates that Congress had the power to impose the *exaction* in § 5000A under the taxing power." (emphasis added)).

The Supreme Court's conclusion that § 5000A constituted a constitutional exercise of Congress's Tax Power turned on several factors. First, the shared-responsibility payment "is paid into the Treasury by taxpayers when they file their tax returns." *Id.* at 563 (cleaned up). Second,

the amount owed under the ACA "is determined by such familiar factors as taxable income, number of dependents, and joint filing status." *Id.* (citing 26 U.S.C. §§ 5000A(b)(3), (c)(2), (c)(4)). And "[t]he requirement to pay is found in the Internal Revenue Code and enforced by the IRS, which . . . must assess and collect it 'in the same manner as taxes.'" *Id.* at 563–64. Third and finally, the shared-responsibility payment "yields the *essential* feature of any tax: It produces at least some revenue for the Government." *Id.* at 564 (citing *United States v. Kahriger*, 345 U.S. 22, 28 n.4 (1953)) (emphasis added). On these bases, the Supreme Court held, "The Federal Government does have the power to impose a tax on those without health insurance. Section 5000A is therefore constitutional, because it can reasonably be read as a tax." *Id.* at 575.

Finally, in **Part IV**, Chief Justice Roberts was joined by Justices Breyer and Kagan in concluding that the ACA's Medicaid-expansion provisions unconstitutionally coerced States into compliance—but given the existence of a severability clause, the unconstitutional portion of the Medicaid provisions could be severed. *Id.* at 575–88 (Roberts, C.J., joined by Breyer and Kagan, JJ.). While Justice Ginsburg, joined by Justice Sotomayor, disagreed that the ACA's mandatory Medicaid expansion was unconstitutionally coercive, *see id.* at 624–45 (Ginsburg, J., joined by Sotomayor, J.), she agreed with the Chief Justice's conclusion—*only* because the Chief Justice found the expansion unconstitutional—that the offending provisions could be severed from the remainder of the Act, *see id.* at 645 ("But in view of THE CHIEF JUSTICE's disposition, I agree with him that the Medicaid Act's severability clause determines the appropriate remedy.").

   2. <u>Joint Dissent</u>

Justices Scalia, Kennedy, Thomas, and Alito agreed with the Chief Justice that the Individual Mandate exceeds Congress's powers under the Interstate Commerce and Necessary and

Proper Clauses, but they concluded § 5000A could not be characterized as a tax.[5] *Id.* at 652–57

(joint dissent). The joint dissent noted that Congress rejected an earlier version of the ACA that

"imposed a tax instead of a requirement-with-penalty" and reasoned that characterizing § 5000A,

including the Individual Mandate, as a tax was therefore contrary to congressional intent. *Id.* at

669 (citations omitted).

Because the joint dissenters concluded the Individual Mandate and the Medicaid expansion

were unconstitutional, they—and only they—addressed whether "all other provisions of the Act

must fall as well." *Id.* at 691. The dissenters noted that the ACA "was passed to enable affordable,

'near universal' health insurance coverage." *Id.* at 694 (citing 42 U.S.C. § 18091(2)(D)). And to

effectuate this goal, the ACA "consists of mandates and other requirements; comprehensive

regulation and penalties; some undoubted taxes; and increases in some governmental expenditures,

decreases in others." *Id.* The dissenters then asked whether this "closely interrelated" scheme could

"function in a coherent way and as Congress would have intended, even when the major provisions

establishing the Individual Mandate and Medicaid Expansion are themselves invalid." *Id.* at 691,

694. They opined it could not.

In passing the ACA, the dissenters noted, Congress understood the fiscal concerns

surrounding healthcare reform and engineered a system whereby "it did not intend to impose the

inevitable costs on any one industry or group of individuals." *Id.* at 694. The dissenters reasoned

the ACA "attempts to achieve near-universal health insurance coverage by spreading its costs to

individuals, insurers, governments, hospitals, and employers—while, at the same time, offsetting

significant portions of those costs with new benefits to each group." *Id.* at 695. In a nutshell:

> the Federal Government bears the burden of paying billions for the new
> entitlements mandated by the Medicaid Expansion and federal subsidies for

---

[5] The joint dissent also agreed the ACA's Medicaid expansion exceeded "Congress' power to attach conditions to federal grants to the States." *NFIB*, 567 U.S. at 671.

insurance purchases on the exchanges; but it benefits from reductions in the reimbursements it pays to hospitals. Hospitals lose those reimbursements; but they benefit from the decrease in uncompensated care, for under the insurance regulations it is easier for individuals with pre-existing conditions to purchase coverage that increases payments to hospitals. Insurance companies bear new costs imposed by a collection of insurance regulations and taxes, including "guaranteed issue" and "community rating" requirements to give coverage regardless of the insured's pre-existing conditions; but the insurers benefit from the new, healthy purchasers who are forced by the Individual Mandate to buy the insurers' product and from the new low-income Medicaid recipients who will enroll in insurance companies' Medicaid-funded managed care programs. In summary, the Individual Mandate and Medicaid Expansion offset insurance regulations and taxes, which offset reduced reimbursements to hospitals, which offset increases in federal spending.

*Id.* at 695–96. "In summary, the Individual Mandate and Medicaid Expansion offset insurance regulations and taxes, which offset reduced reimbursements to hospitals, which offset increases in federal spending." *Id.* at 696. And Congress intended the Individual Mandate and Medicaid Expansion to work *together* with the rest of the ACA. *Id.* (citing 42 U.S.C. §§ 18091(2)(C), (2)(E), (2)(F), (2)(G), (2)(I), (2)(J)).

Next, the joint dissenters detailed the ACA's major provisions. They concluded, given the above, that these provisions—insurance regulations and taxes; hospital-reimbursement reductions and other reductions in Medicare expenditures; health-insurance exchanges and their federal subsidies; and the employer-responsibility assessment—are all inseverable from the Individual Mandate. *See id.* at 697–703. They concluded the same with respect to the ACA's minor provisions. *See, e.g.*, *id.* at 704 ("if the major provision were unconstitutional, Congress would not have passed the minor one"). In sum, the joint dissenters would have declared the ACA "invalid in its entirety." *Id.* at 707.

C.     **The TCJA**

On December 22, 2017, the Tax Cuts and Jobs Act of 2017 was signed into law. *See* Pub. L. No. 115-97, 131 Stat. 2054 (2017). Congress passed the TCJA through budget reconciliation,

"an expedited procedure [for] considering legislation that would bring existing spending, revenue, and debt limit laws into compliance with the current fiscal priorities established in the annual budget resolution." Megan S. Lynch & James V. Saturno, *The Budget Reconciliation Process: Stages of Consideration*, at 1, CONGRESSIONAL RESEARCH SERVICE (Jan. 4, 2017). Budget reconciliation limits congressional action to fiscal matters.

In the TCJA, Congress reduced the ACA's shared-responsibility payment to zero, effective January 1, 2019. *See* TCJA § 11081. Congress took no other action pertaining to the ACA. Nor could it. The reconciliation process limited Congress to doing exactly what it did: reducing taxes. *See* Fed. Defs.' Resp. 16 n.4, ECF No. 92 ("Although Congress was able to revoke the tax penalty, it could not have revoked the guaranteed-issue or community-rating provisions through reconciliation."); Sept. 5, 2018 Hr'g Tr. at 36:7–12 (Intervenor Defendants) [hereinafter "Hr'g Tr."] ("Congress did not repeal any part of the ACA, including the shared responsibility payment. In fact, it could not do so through the budget reconciliation procedures it used.").

## II.     PROCEDURAL BACKGROUND

Plaintiffs are the States of Alabama, Arizona, Arkansas, Florida, Georgia, Indiana, Kansas, Louisiana, Mississippi, Missouri, Nebraska, North Dakota, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, Wisconsin, Governor Paul LePage of Maine (the "State Plaintiffs"), and individuals Neill Hurley and John Nantz (the "Individual Plaintiffs" and, collectively with the State Plaintiffs, "Plaintiffs").

Defendants are the United States of America, the United States Department of Health and Human Services ("HHS"), Alex Azar, in his official capacity as Secretary of HHS, the United States Internal Revenue Service (the "IRS"), and David J. Kautter, in his official capacity as Acting Commissioner of Internal Revenue (collectively, the "Federal Defendants").

Finally, the States of California, Connecticut, Delaware, Hawaii, Illinois, Kentucky, Massachusetts, Minnesota, New Jersey, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, and Washington, and the District of Columbia intervened as defendants (collectively, the "Intervenor Defendants").

The Plaintiffs sued the Federal Defendants seeking, among other things, a declaration that the Individual Mandate, as amended by the TCJA, is unconstitutional and that the remainder of the ACA is inseverable. Am. Compl. 2, ECF No. 27. Their theory is that, because the TCJA eliminated the shared-responsibility tax payment, the tax-based saving construction developed in *NFIB* no longer applies. *Id.* at 2–3. Plaintiffs further argue that, as the four joint dissenters reasoned in *NFIB*, the Individual Mandate is inseverable from the rest of the ACA. Pls.' Br. Prelim. Inj. 35, ECF No. 40 (citing *NFIB*, 567 U.S. at 691–703 (joint dissent)) [hereinafter "Pls.' Br."].

The Federal Defendants agree the Individual Mandate is unconstitutional and inseverable from the ACA's pre-existing-condition provisions. But they argue all other ACA provisions are severable from the mandate. The Intervenor Defendants argue all the Plaintiffs' claims fail.

The Plaintiffs filed an Application for Preliminary Injunction, (ECF No. 39), on April 26, 2018; the Federal Defendants and the Intervenor Defendants responded, (ECF Nos. 91 and 92), on June 7, 2018; and Plaintiffs replied, (ECF No. 175), on July 5, 2018. Because the Federal Defendants argued a judgment, as opposed to an injunction, was more appropriate, the Court provided notice of its intent to resolve the issues in this case on summary judgment. *See* July 16, 2018 Order, ECF No. 176 (citing Fed. R. Civ. P. 56(f)(3)). The parties responded. *See* ECF Nos. 177–79.

The Plaintiffs argued they desire a preliminary injunction but are unopposed to "*simultaneously* considering Plaintiffs' application as a motion for partial summary judgment on

12

the constitutionality of the ACA's mandate." *See* Pls.' Resp. July 16, 2018 Order, ECF No. 181 (emphasis in original). The Intervenor Defendants opposed converting the preliminary-injunction briefing to a summary-judgment ruling because they wished to more fully brief issues such as Article III standing, the Interstate Commerce Clause, and the scope of injunctive relief. Intervenor Defs.' Resp. July 16, 2018 Order 2, ECF No. 182. At the hearing, the Federal Defendants requested the Court "to defer any ruling until after the close of the open enrollment period which is in mid December, [as] that would ensure that there is no disruption to the open enrollment period." Hr'g Tr. at 30:15–18.

The Court finds the Intervenor Defendants adequately briefed and argued at the September 5, 2018 hearing the standing and Interstate Commerce Clause issues. The Court therefore construes the application as a motion for partial summary judgment.

## III.   LEGAL STANDARDS

### A.   Article III Standing

"Every party that comes before a federal court must establish that it has standing to pursue its claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013). Standing doctrine is rooted in the Constitution's grant of judicial power to adjudicate cases or controversies. "The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

"The doctrine of standing asks 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Cibolo Waste*, 718 F.3d at 473 (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)). Standing has both constitutional and prudential components. *See id.* (quoting *Elk Grove*, 542 U.S. at 11) (stating standing "contain[s] two strands: Article III standing . . . and prudential standing"). The "irreducible constitutional

minimum" of Article III standing consists of three elements. *Spokeo*, 135 S. Ct. at 1547; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff must have (1) suffered an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant and (3) that is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61. It is not necessary for all plaintiffs to demonstrate Article III standing. Rather, "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

"Prudential standing requirements exist in addition to 'the immutable requirements of Article III,' . . . as an integral part of 'judicial self-government.'" *ACORN v. Fowler*, 178 F.3d 350, 362 (5th Cir. 1999) (quoting *Lujan*, 504 U.S. at 560). "The goal of this self-governance is to determine whether the plaintiff 'is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial power.'" *Id.* (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 n.8 (1986)). The Supreme Court has observed that prudential standing encompasses "at least three broad principles," including "the general prohibition on a litigant's raising another person's legal rights . . . ." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014); *Cibolo Waste*, 718 F.3d at 474 (quoting *Elk Grove*, 542 U.S. at 12).

As the parties invoking jurisdiction, the Plaintiffs must show the requirements of standing are satisfied. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

## B.    Summary Judgment

Summary judgment is proper when the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record that reveal there are no genuine material-fact issues. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When reviewing the evidence on a motion for summary judgment, the court must resolve all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. And if there appears to be some support for the disputed allegations, such that "reasonable minds could differ as to the import of the evidence," the court must deny the motion for summary judgment. *Id.* at 250.

## IV.    ANALYSIS

The Court's analysis involves three separate inquiries and conclusions. First, the Court finds the Parties satisfy the applicable standing requirements. Second, the Court finds the Individual Mandate can no longer be fairly read as an exercise of Congress's Tax Power and is still impermissible under the Interstate Commerce Clause—meaning the Individual Mandate is unconstitutional. Third, the Court finds the Individual Mandate is essential to and inseverable from the remainder of the ACA.

### A.    Article III Standing

No party initially challenged the Plaintiffs' standing. But amici raised the issue[6] and the Intervenor Defendants addressed it at oral argument. *See, e.g.*, Hr'g Tr. at 52–58; 64–68. And

---

[6] The American Medical Association filed an amicus brief that argued the Individual Plaintiffs lack standing because they "seek to leverage their own voluntary decisions to purchase minimum essential coverage into cognizable injuries-in-fact" and therefore impermissibly base standing on a self-inflicted injury. *See* Br. of

because Article III standing is a requirement of subject-matter jurisdiction, it cannot be waived. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction.").

The Individual Plaintiffs, who are citizens and residents of the State of Texas, challenge the Individual Mandate as an unconstitutional requirement to purchase ACA-compliant health insurance. They argue they are injured by the "obligation to comply with the individual mandate . . . despite the provision's unconstitutionality." Am. Compl. ¶ 43, ECF No. 27. Injury-in-fact must be both particularized and concrete, not conjectural or hypothetical. *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). For an injury to be particularized, it "must affect the plaintiff in a personal and individual way." *Id.* Under *Lujan*, a concrete and particularized injury generally exists if the "plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. The question of "whether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense" and "underlies all three elements of standing." *Contender Farms, LLP v. USDA*, 779 F.3d 258, 264, 266 (5th Cir. 2015).

In *Contender Farms*, a company and its principal, McGartland, challenged a regulation under the Horse Protection Act that required certain entities to suspend horse trainers who engaged in "soring." *Id.* at 262. The Fifth Circuit analyzed whether the plaintiffs had standing to challenge the regulation and the scope of the agency's rulemaking authority. Applying a "commonsense approach to the facts in [the] case," the court held first that the plaintiffs were the object of the challenged regulation because the regulation "target[ed] participants in Tennessee walking horse

---

the Am. Med. Ass'n et al. 7, ECF No. 113. The Association also challenged the State Plaintiffs' standing, arguing their alleged injury is too attenuated and speculative to support standing. *See id.* at 11–12.

events like Contender Farms and McGartland." *Id.* at 265. Second, the court determined the regulation amounted to an increased regulatory burden because it subjected the plaintiffs to "harsher, mandatory penalties" for violation of the soring rules—it also required competitors to "take additional measures to avoid even the appearance of soring." *Id.* at 266. Because "[a]n increased regulatory burden typically satisfies the injury in fact requirement," and because the Fifth Circuit found that causation and redressability naturally flowed from the type of injury alleged, the plaintiffs satisfied Article III standing. *Id.*

Here, the Individual Plaintiffs are the object of the Individual Mandate. It requires them to purchase and maintain certain health-insurance coverage. *See* 26 U.S.C. § 5000A(a); *see also* Pls.' App. Supp. Prelim. Inj., Ex. A (Nantz Decl.) ¶ 15, ECF No. 41 ("I am obligated to comply with the [ACA's] individual mandate"); Pls.' App. Supp. Prelim. Inj., Ex. B (Hurley Decl.) ¶ 15, ECF No. 41 ("I continue to maintain minimum essential health coverage because I am obligated . . . ."). *Cf. Lujan*, 504 U.S. at 561–62; *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636 (5th Cir. 2012).

The American Medical Association argues the Individual Plaintiffs have created their own financial injury because they can choose not to comply with the Individual Mandate and, beginning in January 2019, no penalty will be assessed against them. *See* Br. Am. Med. Ass'n 8–9, ECF No. 113; Hr'g Tr. at 37:9–16. But this argument begs a leading question in this case by assuming the Individual Plaintiffs need not comply with the Individual Mandate. Moreover, a showing of economic injury is not required.

In warning lower courts not to conflate the "actual-injury inquiry with the underlying merits" of a claim, the Fifth Circuit recognizes that standing can be established where a plaintiff alleges that a federal statute or regulation "deters the exercise of his constitutional rights." *Duarte*,

759 F.3d at 520. Here, the Individual Plaintiffs allege just that. They claim "Section 5000A's individual mandate exceeded Congress's enumerated powers by forcing Individual Plaintiffs to maintain ACA-compliant health insurance coverage." Am. Compl. ¶ 49, ECF No. 27. Intervenor Defendants, meanwhile, contend the Individual Mandate remains a constitutional exercise of Congress's tax or regulatory authority. As a result, the "conflicting contentions of the parties . . . present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Railway Mail Assn. v. Corsi*, 326 U.S. 88, 93 (1945)). The Individual Plaintiffs have therefore sufficiently alleged an injury in fact that sits at the center of a live controversy.

"Causation and redressability then flow naturally from" the injury created by the Individual Mandate. *Contender Farms*, 779 F.3d at 266. Without it, the Individual Plaintiffs would not be required to maintain health-insurance coverage and would not be subject to an increased regulatory burden. A favorable decision for the Plaintiffs—a declaration that the Individual Mandate is unconstitutional—would redress the alleged injury. The Individual Plaintiffs, for example, would be free to forego purchasing health insurance altogether or to otherwise purchase health insurance below the "minimum essential coverage" better suited to their health and financial realities. At a minimum, they would be freed from what they essentially allege to be arbitrary governance.

The Court finds the Individual Plaintiffs have standing to challenge the constitutionality of the Individual Mandate.[7] And because the Individual Plaintiffs have standing, the case-or-controversy requirement is met. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981)

---

[7] The Court does not analyze whether the Individual Plaintiffs have prudential standing to bring their claims because "prudential standing (unlike Article III standing) is not jurisdictional, meaning that prudential standing has been forfeited" and is not properly before the court, if, like here, no party contests it. *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 181 (D.C. Cir. 2012) (Kavanaugh, J., dissenting).

("Because we find California has standing, we do not consider the standing of the other plaintiffs."); *Rumsfeld*, 547 U.S. at 53 n.2.

### B.      The Individual Mandate

With standing satisfied, the Court "must . . . determine whether the Constitution grants Congress powers it now asserts, but which many States and individuals believe it does not possess." *NFIB*, 567 U.S. at 534 (Roberts, C.J.). The Court recalls the principles undergirding *NFIB*. Namely, "deference in matters of policy cannot . . . become abdication in matters of law." *Id.* at 538. This means "respect for Congress's policy judgments . . . can never extend so far as to disavow restraints on federal power that the Constitution carefully constructed." *Id.* "The peculiar circumstances of the moment may render a measure more or less wise, but cannot render it more or less constitutional." *Id.* (quoting Chief Justice John Marshall, *A Friend of the Constitution No. V*, Alexandria Gazette, July 5, 1819, *reprinted in* JOHN MARSHALL'S DEFENSE OF *MCCULLOCH V. MARYLAND* 190–91 (G. Gunther ed. 1969)). "And there can be no question that it is the responsibility of this Court to enforce the limits on federal power by striking down acts of Congress that transgress those limits." *Id.* (citing *Marbury v. Madison*, 5 U.S. 137, 175–76 (1803)).

The question of constitutionality is straightforward: Is the Individual Mandate a constitutional exercise of Congress's enumerated powers when the shared-responsibility payment is zero? Because the Supreme Court upheld the Individual Mandate under Congress's Tax Power, the Court will begin there before proceeding to an Interstate Commerce Clause analysis. The Court finds that both plain text and Supreme Court precedent dictate that the Individual Mandate is unconstitutional under either provision.

1.     Congress's Tax Power

In *NFIB*, the Supreme Court held 26 U.S.C. § 5000A to be a constitutional exercise of Congress's Tax Power. *Id.* at 570 (majority) ("Our precedent demonstrates that Congress had the power to impose the exaction in § 5000A under the taxing power, and that § 5000A need not be read to do more than impose a tax. That is sufficient to sustain it."). That power authorizes Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. Previously, the shared-responsibility provision, 26 U.S.C. § 5000A(b), imposed an "exaction" for failure to obey the Individual Mandate, *id.* § 5000A(a). The question here is whether an eliminated shared-responsibility exaction continues to justify construing the Individual Mandate as an exercise of Congress's Tax Power to implement § 5000A.

The Plaintiffs and Federal Defendants say "no." Pls.' Br. 26, ECF No. 40; Fed. Defs.' Resp. 11, ECF No. 92. The Intervenor Defendants, on the other hand, argue § 5000A can still fairly be read as a tax because it continues to satisfy the tax factors discussed in *NFIB*, including that previous shared-responsibility payments will make their way into the treasury for years to come. Intervenor Defs.' Resp. 16–22, ECF No. 91.

a.     *Sections 5000A(a) and (b) Are Distinct*

It is critical to clarify something at the outset: the shared-responsibility payment, 26 U.S.C. § 5000A(b), is distinct from the Individual Mandate, *id.* § 5000A(a). For one thing, the latter is in subsection (a) while the former is in subsection (b).[8] And the Plaintiffs challenge only the Individual Mandate, not the shared-responsibility penalty, as unconstitutional. *See, e.g.*, Am. Compl. ¶ 49, ECF No. 27 ("Section 5000A's *individual mandate* exceeds Congress's enumerated

---

[8] Subsection (c) sets the amount of the shared-responsibility payment erected in subsection (b), *see id.* § 5000A(c), and it is the subsection set at zero per cent by the TCJA, *see* TCJA § 11081(a).

powers . . . ." (emphasis added)); *id.* ("the individual mandate cannot be upheld under any other provision of the Constitution"); *id.* at ¶¶ 55–56 ("[A]fter Congress amended Section 5000A, it is no longer possible to interpret this statute as a tax enacted pursuant to a valid exercise of Congress's constitutional power to tax. Rather, the only reading available is the most natural one; Section 5000A contains a stand-alone legal mandate . . . Accordingly, Section 5000A's *individual mandate* is unconstitutional." (emphasis added)). The Court cannot ignore that the Individual Mandate, § 5000A(a), is separate and distinct from the shared-responsibility penalty, § 5000A(b).[9]

Other ACA text and functionality demand §§ 5000A(a) and (b) not be lumped together, too. Most obviously, Congress exempted some individuals from the shared-responsibility penalty *but not the Individual Mandate*. *See* 26 U.S.C. § 5000A(e). For example, § 5000A(e)(1) provides that "[i]ndividuals who cannot afford coverage" are exempt from the penalty, but not the mandate. *Id.* § 5000A(e)(1). "Members of Indian tribes" are also subject to the mandate but not the penalty. *See id.* § 5000A(e)(3). Congress could not possibly have intended the mandate and penalty to be treated as one when it treated them as two.[10]

Congress's codified ACA findings support the distinction as well. As the Plaintiffs argue, those "findings identify the individual mandate itself—'[t]he *requirement*' to purchase health insurance"—while "making no mention of the separate tax penalty that attaches to some individuals' failure to comply with the mandate." Pls.' Br. 8–9, ECF No. 40 (citation omitted) (emphasis in Plaintiffs' Brief). The Court agrees the findings highlight that Congress believed that,

---

[9] *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174–79 (2012) (Surplusage Canon) [hereinafter "READING LAW"].

[10] Federal agencies recognize this as well. *See, e.g.*, CENTERS FOR MEDICARE & MEDICAID SERVICES, ONE PAGER – INDIAN EXEMPTION, https://marketplace.cms.gov/technical-assistance-resources/exemption-indian-health-care-provider.pdf (last visited December 2018) ("Under the Affordable Care Act, everyone who can afford to is now required by law to have health coverage . . . However, those who can't afford coverage or meet other conditions may qualify for [a shared-responsibility-payment] exemption.").

"if there were no *requirement*"—i.e., no Individual Mandate—"many individuals would wait to purchase health insurance until they needed care." 42 U.S.C. § 18091(2)(I) (emphasis added). That is the belief it acted on and on which it formed its intent.[11]

The 2010 Congress therefore intended the mandate and penalty to be distinct. The 2017 Congress solidified that intent. Section 11081 of the TCJA is entitled "Elimination of shared responsibility payment for individuals failing to maintain minimum essential coverage." TCJA § 11081. This section amends 26 U.S.C. § 5000A(c)—the provision setting the amount of the shared-responsibility penalty, *id.* § 5000A(b)—to "[e]liminat[e]" the existing payment and replace it with "Zero percent" and "$0." TCJA § 11081(a). It does not eliminate the Individual Mandate. So, just as the 2010 Congress subjected *some* individuals to the Individual Mandate but no shared-responsibility payment, the 2017 Congress subjected *all* applicable individuals to the Individual Mandate but no shared-responsibility payment. Congress never intended the two things to be one.

As described below, the Supreme Court's Tax Power analysis in *NFIB* proceeded along these lines—recognizing the Individual Mandate as separate and distinct from the shared-responsibility penalty. This distinction is critical to the Court's remaining legal analysis.

> b.    *Section 5000A(a) Can No Longer Be Sustained as an Exercise of Congress's Tax Power*

*NFIB* does not contravene Congress's intent to separate the Individual Mandate and shared-responsibility penalty. To the extent the Supreme Court held § 5000A could be fairly read as a tax,

---

[11] *See also* CONGRESSIONAL BUDGET OFFICE, KEY ISSUES IN ANALYZING MAJOR HEALTH INSURANCE PROPOSALS 53 (Dec. 2008), *available at* https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-18-keyissues.pdf (December 2008) ("[S]ome compliance is generally observed, even when there is little or no enforcement of mandates. Compliance, then, is probably affected by an individual's personal values and by social norms. Many individuals and employers would comply with a mandate, even in the absence of penalties, because they believe in abiding by the nation's laws.").

it reasoned only that the Individual Mandate could be viewed as part and parcel of a provision supported by the Tax Power—not that the Individual Mandate *itself* was a tax.

The Supreme Court stated its "precedent demonstrate[d] that Congress had the power to impose the *exaction* in § 5000A under the taxing power"—and § 5000A(b) is the exaction—"and that § 5000A need not be read to do more than impose a tax. That is sufficient to sustain it." *NFIB*, 567 U.S. at 570 (emphasis added). In other words, it was only because of the totally distinct shared-responsibility payment, or exaction, that the Supreme Court could construe § 5000A as a tax provision. As the Government argued at the time, and as Chief Justice Roberts recognized, that meant "the mandate [could] be regarded as establishing a condition—not owning health insurance—that *triggers a tax*." *Id.* at 563 (Roberts, C.J.) (emphasis added).

Put plainly, because Congress had the power to enact the shared-responsibility exaction, § 5000A(b), under the Tax Power, it was fairly possible to read the Individual Mandate, § 5000A(a), as a functional part of that tax also enacted under Congress's Tax Power. Therefore, § 5000A *as a whole* could be viewed as an exercise of Congress's Tax Power.

The majority's analysis compels this conclusion.[12] In its very first breath under Part III-C, the majority reasoned:

> The exaction the Affordable Care Act imposes on those without health insurance looks like a tax in many respects. The "[s]hared responsibility payment," as the statute entitles it, is paid into the Treasury by "taxpayer[s]" when they file their tax returns. 26 U.S.C. § 5000A(b). It does not apply to individuals who do not pay federal income taxes because their household income is less than the filing threshold in the Internal Revenue Code. § 5000A(e)(2). For taxpayers who do owe the payment, its amount is determined by such familiar factors as taxable income, number of dependents, and joint filing status. §§ 5000A(b)(3), (c)(2), (c)(4). The requirement to pay is found in the Internal Revenue Code and enforced by the IRS, which—as we previously explained—must assess and collect it "in the same manner as taxes."

---

[12] *Accord* Intervenor Defs.' Resp. 17, ECF No. 91 ("In *NFIB*, the Supreme Court explained that the *shared responsibility payment* 'looks like' a tax in several respects." (emphasis added)).

*NFIB*, 567 U.S. at 563–64 (majority) (final citation to ACA omitted). The Supreme Court's baseline analysis thus turned on the following: the *exaction* looks like a tax; it is *paid* into the treasury; it does not apply to individuals who pay no federal income taxes; familiar tax factors are applied to folks who owe *the payment*; and the requirement *to pay* is in the revenue code. *Id.* Only one of those factors applies to the Individual Mandate, § 5000A(a): it is in the Internal Revenue Code. But the Individual Mandate is not in § 5000A(b), is not called the shared-responsibility payment, is not an exaction, is not paid into the Treasury or otherwise a payment, does not exclude those who pay no federal taxes for income reasons, and is not determined by familiar tax factors. Section 5000A(b) is all those things.

Crucially, after assessing § 5000A(b) against the factors above, the Supreme Court concluded § 5000A "yields the essential feature of any tax: It produces at least some revenue for the Government." *Id.* at 564 (citing *United States v. Kahriger*, 345 U.S. 22, 28 n. 4 (1953)).

The Supreme Court thus identified three basic criteria to conclude § 5000A could be viewed as an exercise of the Tax Power: (1) a payment is paid into the Treasury, (2) the payment amount is determined with reference to income and other familiar factors, and (3) the payment produces revenue for the Government. *Id.* at 563–64. In their brief, the Intervenor Defendants urge the "shared responsibility payment continues to maintain these tax-like characteristics." Intervenor Defs.' Resp. 18, ECF No. 91. But at the hearing, they seemed to concede § 5000A will no longer meet the first and second criteria starting January 1, 2019. *See* Hr'g Tr. at 70:10–16; 70:23–25. They instead focus on the third factor, contending the "production of revenue at all times is not a constitutional requirement for a lawful tax." Intervenor Defs.' Resp. 18, ECF No. 91.

But the Intervenor Defendants downplay the Supreme Court's most crucial conclusion: § 5000A "yield[ed] the *essential* feature of any tax: It produce[d] at least some revenue for the

Government." *NFIB*, 567 U.S. at 564 (emphasis added); *accord Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 841 (1995) ("A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the Government." (citation omitted)). Not indicative, not common—essential.[13] Thus, the bottom line is the Individual Mandate was buoyed by Congress's Tax Power only because it "trigger[ed]" a provision that "produce[d] at least some revenue for the Government." And it was high tide when the Supreme Court decided *NFIB* because the shared-responsibility payment was still a payment. But with the TCJA, the tide has gone out. Section 5000A no longer contains an exaction.

The Intervenor Defendants argue that "[e]ven if Plaintiffs were correct that a constitutionally-valid tax must produce revenue at all times"—a condition the Supreme Court called essential—"it will be years before the shared responsibility payment ceases to do so." Intervenor Defs.' Resp. 21, ECF No. 91. They contend that, due to the frequency of late payments and deferrals, the government will continue to receive revenue from 2018 shared-responsibility payments "until 2020 or beyond." *Id.*

Intervenor Defendants cite no authority for the proposition that the relevant timeframe to analyze tax revenue is the tax year in which it is remunerated. Plaintiffs reply that "the revenue Intervenor-Defendants identify is attributable to tax year 2018." Pls.' Reply 8 n.9, ECF No. 175.

It is a well-accepted practice that tax revenue is attributable to the tax year in which it is assessed, not the one in which it is paid. *See, e.g.*, *NFIB*, 567 U.S. at 563 ("the payment is expected to raise about $4 billion *per year* by 2017") (emphasis added); Congressional Budget Office, Analysis of Major Health Care Legislation Enacted in March 2010, at 14 (Mar. 30, 2011)

---

[13] *See Essential*, Webster's Third New International Dictionary 777 (1986) (defining as "of or relating to an essence"; "having or realizing in itself the essence of its kind"; and "necessary, indispensable"); *see also* Black's Law Dictionary (10th ed. 2014) ("1. Of, relating to, or involving the essence or intrinsic nature of something. 2. Of the utmost importance; basic and necessary.").

(analyzing *by fiscal year* estimated budgetary effects of ACA tax credits and revenue from excise taxes). When individuals file tax returns in April 2019, for example, the taxes they pay and the returns they receive will affect the government's 2018 tax-year revenue. The same holds true even if individuals receive deferrals or make late payments in the months and years thereafter. And at any rate, because the TCJA eliminated the shared-responsibility payment "beginning after December 31, 2018," that provision no longer *produces* revenue for the Government—present tense—and any future monies that come in will be because the provision once *produced* revenue for the Government—past tense. So, it is true the shared-responsibility payment once had the essential feature of any tax. But it no longer does.

Finally, the Intervenor Defendants point to three examples of Congress delaying or suspending taxes within the ACA: the Cadillac Tax, the Medical Device Tax, and the Health Insurance Providers Fee. Intervenor Defs.' Resp. 18– 20. Drawing on these examples, the Intervenor Defenders argue "[t]he shared responsibility payment has not been rendered unconstitutional merely because it will be $0 in 2019." *Id.* at 18.

As an initial matter, suspending or delaying a tax is not equivalent to eliminating it. And the TCJA does not suspend collection of the shared-responsibility payment, it eliminates it. *See* TCJA § 11081 ("Elimination of shared responsibility payment for individuals failing to maintain minimum essential coverage."). Put differently, until a change in law, there is no shared-responsibility payment. True, Congress may reinstate the payment in the future. But that would be a change in law. The Court cannot rule on a hypothetical counterfactual. It may only "say what the law is," not what it someday could be. *Marbury*, 5 U.S. at 177.

But at a more fundamental level, the Intervenor Defendants' argument demonstrates they misapprehend the Plaintiffs' basic position. The Intervenor Defendants assert: "The *shared*

*responsibility payment* has not been rendered unconstitutional merely because it will be $0 in 2019." Intervenor Defs.' Resp. 18, ECF No. 91 (emphasis added). The Plaintiffs do not argue that; they argue the *Individual Mandate* is unconstitutional. And as the Court has explained, the text of the ACA and TCJA, as well as the Supreme Court's reasoning in *NFIB*, all hinge on an understanding that the Individual Mandate and the shared-responsibility payment are two very different creatures. The saving construction in *NFIB* was available only because § 5000A(a) triggered a tax.[14] And § 5000A(b) was a tax because it produced some revenue for the Government. *Sozinsky v. United States*, 300 U.S. 506, 513–14 (1937); *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972) ("The test of validity is whether on its face the tax operates as a revenue generating measure and the attendant regulations are in aid of a revenue purpose.").

Under the law as it now stands, the Individual Mandate no longer "triggers a tax" beginning in 2019. So long as the shared-responsibility payment is zero, the saving construction articulated in *NFIB* is inapplicable and the Individual Mandate cannot be upheld under Congress's Tax Power. *See NFIB*, 567 U.S. at 574 ("Congress's authority under the Taxing power is limited to requiring an individual to *pay money* into the Federal Treasury, no more." (emphasis added)).

2.   Congress's Interstate Commerce Power

Because the Individual Mandate can no longer be read as an exercise of Congress's Tax Power, the Court takes up the Intervenor Defendants' argument that the mandate is now sustainable under the Interstate Commerce Clause.

---

[14] This distinction also explains why the Cadillac Tax, the Medical Device Tax, and the Health Insurance Providers Fee are all inapposite. Even if, for example, Congress had eliminated the payment under Medical Device Tax—which it did not—the analogy would not hold for the fact pattern before the Court. Instead, to make the Medical Device Tax analogous, it would need to contain a provision requiring all applicable individuals to purchase medical devices. And it would also need to contain a separate provision taxing any applicable individual who did not purchase medical devices. Then, if Congress delayed or suspended the tax under that scheme, the Medical Device Tax would be at least usefully analogous. But the Medical Device Tax does not tax inactivity and is therefore unhelpful here.

27

The Constitution grants Congress the power to "regulate Commerce . . . among the several States." U.S. CONST. art. 1, § 8, cl. 3. Before *NFIB*, the Supreme Court had never considered whether Congress's power to regulate interstate commerce allowed it to compel citizens into commerce—i.e., to regulate *inactivity*. 567 U.S. at 647 (joint dissent) (identifying issue of first impression). As outlined above, the Supreme Court concluded it does not. It therefore held the Individual Mandate could not be sustained under the Interstate Commerce Clause. *See id.* at 572 (majority).

The Plaintiffs argue this issue is decided because the Supreme Court already concluded in *NFIB* that the Individual Mandate cannot be upheld under the Interstate Commerce Clause. Pls.' Br. 22, ECF No. 40.[15] The Intervenor Defendants respond that the Individual Mandate "may now be sustained under the Commerce Clause" because "with a tax of zero dollars, there is no compulsion." Intervenor Defs.' Resp. 18 n.17, ECF No. 91. They argue the constitutional problem identified in *NFIB*—Congress "*compelling* the purchase of insurance"—is no longer a problem because a tax of zero dollars imposes no legal consequence on individuals who do not comply with the Individual Mandate. *Id.* (emphasis in original); *see also* Hr'g Tr. at 37:9–25, 66:14–68:7.

The Individual Mandate provides: "An applicable individual shall . . . ensure that the individual . . . is covered under minimum essential coverage . . . ." 26 U.S.C. § 5000A(a). The Intervenor Defendants argue the provision "gives the individuals the same choice they've always had—to either purchase insurance or pay the tax." Hr'g Tr. at 67:17–19. But the Intervenor

---

[15] The Federal Defendants did not separately brief the Interstate Commerce Clause issue but agree with the Plaintiffs. *See* Fed. Defs.' Resp. 11, ECF No. 92 ("[O]nce the associated financial penalty is gone, the 'tax' saving construction will no longer be fairly possible and thus the individual mandate will be unconstitutional. As a majority of the Supreme Court held in *NFIB*, '[t]he Federal Government does not have the power to order people to buy health insurance. Section 5000A would therefore be unconstitutional if read as a command.'" (citations omitted)).

Defendants' position is logically self-defeating and contrary to the evidence in this case, the language of the ACA, and Fifth Circuit and Supreme Court precedent.

a.      *The Intervenor Defendants' Position Is Logically Inconsistent*

At the threshold, the Intervenor Defendants hope to have their cake and eat it too by arguing the Individual Mandate does absolutely nothing but regulates interstate commerce. That is, they first say the Individual Mandate "does not compel anyone to purchase insurance." Hr'g Tr. at 37:12. Yet they ask the Court to find the provision "regulate[s] Commerce . . . among the several States." U.S. CONST. art. 1, § 8, cl. 3. The Intervenor Defendants' theory, then, is that Congress regulates interstate commerce when it regulates nothing at all. But to "regulate" is "to govern or direct according to rule" and to "bring under the control of law or constituted authority." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1913 (1986). Accepting Intervenor Defendants' theory that the Individual Mandate does nothing thus requires finding that it is not an exercise of Congress's Interstate Commerce Power. *Cf. Gibbons v. Ogden*, 22 U.S. 1, 189–90 (1824) ("Commerce . . . is *regulated* by *prescribing rules* . . . ." (emphasis added)).

b.      *The Intervenor Defendants' Position Contradicts the Evidence*

Despite the Intervenor Defendants' logical gymnastics, the undisputed evidence in this case suggests the Individual Mandate fixes an obligation. The Individual Plaintiffs assert they feel compelled to comply with the law. Pls.' App. Supp. Prelim. Inj., Ex. A (Nantz Decl.) ¶ 15, ECF No. 41 ("I value compliance with my legal obligations . . . [t]he repeal of the associated health insurance tax penalty did not relieve me of the requirement to purchase health insurance"); Pls.' App. Supp. Prelim. Inj., Ex. B (Hurley Decl.) ¶ 15, ECF No. 41 ("I continue to maintain minimum essential health coverage because I am obligated to comply with the [ACA's] individual mandate"). This should come as no surprise. "It is the attribute of law, of course, that it binds; it

states a rule that will be regarded as compulsory for all who come within its jurisdiction." HADLEY ARKES, FIRST THINGS: AN INQUIRY INTO THE FIRST PRINCIPLES OF MORALS AND JUSTICE 11 (1986). Law therefore has an enormous influence on social norms and individual conduct in society. *See* CONGRESSIONAL BUDGET OFFICE, KEY ISSUES IN ANALYZING MAJOR HEALTH INSURANCE PROPOSALS at 53 (Dec. 2008) (noting compliance "is generally observed, even when there is little or no enforcement"). That is the point.

Undoubtedly, now that the shared-responsibility payment has been eliminated, more individuals will choose not to comply with the Individual Mandate. *See* CONGRESSIONAL BUDGET OFFICE, REPEALING THE INDIVIDUAL HEALTH INSURANCE MANDATE: AN UPDATED ESTIMATE at 1 (Nov. 8, 2017). And that is likely to undermine Congress's intent in passing the ACA: Near-universal healthcare and reduced healthcare costs. *See id.* But the fact that many individuals will no longer feel bound by the Individual Mandate does not change either that some individuals will feel so bound—such as the Individual Plaintiffs here—or that the Individual Mandate is still law.

> c.   *The Intervenor Defendants' Position Is Contrary to Text and Binding Precedent*

And therein lies the rub. The Individual Mandate is law. 26 U.S.C. § 5000A(a). To be precise, the "*[r]equirement* to maintain minimum essential coverage" is still law. *Id.* § 5000A(a) (emphasis added). As the Intervenor Defendants concede, Congress "deliberately left the rest of the ACA untouched"—*including* the Individual Mandate. Hr'g Tr. at 40:12–13.

That the Individual Mandate persists, the Court must conclude, is no mistake. "[I]t is no more the court's function to revise by subtraction than by addition." READING LAW, *supra* note 9, at 174. The surplusage canon holds that, while "[s]ometimes lawyers will seek to have a crucially important word ignored," courts must "avoid a reading that renders some words altogether redundant" or "pointless." *Id.* at 174, 176. And this is just as true when parties "argue that an entire

provision should be ignored." *Id.* at 175; *see also Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) ("We resist a reading . . . that would render superfluous an entire provision . . . .").

To accept the Intervenor Defendants' argument that the Individual Mandate does nothing would be doubly sinful under the canon against surplusage—it would require ignoring both the mandatory words of the provision and the function of the provision itself. As to the words of the provision, it is entitled, "Requirement to maintain minimum essential coverage," and provides that "[a]n applicable individual shall . . . ensure" that she or he is covered under an appropriate plan. 26 U.S.C. § 5000A(a). These words must be interpreted according to their plain meaning. *See United States v. Yeatts*, 639 F.2d 1186, 1189 (5th Cir. 1981) ("A basic canon of statutory construction is that words should be interpreted as taking their ordinary and plain meaning." (citing *Perrin v. United States*, 444 U.S. 37, 42 (1980))); READING LAW, *supra* note 9, at 69.

The words "requirement" and "shall" are both mandatory. Webster's defines "requirement" as "something required," "something wanted or needed," and "something called for or demanded." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1929 (1986). And it provides the following as the non-archaic meaning of "shall": "used to express a command or exhortation." *Id.* at 2085. But a plethora of binding caselaw already establishes that there is nothing permissive about a Congressionally enacted requirement that properly[16] employs the verbiage "shall." *See, e.g.*, *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (reasoning "'shall' imposes obligations on agencies to act"); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (noting "shall" indicates an intent to "impose discretionless obligations"); *Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL

---

[16] There are some instances where drafters improperly use the word "shall" as part of a negative command. For example, "Neither party *shall* claim reimbursement for its expenses from the other party." READING LAW, *supra* note 9, at 113. In such an instance, "shall" means something more akin to the traditionally permissive "may." But § 5000A(a) is not a negative command. And "[w]hen drafters use *shall* . . . correctly"—as in § 5000A(a)—"the traditional rule holds"—i.e., "that *shall* is mandatory." *Id.* at 112.

1744422, at *8 (N.D. Tex. Apr. 23, 2013), *aff'd sub nom. Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) ("Congress's use of the word 'shall' . . . imposes a mandatory obligation").

This is precisely why Chief Justice Roberts, in explaining his road to the *NFIB* majority, noted that the Individual Mandate "reads more naturally as a command to buy insurance." *NFIB*, 567 U.S. at 574 (Roberts, C.J.). Indeed, the Chief Justice reasoned that he "would uphold it as a command if the Constitution allowed it." *Id.* But because courts "have a duty to construe a statute to save it, if fairly possible," *id.*, and because "§ 5000A [could] be interpreted as a tax" at the time, *id.*, the Chief Justice construed the Individual Mandate "as establishing a condition . . . that triggers a tax," *id.* at 563. In other words, to the extent the majority construed the Individual Mandate as something other than a standalone mandate, it did so only because it was possible to construe the provision as triggering a tax. That "fundamental construct," as the Intervenor Defendants call it, *see* Hr'g Tr. at 66:15, was just that—a construct. And in light of this Court's finding on the Tax Power today, the construct no longer holds.

But even under the *NFIB* construct, the Individual Mandate created an obligation.[17] As the majority noted, "the individual mandate clearly aims to induce the purchase of health insurance."[18] *NFIB*, 567 U.S. at 567 (majority). It continued, "Neither the Act nor any other law attaches negative legal consequences to not buying health insurance, beyond requiring a payment to the IRS." *Id.* at 568. And the Government agreed at the time, "if someone chooses to pay rather than obtain health insurance, they have fully complied with the law." *Id.*

---

[17] *Cf.* READING LAW, *supra* note 9, at 63 (Presumption Against Ineffectiveness).

[18] That conduct-inducing characteristic is what led five Justices to conclude the Individual Mandate was unsustainable under the Interstate Commerce Clause. *See NFIB*, 567 U.S. at 552 (Roberts, C.J.) ("The individual mandate, however, does not regulate existing commercial activity. It instead compels individuals to *become* active in commerce . . . ."); *id.* at 649 (joint dissent) ("To be sure, purchasing insurance is 'Commerce'; but one does not regulate commerce that does not exist by compelling its existence.").

The logic of the *NFIB* construct is that an individual can comply with the law after disobeying the Individual Mandate only by paying the shared-responsibility payment. "The only thing they may not lawfully do is not buy health insurance and not pay the resulting tax." *Id.* at 574 n.11. But this means the Individual Mandate is no more optional than the tax.

If an individual can satisfy the law only by satisfying either Condition 1 (the Individual Mandate) or Condition 2 (the tax), then both conditions are equally optional and mandatory. To state it differently, under the *NFIB* construct, failing Condition 1 no more triggers Condition 2 than failing Condition 2 triggers Condition 1. So, an individual who disobeys the Individual Mandate can satisfy the law only by paying a tax, but an individual who disregards the tax can satisfy the law only by obeying the Individual Mandate. And only in a world where the Individual Mandate were truly non-binding could an individual disobey the Individual Mandate and forego the tax. But under the *NFIB* majority's construct, that is not the case. That is because logic demands that the Individual Mandate was never—pardon the oxymoron—a non-binding law.

The remainder of the ACA proves that, too. As noted above, § 5000A(e), did and still does exempt some individuals from the eliminated shared-responsibility payment but not the Individual Mandate—"a distinction that would make no sense if the mandate were not a mandate." *Id.* at 665 (joint dissent). What is more, Congress exempted, and continues to exempt, certain individuals from the Individual Mandate itself. *See* 26 U.S.C. § 5000A(d)(1). Why would Congress exempt individuals from a mandate that is not mandatory? To ask is to answer.

At least five Justices agreed the Individual Mandate reads more naturally as a command to buy health insurance than as a tax,[19] and those five Justices agreed the mandate could not pass

---

[19] Justices Ginsburg, Breyer, Kagan, and Sotomayor seemingly took no position on this construction but instead reasoned that the Individual Mandate was constitutional even it were construed as a command. *See, e.g.*, *NFIB*, 567 U.S. at 610 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ.) ("Requiring

muster under the Interstate Commerce Clause. Given that the Individual Mandate no longer "triggers a tax," the Court finds the Individual Mandate now serves as a standalone command that continues to be unconstitutional under the Interstate Commerce Clause.

\* \* \*

The Court today finds the Individual Mandate is no longer fairly readable as an exercise of Congress's Tax Power and continues to be unsustainable under Congress's Interstate Commerce Power. The Court therefore finds the Individual Mandate, unmoored from a tax, is unconstitutional and **GRANTS** Plaintiffs' claim for declaratory relief as to Count I of the Amended Complaint.

### C.      Severability

Since the Individual Mandate is unconstitutional, the next question is whether that provision is severable from the rest of the ACA. The Plaintiffs and the Federal Defendants agree, based on the text of 42 U.S.C. § 18091 and all the opinions in *NFIB*, that the guaranteed-issue and community-rating provisions of the ACA are inseverable from the Individual Mandate. *See* Pls.' Br. 30–35, ECF No. 40; Fed. Defs.' Resp. 13–16, ECF No. 92; Pls.' Reply 9, ECF No. 175. The Plaintiffs, however, argue the Individual Mandate is inseverable from the entire ACA, pointing again to § 18091 and *NFIB*. Pls.' Br. 27–40, ECF No. 40. The Intervenor Defendants first argue the Individual Mandate is severable from all provisions in the ACA. Intervenor Defs.' Resp. 28–33, ECF No. 91. But they also specifically urge that the guaranteed-issue and community-rating provisions are severable from the Individual Mandate. *Id.* at 33–43.

Notably, the parties dispute which Congress's intent controls—the 2010 Congress that passed the ACA or the 2017 Congress that passed the TCJA. *See* Pls.' Reply 14, ECF No. 175 (arguing the intent of the 2010 Congress controls); Intervenor Defs.' Resp. 28–30, ECF No. 91

---

individuals to obtain insurance unquestionably regulates the interstate health-insurance and health-care markets, both of them in existence well before the enactment of the ACA.").

(contending the intent of the 2017 Congress controls); Hr'g Tr. at 43–44. This is a bit of a red herring because, applying the relevant standards, the Court finds both Congresses manifested the same intent: The Individual Mandate is inseverable from the entire ACA.

Because the story begins with the 2010 Congress, the Court begins there as well, analyzing both plain text and Supreme Court precedent. But first, a word about severability doctrine.

### 1.   Severability Doctrine

The doctrine of severability is rooted in the separation of powers. *See Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329–30 (2006); *Regan v. Time, Inc.*, 468 U.S. 641, 652–53 (1984) (plurality opinion). The Supreme Court has therefore frequently severed unconstitutional provisions from constitutional ones.[20] This practice reflects a judicial duty to "try to limit the solution to the problem." *Ayotte*, 546 U.S. at 328. In other words, "a court should refrain from invalidating more of the statute than is necessary." *Regan*, 468 U.S. at 652.

Severability, however, is possible only where "an act of Congress contains unobjectionable provisions *separable* from those found to be unconstitutional." *Id.* (quoting *El Paso & Ne. R. Co. v. Gutierrez*, 215 U.S. 87, 96 (1909)) (emphasis added). Were a court to overplay deference to sever an inseverable statute, it would embrace the very evil the doctrine is designed to deter. *See, e.g.*, *R.R. Ret. Bd. v. Alton R.R. Co.*, 295 U.S. 330, 362 (1935) ("[W]e cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole."). Put bluntly, severing an inseverable statute "is legislative work beyond the power and function of the

---

[20] *See, e.g.*, *Chadha*, 462 U.S. at 931–35 (severing the legislative-veto provision from the remainder of the Immigration and Nationality Act); *Alaska Airlines*, 480 U.S. at 684–97 (holding the legislative-veto provision severable from the remainder of the Airline Deregulation Act of 1978); *New York v. United States*, 505 U.S. at 186–87 (holding the take provision severable from the remainder of the Low-Level Radioactive Waste Policy Amendments Act of 1985); *Buckley v. Valeo*, 424 U.S. 1, 108–09 (1976) (holding campaign expenditure limits severable from other provisions in the Federal Election Campaign Act of 1971).

court." *Hill v. Wallace*, 259 U.S. 44, 70 (1922). For that reason, the Supreme Court has also readily held whole statutes unconstitutional due to an inseverable part.[21]

In light of these background principles, the test for severability is often stated as follows: "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law."[22] *Alaska Airlines*, 480 U.S. at 684. Even under this statement of the rule, "[t]he inquiry into whether a statute is severable is essentially an inquiry into legislative intent." *Mille Lacs*, 526 U.S. at 191.[23] It "requires judges to determine what Congress would have intended had it known that part of its statute was unconstitutional." *Murphy*, 138 S. Ct. at 1486–87 (Thomas, J., concurring). And consistent with the separation of powers, "enacted text is the best indicator of intent." *Nixon v. United States*, 506 U.S. 224, 232 (1993); *cf. United States v. Maturino*, 887 F.3d 716, 723 (5th Cir. 2018) ("Text is the alpha and the omega of the interpretive process.").

So, a court's severability analysis begins with a bread-and-butter exercise: parsing a provision's text and gleaning the ordinary meaning. *See Murphy*, 138 S. Ct. at 1486 (Thomas, J., concurring) ("Because courts cannot take a blue pencil to statutes, the severability doctrine must be an exercise in statutory interpretation."). If the text reflects Congress's intent that an

---

[21] *See, e.g.*, *Wallace*, 259 U.S. at 70 ("Section 4 with its penalty to secure compliance with the regulations of Boards of Trade is so interwoven with those regulations that they cannot be separated. None of them can stand."); *Alton*, 295 U.S. at 362 ("[W]e are confirmed by the petitioners' argument that, as to some of the features we hold unenforceable, it is 'unthinkable' and 'impossible' that the Congress would have created the compulsory pension system without them. They so affect the dominant aim of the whole statute as to carry it down with them."). *See also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (applying "the severability standard for statutes" to an Executive Order and holding "it is clear that President Taylor intended the 1850 order to stand or fall as a whole").

[22] This statement of the rule represents something of a departure from the Supreme Court's reasoning in other decisions that there is a "presumption . . . of an intent that, unless the act operates as an entirety, it shall be wholly ineffective." *Alton*, 295 U.S. at 362 (citing *Wallace*, 259 U.S. at 70). But even as stated in *Alton*, the crux of the inquiry is Congressional "intent."

[23] *See Murphy v. Nat'l Collegiate Athletic Ass'n,*, 138 S. Ct. 1461, 1485–87 (2018) (Thomas, J. concurring) (discussing the problems with applying the modern severability doctrine as a remedy rather than an exercise in statutory interpretation).

unconstitutional provision not be severed—i.e., if "it is evident" Congress "would not have enacted those provisions which are within its power, independently of that which is not," *Alaska Airlines*, 480 U.S. at 684—the analysis ends. The provision is inseverable.

If the text does not reflect a clear legislative intent, however, the court must ask whether the constitutional provisions, severed from the unconstitutional one, would remain "fully operative as a law." *Free Enterprise*, 561 U.S. at 509 (citing *New York*, 505 U.S. at 186; *Alaska Airlines*, 480 U.S. at 684). This is because "Congress could not have intended a constitutionally flawed provision to be severed from the remainder of the statute if the balance of the legislation is incapable of functioning independently." *Alaska Airlines*, 480 U.S. at 684. Here too the touchstone is intent.

Applying these standards, the Court finds the 2010 Congress expressed through plain text an unambiguous intent that the Individual Mandate not be severed from the ACA. Supreme Court precedent supports that finding. And in passing the TCJA through the reconciliation process, the 2017 Congress further entrenched the intent manifested by the 2010 Congress.

### 2.   The Intent of the 2010 Congress

The Intervenor Defendants contend that, "even if it were proper to consider the legislative intent of the 2010 Congress that passed the minimum coverage provision in its original . . . form— and to graft that intent onto a statutory amendment passed by a different Congress—that would still be of no assistance to Plaintiffs." Intervenor Defs.' Resp. 30, ECF No. 91. They first briefly point to the fact that several ACA provisions went into effect before the Individual Mandate. *Id.* at 31–32. They then argue that, "[i]n light of the ACA's numerous stand-alone provisions addressing a vast array of diverse topics, it is not remotely 'evident' that Congress would want the extraordinary disruption that would be caused by" a finding of inseverability. *Id.* at 32–33. Finally,

the Intervenor Defendants devote ten pages to explaining why the Individual Mandate is specifically severable from the guaranteed-issue and community-rating provisions, arguing Congress intended to end discriminatory underwriting practices and that Congress's findings are irrelevant as they focused on an adverse-selection problem that no longer exists. *Id.* at 33–43.

> ### a.    The ACA's Plain Text

"[T]he touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature." *Ayotte*, 546 U.S. at 330 (citation and quotation marks omitted). And if it is "the well-established rule that the plain language of the enacted text is the best indicator of intent," *Nixon*, 506 U.S. at 232, then the intent of the 2010 Congress could not be clearer. Congress codified its intent plainly in 42 U.S.C. § 18091, "Requirement to maintain minimum essential coverage; findings." Those findings are not mere legislative history—they are enacted text that underwent the Constitution's requirements of bicameralism and presentment; agreed to by both houses of Congress and signed into law by President Obama. *See INS v. Chadha*, 462 U.S. 919, 951 (1983) (noting "the Framers were acutely conscious that the bicameral requirement and the Presentment Clauses would serve essential constitutional functions" and "[i]t emerges clearly that the prescription for legislative action . . . represents the Framers' decision that the legislative power of the Federal government be exercised in accord with a single, finely wrought and exhaustively considered, procedure").

The findings state Congress intended to "significantly increas[e] healthcare coverage," "lower health insurance premiums," ensure that "improved health insurance products that are guaranteed issue," and ensure that such health insurance products "do not exclude coverage of pre-existing conditions." 42 U.S.C. § 18091(2)(I). And Congress intended to achieve those goals in a

very specific way. Congress knew that "[i]n the absence of the requirement,[24] some individuals would make an economic and financial decision to forego health insurance coverage and attempt to self-insure, which increases financial risks to households and medical providers." *Id.* § 18091(2)(A). So, Congress designed "[t]he requirement, *together* with the other provisions of this Act" to "add millions of new customers to the health insurance market." *Id.* § 18091(2)(C) (emphasis added).

"The requirement," Congress intended, would "achieve[] near-universal coverage"—a major goal of the ACA—"by building upon and strengthening the private employer-based health insurance system." *Id.* § 18091(2)(D). Congress believed this would work because "[i]n Massachusetts, a similar requirement ha[d] strengthened private employer-based coverage." *Id.* Moreover, Congress stated "the requirement, together with the other provisions of this Act, will significantly reduce [the] economic cost" caused by uninsured individuals. *Id.* § 18091(2)(E). Congress also intended the Individual Mandate to achieve another stated goal: "By significantly reducing the number of the uninsured, the requirement, together with the other provisions of this Act, will lower health insurance premiums." *Id.* § 18091(2)(F). And "the requirement, together with the other provisions of this Act," Congress stated, "will improve financial security for families." *Id.* § 18091(2)(G).

If there were any lingering doubt Congress intended the Individual Mandate to be inseverable, Congress removed it: "The requirement is an *essential* part of this larger regulation of economic activity, and *the absence of the requirement would undercut Federal regulation* of the health insurance market." *Id.* § 18091(2)(H) (emphasis added). That is because, "if there were no requirement, many individuals would wait to purchase health insurance until they needed care."

---

[24] In § 18091, the Individual Mandate is "referred to as the 'requirement.'" *Id.* § 18091(1).

*Id.* §18091(2)(I). And that would undermine the entire project. So, Congress intended "the requirement, together with the other provisions of this Act," to "minimize this adverse selection and broaden the health insurance risk pool . . . which will lower health insurance premiums." *Id.* In other words, "[t]he requirement is *essential* to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." *Id.* (emphasis added).

Congress closed by adding that it intended "the requirement, together with the other provisions," to "significantly reduce administrative costs and lower health insurance premiums." *Id.* § 18091(2)(J). "The requirement is *essential*," Congress reiterated, "to creating effective health insurance markets that do not require underwriting and eliminate its associated administrative costs." *Id.* (emphasis added).

All told, Congress stated three separate times that the Individual Mandate is *essential* to the ACA.[25] That is once, twice, three times and plainly. It also stated the absence of the Individual Mandate would "undercut" its "regulation of the health insurance market." Thirteen different times, Congress explained how the Individual Mandate stood as the keystone of the ACA. And six times, Congress explained it was not just the Individual Mandate, but the Individual Mandate "together with the other provisions" that allowed the ACA to function as Congress intended.

As the Supreme Court has repeatedly explained, "The best evidence of congressional intent . . . is the statutory text that Congress enacted."[26] *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 392

---

[25] *See supra* note 13 (defining "essential" as, among other imperatives, "the essence of its kind," "indispensable," and "[o]f the utmost importance; basic and necessary") (citations omitted).

[26] It is also instructive to consider what text Congress did not enact. In *NFIB*, the Supreme Court held that the unconstitutional portions of the ACA's Medicaid-expansion provisions could be severed from the constitutional portions because Congress included a severability clause. *See NFIB*, 567 U.S. at 585–86 (Roberts, C.J., joined by Breyer and Kagan, JJ.); *id.* at 645 (Ginsburg, J., joined by Sotomayor, J.). In severing the unconstitutional portions of the Medicaid-expansion provisions, the Supreme Court was "follow[ing] Congress's explicit textual instruction." *Id.* at 586 (Roberts, C.J., joined by Breyer and Kagan,

n.4 (2013) (citing *West Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 98 (1991)).[27] On the issue of severability, the text of the ACA is unequivocal. Virtually every subsection of 42 U.S.C. § 18091 is teeming with Congress's intent that the Individual Mandate be inseverable—because it is *essential*—from the entire ACA—because it must work *together* with the other provisions.

On the unambiguous enacted text alone, the Court finds the Individual Mandate is inseverable from the Act to which it is essential.[28]

### b.      The Supreme Court's ACA Decisions

While the ACA's plain text alone justifies finding complete inseverability, this text-based conclusion is further compelled by two separate Supreme Court decisions. All nine Justices to address the issue, for example, agreed the Individual Mandate is inseverable from at least the pre-

---

JJ.); *accord id.* at 645 (Ginsburg, J., joined by Sotomayor, J.) ("I agree . . . that the Medicaid Act's *severability clause* determines the appropriate remedy." (emphasis added)). The Supreme Court's Medicaid-severability analysis in *NFIB* thus supports this Court's finding of Individual Mandate inseverability in two ways. First, it confirms the Court must foremost look to Congress's "explicit textual instruction"—here, that the mandate is "essential" to the ACA. *See* 42 U.S.C. § 18091(2). Second, it confirms Congress knew exactly how to signal its intent that an offending ACA provision be severed from non-offending provisions—i.e., through enacted text. *Cf. Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Russello v. United States,* 464 U.S. 16, 23 (1983))). Yet Congress sent up no such signals anywhere in the ACA with respect to the Individual Mandate. While not dispositive, the lack of a severability clause covering the Individual Mandate is therefore not only consistent with Congress's repeated statements that the Individual Mandate is "essential" to the ACA but also probative of Congress's intent on its own terms.

[27] *See also EEOC v. Hernando Bank, Inc.*, 724 F.2d 1188, 1190 (5th Cir. 1984) (noting severability requires "the court [to] inquire into whether Congress would have enacted the remainder of the statute in the absence of the invalid provision" and reasoning "Congressional intent and purpose are best determined by an analysis of the language of the statute in question").

[28] *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (reasoning statutory construction "ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent" (cleaned up)); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there . . . When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241–42 (1989); *Rubin v. United States*, 449 U.S. 424, 430 (1981); *United States v. Goldenberg*, 168 U.S. 95, 102–03 (1897); and *Oneale v. Thornton*, 6 Cranch 53, 68 (1810))).

existing-condition provisions.[29] In *NFIB*, Chief Justice Roberts explained "Congress addressed the problem of those who cannot obtain insurance coverage because of preexisting conditions or other health issues . . . through the [ACA's] 'guaranteed-issue' and 'community-rating' provisions." *NFIB*, 567 U.S. at 547–48 (Roberts, C.J.). But these "reforms sharply exacerbate [the] problem" of healthy individuals foregoing health insurance. *Id.* at 548. "The reforms also threaten to impose massive new costs on insurers," the Chief Justice continued. *Id.* "The individual mandate was Congress's solution to these problems. By requiring that individuals purchase health insurance, the mandate prevents cost shifting . . . [and] allows insurers to subsidize the costs of covering the unhealthy individuals the reforms require them to accept." *Id.* The Individual Mandate, the Chief Justice thus explained, was the fulcrum on which the macro-level trade-offs pivoted.

Justice Ginsburg, joined by Justices Breyer, Kagan, and Sotomayor, agreed. She wrote: "To make its chosen approach work . . . Congress *had* to use some new tools, *including a requirement* that most individuals obtain private health insurance coverage." *Id.* at 596 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ.) (citing 26 U.S.C.§ 5000A) (emphasis added). She elaborated: "To ensure that individuals with medical histories have access to affordable insurance, Congress devised a three-part solution." *Id.* at 597. Part one: guaranteed issue. *Id.* Part two:

---

[29] The Federal Defendants here are consistent in taking the same position the previous administration took during the *NFIB* litigation. *See* Br. for Resp. (Severability) at 45, *NFIB*, 567 U.S. 519 (No. 11-393) ("Congress's findings establish that the guaranteed-issue and community-rating provisions are inseverable from the minimum coverage provision."); *id.* at 11; *see also* Memorandum from Att'y Gen. Jefferson B. Sessions III for Speaker Paul Ryan (June 7, 2018) (on file with the Dep't of Justice) (noting that, "[i]n *NFIB*, the Department previously argued that if Section 5000A(a) is unconstitutional, it is severable from the ACA's other provisions, except" the guaranteed-issue and community-rating provisions). Also notable is that many of the Intervenor Defendants appeared as amici in *NFIB* and expressly declined to challenge the Government's concession that the community-rating and guaranteed-issue provisions were inseverable from the Individual Mandate. *See* Br. for California et al. as Amici Curiae Supporting Respondents at 3 n.2, *NFIB*, 567 U.S. 519 (No. 11-393) ("Respondents have conceded that the guaranteed issue and community rating provisions that go into effect in 2014 should be invalidated if the Court concludes the minimum coverage provision is unconstitutional. Amici States do not seek to challenge this concession."). But that was then, and this is now.

community rating. *Id.* "But these two provisions, Congress comprehended, *could not work* effectively unless individuals were given a powerful incentive to obtain insurance." *Id.* (emphasis added). Congress drew this lesson from the "disastrous" results of seven different states that experienced "skyrocketing insurance premium costs, reductions in individuals with coverage, and reductions in insurance products and providers" after "enact[ing] guaranteed-issue and community-rating laws without requiring universal acquisition of insurance coverage." *Id.* at 597–98 (citations and quotation marks omitted).

Based on these lessons, "Congress comprehended that guaranteed-issue and community-rating laws *alone will not work*." *Id.* at 598 (emphasis added). So, taking a cue from Massachusetts, "Congress passed the minimum coverage provision as a *key component* of the ACA." *Id.* at 599 (emphasis added). As did the Chief Justice, then, Justices Ginsburg, Breyer, Kagan, and Sotomayor all understood what Congress understood: Without the Individual Mandate, the guaranteed-issue and community-rating provisions "could not work."

Make that nine Justices. As the joint dissent explained, "Insurance companies bear new costs imposed by a collection of insurance regulations and taxes, including 'guaranteed issue' and 'community rating' requirements to give coverage regardless of the insured's pre-existing conditions." *Id.* at 695 (joint dissent). But, keeping with the careful balance described by the other Justices, "the insurers benefit from the new, healthy purchasers who are forced by the Individual Mandate to buy the insurers' product and from the new low-income Medicaid recipients who will enroll in insurance companies' Medicaid-funded managed care programs." *Id.* at 695–96. Because the Supreme Court held the ACA's Medicaid Expansion could not be compulsory, *see id.* at 575–85 (Roberts, C.J.), the Court's finding today that the Individual Mandate is unconstitutional means

both components the joint dissenters found to be inseverable from the pre-existing-conditions provisions have now fallen.

In *King v. Burwell*, the Supreme Court reaffirmed many of the Justices' severability conclusions from *NFIB*. *See* 135 S. Ct. 2480, 2485–87 (2015). There, a six-Justice majority recounted the history of several states attempting to expand health-insurance coverage without implementing a mandate—an experiment that repeatedly "led to an economic 'death spiral.'" *Id.* at 2486. It then explained what all nine Justices in *NFIB* expressed: the guaranteed-issue provision, the community-rating provision, and the Individual Mandate "are closely intertwined." *Id.* at 2487. And citing directly to Congress's findings for support,[30] the Supreme Court stated unequivocally: "Congress found that the guaranteed issue and community rating requirements *would not work* without the coverage requirement." *Id.* (citing 42 U.S.C. § 18091(2)(I)) (emphasis added).

So, after *King*, the Government[31] and all nine Justices had agreed that *at least* the guaranteed-issue and community-rating provisions "could not work" without the Individual Mandate.[32] And all of them cited Congress's findings in reaching that conclusion.

But the reasoning in the above opinions also confirms the Individual Mandate is inseverable from the *entirety* of the ACA. *See, e.g., King*, 135 S. Ct. at 2486 (noting the successful Massachusetts model used by Congress relied not only on a mandate but instead on "[t]he

---

[30] As noted above, the Intervenor Defendants argue Congress's ACA findings are no longer relevant to severability because they addressed only how the ACA would be *created*, not how it would work. *See* Intervenor Defs,' Resp. 39–43, ECF No. 91. But the Supreme Court relied on those findings in 2015—after the ACA was up and running—when deciding *King*. *See* 135 S. Ct. at 2487.

[31] *See* Randy Barnett, C*ommandeering the People: Why the Individual Health Insurance Mandate Is Unconstitutional*, 5 N.Y.U. J.L. & LIBERTY 581, 614–21 (2010) (detailing the Government's position leading up to the *NFIB* litigation that the Individual Mandate was constitutional under the Interstate Commerce Clause because it was "essential" to "a broader regulatory scheme").

[32] The Intervenor Defendants nearly agree. *See* Intervenor Defs,' Resp. 37, ECF No. 91 ("To be sure, Congress intended that the requirement to purchase health insurance, along with the community-rating and guaranteed-issue provisions, would work together harmoniously to increase the number of insured Americans and lower premiums.").

combination of these three reforms—insurance market regulations, a coverage mandate, *and tax credits*" (emphasis added)). Notably, the joint dissent in *NFIB* was the only block of Justices to fully consider severability because it was the only block of Justices to find the Individual Mandate unconstitutional—which is now the controlling framework. And they explained why the Individual Mandate was inseverable from the ACA as a whole. That explanation is consistent with the reasoning offered in the Chief Justice's opinion and in Justice Ginsburg's opinion.

The joint dissent first detailed how "[t]he whole design of the [ACA] is to balance the costs and benefits affecting each set of regulated parties." *Id.* at 694; *accord id.* at 548 (Roberts, C.J.) (noting "the mandate prevents cost shifting"); *id.* at 593 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ.) (noting Congress wanted to address "[t]hose with health insurance subsidiz[ing] the medical care of those without it"). To that end, "individuals are required to obtain health insurance"; insurers must "sell them insurance regardless of . . . pre-existing conditions and . . . comply with a host of other regulations . . . [and] pay new taxes"; "States are expected to expand Medicaid eligibility and to create regulated marketplaces"; "[s]ome persons who cannot afford insurance are provided it through the Medicaid Expansion, and others are aided in their purchase of insurance through federal subsidies"; "[t]he Federal Government's increased spending is offset by new taxes and cuts in other federal expenditures"; and certain employers "must either provide employees with adequate health benefits or pay a financial exaction." *Id.* at 694–95 (joint dissent) (citations omitted). "In short," the joint dissent explained, "the Act attempts to achieve near-universal health insurance coverage by spreading its costs to individuals, insurers, governments, hospitals, and employers—while, at the same time, offsetting significant portions of those costs with new benefits to each group." *Id.* at 695; *accord id.* at 596 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ.) ("A central aim of the ACA is to reduce the number of

uninsured U.S. residents . . . The minimum coverage provision advances this objective." (citing 42 U.S.C. §§ 18091(2)(C) and (I))). Congress, in other words, "did not intend to impose the inevitable costs on any one industry or group of individuals." *Id.* at 694 (joint dissent); *accord id.* at 548 (Roberts, C.J.) (noting "the mandate forces into the insurance risk pool more healthy individuals, whose premiums on average will be higher than their health care expenses" which "allows insurers to subsidize the costs of covering the unhealthy individuals the reforms require them to accept").

As the joint dissent concluded, "the Act's major provisions are interdependent." *Id.* at 696 (joint dissent). Indeed, the ACA "refers to these interdependencies as 'shared responsibility.'" *Id.* (citations omitted). And the joint dissent cited Congress's findings to buttress its conclusion on the Individual Mandate's complete inseverability, noting that "[i]n at least six places, the Act describes the Individual Mandate as working 'together with the other provisions of this Act.'" *Id.* (citing 42 U.S.C. §§ 18091(2)(C), (E), (F), (G), (I), and (J)). The joint dissent further noted that the ACA "calls the Individual Mandate 'an essential part' of federal regulation of health insurance and warns that 'the absence of the requirement would undercut Federal regulation of the health insurance market.'" *Id.* (citing 42 U.S.C. § 18091(2)(H)).

"In sum, Congress passed the minimum coverage provision as a *key component of the ACA*." *Id.* at 599 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ.) (emphasis added); *accord id.* at 539 (majority) ("This case concerns constitutional challenges to two *key provisions*, commonly referred to as the individual mandate and the Medicaid expansion." (emphasis added)). Not a key component of the guaranteed-issue and community-rating provisions, but of the ACA. The Supreme Court's only reasoning on the topic thus supports what the text says: The Individual Mandate is essential to the ACA.

### c.  The Individual Mandate is Inseverable from the Entire ACA

The ACA's text and the Supreme Court's decisions in *NFIB* and *King* thus make clear the Individual Mandate is inseverable from the ACA. As Justice Ginsburg explained, "Congress could have taken over the health-insurance market by establishing a tax-and-spend federal program like Social Security." *Id.* at 595 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ.). But it did not. "Instead of going this route, Congress enacted the ACA . . . To make its chosen approach work, however, Congress had to use . . . a requirement that most individuals obtain private health insurance coverage." *Id.* (citing 26 U.S.C.§ 5000A). That requirement—the Individual Mandate— was *essential* to the ACA's architecture. Congress intended it to place the Act's myriad parts in perfect tension. Without it, Congress and the Supreme Court have stated, that architectural design fails. "Without a mandate, premiums would skyrocket. The guaranteed issue and community rating provisions, in the absence of the individual mandate, would create an unsustainable death spiral of costs, thus crippling the entire law." BLACKMAN, *supra* note 3, at 147; *accord NFIB*, 567 U.S. at 597 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ.) (noting the mandate was essential to staving off "skyrocketing insurance premium costs"). Congress simply never intended failure.

Yet the parties focus on particular provisions. It is like watching a slow game of Jenga, each party poking at a different provision to see if the ACA falls. Meanwhile, Congress was explicit: The Individual Mandate is *essential* to the ACA, and that essentiality requires the mandate to work *together* with the Act's other provisions. *See* 42 U.S.C. § 18091. If the "other provisions" were severed and preserved, they would no longer be working *together* with the mandate and therefore no longer working as Congress intended. On that basis alone, the Court must find the Individual Mandate inseverable from the ACA. To find otherwise would be to introduce an entirely new regulatory scheme never intended by Congress or signed by the President. And the Court

"cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole." *Murphy*, 138 S. Ct. at 1482 (quoting *Alton*, 295 U.S. at 362).

Even if the Court preferred to ignore the clear text of § 18091 and parse the ACA's provisions one by one, the text- and precedent-based conclusion would only be reinforced: Upholding the ACA in the absence of the Individual Mandate would change the "effect" of the ACA "as a whole." *See Alton*, 295 U.S. at 362. For example, the Individual Mandate reduces the financial risk forced upon insurance companies and their customers by the ACA's major regulations and taxes. *See* 42 U.S.C. §§ 18091(2)(C), (I). If the regulations and taxes were severed from the Individual Mandate, insurance companies would face billions of dollars in ACA-imposed regulatory and tax costs without the benefit of an expanded risk pool and customer base—a choice no Congress made and one contrary to the text. *See NFIB*, 567 U.S. at 698 (joint dissent); 42 U.S.C. § 18091(2)(C) and (I). Similarly, the ACA "reduce[d] payments by the Federal Government to hospitals by more than $200 billion over 10 years." *NFIB*, 567 U.S. at 699 (joint dissent). Without the Individual Mandate (or forced Medicaid expansion), hospitals would encounter massive losses due to providing uncompensated care. *See* BLACKMAN, *supra* note 3, at 2–4 (discussing the free-rider and cost-shifting problems in healthcare). This would, as Plaintiffs argue, "distort the ACA's design of 'shared responsibility.'" Pls.' Br. 36, ECF No. 40 (citing *NFIB*, 567 U.S. at 699 (joint dissent)).

The story is the same with respect to the ACA's other major provisions, too. The ACA allocates billions of dollars in subsidies to help individuals purchase a government-designed health-insurance product on exchanges established by the States (or the federal government). *See, e.g.*, 26 U.S.C. § 36B; 42 U.S.C. § 18071. But if the Individual Mandate falls, and especially if the pre-existing-condition provisions fall, upholding the subsidies and exchanges would transform the

48

ACA into a law that subsidizes the kinds of discriminatory products Congress sought to abolish at, presumably, the re-inflated prices it sought to suppress. *Cf. Williams v. Standard Oil Co. of Louisiana*, 278 U.S. 235, 244 (1929), *overruled in part on other grounds by Olsen v. Nebraska ex rel. W. Reference & Bond Ass'n*, 313 U.S. 236 (1941) ("The taxes imposed by section 10 are solely for the purpose of defraying the expenses of the division of motors and motor fuels, and since the functions of that division practically come to an end with the failure of the price-fixing features of the law, it is unreasonable to suppose that the Legislature would be willing to authorize the collection of a fund for a use which no longer exists.").

Nor did Congress ever contemplate, never mind intend, a duty on employers, *see* 26 U.S.C. § 4980H, to cover the "skyrocketing insurance premium costs" of their employees that would inevitably result from removing "a key component of the ACA." (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ.). And the Medicaid-expansion provisions were designed to serve and assist fulfillment of the Individual Mandate and offset reduced hospital reimbursements by aiding "low-income individuals who are simply not able to obtain insurance." *Id.* at 685 (joint dissent).

The result is no different with respect to the ACA's minor provisions. For example, the Intervenor Defendants assert that, "[i]n addition to protecting consumers with preexisting medical conditions, Congress also enacted the guaranteed-issue and community-rating provisions to reduce administrative costs and lower premiums." Intervenor Defs.' Resp. 35, ECF No. 91; *see also id.* at 34 ("Congress independently sought to end discriminatory underwriting practices and to lower administrative costs."). But Congress stated explicitly that the Individual Mandate "is *essential* to creating effective health insurance markets that *do not require underwriting* and *eliminate its associated administrative costs*." 42 U.S.C. § 18091(2)(J) (emphasis added). At any rate, to the extent most of the minor provisions "are mere adjuncts of the" now-unconstitutional Individual

Mandate and nonmandatory Medicaid expansion, "or mere aids to their effective execution," if the Individual Mandate "be stricken down as invalid" then "the existence of the [minor provisions] becomes without object." *Williams*, 278 U.S. at 243.

Perhaps it is impossible to know which minor provisions Congress would have passed absent the Individual Mandate. But the level of legislative guesswork entailed in reconstructing the ACA's innumerable trade-offs without the one feature Congress called "essential" is plainly beyond the judicial power. *See Alton*, 295 U.S. at 362; *Wallace*, 259 U.S. at 70. And there is every reason to believe Congress would not have enacted the ACA absent the Individual Mandate— given the Act's text as interpreted by the Supreme Court—but "no reason to believe that Congress would have enacted [the minor provisions] independently." *NFIB*, 567 U.S. at 705 (joint dissent).

In sum, the Individual Mandate "is so interwoven with [the ACA's] regulations that they cannot be separated. None of them can stand." *Wallace*, 259 U.S. at 70.

* * *

Neither the ACA's text nor Supreme Court precedent leave any doubt. The 2010 Congress never intended the ACA "to impose massive new costs on insurers" while allowing widespread "cost shifting." *Id.* at 548 (Roberts, C.J.). It never intended the ACA to go on without the signature provision that everyone knew would "make its chosen approach work"—the signature provision Congress "had to use." *Id.* at 596 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ.). It never agreed to a law that would lead to "disastrous" results like "skyrocketing insurance premium costs, reductions in individuals with coverage, and reductions in insurance products and providers." *Id.* at 597–98 (citations and quotation marks omitted). And Congress never intended to excise "a key component of the ACA." *Id.* at 599.

Historical context confirms Congress would not have enacted the ACA absent the constitutional infirmities.[33] *See Free Enterprise*, 561 U.S. at 509 (considering "the statute's text" and "historical context"). Every state's attempt to do so failed miserably. *See King*, 135 S. Ct. at 2485–86. To leave the ACA in place without the Individual Mandate—or, even more drastically, to leave it in place without either the Individual Mandate or the provisions covering pre-existing conditions as the Federal Defendants suggest—would thus be wildly inconsistent "with Congress' basic objectives in enacting the statute." *Booker*, 543 U.S. at 259 (citing *Regan*, 468 U.S. at 653).

This tells the Court all it needs to know. Based on unambiguous text, Supreme Court guidance, and historical context, the Court finds "it is evident that the Legislature would not have enacted" the ACA "independently of" the Individual Mandate. *Alaska Airlines*, 480 U.S. at 684. That is to say, Congress "would not have enacted those provisions which are within its power, independently of [those] which [are] not." *Murphy*, 138 S. Ct. at 1482 (quoting *Alaska Airlines*, 480 U.S. at 684). "Though this inquiry can sometimes be elusive, the answer here seems clear." *Free Enterprise*, 561 U.S. at 509 (cleaned up). Congress intended the Individual Mandate to serve as the keystone, the linchpin of the ACA. That is a conclusion the Court can reach without marching through every nook and cranny of the ACA's 900-plus pages because Congress plainly told the public when it wrote the ACA that "[t]he minimum coverage provision is . . . an 'essential par[t] of a larger regulation of economic activity'" and "without the provision, 'the regulatory scheme [w]ould be undercut.'" *NFIB*, 567 U.S. at 619 (Ginsburg, J., joined by Breyer, Kagan, and Sotomayor, JJ.) (quoting but not citing Congress's findings in 42 U.S.C. § 18091).

In the face of overwhelming textual and Supreme Court clarity, the Court finds "it is 'unthinkable' and 'impossible' that the Congress would have created the" ACA's delicately

---

[33] *See, id.* ("In coupling the minimum coverage provision with guaranteed-issue and community-rating prescriptions, Congress followed Massachusetts' lead.").

balanced regulatory scheme without the Individual Mandate. *Alton*, 295 U.S. at 362. The Individual Mandate "so affect[s] the dominant aim of the whole statute as to carry it down with" it. *Id.* To find otherwise would "rewrite [the ACA] and give it an effect altogether different from that sought by the measure viewed as a whole." *Alton*, 295 U.S. at 362. Employing such a strained view of severance would be tantamount to "legislative work beyond the power and function of the court." *Wallace*, 259 U.S. at 70.

### 3.   The Intent of the 2017 Congress

Looking for any severability-related intent in the 2017 Congress is a fool's errand because the 2017 "Congress did not repeal any part of the ACA, including the shared responsibility payment. In fact, it could not do so through the budget reconciliation procedures that it used." Hr'g Tr. at 36:7–10 (Intervenor Defendants); *accord id.* at 98:1–3 (Federal Defendants) ("The only thing that we know for sure about Congress' intent in 2017 . . . is that Congress wanted to pass a tax cut."). So, asking what the 2017 Congress intended with respect to the ACA qua the ACA is unhelpful. There is no answer.

But suppose it is true the intent of the TCJA-enacting Congress of 2017 controls severability rather than the intent of the ACA-enacting Congress of 2010. The Intervenor Defendants argue the Court should infer that, by eliminating the shared-responsibility payment while leaving the rest of the ACA intact, the 2017 Congress intended to preserve the balance of the ACA. Intervenor Defs.' Resp. 28–30, ECF No. 91; Hr'g Tr. at 42:10–11 ("The 2017 Congress that amended § 5000A(c) deliberately left the rest of the ACA intact . . . .").

But consider what Congress did *not* do in 2017—or ever. First and foremost, it did not repeal the Individual Mandate. As the Court described in great detail, *see supra* Part IV.B.1.a, the shared-responsibility payment is not the Individual Mandate. That matters. The Individual

Mandate, not the shared-responsibility payment, is "essential" to the ACA. *See* 42 U.S.C. § 18091. And the 2017 Congress did not repeal it. *Accord* Hr'g Tr. at 42:10–11 (Intervenor Defendants) ("The 2017 Congress that amended § 5000A(c) deliberately left the rest of the ACA intact . . . ."). So, at best, searching the 2017 Congress's legislation for severability-related intent would create an inference that the 2017 Congress, like the 2010 Congress, intended to preserve the Individual Mandate because the 2017 Congress, like the 2010 Congress, knew that provision is essential to the ACA. Intervenor Defendants' argument that the 2017 Congress manifested an intent of severability is therefore unavailing. Indeed, one would have to take the incorrect view that the shared-responsibility payment *is* the Individual Mandate to accept the argument that the 2017 Congress, by eliminating the *payment*, intended to sever the *Individual Mandate*.

Secondly, the 2017 Congress did not repeal 42 U.S.C. § 18091, which every Supreme Court Justice to review the ACA cited and which definitively establishes Congress's intent that the Individual Mandate be "an essential part of" its "regulation of the health insurance market." 42 U.S.C. § 18091(2)(H); *see generally supra* Part IV.C.1.a. Finally, given the 2017 Congress repealed neither the Individual Mandate nor § 18091, the 2017 Congress did nothing to repudiate or otherwise supersede the Supreme Court's *NFIB* and *King* opinions detailing the Individual Mandate's essentiality to the ACA.

The Intervenor Defendants thus ask the Court to infer a severability-related intent from a Congress that did not and could not amend the ACA and that therefore did not and could not repeal the Individual Mandate or the enacted text stating the mandate is "essential" to the whole scheme when working "together with the other provisions." They then ask the Court "to graft that intent" onto the Congress that *did* pass the ACA, that *did* employ the Individual Mandate as the keystone, and that *did* memorialize its intent through enacted text stating the Individual Mandate is essential.

The Court finds the 2017 Congress had no intent with respect to the Individual Mandate's severability. But even if it did, the Court would find that "here we know exactly what Congress intended based on what Congress actually did." Hr'g Tr. at 42:8–10 (Intervenor Defendants). If the 2017 Congress had any relevant intent, it was to preserve § 18091 and to preserve the Individual Mandate, which the 2017 Congress must have agreed was essential to the ACA.

4.    Severability Conclusion[34]

In some ways, the question before the Court involves the intent of both the 2010 and 2017 Congresses. The former enacted the ACA. The latter sawed off the last leg it stood on. But however one slices it, the following is clear: The 2010 Congress memorialized that it knew the Individual

---

[34] The Intervenor Defendants also argue the Court should forego a traditional severability analysis and instead remedy the harm to Plaintiffs by striking TCJA § 11081. Intervenor Defs.' Resp. 22–24, ECF No. 91. For this, the Intervenor Defendants rely on *Frost v. Corporation Commission of Oklahoma*, a case in which the Supreme Court held that "when a *valid* statute is amended and the *amendment is unconstitutional*, the amendment 'is a nullity and, therefore, powerless to work any change in the existing statute . . . .'" 278 U.S. 515, 525–27 (1928) (citation omitted) (emphasis added). *Frost* is inapposite. There, the Appellant challenged the amendment, not the original statute, on equal-protection grounds and won. *Id.* at 517, 523–24. The Supreme Court held the amendment to be "a nullity," not because it rendered the original statute unconstitutional but because it was unconstitutional itself. *Id.* at 526 (reasoning that because "the *amendment* is void for unconstitutionality, it cannot be given" "its practical effect [which] would be to repeal *by implication* the requirement of the existing statute in respect of public necessity" (emphasis added)). The original statute therefore was permitted to "stand as the only valid expression of legislative intent." *Id.* at 527. But here, the Plaintiffs challenge the original statute, not the TCJA. Nor would it make sense for them to challenge the TCJA—Congress has plenary power to lay and repeal taxes, as the Intervenor Defendants argue. *See, e.g.*, Intervener Defs.' Resp. 19, ECF No. 91 ("In light of the broad taxing power afforded by the Constitution, it is not unusual for Congress to enact taxes with delayed effective dates . . . ."); *accord* Pls.' Reply 13–14, ECF No. 175 (citing *Brushaber v. Union Pac. R.R. Co.*, 240 U.S. 1, 12 (1916)); Hr'g Tr. at 72:23–24. Plus, the TCJA repeals nothing "by implication." And at any rate, *Frost* is not a license for courts to reach out and hold unchallenged constitutional acts unconstitutional as a remedial safety valve. *See* Josh Blackman, *Undone: the New Constitutional Challenge to Obamacare*, 23 TEX. REV. L. & POL. (forthcoming 2018) (manuscript at 35–36) ("*Frost*'s bite is not available in *Texas v. United States* for a simple reason. Because of how Texas structured its challenge, the district court is presented with a narrower menu of options with respect to severability. No one—not the Plaintiffs, not the Intervenors—has challenged the constitutionality of the TCJA. Federal courts lack a roving license to flip through the U.S. Code with a red pencil to void one statute in order to save another. Invalidating the 2017 tax cut is simply not an option in the Texas litigation because it has not been challenged." (citations omitted)). To the extent *Frost* is relevant here, it stands only for the proposition that a court should hold unconstitutional acts invalid and constitutional ones valid. The unconstitutional act in this case is the Individual Mandate, not the TCJA.

Mandate was the ACA keystone, *see* 42 U.S.C. § 18091; the Supreme Court stated repeatedly that it knew Congress knew that, *see, e.g.*, *NFIB*, 567 U.S. at 547 (Roberts, C.J.) (citing 42 U.S.C. § 18091(2)(F)); *King*, 135 S. Ct. at 2487 (citing 42 U.S.C. § 18091(2)(I)); and knowing the Supreme Court knew what the 2010 Congress had known, the 2017 Congress did not repeal the Individual Mandate and did not repeal § 18091.

"The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the documents that they drafted in Philadelphia in the summer of 1787." *Chadha*, 462 U.S. at 946 (quoting *Buckley*, 424 U.S. at 124). For that reason, the Court respects Congress's plain language. And here, "[t]he language is plain. There is no room for construction, unless it be as to the effect of the Constitution." *In re Trade-Mark Cases*, 100 U.S. 82, 99 (1879). "To limit this statute in the manner now asked for," therefore "would be to make a new law, not to enforce an old one. This is no part of [the Court's] duty." *Id.*

The Court finds the Individual Mandate "is essential to" and inseverable from "the other provisions of" the ACA.

## V.    CONCLUSION

For the reasons stated above, the Court grants Plaintiffs partial summary judgment and declares the Individual Mandate, 26 U.S.C. § 5000A(a), **UNCONSTITUTIONAL.** Further, the Court declares the remaining provisions of the ACA, Pub. L. 111-148, are **INSEVERABLE** and therefore **INVALID**. The Court **GRANTS** Plaintiffs' claim for declaratory relief in Count I of the Amended Complaint.

**SO ORDERED** on this **14th day** of **December, 2018**.

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**